# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FILED

OCT 17 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**Billy G. Asemani,** # 339096

n.1 ←——*Pro Se* Petitioner,——→ n.1

NBCI. 2B-63

v. 13800 Mc Mullen Highway. SW

Cumberland, MD 21502

Case: 1:07-cv-01868
Assigned To : Unassigned
Assign. Date : 10/17/2007
Description: HABAES CORPUS

The Attorney General of the
of the U.S.A.; and The Secretary of Department of Homeland Security,

n.2 ←——-Respondents ——→ n.2

## PETITION FOR WRIT OF HABEAS CORPUS

COMES NOW, *pro se* Petitioner Billy G. Asemani ("Asemani") and files

this Petition for Writ of Habeas Corpus ("Petition") as an American who

is a United States "national," by Order of a federal court of competent juris-

diction (*see Asemani v. Islamic Republic of Iran, et al.*, 266 F.Supp.2d 24

(D.D.C. 2003))("*Asemani*"), Exhibit A. *See also United States v. Morin,*  n.3

80 F.3d 124, 126 (4ᵗʰ Cir. 1986); Shekoyan v. Sibley Int'l

Corp. 217 F. Supp. 2d 59 (D.D.C. 2002).

n.1:

n.1: Pro Se Petitioner Asemani's address is as follows:

Billy G. Asemani
D.O.C. No.: 339096
North Branch Correctional Institution
Housing Unit: 2B-63
13800 Mc Mullen Highway, SW
Cumberland, MD 21502

n.2:

n.2: Since the President is about to nominate a new
Attorney General for the U.S. Senate's consideration,
Asemani has decided not to name Alberto Gonzales
as this Petition's Respondent, so a future substitution
will become unnecessary. Same with the DHS secretary.

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT
SEP 20 2007
RECEIVED

# Table of Contents

| | Page(s) |
|---|---|
| The Pro Se Posture of this Petition | 2-3 |
| Jurisdiction | 4 |
| The Petition's "Case" or "Controversy" | 4 |
| Asemani's Current Custody Status | 5 |
| The Timing of This Petition | 6 |
| Asemani's "Injuries" Are "Traceable" To The Respondents | 7 |
| Procedural History | 8-10 |
| Successive/Repetitious Habeas Petitions | 11 |
| Exhaustion of Administrative Remedies | 12 |
| This is NOT a "Petition for Review" of a Final Order of Removal | 13 |
| RIDA's Impact on Proper Respondent | 14-15 |
| The Mootness Issue | 15-18 |
| Further Discussion on Jurisdiction | 19 |
| Additional Venue Considerations | 20-22 |
| The Attorney General as the Proper Respondent | 22-25 |
| The Soundness of Judge Bates' Asemani Ruling | 26-27 |
| Relief Sought | 28 |

Exhibits A-H

Supplemental Appendix: Exhibits I-P



## The Pro Se Posture of this Petition

This Federal Circuit has long recognized that it has an "Obligation to construe Pro se filings liberally." *Toolasprashad v. Bureau of Prisons*, 286 F.3d 576, 583 (D.C. Cir. 2002)(citing *Richardson v. United States*, 193 F.3d 545, 548 (D.C. Cir. 1999)).

Asemani respectfully asserts that "technicalities are particularly inappropriate in a statutory scheme in which laymen, unassisted by trained lawyers initiate the [litigation] Process." *Love v. Pullman Co.*, 404 U.S. 522, 527 (1972); *See also Boag v. MacDougall*, 454 U.S. 364 (1982).

Asemani moves this Honorable Court to construe his Petition liberally and to cure all procedural errors as adjudged by the United States Supreme Court in *Haines v. Kerner*, 404 U.S. 519, 520 (1972).

Pro se Petitioners are held "to less stringent standards than formal pleadings drafted by lawyers." *Haines*, *supra*, at 521. Asemani also urges the Court to apply the standards in *Burgos v. Hopkins*, 4 F.3d 787, 790 (2d Cir. 1994)(" Pro se papers should be interpreted to raise the strongest argument that they suggest [.]"); *see also Orazio v. Dugger*, 876 F.2d 1508 (11th Cir. 1989).

<u>n.3</u> : This Petition's exhibits are included in the attached Supplemental Appendix.

" The handwritten Pro se document is to be liberally construed. The Court unanimously held in <u>Haines</u>, a Pro se [Petition], however inarttully Pleaded,' [] can only be dismissed for failure to state a claim if it appears 'beyond doubt that [Petitioner] can prove no set of facts in support of his claim which would entitle him to relief.' Id., 520-521,... Quoting <u>Conley</u> v. <u>Gibson</u>, 3 U.S. 41 ... (1957). " <u>Estelle</u> v. <u>Gamble</u>, 429 U.S. 97; <u>See also</u> <u>Fernandez</u> v. U.S., 941 F.2d 1488 (11th Cir. 1991); <u>Hughes</u> v. <u>Rowe</u>, 449 U.S. 5 (1980); <u>Sands</u> v. <u>Lewis</u>, 886 F.2d 1166 (9th Cir. 1989); <u>Haddock</u> v. <u>Board of Dental Examiners</u>, 777 F.2d 462, 464 (9th Cir. 1985).

# VENUE [n.4]

Under traditional standards, venue, in this jurisdiction, is Proper because both Respondents (the Attorney General and the DHS Secretary) reside in the District of Columbia. <u>See</u> 28 U.S.C. § 1391 (e)(1)(Providing that venue is Proper and an action may be brought in any judicial district in which "a defendant in the action resides[.]" <u>See also</u> <u>Rumsfeld</u> v. <u>Padilla</u>[n.5], 542 U.S. 426 (2004)("we have interpreted [§2241] to require nothing more than that the court issuing the writ have jurisdiction over the custodian[.]")(internal quotation omitted).

n.4 : A more detailed discussion on venue will follow later.
n.5 : <u>See</u> Exhibit K.



# JURISDICTION

This action is brought Pursuant to 28 U.S.C.A. § 2241.

### n.6

* Power to grant writ

  * (a) Writs of habeas corpus may be granted by the Supreme Court, any Justice thereof, the district courts and any circuit Judge within their respective Jurisdictions."

## The Petition's "Case" or "Controversy"

### n.7

Asemani is __NOT__ in INS (immigration) custody. However, his liberty interests are sufficiently infringed upon (by the Respondents) to give rise to Article III claims.

---

n.6: _See_ Exhibit I.

n.7: On March 01, 2003, the INS ceased to exist as an agency within the Department of Justice, and its enforcement functions were transferred to the Department of Homeland Security, Pursuant to Sections 441 and 471 of the Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135. As a consequence, the INS became the Bureau of Immigration and Customs Enforcement "BICE." BICE has since become the United States Immigration and Customs Enforcement or "USICE."

# Asemani's Current Custody Status ⑤

Asemani is presently in the physical custody of the State of Maryland's Division of Corrections. The circumstances surrounding his instant confinement may be learned by a review of Exhibit H; "Case History."

The Respondents to this petition are <u>not</u> affiliated in any shape, way, or form with the State of Maryland, or with its Division of Corrections.

However, what satisfies the requirements of Article III, § 2 of the Constitution, in the case at bar, is that because of the Respondents' intention to take Asemani into their custody upon the completion of his State sentence, [n.8] Asemani's security level/status/classification has been raised (by the Division of Corrections) from medium to maximum. Additionally, due to the increased security level (which is the proximate result of the Respondents' pending and intended actions), Asemani has been, continues to be, and will be deprived of the various institutional programs which would have otherwise been available to him had his security classification been kept at "medium". Asemani is eligible for early release, but he can not earn as much "good conduct" days – to earn him an earlier release – because of his elevated security level.

# The Timing of This Petition

⑥

What has prompted the submission of this Petition by Asemani is that on Friday, September 07, 2007, he was transferred from the Maryland Correctional Institution - Hagerstown (a medium-security facility) to the Maryland Correctional Institution - North Branch - Cumberland (a maximum-security facility). Asemani's release from state custody could easily be delayed by years were his custody status to remain at a maximum level.

---

n.8 :  In a December 11 2006 "Respondent's Opposition to Petitioner's Request for Emergency Stay of Deportation" (in connection with a previously-pending action - No.: 04-1767- in the U.S. Court of Appeals for the Third Circuit), Lyle D. Jentzer (an attorney with the U.S. D.O.J.'s Office of Immigration Litigation) argued that Asemani will " return to DHS's custody [upon] release from state custody[.]"

Mr. Jentzer's contact information is as follows:
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044
(202) 305-0192 , (Fax) 616-9777
email : Lyle.Jentzer@usdoj.gov

Asemani's "Injuries" Are "Traceable" To the Respondents

Asemani "suffers" from, and is "threatened with" the Respondents' on-going acts and their future actions. As the U.S. Supreme Court has explained:

- "Th[e] case-or-controversy requirement subsists through all stages of federal judicial Proceedings [.]"

- "The parties must continue to have a personal stake in the outcome of the lawsuit.

- "This means that, throughout the litigation, the plaintiff must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." n.9

The Respondents' concrete decision to take Asemani into their custody has an immediate, direct, and continuing effect on him.

Were such an imposing threat to be removed, Asemani would no longer live in peril of being denied institutional privileges in order to secure an early release from State custody.

---

n.9:  Spencer v. Kemna, 523 U.S. 1, 7 (1998).
    quoting Lewis v. Continental Bank Corp., 494 U.S.
    472, 477-478 (1990)(internal quotations omitted).

# Procedural          History                    (8)

On April 23, 2003, by a "Memorandum and Order,"
the Honorable Judge Bates of this very same Court,
held that

   "[Asemani] has demonstrated his permanent
   allegiance to the United States sufficient
   to constitute him a 'national' [.]

   " ORDERED that [Asemani] has demonstrated
   that he was a 'national' of the United
   States ... in July 2000 [.]" <u>n.10</u>
   <u>See</u> Exhibit A. (<u>Asemani</u> hereinafter).


Despite the above ruling, the Respondents, on July 23,
2003, took Asemani into their custody on the erroneous
assumption that he remains a foreign alien. On Sep-
tember 05, 2003, an Immigration Judge disagreed with
the Respondents' contention and ordered the "Termination
of Removal Proceedings;" <u>see</u> Exhibit B.

---

<u>n.10</u> :   <u>See</u>   <u>Ghafour Asemani v. Islamic Republic</u>
              <u>of Iran, et al.</u>, Civil Action No. 01-2231
              (JDB).

       <u>See Also</u>  <u>Asemani v. Islamic Republic of</u>
              <u>Iran</u>, 266 F.Supp.2d 24 (D.D.C. 2003)

(9)

While still in the Respondents' custody, Asemani filed (on March 23, 2004) a Petition for Writ of Habeas Corpus in this Court (No.: 1:04cv00485). See Exhibit C.

On November 04, 2004, Asemani was released from immigration detention pursuant to an "Order of Supervision." See Exhibit D.

On July 22, 2005, the U.S. Court of Appeals for the Third Circuit issued an Opinion (Asemani v. Attorney General, 140 Fed. Appx. 368) with respect to five of Asemani's consolidated appeals. See Exhibit E. **n.11**

In a footnote (FN5), the Third Circuit (in the above-cited appeal) stated:

> "Because we lack jurisdiction over Asemani's petition, we refrain from considering his nationality claim."

---

n.11: much of the procedural detail left out by Asemani in this petition is made available in the above-mentioned 3rd Cir. decision.

On April 11, 2005, Asemani filed another habeas petition (this time in federal court in Baltimore, MD- NO.: 1:05-cv-00987-RDB). See Exhibit F.

The earlier habeas petition, which was filed in this Court in 2003 (Exhibit C) eventually found its way into the U.S. Court of Appeals for the D.C. Circuit (NO.: 04 cv 005300).

On July 07, 2006, said petition was dismissed as well on jurisdictional grounds. In its dismissal opinion, the D.C. Circuit acknowledged that

"Th[is] Court ... determined [in Asemani, supra] [that Asemani] was a U.S. national [.]"

Just like the 3rd Cir. (Exhibit E), the federal court of Appeals in D.C. did not comment on Asemani's U.S. nationality beyond the findings in Asemani.

Ultimately, both the 1st habe petition in this Court (Exhibit C) and the subsequent one filed in Baltimore (Exhibit E) were transferred to the 3rd Cir. in accordance with the Real ID Act of 2005, Pub. L. NO. 109-13, 119 Stat. 231. See Exhibit J. n.12

By an Order of the 3rd Cir. (dated June 25, 2007), the newly-consolidated appeals (Nos.: 05-3078 & 06-5012) were "dismissed for failure to timely prosecute [.]"

n.12: "RIDA" hereinafter.

# Successive/Repetitious Habeas Petitions

This action is <u>NOT</u> a repeat of Asemani's 2004 habeas petition in this Court (Exhibit C). In said proceeding, the "Relief Sought" was for "this Court ~~ to order the DHS to release him immediately."

Furthermore, the 2004 petition became so convoluted by the time it reached the appellate court, that the primary question as to the appropriateness of the Attorney General as a respondant was never resolved.

Asemani has not had the opportunity to have the merits of his prior habeas action decided on in this or in the higher court. The Government (in response to an Order to Show Cause) will undoubtedly move the Court for this petition's transfer to the federal court in Baltimore, MD.

In the event the Court grants such motion, Asemani's timely appeal of a possible transfer order (in advance of the twenty-day waiting period outlined in <u>Starnes, supra</u>) will preserve the Att. Gen. question for the Court of Appeal's review. Asemani was not given that chance the 1st time around. Logically, then, the present petition cannot be construed as seeking resolution of claims which have been decided before.

# Exhaustion of Administrative Remedies (12)

Asemani has been found to be a U.S. national by this Court in <u>Asemani</u>. No federal court (district or circuit), since <u>Asemani's</u> issuance, has, substantively, dealt w/ Asemani's U.S. national status. The Respondents; however, continue to assert that Asemani remains a foreign alien!

8 U.S.C.A. § 1101 (Exhibit J ) Provides:

> "The term 'alien' means any person not a citizen or <u>NATIONAL</u> of the United States."
>
> Emphasis added.

There are, of course, no State remedies available to Asemani to seek the relief which are the subject of this Petition. The State authorities will not de-classify Asemani as a <u>maximum-security</u> inmate and they will not re-classify him as a <u>medium-security</u> inmate for as long as the Respondents' intention of taking him into their custody exists.

Only a federal court, through grant of writ of habeas corpus, is empowered to offer the remedies sought in this Petition.

(13)

# This is __NOT__ a Petition for Review of a Final Order of Removal

Through this Petition, Asemani is __NOT__ asking the Court to review the Immigration Court's final order of removal against him. __See__ Exhibit G. RIDA no longer permits habeas reviews of such orders.

But,

> " Habeas challenges to Pure detention --
> that is, challenges only to the fact of
> detention or continuing detention rather
> than to the lawfulness of a removal
> order -- are not affected by the RIDA
> Section INA § 106 jurisdictional amend-
> ments. __See__ Conference Report, 151 Cong.
> Rec. H2813, 2873, 109th Cong., 1st Sess.,
> __available at__ 2005 WL 1025891 (May 3, 2005)
> ('moreover, Section 106 would not Preclude
> habeas review over challenges that are
> independent of challenges to removal
> orders.'). " __n.13__.

---

__n.13__ :  The above concession was made by the Government
in its "Brief for Respondent" (dated Feb. 17, 2006)
in reference to Asemani's "Petition for a Writ of
Mandamus" (No.: 04-5300 D.C. Cir.) by A.U.S.A.
Roy W. McLeese III, and A.U.S.A. Patricia A.
Heffernan.

# RIDA's Impact on Proper Respondent

RIDA's alterations to existing law did not extend to the question of venue and proper respondent. Indeed, just months before RIDA's passage, the Supreme Court remarked in <u>Padilla</u> (<u>Supra</u>) that this remained an open question. Yet Congress did nothing to change the standards.

RIDA narrowed the various statutes potentially applicable to petitions for habeas corpus seeking review of final administrative orders of removal to one: 8 U.S.C. § 1252.

It is worth repeating that Asemani is <u>NOT</u> seeking a review of the final order of removal. Accordingly, RIDA has no bearing on his petition, other than its affirmation of the Pre-RIDA policy of allowing habeas claims, such as this one, to be filed in federal district courts.

Section 106 (a) of RIDA made several significant amendments to the jurisdictional provisions of the Immigration and Nationality Act ("INA"). The jurisdiction-divesting provision of the INA (8 U.S.C. § 1252 (a)(2)(c)); however, does not impact proper venue or proper respondent in this case.

Most important for the purposes of this case, Congress has provided that, for habeas petitions

"Pending in a district court on the date of enactment ... the district court shall transfer the case (or the part of the case that challenges the order of removal ...) to the court of appeals for the circuit in which a petition for review could have been properly filed [.]"  RIDA § 106 (c).

Obviously, this Petition was not pending on the date of RIDA's enactment. Moreover, no part of this petition challenges the order of removal. Therefore, no transfer to the 3rd cir. (where a petition for review could have been filed) is warranted.

## The Mootness Issue

Clearly, Asemani is not in immigration custody. Nor is he subject to the reporting requirements of the Respondents' "Order of Supervision" (Exhibit D). But, for habeas purposes, the Respondents have, indirectly, "significantly restrict[ed his] freedom[.]" <u>n.14</u>

_____

<u>n.14</u> : <u>see</u> Jago v. Van Curen, 454 U.S. 14, 21 n.3 (1981).

An individual need not be in a Respondent's physical custody in order for a Petition for habeas to be appropriate.

"History, usage, and precedent can leave no doubt that, besides physical imprisonment, there are other restraints on a man's liberty, restraints not shared by the public [n.15] generally, which have been thought sufficient in the English-speaking world to support the issuance of habeas corpus." n.16

---

n.15: In this case, the general prison population, or a typical/average prisoner, is not deprived of institutional privileges afforded medium-security designation.

n.16: Jones v. Cunningham, 371 U.S. 236, 240 (1963); See also Spencer v. Kemna, 523 U.S. 1 (1998) (considering the individual's proffered consequences as insufficient to overcome mootness because the individual failed to show any real effect);

Justices of Boston Municipal Court v. Lydon, 466 U.S. 294, 301 (1984) ("the use of habeas corpus has not been restricted to situations in which the applicant is in actual, physical custody") (citation omitted).
See also United States v. Cooper, 725 F.2d 756 (D.C. Cir. 1984).

Asemani's habeas petition presents a live and active controversy. Actions are mooted only where the

> "events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." n.17.

Because the RIDA simply changed the nature and character of the relief available to Asemani, not the Court's ability to provide relief, a live controversy remains.

Asemani's claims are neither jurisdictionally nor prudentially moot. See City of New York v. Baker, 878 F.2d 507 (D.C. Cir. 1989). Cases are jurisdictionally moot under Article III only when they do not present a claim for injury that is "fairly traceable to the challenged action" and thus do not present a "case" or "controversy." Int'l Union of Bricklayers & Allied Craftsmen v. Meese, 761 F.2d 798 (D.C. Cir. 1985).

If, and only if, all of the remedial options of the court have been removed is the matter necessarily moot. _See_ Vandenberg v. Rodgers, 801 F.2d 377 (10th Cir. 1986)(because prisoner was released, his claims for habeas based on denial of good time credit was moot); _see also_ Anyanwutaku v. Moore, 151 F.3d 1053 (D.C. Cir. 1998)(noting that collateral consequences could preclude a finding of mootness).

Prudential mootness arises in situations where a claimant seeks injunctive relief or a declaratory judgment and the effect of either remedy is

> "so attenuated that considerations of prudence and comity for coordinate branches of government counsel the court to stay its hand, and to withhold relief it has the power to grant." n.17

While this consideration may have applied to Asemani's request for bail (if he were in Respondents' custody), it has no effect upon his underlying request to be free of the Respondents' imposition of restrictions on his liberty interests.

---

n.17: _Baker_, _supra_, 878 F.2d. at 309-10. (internal citation omitted).

# Further Discussion on Jurisdiction

Article III of the U.S. Constitution requires petitioners invoking federal jurisdiction to establish three elements of standing:

' First, the [Petitioner] must have suffered an injury in fact — an invasion of a legally protected interest which is
(a) concrete and particularized and
(b) actual or imminent, not conjectual or hypothetical.

" Second, there must be a causal connection between the injury and the conduct complained of — the injury has to be fairly trace[able] to the challenged action of the [Respondent], and not th[e] result [of] the independent action of some third party not before the court.

' Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." n.18

In this petition, Asemani has established all the above-three-conditions.

n.18 : Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992).

# Additional Venue Considerations

As explained previously, venue is proper in this jurisdiction because the Respondents are proper and they can be found there in the District of Columbia.

This Court's Parent has held that

> "[W]hen the federal officers named as defendants are to be found within the District of Columbia for purposes of personal jurisdiction, venue is properly laid here under Section 1391 (e)." n. 19

Asemani is entitled to choose the District of Columbia as the forum for his Petition. When considering a transfer order, the District Court

> "must give due regard to the factors traditionally associated with the doctrine of forum non conveniens, including the [Petitioner's] choice of forum under the limited options venue statutes offer the initiator of litigation." n. 20

n. 19 : <u>Starnes v. McGuire</u>, 512 F.2d 918 (D.C. Cir. 1974).

n. 20 : <u>In re Scott</u>, 709 F.2d 717 (D.C. Cir. 1983).

Thus, where, as here, the Petitioner Properly chooses this forum, the District Court ought not transfer his case. Asemani has Properly filed his habeas Petition in this Court. His claims of nationality were resolved by the same court on a Previous occasion. See Asemani, supra.

The antiquated doctrine that the District of Columbia is an improper venue where the United States is the Respondent in the immigration context, initially raised in Ahrens, [n.21] has been called into question by Braden, [n.22] and noted as a further open question by the Padilla court, 542 U.S. at 435 n.8. [n.23]

---

n.21 :   Ahrens v. Clark, 335 U.S. 188 (1948)

n.22 :   Braden v. 30th Judicial Circuit Court of Kentucky, 410 U.S. 484 (1973).

n.23 :   See also Armentero v. INS, 412 F.3d 1088 (9th Cir. 2005) (Berzon, J. dissenting)(explaining the immediate custodian rule does not contain a district of confinement rule; applying traditional rules of venue instead).

No bar therefore exists to this Court's exercise of jurisdiction over the present matter, where the proper Respondents have been named and the District of Columbia is an appropriate venue, under traditional venue rules.

For this reason, the Court need not be concerned that resolving the venue question in Asemani's favor will create venue for all such petitions. Asemani's unique claims are limited in their scope and size.

## The Attorney General as the Proper Respondent

The Supreme Court, in the context of a dispute over the proper respondent in a criminal habeas petition noted that it was a far from settled fact whether the Attorney General was, individually, the proper respondent in habeas petitions for immigration-related proceedings. See Padilla, supra, at 435 n. 8. Specifically, the High Court observed that the unsettled question was whether, in the context of civil removal proceedings, the "immediate custodian rule" applies. Id.

The immediate custodian rule has long governed petitions for habeas based upon criminal convictions and it requires a petitioner to file in the district where the petitioner's immediate custodian is located. Id.

The same cannot be said, however, for cases where a habeas petition involves immigration-related infringments of one's liberty interests. See Henderson v. INS, 157 F.3d 106, 124-28 (2d Cir. 1998)(examining the jurisprudential evolution of habeas petitions).

The present case is distinguishable from Stokes v. United States Parole Comm'n, 374 F.3d 1235 (D.C. Cir. 2004), where the petitioner challenged a criminal conviction while physically in custody in an Ohio prison. The facts in Stokes fell squarely within the Supreme Court's mandate in Padilla, 542 U.S. at 435, and not the limited exception noted for individuals in Asemani's position.

The Court should resolve the open question of the properness of the Attorney General as a respondent (in such limited instances) in Asemani's favor.

The Attorney General, because of his position in the immigration system, is an appropriate respondent. First, the Attorney General is the individual charged with interpreting the statutes relevant to Asemani's claims. See Ali v. Gonzales, 421 F.3d 795, 796 (9th Cir. 2005)(noting its prior holding that the Attorney General was the proper respondent because of his "unique role as the interpreter of the statute and the ultimate decision maker")(internal quotation omitted).

Second, as Judge Berzon of the Ninth Circuit has explained, a lower federal official has no power to relieve Asemani of the immigration-related restraints on him. See Armentero v. INS., 412 F.3d 1088, 1100 (9th Cir. 2005)(Berzon, J., dissenting). See Exhibit P.

Indeed, in Ali v. Ashcroft, the Ninth Circuit had determined that the Attorney General was the ultimate decision maker and thus a proper respondent. 346 F.3d 873 (9th Cir. 2003), rev'd and remanded on other grounds, 421 F.3d 795 (9th Cir. 2005).

In _Padilla, supra,_ the Supreme Court explained that

> "[i]n _Ahrens[, supra]_ we left open the
> question whether the Attorney General
> is a proper respondent to a habeas
> petition filed by [an individual who is
> awaiting] deportation."

Although the Court in _Padilla_ acknowledged that the majority of lower courts held that the Attorney General was not a proper respondent, the lower courts were divided.

It is no answer to argue that if Asemani's claims are permitted to remain in this Court, that the Court could become inundated with other similar habeas petitions.

As explained in _Scott, supra,_ the potential for a large number of cases to enter this Court is an insufficient reason to transfer the case.

# The Soundness of Judge Bates' Asemani Ruling

In _Asemani_, the Honorable Judge Bates rested his determination of Asemani's U.S. nationality based on the then "current interpretation of the term 'national' [:]" See _Asemani_, at 87.

Although this Circuit has not re-examined said "interpretation" in Asemani's (or in any other) case, most other federal circuits which have done so (in cases other than Asemani's) have offered an opposing view to that of Judge Bates'; but, none of those more recent decisions takes away from _Asemani_ or invalidates it. They have no retroactive effect whatsoever.

As early as 1950, the Supreme Court held that an immigrant's

> "rights become more extensive and secure when he makes preliminary declaration of intention to become a [U.S.] citizen." n.24

---

n.24 :   _Johnson v. Eisentrager_,
            339 U.S. 763 (1950).
            See _Exhibit L._

That was just one of the many reasons why Asemani was declared to be a U.S. national. Interestingly, to this day, the 4th Circuit's positions on what it takes to become a U.S. national are the same as Judge Bates'.

In United States v. Morin, 80 F.3d 124, 126 (4th Cir. 1996), this federal circuit's sister explained that the filing of a citizenship application is the

> "most compelling evidence of permanent allegiance to the United States short of citizenship itself."
>
> See Exhibit M.

Morin is still good law in the Fourth Circuit and it was cited in Asemani by Judge Bates. Another significant consideration by Judge Bates was the 9th Circuit's decision in Hughes v. Ashcroft, 255 F.3d 752 (9th Cir. 2001).

> "[I]n order for a person who is born outside the United States to qualify for 'national' status, the person must ... demonstrate ... an application for United States citizenship." See Exhibit N.

At least one other federal district court has reached the same conclusions as determined in Asemani. See Lee v. Ashcroft, 216 F. Supp. 2d 51 (E.D.N.Y. 2002). See Exhibit O.

# Relief Sought

WHEREFORE, Asemani, the Pro se Petitioner herein, Prays:

A. That the Court grant his Petition by ordering the Respondents to notify the Maryland State Division of Corrections that they no longer intend to take Asemani into their custody (upon the completion of his State Sentence) because, as a U.S. national, he is not removable from the U.S.

B. And for such other and further relief as this Court deems necessary.

Respectfully Submitted,

Billy G. Asemani

September 17, 2007

Ghafour ASEMANI, Plaintiff.

v.

The ISLAMIC REPUBLIC OF
IRAN, et al., Defendants.

No. CIV.A.01-2231 JDB EC.

United States District Court.
District of Columbia.

April 23, 2003.

Petitioner filed an action against the Islamic Republic of Iran, the Ayatollah Khamenei, and several agencies of Iran under the Foreign Sovereign Immunities Act (FSIA), alleging he was tortured and falsely detained by defendants because of his adherence to the Baha'i faith. The complaint was dismissed for failing to show that foreign state had a reasonable opportunity to arbitrate the claim. Petitioner appealed and filed a motion for relief from judgment. The Court of Appeals, 2002 WL 31189802, held the appeal in abeyance pending action on petitioner's motion, and remanded the action for consideration of petitioner's request for judicial declaration of his nationality. On remand, the District Court, Bates J., held that petitioner sufficiently demonstrated his permanent allegiance to the United States to qualify as a national under the FSIA.

Issuance of summonses ordered.

**International Law** ⟜10.31

Petitioner sufficiently demonstrated permanent allegiance to the United States to qualify as a national under the Foreign Sovereign Immunities Act (FSIA): petitioner had filed notice that he intended to apply for United States citizenship, an application for citizenship that was denied as premature and that he continued to pursue with an Immigration and Naturalization officer, and an oath of allegiance to the United States. Immigration and Nationality Act, § 101(a)(22), 8 U.S.C.A. § 1101(a)(22); 28 U.S.C.A. § 1605(a)(7)(B)(ii).

---

Ghafour Asemani, Jackson, MS, Plaintiff pro se.

*MEMORANDUM AND ORDER*

BATES, District Judge.

Plaintiff has filed a complaint against the Islamic Republic of Iran, the Ayatollah Khamenei, and several agencies of the Government of Iran, alleging that he was tortured and falsely detained by defendants on July 14, 2000, because of his adherence to the Baha'i faith. His claim is based on the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602 *et seq.*, which authorizes certain actions against a foreign state in the courts of the United States, including an action "in which money damages are sought against a foreign state for personal injury ... that was caused by an act of torture ... if such act ... is engaged in by an official, employee, or agent of such foreign state while acting within the scope of" employment. 28 U.S.C. § 1605(a)(7).[1]

On initial review, plaintiff's complaint was dismissed because it did not show that he had "afforded the foreign state a rea-

---

1. Section 1605(a)(7) also requires that the foreign state has been designated as a state sponsor of terrorism. Iran has received such a designation. *See, e.g., Jenco v. Islamic Republic of Iran,* 154 F.Supp.2d 27 (D.D.C.

2001); *Elahi v. Islamic Republic of Iran,* 124 F.Supp.2d 97 (D.D.C.2000); *Cicippio v. Islamic Republic of Iran,* 18 F.Supp.2d 62, 68 (D.D.C.1998).

ntended to
hip. an ap-
; denied as
1 to pursue
uralization
nce to the
d National-
U.S.C.A.
U.S.C.A.

IS, Plaintiff

*RDER*

iint against
ie Ayatollah
ries of the
:hat he was
. by defen-
ause of his
His claim is
gn Immuni-
§§ 1602 *et*
ain actions
:ourts of the
action "in
ight against
ury . . . that
e . . . if such
official, em-
n state while
employment.

's complaint
.ot show that
state a rea-

*c of Iran,* 124
:icippio v. Is-
.upp.2d 62. 68

sonable opportunity to arbitrate the claim"
as required by Section 1605(a)(7)(B)(i).
See *Daliberti v. Republic of Iraq,* 97
F.Supp.2d 38, 42, 44 (D.D.C.2000). Plain-
tiff filed both an appeal (Dkt. #7) and a
motion for relief from the dismissal (Dkt.
#10). With his post-judgment motion,
plaintiff submitted a copy of an arbitration
offer that he had sent by certified mail to
the Interests Section of the Islamic Re-
public of Iran. The Court of Appeals held
the appeal in abeyance pending action by
this Court on his motion for relief from
judgment. Because plaintiff had provided
evidence that he had offered the foreign
state a reasonable opportunity to arbitrate
his claim,[2] this Court granted his motion
for relief from judgment. Thereafter, the
Court of Appeals remanded the case to
this Court

> for further proceedings on [plaintiff's]
> complaint, including his contentions that
> he was a "national of the United States"
> at the time he suffered the injuries of
> which he complains, *see* 28 U.S.C.
> § 1605(a)(7)(B)(ii), and that he was a
> victim of "torture" for purposes of the
> Foreign Sovereign Immunities Act
> ("FSIA"), *see id.* § 1605(a)(7).

Court of Appeals Order dated October 2,
2002 (Dkt. #12). Because plaintiff had
filed in the Court of Appeals a petition for
a judicial declaration of nationality under 8
U.S.C. § 1503(a), the Court of Appeals
further ordered

> that [plaintiff's] petition for a judicial
> declaration of nationality under 8 U.S.C.
> § 1503(a) and 28 U.S.C. § 2201 be re-
> ferred to the district court for consider-
> ation. If, as a condition of his FSIA
> "torture" action, [plaintiff] prevails on
> his claim that he was a "national of the
> United States" under 28 U.S.C.
> § 1605(a)(7)(B)(ii), it is unclear whether

it will be necessary for the district court
to decide questions that might arguably
be posed under 8 U.S.C. § 1503(a) and
28 U.S.C. § 2201. In any event, it is
clear that the petition for a judicial dec-
laration of nationality is not now proper-
ly before this court, because the district
court has yet to consider whether it has
jurisdiction to entertain such claim un-
der 8 U.S.C. § 1503(a) and 28 U.S.C.
§ 2201. and, if so, whether such a claim
is meritorious.

*Id.* This matter has now been assigned to
the undersigned judge of this Court.

Suit under the "torture" provision of the
FSIA is available only when the victim was
a "national of the United States (as that
term is defined in section 101(a)(22) of the
Immigration and Nationality Act) when
the act upon which the claim is based
occurred." 28 U.S.C. § 1605(a)(7)(B)(ii).
Section 101(a)(22) of the Immigration and
Nationality Act, now codified at 8 U.S.C.
§ 1101(a)(22), provides that "[t]he term
'national of the United States' means (A) a
citizen of the United States, or (B) a per-
son who, though not a citizen of the United
States, owes permanent allegiance to the
United States." Plaintiff, who was born in
Iran of Iranian parents, is not a citizen of
the United States. He asserts, however,
that he is a "national" of the United States
who "owes permanent allegiance to the
United States," and that this status existed
in July 2000, when he incurred the alleged
injuries.

Plaintiff's pleadings and supporting doc-
uments show that he came to the United
States on a student visa in 1984. He
graduated from high school, college, and
dental school in the United States, and
registered for the Selective Service in
1991. In 1991 he married Salmira Salmas-

---

2. Exhibits 1—7 to the motion for relief from
   judgment show that plaintiff's arbitration of-

fer was received by the Interests Section on
October 1, 2001.



si, an Iranian-born woman who became a United States citizen in 1996; they have four children. Plaintiff became a permanent resident in 1994. Attached to his petition for declaration of nationality (Dkt.# 13) are the following documents:

— Application to File Declaration of Intention to become a citizen, dated April 26, 1996 (Exhibit 4)

— Application for Naturalization dated August 20, 1997 (Exhibit 7) [3]

— Documents from 1999 indicating that his application for citizenship had been reopened (Exhibits 16, 17).

— Updated application dated August 28, 1999 (Exhibit 19).

With his Supplemental Brief in support of his petition for a judicial declaration of nationality (Dkt.# 20), plaintiff provided the following additional documents:

— Certificate Preparation Sheet and Oath Declaration, signed September 21, 1998, in which plaintiff renounces all allegiance and fidelity to any state of which he has previously been a subject, and vows to "support and defend the Constitution and the laws of the United States of America against all enemies, foreign and domestic" and that he "will bear true faith and allegiance to the same." (Exhibit IV).

— Notice to appear for an N–400 Citizenship Examination on July 14, 1999 and a copy of his 1997 application for citizenship with notes apparently made by the Immigration and Naturalization Service examiner at the July 1999 interview (Exhibits VII, VIII).

The designation "national" originally was limited to residents of territories of the United States, such as persons born in the Philippines before that country obtained independence. See, e.g., Scholz v. Shaughnessy, 180 F.2d 450 (2d Cir.1950); Yuen v. Internal Revenue Service, 497 F.Supp. 1023 (S.D.N.Y.1980); Cabebe v. Acheson, 84 F.Supp. 639 (D.Hawai'i 1949). Lengthy residence in the United States and marriage to a citizen would not render a person a "national" under these earlier decisions. Recent cases, however, suggest that a person may become a "national" of the United States by applying for citizenship. See, e.g., Hughes v. Ashcroft, 255 F.3d 752 (9th Cir.2001); United States v. Morin, 80 F.3d 124, 126 (4th Cir.1996); Oliver v. United States Dep't of Justice, 517 F.2d 426 (2d Cir.1975); Carreon–Hernandez v. Levi, 409 F.Supp. 1208 (D.Minn. 1976), aff'd, 543 F.2d 637 (8th Cir.1976), cert. denied sub nom. Hernandez v. Bell, 430 U.S. 957, 97 S.Ct. 1605, 51 L.Ed.2d 808 (1977). In Oliver, the Court of Appeals for the Second Circuit concluded that the plaintiff was not a "national of the United States" because she had not begun the process of naturalization and thus was assumed still to owe allegiance to Canada. See 517 F.2d at 427–28. Similar results were reached in Carreon–Hernandez v. Levi and Hughes v. Ashcroft. As the Court of Appeals for the Fourth Circuit said in Morin, an application for citizenship is "the most compelling evidence of permanent allegiance to the United States short of citizenship itself." See 80 F.3d at 126; see also Shekoyan v. Sibley Int'l Corp., 217 F.Supp.2d 59 (D.D.C.2002).

The documents submitted by plaintiff establish that in 1996 he filed a notice that

he intenc
citizenshij
citizenshij
denied at
in 1998 he
United St
for citizei
an Immig
in July 19
tation of
demonstr;
the Unite
him a "na
FSIA. S(
That is a'
this time

Accordi
day of Ap

ORDE
strated t
United S
U.S.C. §
therefore
under the
Act, 28 U

FURTI
motion fc
ality [DI
prejudice

FURTI
motion to
DENIED

FURTI
es shall l
to Rule
Procedu:

---

3. This application was denied because, although plaintiff was married to a United States citizen and was a permanent resident, his wife had only become a citizen nine months earlier, on November 23, 1996, whereas the statute under which he applied for citizenship required that the spouse have been a citizen for three years. In addition, plaintiff had not been admitted for permanent residence for the required five years. He was, therefore, ineligible to apply for citizenship at that time. (Exhibit 12.)



persons born in
t country ob-
*e.g.*, *Scholz v.*
(2d Cir.1950);
*Service*, 497
0); *Cabebe v.*
.Hawai'i 1949).
United States
uld not render
r these earlier
wever, suggest
a "national" of
ing for citizen-
*Ashcroft*, 255
*nited States v.*
(4th Cir.1996);
*p't of Justice.*
*Carreon-Her-*
1208 (8th
(8th Cir.1976),
*nandez v. Bell*,
51 L.Ed.2d 808
of Appeals for
ded that the
of the United
not begun the
d thus was as-
ce to Canada.
Similar results
*-Hernandez v.*
*roft.* As the
Fourth Circuit
on for citizen-
ng evidence of
United States
*See* 80 F.3d at
. *Sibley Int'l*
).C.2002).

d by plaintiff
d a notice that

the spouse have
s. In addition,
d for permanent
five years. He
pply for citizen-
.)

he intended to apply for United States citizenship, that he filed the application for citizenship in 1997, that his application was denied at that time as premature, and that in 1998 he filed an oath of allegiance to the United States. He pursued his application for citizenship through an interview with an Immigration and Naturalization officer in July 1999. Under the current interpretation of the term "national," plaintiff has demonstrated his permanent allegiance to the United States sufficient to constitute him a "national" within the meaning of the FSIA. *See* 28 U.S.C. § 1605(a)(7)(B)(ii). That is all that this Court must decide at this time for purposes of the current case.

Accordingly, it is by the Court this 23rd day of April, 2003, hereby

**ORDERED** that plaintiff has demonstrated that he was a "national" of the United States within the meaning of 28 U.S.C. § 1605(a)(7)(B)(ii) in July 2000 and therefore is authorized to pursue this claim under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 *et seq.* It is

**FURTHER ORDERED** that plaintiff's motion for a judicial declaration of nationality [Dkt. # 13] is **DENIED without prejudice.** It is

**FURTHER ORDERED** that plaintiff's motion to expedite rulings [Dkt. # 19] is **DENIED** as moot. It is

**FURTHER ORDERED** that summonses shall issue for the defendants pursuant to Rule 4(j) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1608.



Robert H. **HOFFMANN**,
et al., Plaintiffs.

v.

**UNITED STATES of America,**
et al., Defendants.

No. CIV.A. 98–0857(HHK).

United States District Court,
District of Columbia.

May 30, 2003.

Texas businessman and German citizens sued United States for refusing to turn over watercolors painted by Adolf Hitler and photographic archives taken from Germany during post-World War II allied occupation. The United States District Court for the Southern District of Texas, Lynn N. Hughes, J., 707 F.Supp. 1465, entered partial summary judgment for plaintiffs. Government appealed. The Court of Appeals, 69 F.3d 46, reversed and remanded, then, on petition for rehearing, the Court of Appeals, 81 F.3d 520, dismissed portion of archives claim without prejudice. After consolidating case with second action, the District Court dismissed businessman and transferred action. The United States District Court for the District of Columbia, 53 F.Supp.2d 483, granted partial summary judgment for government. Plaintiffs appealed. The Court of Appeals, 17 Fed.Appx. 980, affirmed in part, vacated in part, and remanded, and subsequently, 25 Fed.Appx. 885, denied government's petition for rehearing. Parties filed various motions. The District Court, Kennedy, J., held that: (1) denial of motion to amend complaint was warranted; (2) district court lacked power to transfer action, in whole or in part, to Court of Federal Claims; (3) mandate rule applied to preclude district court's reconsideration of prior ruling; (4) claim for breach of



UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
UNITED STATE IMMIGRATION COURT
YORK, PENNSYLVANIA

| | |
|---|---|
| IN THE MATTER OF: | ) IN REMOVAL PROCEEDINGS |
| | ) |
| ASEMANI, Ghafour | )     File # A 29 973 952 |
| | ) |
| | ) |
| Respondent | ) |
| | ) |

GROUND OF REMOVAL: 237(a)(2)(A)(iii): Aggravated felony

**ON BEHALF OF RESPONDENT:**    **ON BEHALF OF THE SERVICE**
Dennis Mulligan, Esq.        John Staples
                        Assistant District Counsel

APPLICATION: Termination

## TERMINATION OF REMOVAL PROCEEDINGS

    The respondent in this case is a 35-year-old married male alien, native and citizen of Iran. He adjusted status to lawful permanent resident on or about November 28, 1994, through marriage to a lawful permanent resident spouse. According to the Form I-213, Record of Deportable Alien, he was indicted on various federal criminal charges relating to fraud in his dentistry practice, but departed the United States for Iran in October 1999 in order to avoid federal prosecution. He voluntarily returned to the United States with his immediate family on or about October 12, 2000. He was subsequently convicted in federal district court in Mississippi and sentenced to 30 months' imprisonment.

    A Notice to Appear, Form I-862, was issued against the respondent on or about June 6, 2001. Pleadings and findings were made on this charging document by a prior immigration judge. Importantly, the respondent, according to the notes of the prior immigration judge on the Form I-862, denied that he was not a "national" of the United States. In a written motion to terminate proceedings, the respondent, through counsel, sought to have the immigration judge terminate proceedings based on the fact that he was a "national" of the United States. In a comprehensive written decision dated August 1, 2003, the prior immigration judge denied the motion to terminate, finding that the respondent was not a "national" of the United States. Upon the detention of the respondent by the Bureau which caused this case to be

1



transferred to the York immigration court, respondent's counsel once again moved for a termination of the case and dismissal of the immigration charges against him on the grounds that he is a "national" of the United States.

Ordinarily, a decision on the merits of an issue litigated before a prior immigration judge should be binding on subsequent immigration judges who acquire the case, absent extraordinary circumstances. I routinely follow this policy. However, where, as here, the question deals with the jurisdiction of the court, I believe it prudent to review the record to ensure that the immigration judge arrived at the correct conclusion. I have particularly done so in this case given that it has been brought to my attention that a federal district court has resolved the issue of "nationality" in favor of this respondent.

This record of proceedings contains the Memorandum and Order of the U.S. District Court for the District of Columbia. The findings and order in this memorandum are based on a civil suit filed by the respondent in Asemani v. Islamic Republic of Iran, civil action No. 01-2231 (Dis. Ct. D.C.2003), pursuant to the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1602 et seq. which authorizes civil actions against a foreign state for personal injuries caused by an act of torture by an official, employee, or agent of the foreign nation. As the district court pointed out, such action is only available when the victim is a "national of the United States (as that term is defined in section 101(a)(22) of the Immigration and Nationality Act) when the act upon which the claim is based occurred.

I need not repeat here the reasoning and analysis of the federal district court, which is clear from the memorandum. However, the court, in the end, found

that plaintiff has demonstrated that he was a "national" of the United States within the meaning of 28 U.S.C. § 1605(a)(7)(B)(ii) in July 2000 and therefore is authorized to pursue this claim under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 et seq.

My brief review of the immigration judge's written ruling, however, does not reveal that the immigration judge acknowledged the findings of the federal district court pertaining to the respondent's "nationality," although respondent's counsel alluded that a discussion of the district court's ruling was made on the record in earlier proceedings. But it is the very fact of the district court's ruling and order which causes me great concern over my continued jurisdiction in this case.

That is, my jurisdiction is restricted to "aliens" of the United States, defined as "any person not a citizen or national of the United States." Section 101(a)(3) INA, 8 U.S.C. §§ 1101(a)(3); see 8 C.F.R. § 3.12 et seq.; Part 240 - Proceedings to Determine Removability Of Aliens In The United States. Moreover, an immigration judge is empowered to determine the claim of an alien arriving in the United States and applying for admission as a U.S. citizen. See 8 C.F.R. § 235.3(b)(5)(iv). In short, an immigration court is not empowered to conduct removal or any other immigration proceedings against those individuals deemed citizens or nationals of the United States except to determine the bona fides of a claimed status as a U.S. citizen, or in this case, as a "national" of the United States. Once an individual has

2

been determined to be either a U.S. citizen or "national," the removal proceedings must be terminated for lack of jurisdiction.

While I essentially concur with the prior immigration judge's determination that the respondent is not a "national" of the United States, which is in full conformity with the Board's recent ruling in Matter of Navas-Acosta, 23 I&N Dec. 586 (2003), the fact of the matter is that a federal district court has previously determined this issue in the respondent's FSLA civil action before that court. While Bureau counsel maintains that I am not bound by such ruling given that the district court's order was limited to the respondent being a "national" of the United States only for purposes of the FSLA, such argument is unpersuasive. The United States Code does not, to my knowledge, define the term "national" in varying levels of applicability, depending upon the manner in which the purported "national" is seeking such status. And while I respectfully disagree with the federal district court's reasoning upon which it found the respondent to have satisfied his burden of establishing his United States "nationality," I must conclude that, as an administrative court, I have no authority to override or ignore such findings.

As the respondent has been determined to be a "national" of the United States by the United States District Court for the District of Columbia, I am legally bound by such ruling. I have neither *in personam* jurisdiction over the respondent nor subject matter jurisdiction over this removal case, nor am I empowered to relitigate this issue. Therefore, under these particular circumstances, I must conclude that the Bureau has failed to establish the respondent's "alienage" and thus termination is in order.

ORDER: The removal proceedings are hereby terminated.

Walt Durling
Immigration Judge

September 5, 2003

3

**FILED**

MAR 2 3 2004

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# IN THE
# UNITED STATES DISTRICT COURT
## FOR THE DICTRICT OF COLUMBIA

**BILLY G. ASEMANI,**
***PRO SE* PETITIONER,**

CARBON COUNTY CORRECTIONS
331 BROAD STREET
NESQUEHONING, PA. 18240

**V.**

CASE NUMBER  1:04CV00485

JUDGE: John D. Bates

DECK TYPE: Habeas Corpus/2255

DATE STAMP: 03/██/2004
              23

**DEPARTMENT OF
HOMELAND SECURITY,
RESPONDENT.**

# PETITION
# FOR
# WRIT OF
# HABEAS
# CORPUS

Dbt f !4;15.dw 131: . .F N L MR!!!!!Epdvn f ou2.3!!!!!Gjrne!1: 0343115!!!!!Qbhf !3!pg24

**COMES NOW,** Billy G. Asemani ("Asemani"), *Pro Se* Petitioner herein,

and files this Petition for Writ of Habeas Corpus ("Petition"), as a person

who is a "United States 'national'," by this Court's Order (*See Asemani*

*v. Islamic Republic of Iran, et al.,* **266 F.Supp.2d 24 (D.D.C. 2003)**

(*"Asemani"* ), *Exhibit* **A,** and, "owes permanent allegiance to the United

States," *Asemani, supra,* **at 27.**

## I. PRELIMINARY STATEMENT

Asemani vehemently asserts that he has been unlawfully detained,

and illegally imprisoned, by the Defendant, the Department of Homeland

Security ("DHS"), pursuant to Section 236(c) of the Immigration and

Nationality Act ("INA"), which is only applicable to foreign "aliens,"

and that his continued confinement violates legal protections

afforded him as a non-alien.

## II. VENUE

Venue is proper because:

1) The question of whether Asemani is a United States 'national' or not

was originally raised in this judicial forum before the United States Court

of Appeals for the District of Columbia Circuit ("Court of Appeals"), and,

on remand, *Exhibit* **B,** said question was necessarily and conclusively

resolved, in his favor, by this Court, by virtue of *Asemani* ;

**1**

Dbt f !4;15.dw 131: : .FNL MR!!!!!Epdvn f ou2.3!!!!!Gjme!1: 0408115!!!!!Qbhf !4!pg24

2) The DHS is headquartered within this Court's immediate jurisdiction; and

3) The DHS is represented in the District of Columbia by both the United States
   Attorney's Office and by the United States Justice Department's Office of
   (Immigration) Litigation, Civil Division (which is physically located in this
   district, and whose mailing address is: Post Office Box 878, Ben
   Franklin Station, Washington, D.C. 20044).

The requisite nexus for the establishment of venue in this federal district
(between Asemani, the Court, and DHS) sufficiently exists, and although
**Asemani** was decided in the context of the Foreign Sovereign Immunities
Act ("FSIA"), Asemani's U.S. nationalism was determined based on the
country's laws embedded in the INA.

In recognizing Asemani as an individual who "owes permanent allegiance
to the United States," the Court 'borrowed' the definition of "national" from
the embodiment of U.S. immigration authority; the INA, which is, for all intents
and purposes, the DHS' regulatory 'Bible' in all aspects of immigration-
related affairs. In reliance on the INA, this Court, in **Asemani,** stated:

> "Suit under the 'torture' provision of the FSIA is avai-
> lable only when the victim was a 'national' of the Uni-
> ted States ( *as that term is defined in Section 101(a)(22)*
> *of the Immigration and Nationality Act* ) when the [tor-
> ture] act upon which the claim is based occurred."
>
> At 25 (emphasis added.)

2

Dbt f !4;15.dw 131: : .FNLJ.MR!!!!!Epdvn f ou2.3!!!!!Gjrhe!1: 0348115!!!!!Qbhf !5!pg24

## III.  JURISDICTION

This action arises under the United States Constitution, Article I, Section 9, cl. 2.  The Court also maintains jurisdiction in this case under 28 U.S.C. § 2241.

Additionally, since 8 U.S.C.  § 1252(b)(5) is devoid of any mention of habeas, or 28 U.S.C. § 2241, that the "clear statement rule" articulated in **INS v. St. Cyr.,** **533 U.S. 289, 311 (2001)**(holding that the limitations on judicial review enacted by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") and the "IRIRA" do not repeal habeas corpus jurisdiction) counsels against construing the statute as replacing habeas review.

> **"In the immigration context, 'judicial review' and 'habeas corpus' have historically distinct meanings."**
>
> **St. Cyr., supra, at 311. See also Calcano-Martinez v. INS, 232 F.3d 328, 338 (2000):**

> **"Judicial review and habeas corpus have distinct technical meanings under the law."**
>
> **Aff'd, 533 U.S. (2001).**

The Supreme Court has specifically addressed the limitations enacted by other subsections of § 1252 and it has found that they limit only ...

> **" 'judicial review'—that is, full, nonhabeas review."**
>
> **St. Cyr., at 312.**

3

Dbt f !4;15.dw 131: : .FNL.MR!!!!!Epdvn f ou2.3!!!!!Gjhe!1: 0403115!!!!!Qbhf !6!pg24

Thus, a statute that establishes the procedures for judicial review of immigration decisions does not necessarily speak to the continuing availability of habeas review of those decisions. In *St. Cyr.* the Supreme Court reiterated the continuing vitality of habeas review pursuant to 28 U.S.C. § 2241.

In the face of limitations enacted by Congress in AEDPA and IRIRA, the high court held that ...

> "implications from statutory text or legislative history are not sufficient to repeal habeas jurisdiction: instead, Congress must articulate specific and unambiguous Statutory directives to effect a repeal."

> At 299. *See also Demore v. Hyung Joon Kim,* 155 L. Ed. 2d. 724, 123 S. Ct. 1708 (2003):

> "Where a provision precluding review is claimed to bar habeas review, the Court has required a particularly clear statement that such is Congress' intent."

*See also Wang v. Ashcroft,* 320 F.3d 130, 140-141 (2nd Cir. 2003):

> "The Supreme Court's decision in *St. Cyr.* makes clear that a statute must, at a minimum, explicitly mention either 'habeas corpus' or 28 U.S.C. § 2241 in order to limit or restrict § 2241 jurisdiction."

4

Dbt f !4;15.dw 131: : .F N L] MR !!!!!Epdvn f ou2. 3!!!!!Gjrhe!1: 0 @3 n15!!!!!Qbhf !7!pg24

## IV. **BACKGROUND**

A relevant look into Asemani's immigration history has previously been made by this Court in *Asemani, Exhibit* **A.** It would be redundant to recite the same here.

What follows is a historical 'pick up' on where *Asemani* 'left off:'

### (1)

On June 06, 2001, the now-defunct Immigration and Naturalization Service[1] ("INS") charged Asemani as an "arriving alien;" in a document referred to as "Notice to Appear;" *Exhibit* **C.** Asemani arrived in the United States, on October 12, 2000, from a trip to Iran which resulted in his torture encounter there.

In *Asemani,* it was ...

> "ORDERED that [Asemani] has demonstrated
> that he was a 'national' of the United States
> ... in July 2000 [.]" At 27.

As such, upon return to the United States, in October of 2000, Asemani was, in truth and in fact, an arriving U.S. national and not an "arriving alien."

---

[1] On March 01, 2003, the INS was officially abolished and subsumed into the DHS, under the direction of Secretary Tom Ridge (Homeland Security Act of 2002, Pub. L. No. 107-296, § 471, 116 Stat. 2135 (2002)).

**5**

Dbt f !4;15.dw 131: : .FN L: MR !!!!!Epdvn f ou2.3!!!!!Gjrhe!1: 03 03 115!!!!!Qbhf !8!pg24

**(2)**

On July 23, 2003 (despite the fact that DHS was immediately made aware

of *Asemani*'s April 23, 2003 decision) Asemani was illegally arrested, and

he was unlawfully detained, by DHS, under the misguided allegation that

he remains an alien subject to removal from the United States. Asemani

continues to be in DHS custody to this day.

**(3)**

On September 05, 2003, DHS' Immigration Judge ("IJ") Durling, finding

his administrative court bound by *Asemani,* terminated the removal pro-

ceedings against Asemani and he ordered him released; *Exhibit* **D.**

The IJ noted:

> "[A] federal district court [this Court] has resolved the issue
> of 'nationality' in favor of [Asemani.] ...[M]y jurisdiction is
> restricted to 'aliens' of the United States, defined as 'any
> person not a citizen or national of the United States.' Sec-
> tion 101(a)(3) INA, 8 U.S.C. §§ 1101(a)(3); *see* 8 C.F.R. §
> 3.12 *et seq.;* Part 240 – Proceedings to Determine Remo-
> vability Of Aliens In The United States. Moreover, an immig-
> ration judge is empowered to determine the claim of an alien
> arriving in the United States and applying for admission as
> a U.S. citizen. *See* 8 C.F.R. § 235.3(b)(5)(iv). In short, an
> immigration court is not empowered to conduct removal
> or any other immigration proceedings against those indi-
> viduals deemed citizens or nationals of the United States
> except to determine the *bona fides* of a claimed status
> as a U.S. citizen, or in this case, as a 'national' of the
> United States. Once an individual has been determined
> to be either a U.S. citizen or 'national,' the removal
> proceedings must be terminated for lack of jurisdiction. ...
>
> *Exhibit* **D,** at 2-3.

6

Dbt f !4;15.dw131: . .F(N)L.MR!!!!!Epdvn f ou2.3!!!!!Gme!1: 0&4©115!!!!!Qbhf !9!pg24

IJ Durling continued:

> "[T]he fact of the matter is that a federal district court
> has previously determined this [nationality] issue in
> [Asemani's] FSLA [sic] civil action before that court.
> While [DHS] counsel maintains that I am not bound
> by such ruling given that the district court's order
> was limited to [Asemani] being a 'national' of the
> United States for purposes of the FSLA [sic], such
> argument is unpersuasive. The United States Code
> does not, to my knowledge, define the term 'national'
> in varying levels of applicability, depending upon the
> manner in which the proposed 'national' is seeking
> such status. ... [A]s an administrative court, I have
> no authority to override or ignore [Asemani's]
> findings.

> "As [Asemani] has been determined to be a 'national'
> of the United States by the United States District Court
> for the District of Columbia, I am legally bound by such
> ruling. I have neither *in personam* jurisdiction over
> the respondent nor subject matter jurisdiction over
> this removal case, nor am I empowered to relitigate
> this issue. Therefore, under these particular cirums-
> tanes, I must conclude that the [DHS] has failed to
> establish [Asemani's] 'alienage' and thus termi-
> nation is in order."

> *Exhibit* D, at 3.

## (4)

On September 10, 2003, DHS' Board of Immigration Appeals ("BIA") granted

(*Exhibit* E) DHS' "request[ for] a stay of execution of the Immigration Judge's

bond order of September 05, 2003, ordering [Asemani] released on his own

recognizance."

7

Dbt f !4;15.dw 131: : .FNL MR!!!!!Epdvn f ou2.3!!!!!Gjrne!1: 0343115!!!!!Qbhf !: !pg24

### (5)

On December 12, 2003, the BIA, in a "PER CURIAM" order, *Exhibit* **F**,

stated: "[T]he DHS's bond appeal is sustained and the Immigration Judge's

September 5, 2003, custody order is vacated."

### (6)

On March 09, 2004, the BIA rendered a final decision (*Exhibit* **G**) on

whether it considers Asemani to be a U.S. national or an alien. The BIA

defiantly disregarded this Court's determinations in *Asemani,* by claiming:

"We are not bound by this finding, because the FSIA suit does not involve

the immigration laws of the United States and because the parties to the

FSIA suit are not equal to the parties in the current proceedings." At 2.

## V. DISUSSION

It has already been noted in this Petition that this Court did in fact place

the strength of its finding, of Asemani to be U.S. national, on the definition

of that term found in the INA. It is true that the FSIA is not a part of (or an

offshoot of) the INA, but it does not have to be so when a court of competent

jurisdiction, as this Court did in *Asemani,* is deciding the question of a terrorist-

victim's nationality "within the meaning of the FSIA."

**8**

Furthermore, what matters the most in these particular circumstances, is that Asemani is a party to both FSIA and the DHS' removal proceedings against him; the two actions' pivotal issue being Asemani's political/legal/immigration status.

According to the Supreme Court's decision in **Montana v. United States, 440 U.S. 147 (1979):**

> "[O]nce an issue is actually and necessarily determined
> by a court of competent jurisdiction, that determination
> is conclusive in subsequent suits based on a different
> cause of action involving <u>A</u> party to the prior litigation."
>
> **(emphasis added.)**

## VI. <u>ARGUMENT</u>

The only authority DHS has is over aliens.  Title 8 U.S.C.  § 1103(a)(1) provides:

> **"Powers and duties (a) Attorney General [2]**
>
> **(1) The Attorney General shall be charged with the adminis-
> tration and enforcement of this chapter and all other laws
> relating to the immigration and naturalization of aliens [.]"**

A slew of pertinent Supreme Court case law exists in support of Asemani's position that **Asemani** "binds the world."  They include:

---

[2] References to the "Attorney General," in immigration proceedings, should be read as "Secretary of Homeland Security" because such immigration-related responsibilities have been transferred.

9

Dbt f !4;15.dw131: : .FNL)MR!!!!!Epdvn f ou2.3!!!!!Gjrhe!1: 03-03115!!!!!Qbhf !22!pg24

> "We cannot hesitate in giving a distinct and unqualified
> negative to [the] proposition [that an] order of a court
> of competent jurisdiction, may be declared a nullity in
> a collateral action[,] both on principle, and authority
> too well and long settled to be questioned. ... There
> is no principle of law better settled, than that every
> act of a court of competent jurisdiction shall be
> presumed to have been rightly done."

*Voorhees v. Jackson*, U.S. 453 (1836).

> "[T]he usual rule is that merits of a legal claim once
> decided in a court of competent jurisdiction are not
> subject to redetermination in another forum. ...
> [A] matter once judicially decided is finally decided."

*Allen v. Mc Curry*, 499 U.S. 90 (1980).

## VII. EXHAUSTION OF ADMINISTRATIVE REMEDIES

The exhaustion requirement (8 U.S.C. Section 1252(d)(1)) mandates that:

> "A court may review a final order of removal only if [ ]
> the *ALIEN* exhausted all administrative remedies
> available to the *ALIEN* as of right."

> (emphasis added.)

Inasmuch as Asemani has been previously, and irreversibly, found by this
Court to be a U.S. national (and thus not an alien) said exhaustion requirements
are statutorily inapplicable to him. He is beyond the reach of the statute in
question for the purposes of this habeas action. Additionally, BIA's March 09,
2004 reversal of the IJ's decision (*Exhibit* G) is, for all intents and purposes,
that quasi-judicial administrative body's 'final' order, as *it* views the matter,
that: "[Asemani's] alienage has been established." At 2.                    **10**

Dbt f !4;15.dw 131: : .F!\_ `R!!!!!Epdvn f ou2.3!!!!!Gjrhe!1: `04`` ,3!!!!!Qbhf !23!pg24

The decisions made by an administrative agency are often shaped by political and bureaucratic forces which can be at odds with legislation passed by congress. Ultimately, it is the federal courts that force the agency to act in a lawful manner, within the scope of the authority delegated by Congress and consistently with the Constitution.

> "[A] main purpose of judicial review of administrative action is to ensure that administrators do whatever is required for procedural and substantive justice. Reviewing courts are the experts on the content of procedural and substantive justice."
>
> *Kenneth C. Davis,*
> **5 Administrative Law s 28:7, at 285 (2nd ed. 1984).**

## VIII. CONCLUSION

Statutes that are jurisdictional in nature must be ...

> "construed both with precision and with fidelity to the terms by which Congress has expressed its wishes."
>
> *Cheng Fan Kwok v. INS,* **392 U.S. 206 (1970).**

Various statutes have been cited in this Petition. They explicitly distinguish U.S. nationals from aliens. Asemani can not be, as DHS wishes to see, a national for the country's anti-terrorism laws, and an alien for its immigration laws. He either is a national or he is not. This Court has once staged its voice, in *Asemani,* that Asemani is a U.S. national. Said ruling is etched in stone and it should be free from collateral attack (please *see **Exhibit** F* for a complete analysis of this Court's decision in Asemani).                **11**

## IX. RELIEF SOUGHT

**WHEREFORE,** premises considered, Asemani prays to this Court to grant him habeas relief and to order the DHS to release him immediately.

**Respectfully submitted,**

Asemani, 03/17/04
*Pro Se* Petitioner

Via: **U.S.P.S. Certified Mail**
     **#: 7099 3400 0015 0967 8226**

**12**

SA0013

U.S. Department of Homeland Security
Immigration and Customs Enforcement

# Order of Supervision

File No: __A-29 973 952__
Date: __November 04, 2004__

Name: __ASEMANI, Ghafour__

on __6/1/2004_____, you were ordered:
  (Date of final order)

    [   ]   Ordered excluded or deported pursuant to proceedings commenced prior to April 1, 1997.
    [X ]   Ordered removed pursuant to proceedings commenced on or after April 1, 1997.

Because ICE has not effected your deportation or removal during the period prescribed by law, it is ordered that you be placed under supervision and permitted to be at large under the following conditions:

[X ] That you appear in person at the time and place specified, upon each and every request of ICE, for identification and for deportation or removal.

[X ] That upon request of ICE, you appear for medical or psychiatric examination at the expense of the United States Government.

[X ] That you provide information under oath about your nationality, circumstances, habits, associations, and activities and such other information as ICE considers appropriate.

[X ] That you do not travel outside __The State of Maryland_____ for more than 48 hours without first
                                    (Specify geographic limits, if any)
having notified this ICE office of the dates and places of such proposed travel.

[X ] That you furnish written notice to this Service office of any change of residence or employment within 48 hours of such change.

[X ] That you report in person on __To Be Determined__ at: __To Be Determined__
unless you are granted written permission to report on another date.

    [   ] That you assist ICE in obtaining any necessary travel documents.

[X ] Other: __You must comply with ALL requirements of the ISAP Program.__

    [   ]

_____
(Signature of ICE official)
Calvin McCormick
(Print name and title of ICE official)

## Alien's Acknowledgment of Conditions of Release under an Order of Supervision

I hereby acknowledge that I have (read) (had interpreted and explained to me in the English language) the contents of this order, a copy of which has been given to me. I understand that failure to comply with the terms of this order may subject me to a fine, detention, or prosecution.

_____
(Signature of ICE official serving order)

x __Bill C. Axeni__
(Signature of alien)

__11/4/4__
Date

05 1302

FILED

JUN 2 9 2005

Form I-220B(Rev. 4/1/97)N

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

U.S. Department of Homeland Security
Immigration and Customs Enforcement

**Order of Supervision-Addendum**

File No: __A-29 973 952__
Date: __November 04, 2004___

Name: __ Asemani, Ghafour_____

[X ] That you do not associate with known gang members, criminal associates, or be associated with any such activity.

[ ] That you register in a substance abuse program within 14 days and provide ICE with written proof of such within 30 days. The proof must include the name, address, duration, and objectives of the program as well as the name of a program counselor.

[ ] That you register in a sexual deviancy counseling program within 14 days and provide ICE with written proof of such within 30 days. You must provide ICE with the name of the program, the address of the program, duration and objectives of the program as well as the name of a counselor.

[ ] That you register as a sex offender, if applicable, within 7 days of being released, with the appropriate agency(s) and provide ICE with written proof of such within 10 days.

[X] That you do not commit any crimes while on this Order of Supervision.

[ ] That you report to any parole or probation officer as required within 5 business days and provide ICE with written verification of the officers name, address, telephone number, and reporting requirements.

[X] That you continue to follow any prescribed doctors orders whether medical or psychological including taking prescribed medications.

[X] That you provide ICE with written copies of requests to Embassies or Consulates requesting the issuance of a travel document.

[ ] That you provide ICE with written responses from the Embassy or Consulate regarding your request.

[X] Any violation of the above conditions may result in revocation of your employment authorization document.

[X] Any violation of these conditions may result in you being taken into Service custody and you being criminally prosecuted.

[ ] Other.

140 Fed.Appx. 368
140 Fed.Appx. 368
(Cite as: 140 Fed.Appx. 368)

Briefs and Other Related Documents

This case was not selected for publication in the Federal Reporter.

NOT PRECEDENTIAL

Please use FIND to look at the applicable circuit court rule before citing this opinion. Third Circuit Local Appellate Rule 28.3(a) and Internal Operating Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3 IOP APP I 5.3.)

United States Court of Appeals,
Third Circuit.
Ghafour ASEMANI, Petitioner,
v.
ATTORNEY GENERAL OF THE UNITED
STATES,* Secretary for the Department of
Homeland Security,* Respondents, * Caption
amended pursuant to Rule 43(c), Fed.
R.App. P.
Ghafour Asemani, Appellant
v.
Secretary of the Department of of Homeland
Security,* Asa Hutchinson, as
Undersecretary of the Department of Homeland
Security, Directorate of Border
and Transportation Security;  Michael Garcia, as
Assistant Secretary for the
Bureau of Immigration and Customs Enforcement;
Theodore Nordmark, as Acting
Philadelphia District Director of the Bureau of
Immigration and Customs
Enforcement * Caption amended pursuant to Rule
43(c), Fed. R.App. P.
* Ghafour Asemani, A29 973 952 a/k/a Billy G.
Asemani, Petitioner
v.
Michael Chertoff, as Secretary Department of
Homeland Security,**
Respondents * (Amended-Pursuant to Clerk's Order
of 3/2/04) ** Caption amended
pursuant to Rule 43(c), Fed. R.App. P.
Ghafour Asemani, Petitioner
v.
Department of Homeland Security, Respondent.
Nos. 03-4059, 04-1767, 04-1268, 03-4434, 04-1068.

Argued April 4, 2005.
Decided July 22, 2005.

Background:  Alleged alien, an Iranian native and citizen, petitioned for a writ of habeas corpus, claiming that he was a United States national, and thus, not subject to the immigration laws, including removal proceedings. The District Court for the Eastern District of Pennsylvania dismissed, and the alien appealed. Another habeas proceeding initiated by the alien in the District Court for the Middle District of Pennsylvania was transferred by that court to the Court of Appeals on the basis that the District Court lacked subject matter jurisdiction. Additionally, the alien petitioned for review of three orders of the Board of Immigration Appeals (BIA).

Holdings:  The Court of Appeals, Cowen, Circuit Judge, held that:
(1) alien's habeas petition was properly dismissed for failure to exhaust administrative remedies;
(2) the court lacked jurisdiction to review alien's habeas claim that he was being unlawfully detained, and thus, transfer of the petition to the court was inappropriate; and
(3) the court lacked jurisdiction over petitions for review of the BIA's interlocutory orders.
Ordered accordingly.

Ambro, Circuit Judge, filed a concurring opinion.

West Headnotes

[1] Habeas Corpus ☞282
197k282
Alleged alien's habeas petition, claiming that he was a United States national, and thus, not subject to removal proceedings, was properly dismissed for failure to exhaust administrative remedies;  the habeas petition was filed while removal proceedings were still pending, and his claim of citizenship would not properly be considered by the federal courts until the administrative process was complete. Immigration and Nationality Act, § 242(d)(1), 8 U.S.C.A. § 1252(d)(1).

[2] Aliens ☞54.3(1)
24k54.3(1)
Court of Appeals lacked jurisdiction to review alleged alien's habeas claim that he was being unlawfully detained because, as a United States national, he was not subject to Bureau of Immigration and Customs Enforcement (BICE)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

140 Fed.Appx. 368
(Cite as: 140 Fed.Appx. 368)

detention and removal, and thus, district court's transfer of the petition to the Court of Appeals was inappropriate; exhaustion of administrative remedies was required even though the alien claimed to be a national, and no final order of deportation was issued at the time the petition was filed. Immigration and Nationality Act, § 242(d)(1), 8 U.S.C.A. § 1252(d)(1); 28 U.S.C.A. § 1631; 8 C.F.R. § 1003.39.

[3] Aliens ⟨⟨⟨⟩⟩⟩54.3(1)
24k54.3(1)
Court of Appeals lacked jurisdiction over petitions for review of the Board of Immigration Appeals' (BIA) interlocutory orders, which vacated alleged alien's release and overturned a bond redetermination, granted a stay of execution of the bond redetermination, and vacated an Immigration Judge's (IJ) termination of proceedings and remanded the case for removal proceedings after finding that the alien was not a United States national. Immigration and Nationality Act, § 236(e), 8 U.S.C.A. § 1226(e).
*369 On Petition for Review from an Order of the Board of Immigration Appeals. (D.C. No. 0090-1: A29 973 952).

On Appeal from the United States District Court for the Eastern District of Pennsylvania. (D.C. Civil No. 03-cv-04612). District Judge: Hon. Ronald L. Buckwalter.

Ricky Malik, (Argued), Herndon, VA, for Petitioner/Appellant.

Ghafour Asemani, Ellicott City, MD, Petitioner/ Appellant pro se.

Douglas E. Ginsburg, Lyle D. Jentzer, (Argued), Christopher C. Fuller, United States Department of Justice, Office of Immigration Litigation, Ben Franklin Station, Washington, DC, for Respondents.

*370 Paul G. Shapiro, Office of United States Attorney, Philadelphia, PA, for Appellees.

Stephanie R. Reiss, (Argued), Jones Day, Pittsburgh, PA, for Amicus Curiae.

Before BARRY, AMBRO and COWEN, Circuit Judges.

OPINION

COWEN, Circuit Judge.

Ghafour "Billy" Asemani, an Iranian native and citizen, appeals the order of the District Court for the Eastern District of Pennsylvania dismissing his petition for a writ of habeas corpus for failure to exhaust administrative remedies. Essentially, he asserts that he is a United States national and accordingly is not subject to the immigration laws, including removal proceedings. Also before us is Asemani's habeas petition which the District Court for the Middle District of Pennsylvania transferred to this Court on the basis that it lacked subject matter jurisdiction. Asemani asserts that the petition should not have been transferred because the District Court has jurisdiction to determine citizenship in the first instance. In addition to habeas proceedings, Asemani also initiated petitions for review of three orders executed by the Board of Immigration Appeals ("BIA"). These orders vacated Asemani's release and overturned the bond redetermination, granted a stay of execution of the bond redetermination, and vacated the Immigration Judge's termination of proceedings and remanded the case for removal proceedings after finding that Asemani was not a United States national.

We have jurisdiction pursuant to 28 U.S.C. § 1291 to consider the order of the District Court for the Eastern District of Pennsylvania dismissing Asemani's petition for a writ of habeas corpus and will affirm. However, we do not have jurisdiction to consider the habeas petition transferred from the District Court for the Middle District of Pennsylvania because Asemani failed to exhaust his administrative remedies and is not appealing a final order of removal. Similarly, we do not have jurisdiction to consider the petitions for review of the BIA's interlocutory orders.

II. FACTUAL AND PROCEDURAL HISTORY

Asemani entered the United States on a student visa and received an adjustment of status to lawful permanent resident after marrying a lawful permanent resident. Asemani filed applications for citizenship in August 1997 and 1999, given that his wife had become a United States citizen; however, he never completed the naturalization process.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

140 Fed.Appx. 368                                                                 **Page 3**
(Cite as: 140 Fed.Appx. 368, *370)

In October 1999, Asemani was indicted on twelve counts of criminal health care fraud for practicing dentistry without a license. Later that month he went back to Iran for over a year, returning to the United States in October 2000. Six months later, he pled guilty to eleven counts in the indictment and on May 8, 2001 was sentenced to thirty months confinement.

While in federal custody, the Immigration and Naturalization Service ("INS") (now, the Bureau of Immigration and Customs Enforcement ("BICE")), began removal proceedings, charging Asemani as a deportable alien under the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA") for commission of crimes involving moral turpitude within ten years of his acquiring the status of lawful permanent resident. 8 U.S.C. § 1227(a)(2)(A)(i)(I).

While these proceedings were pending, in September 2001, Asemani filed a complaint in the United States District Court *371 for the District of Columbia under the Foreign Sovereign Immunities Act ("FSIA") against the Islamic Republic of Iran, for his alleged torture and false detention based on his religious affiliation. BICE was not named in the complaint and did not otherwise participate in these proceedings. The District Court determined that Asemani was a "national" of the United States for purposes of 28 U.S.C. § 1605(a)(7)(B)(ii) and therefore had standing to maintain the action. *See Asemani v. Islamic Republic of Iran,* 266 F.Supp.2d 24, 26-27 (D.D.C.2003). The Court, however, denied without prejudice Asemani's motion for judicial declaration of nationality pursuant to 8 U.S.C. § 1503(a) and 28 U.S.C. § 2201. *See id.* Such a declaration is only authorized where a claim is brought against the government for denying a claimant his rights and privileges as a United States national. *See id.* at 27. Further, a court may not make a declaration of nationality pursuant to § 1503 if nationality "is in issue in any [ ] removal proceeding." 8 U.S.C. § 1503(a).

Relying on the District Court decision, Asemani moved to terminate his removal proceedings, contending that BICE was estopped from demonstrating that he was not a United States national and removing him. On September 5, 2003, the Immigration Judge granted the motion and terminated the removal proceedings. On March 9,

2004, the BIA reversed and vacated the order, holding that BICE was not estopped from contesting the nationality claim and finding that Asemani was not a United States national.

On August 8, 2003, Asemani filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 in the United States District Court for the Eastern District of Pennsylvania asserting that he was entitled to be released from BICE custody because of his status as a United States national. (Case No. 03-4434). On October 29, 2003, the petition was dismissed for lack of subject matter jurisdiction due to Asemani's failure to exhaust administrative remedies. *See Asemani v. Ridge,* No. 03-4612, slip. op. (E.D.Pa. Oct. 29, 2003). An appeal to this Court ensued and the government moved for summary affirmance.

On January 21, 2004, Asemani filed another petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241, this time in the United States District Court for the Middle District of Pennsylvania. (Case No. 04-1268). In this petition, he again asserted that he is a United States national not subject to BICE detention and removal. The District Court held that we should determine the issue of nationality in the first instance, pursuant to 8 U.S.C. § 1252(b)(5), and therefore transferred the petition for our consideration. *See Asemani v. Ridge,* Civ. No. 3:CV-04-0135, slip. op. (M.D.Pa. Jan. 30, 2004).

In addition to the habeas petitions, Asemani also filed in this Court petitions for review of three BIA orders: (1) vacating his release and overturning the bond redetermination (Case No. 04-1068); (2) granting a stay of execution of the bond redetermination (Case No. 03-4059); and (3) vacating the Immigration Judge's termination of proceedings finding that Asemani was not a United States national and remanding the case for removal proceedings (Case No. 04-1767).

On April 26, 2004, we consolidated these five cases. The Immigration Judge ("IJ") issued a final order of removal to Iran on June 1, 2004. Asemani waived his appeal to the BIA, making the IJ's order the final order of removal. A petition for review of this order has not been filed with this Court.

A District Court's determination that it lacks

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

subject matter jurisdiction is a determination *372 of law over which we exercise plenary review. *See Duvall v. Elwood,* 336 F.3d 228, 229 (3d Cir.2003); *see also Gould Elec. Inc. v. United States,* 220 F.3d 169, 176 (3d Cir.2000).

### I. Habeas Petition Dismissed for Failure to Exhaust

[1] The District Court for the Eastern District of Pennsylvania dismissed Asemani's habeas petition, filed on August 8, 2003 (Case No. 03-4434), without prejudice for lack of jurisdiction because Asemani failed to exhaust his administrative remedies. [FN1]    Citing *Duvall,* the Court concluded a petitioner must exhaust administrative remedies before it could consider a habeas petition. *See Asemani v. Ridge,* No. 03-4612, slip. op. (E.D.Pa. Oct. 29, 2003).    The Court rejected Asemani's argument that as a national he is not subject to the exhaustion requirements applicable to aliens because "[t]hat would defeat the rationale for exhaustion." (*Id.*).

> FN1. The recent enactment of the Real ID Act of 2005 does not affect our analysis of whether the District Court erred in dismissing Asemani's habeas petition because he failed to exhaust his administrative remedies. Pub L. No. 109-113, 119 Stat. 231 (May 11, 2005). Section 106(a)(1) strips district courts of jurisdiction to review final orders of removal by providing in pertinent part:
> Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 ... or any other habeas corpus provision ... a petition for review filed with the appropriate court of appeals in accordance with this section *shall be the sole and exclusive means for judicial review of an order of removal* entered or issued under any provision of this Act.... For purposes of this Act, in every provision that limits or eliminates judicial review or jurisdiction to review, the terms "judicial review" and "jurisdiction to review" include habeas corpus review pursuant to section 2241....
> *Id.* at § 106(a)(1) (emphasis added) (amending 8 U.S.C. § 1252(a)(5)). However, this provision is inapplicable here because Asemani's petition was dismissed by the District Court in August, 2003, almost two years before the enactment of the Act. Further, Asemani was not seeking judicial review of an order of removal, as such an order was not entered until eight months after he filed his petition. Accordingly, we will consider whether the petition was properly dismissed by the District Court for failure to exhaust.

In *Duvall* this Court concluded that 8 U.S.C. §

1252(d)(1) requires exhaustion as a statutory prerequisite for federal jurisdiction. *Duvall,* 336 F.3d at 232-233.    We reject amicus curiae's argument that "in accordance with *St. Cyr,* the jurisdictional requirements applicable to immigration habeas petitions asserting a colorable claim to United States citizenship or national status are merely prudential and the jurisdictional requirements of § 1252(d)(1) do not apply." (Amicus Br. at 14.) Although the *Duvall* court stated that it need not discuss *St. Cyr* in detail because it was not raised or relied on, the court adequately distinguished *St. Cyr.* before holding that:

> [T]he requisites of § 1252(d)(1) do indeed apply to petitions for habeas corpus, notwithstanding the fact that the statute does not specifically reference habeas corpus.    To read the statute otherwise would defeat the statute's purpose in seeking to streamline the administrative process and in preventing delay by premature and unnecessary recourse to a federal court.

*Id.* at 231 n. 5 (citing *Massieu v. Reno,* 91 F.3d 416, 421-22 (3d Cir.1996)).    Even if this determination is dicta as amicus avers, it is highly persuasive in that it clearly reflects the reasoning of this Court and is in accord with the holdings of our sister circuits.    *See Sundar v. INS,* 328 F.3d 1320 (11th Cir.2003) (explaining that the decision in *St. Cyr* did not preclude it from holding that the exhaustion *373 requirements of 8 U.S.C. § 1252(d)(1) apply to habeas petitions as well as direct appeals because the requirement is not tantamount to complete preclusion of jurisdiction and therefore does not raise any serious constitutional issues.); *see also Sayyah v. Farquharson,* 382 F.3d 20, 26 (1st Cir.2004) ("[W]e hold that section 1252(d)'s exhaustion requirement applies broadly to all forms of court review of final orders of removal, including habeas corpus."); *Theodoropoulos v. INS,* 358 F.3d 162, 171 (2d Cir.2004) ("[W]e hold that, by its plain language, § 1252(d)'s [exhaustion] mandate ... applies to all forms of review including habeas corpus."). We also reject Asemani's attempt to distinguish *Duvall* on the basis that the petitioner in that case admitted her alienage because such a fact was not relied on by the Court in its holding. [FN2]

> FN2. While the Real ID Act does not apply here, *see supra* note 2, we do recognize that our discussion of *Duvall v. Elwood,* 336 F.3d 228 (3d Cir.2003) and *INS v. St. Cyr,* 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) is only relevant because of the unique circumstances and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

timing of this appeal. Indeed, the question of whether exhaustion is required before an alien's habeas petition is filed has been mooted by passage of the Act; exhaustion or not, an alien cannot even bring such a petition under today's law. *See* 8 U.S.C. § 1252.

Because the exhaustion requirement in habeas proceedings is statutory, as in direct appeals, there is no futility exception. *See Nyhuis v. Reno,* 204 F.3d 65, 69 (3d Cir.2000) (a statute with a jurisdictional requirement by definition cannot be subject to a futility exception). "Although judicially developed exhaustion requirements might be waived for discretionary reasons by courts, statutorily created exhaustion requirements bind the parties and the courts." *Massieu,* 91 F.3d at 419. Under prudential exhaustion principles, we have discretion to hear unexhausted claims if an administrative appeal would be futile or if the claims were exhausted subsequent to filing of the petition. However, under jurisdictional exhaustion principles we lack discretion to hear any claims that were not exhausted prior to filing the appeal.

Here, Asemani filed his habeas petition while removal proceedings were still pending. Accordingly, the District Court lacked jurisdiction to consider Asemani's petition which was filed before he exhausted his administrative remedies despite the fact that the administrative proceedings may have been futile and that he may have exhausted his claims after filing his petition.

We reject Asemani's argument that he is not subject to the exhaustion requirement because he asserts a colorable claim that he is a national, and the IIRIRA is only applicable to aliens. As we have held in *Massieu:*

[E]ven where an alien is attempting to prevent an exclusion or deportation proceeding from taking place in the first instance and is thus not, strictly speaking, attacking a final order of deportation or exclusion, it is well settled that judicial review is precluded if the alien has failed to avail himself of all administrative remedies, one of which is the deportation or exclusion hearing itself.

91 F.3d at 421 (internal quotation marks and citations omitted).

Like all other immigration issues raised in habeas petitions, Asemani's claim of citizenship should not be considered by the federal courts until the

administrative process is complete. As the Fourth Circuit has explained:

While upholding the exhaustion requirement may seem strict in an individual *374 case, exhaustion serves the twin purposes of protecting administrative agency authority and promoting judicial efficiency. The BIA was not given the opportunity to review the case because [petitioner] neglected to appeal. The exhaustion doctrine embodies a policy of respect for administrative agencies, which allows them to carry out their responsibilities and to discover and correct their own errors. A rule that allowed parties to circumvent the administrative process under the circumstances of this case would undermine agency functions and clog the courts with unnecessary petitions. The rules are clear: before proceeding to federal court, an alien must exhaust his or her administrative remedies.

*Kurfees v. INS,* 275 F.3d 332, 336 (4th Cir.2001) (internal quotation marks and citation omitted).

We affirm the District Court's order dismissing Asemani's habeas petition for lack of jurisdiction because he failed to exhaust his administrative remedies prior to filing the petition.

## II. Habeas Petition Transferred for Lack of Subject Matter Jurisdiction

[2] Asemani filed a petition for a writ of habeas corpus with the District Court for the Middle District of Pennsylvania (Case No. 04-1268) alleging that he is being unlawfully detained because as a United States national he is not subject to BICE detention and removal. Finding that it lacked jurisdiction to consider nationality claims in the first instance, the District Court transferred the petition to this Court pursuant to 28 U.S.C. § 1631. [FN3]

> FN3. The recent enactment of the Real ID Act of 2005 does not affect our analysis of whether Asemani's habeas petition was properly transferred to this Court. Pub L. No. 109-113, 119 Stat. 231 (May 11, 2005). Section 106(c) provides in pertinent part:
> If an alien's case, brought under section 2241 of title 28, United States Code, and challenging a final administrative order of removal, deportation, or exclusion, *is pending in a district court on the date of the enactment of this division,* then the district court shall transfer the case … to the court of appeals for the circuit in which a petition for review could have been properly filed under

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

section 242(b)(2) of the Immigration and Nationality Act (8 U.S.C. 1252), as amended by this section.

*Id.* at § 106(c) (emphasis added). Because Asemani's petition was transferred to this Court in January 2004, over a year before the enactment of this statute, the transfer provision is inapplicable. Accordingly, we will consider whether the petition was properly transferred under 28 U.S.C. § 1631.

A court may transfer, rather than dismiss, an action pursuant to Section 1631 if certain circumstances exist:

Whenever a civil action is filed in a court ... or an appeal, including a petition for review of administrative action ... and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court in which the action or appeal could have been brought at the time it was filed.

28 U.S.C. § 1631.

The first part of the transfer statute--the District Court lacks jurisdiction--was clearly met. We agree with the District Court that it lacked jurisdiction over the petition; however, we rely on different grounds. The District Court held that 8 U.S.C. § 1252(b)(5) strips district courts of jurisdiction to consider nationality claims in the first instance because it vests the courts of appeals with exclusive jurisdiction over that issue. We refrain from considering the jurisdiction-stripping effect of that statute, and instead find that the *375 District Court lacked jurisdiction over Asemani's petition for failure to exhaust administrative remedies.

As discussed, a district court lacks jurisdiction over a habeas petition where the petitioner failed to exhaust his administrative remedies prior to filing the petition. Because the exhaustion requirement is statutory it is not subject to any prudential or equitable exceptions. Here, Asemani filed his petition while his administrative proceedings were still pending and therefore failed to exhaust his claims. Accordingly, the District Court lacked jurisdiction to consider the petition.

Further, the second part of the transfer statute was met--it was in the interests of justice to transfer the petition. The interests of justice favor transferring a case to assist litigants who are confused as to the proper forum for review: "Due to the uncertain

nature of jurisdiction in this area, the filing of the habeas petition is understandable and transfer to the proper forum is particularly appropriate." *See Baeta v. Sonchik,* 273 F.3d 1261, 1265 (9th Cir.2001).

However, under the third part of the test, transfer would only be appropriate if we had jurisdiction to review the claims at the time the petition was initially filed with the District Court. *See Taniguchi v. Schultz,* 303 F.3d 950, 956 (9th Cir.2002) (finding that transfer of habeas petition is not appropriate because petitioner failed to exhaust administrative remedies and the petition for review would have been untimely as of the date the habeas petition was filed). Under the IIRIRA, we may only review a *final order of removal* if "the alien has *exhausted all administrative remedies* available to the alien as of right." 8 U.S.C. § 1252(d)(1) (emphasis added). Thus, we must consider two jurisdictional hurdles--exhaustion of administrative remedies and the necessity for a final order of removal. *See, e.g., Duvall,* 336 F.3d at 231; *Massieu,* 91 F.3d at 420.

Asemani argues that the exhaustion requirement should not apply because as a national he is not subject to the requirements of the IIRIRA, which by its terms only applies to aliens. This argument is meritless. As amicus curiae concedes, exhaustion is required even if petitioner claims to be a national: "[I]t is illogical to argue that jurisdiction for direct appeal may be had through the INA, but that the INA's exhaustion requirements do not apply." (Amicus Br. at 20.)

As with all direct appeals under Section 1252, there is a requirement that the petitioner exhaust all administrative remedies before appealing a determination of alienage. *See Duvall,* 336 F.3d at 231. Further, the exhaustion requirement is statutory and thus jurisdictional, thereby barring a direct review absent exhaustion of administrative remedies, regardless of any equitable considerations. *See Duvall v. Elwood,* 336 F.3d 228, 231 (3d Cir.2003); *see also Nyhuis v. Reno,* 204 F.3d 65, 69 (3d Cir.2000). Here, Asemani filed his petition with the District Court while his removal proceedings were still pending and therefore failed to exhaust his administrative remedies. Accordingly, like the District Court, we lack jurisdiction to consider this petition.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

140 Fed.Appx. 368                                                                    **Page 7**
(Cite as: 140 Fed.Appx. 368, *375)

While exhaustion is an independent basis for stripping this Court of jurisdiction over Asemani's petition, we note than an additional bar to our jurisdiction is the fact that a final order of deportation was not issued at the time the petition was filed. We only have jurisdiction to consider final orders of removal, not interlocutory orders issued by the IJ. Asemani did not obtain a final order of removal until June 1, 2004 when he waived his hearing before the IJ and waived his appeal to the BIA. *See* 8 C.F.R. §§ 1003.39 ("Except when certified **\*376** to the Board, the decision of the Immigration Judge becomes final upon waiver of appeal or upon expiration of the time to appeal if no appeal is taken, whichever occurs first.") and 1240.14 ("The order of the immigration judge shall become final in accordance with § 1003.39 of this chapter.").

Despite the five consolidated actions Asemani currently has pending before this Court, Asemani never filed a direct appeal of his final order with this Court and never filed a habeas petition with the District Court after the final order was issued. [FN4] (Respondent Br. at 12.) ("Asemani has not only failed to exhaust his administrative remedies, he has failed to file a petition for review of the only order over which this Court could have had jurisdiction.")

> FN4. Asemani filed a "Motion to Incorporate a June 1, 2004 Final Order of Removal Against the Petitioner Into the Record." That motion, however, does not alter the procedural posture of this case. Asemani cannot cure the jurisdictional bar created by not appealing a final order of removal by asking this Court to incorporate the removal order into his previous inadequate filings. We deny this motion as moot.

We do not have jurisdiction over the habeas petition filed in the District Court and transferred to this Court in January 2004. Accordingly, the provisions of the transfer statute were not met and the District Court should have dismissed, rather than transferred, the petition. Therefore, we will transfer the petition back to the District Court with instructions to dismiss for lack of jurisdiction. [FN5]

> FN5. Because we lack jurisdiction over Asemani's petition, we refrain from considering his nationality claim. *See Firestone Tire & Rubber Co. v. Risjord,* 449 U.S. 368, 379, 101 S.Ct. 669, 66 L.Ed.2d 571 (1981) ("A court lacks discretion

to consider the merits of a case over which it is without jurisdiction...."). "Without jurisdiction [we] cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (internal quotation marks and citations omitted). We may not assume jurisdiction and proceed to the merits: "Hypothetical jurisdiction produces nothing more than a hypothetical judgment--which comes to the same thing as an advisory opinion, disapproved by this Court from the beginning." *Id.* at 101, 118 S.Ct. 1003.

III. Petitions for Review of BIA Orders

[3] We do not have jurisdiction over the petitions for review of the BIA's interlocutory orders--Case Nos. 04-1767 (appealing the BIA order on nationality), 04-1068 (appealing the order vacating the change in custody status and release and sustaining bond appeal), and 03-4059 (appealing the order granting stay of execution of the bond order)--and each should therefore be denied. As discussed, our review of BIA orders is precluded by the principles of exhaustion and finality. Accordingly, we may not review orders entered by the BIA while removal proceedings are still pending. Further, Case Nos. 04-1068 and 03-4059 should be denied because the IIRIRA specifically prohibits direct review of bond orders. *See* 8 U.S.C. § 1226(e) ("No court may set aside any action or decision by the Attorney General under this section regarding the detention or release of any alien or the grant, revocation or denial of bond or parole.").

For the foregoing reasons, the judgment of the District Court for the Eastern District of Pennsylvania entered on October 29, 2003 (Case No. 03-4434) will be affirmed. The judgment of the District Court for the Middle District of Pennsylvania entered on January 30, 2004 (Case No. 04-1268) will be vacated and the case **\*377** will be transferred back to the Middle District of Pennsylvania with instructions to dismiss. The petitions for review of the BIA orders (Case Nos. 04-1068, 03-4059, and 04-1767) will be denied.

AMBRO, Circuit Judge, Concurring.

In my estimation, we need look no farther than the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

exhaustion requirement codified at 8 U.S.C. § 1252(d)(1) to dispose of Asemani's consolidated cases. By its own terms, the Real ID Act applies to "cases in which the final administrative order of removal ... was issued *before, on or after the date of the enactment of [the Act]."* Real ID Act of 2005 § 106(b), 119 Stat. at 311 (emphasis added). As we recently explained:

In the Real ID Act ... the Congress was silent as to what was to be done with an appeal from a district court habeas decision that is now pending before a court of appeals. Despite this silence, it is readily apparent, given Congress' clear intent to have all challenges to removal orders heard in a single forum (the courts of appeals) ... that those habeas petitions that were pending before this Court on the effective date of the Real ID Act are properly converted to petitions for review and retained by this Court. We thus generally have jurisdiction to consider such a petition pursuant to section 242(a) of the INA. 8 U.S.C. § 1252(a) (1999 & Supp.2005).

*Bonhometre v. Gonzales,* 414 F.3d 442, 445-46 (3d Cir.2005). The text of the Act and our decision in *Bonhometre* teach that we are to apply the Real ID Act to Asemani's consolidated cases, treating them as a petition for review. [FN6] I disagree with my colleagues' conclusion to the contrary.

> FN6. "An order of removal made by [an] immigration judge ... shall become final," *inter alia,* "[u]pon waiver of appeal by the respondent," or "[u]pon expiration of the time allotted for an appeal if the respondent does not file an appeal within that time." 8 C.F.R. § 1241.1(b),(c). As the Government explained in its brief:
> On June 1, 2004, Asemani appeared before Immigration Judge Durling on his remanded removal proceedings. Asemani withdrew all requests for relief from removal other than his claim of United States nationality, and *was ordered removed to Iran.* A.R. 1198. Asemani waived his appeal to the BIA, *id.,* making the immigration judge's order *the final order of removal. ...* He did not file a petition for review of the immigration judge's order.
> (emphases added). We must thus treat IJ Durling's June 1, 2004 removal order as a final order of removal.

As described in the majority opinion, the Real ID Act has left no question that exhaustion of administrative remedies is a subject matter jurisdiction prerequisite to our review under 8 U.S.C. § 1252--the only review now available. Asemani clearly failed to exhaust available administrative remedies. For this reason alone, I reach the same result as that reached by my colleagues. However, I take no part in their application of pre-Real ID law (*e.g., Duvall v. Elwood,* 336 F.3d 228 (3d Cir.2003)) to this case.

140 Fed.Appx. 368

Briefs and Other Related Documents (Back to top)

. 04-1767 (Docket) (Mar. 22, 2004)

. 04-1268 (Docket) (Feb. 03, 2004)

. 04-1068 (Docket) (Jan. 09, 2004)

. 03-4434 (Docket) (Nov. 18, 2003)

. 03-4059 (Docket) (Oct. 09, 2003)

**END OF DOCUMENT**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (BALTIMORE DIVISION)

**Billy G. Asemani,**
*Pro Se* **Petitioner,**

APR 1 1 2005

**v.**                                   **Case No.: _____**

**U.S. Bureau of Immigration**
**and Customs Enforcement**
**(Baltimore Office),**
**Respondent.**

## PETITION FOR WRIT OF HABEAS CORPUS

COMES NOW, *pro se* Petitioner Billy G. Asemani ("Asemani") and files this Petition for Writ of Habeas Corpus ("Petition") as an American who is a United States "national," by Order of a federal court of competent juris-diction (*see Asemani v. Islamic Republic of Iran, et al.,* 266 F.Supp.2d 24 (D.D.C. 2003))(*"Asemani"*), **Exhibit A**. *See also United States v. Morin,* 80 F.3d 124, 126 (4th Cir. 1986). Despite the fact that Asemani has been declared to be an American, he has been ordered removed (deported) from the United States by an Immigration Court (*see* **Exhibit B**), and he remains in Respondent's custody pending his clearly-impermissible removal from the country. Habeas relief is sought to prevent such manifest injustice from taking place. Asemani, an American national, is non-deportable.    **-1-**

## JURISDICTION

This action is brought pursuant to the U.S. Constitution, Article I, Section 9, Cl. 2, and under 28 U.S.C. §2241.

## VENUE

Venue in this federal district is proper because Asemani is "in custody" of the Respondent, whose permanent location is in Baltimore, Maryland. The Respondent is Asemani's "immediate custodian" and is within the reach of this Court's service of process.

## ASEMANI'S CUSTODY STATUS

Although Asemani is not in physical detention, he satisfies federal habeas corpus statute's "in custody" prerequisite; in that, he is "at large" only by way of the Respondent's "Order of Supervision;" *see* **Exhibit C.** *See also Hensley v. Municipal Court,* **411 U.S. 345 (1973).**

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

A final order of removal has been entered against Asemani; *see* **Exhibit B**. He has no further administrative remedies available to him. The legality of Asemani's current "in custody" status may only be examined through the instant habeas corpus action.

-2-

## RELEIF SOUGHT

Neither the U.S. Code, nor the Immigration and Nationality Act, allows removal/deportation of a United States national; nor do those statutes permit placement of a U.S. national "in custody" for the purpose of his/her removal from the country.

**WHEREFORE, premises considered,** Asemani, a bona fide U.S. national, prays to this Honorable Court to issue an Order directing the Respondent to terminate Asemani's "in custody" status.

Respectfully submitted,

April 07, 2005

Billy G. Asemani, *pro se*
8559 Old Frederick Road
Ellicott City, MD 21043
(410) 615-6255

Via:  U.S.P.S. Certified Mail No.:  7004 1350 0001 3800 8774

-3-

Dbt f.!4;15.dw131: :.F,   R!!!!!Epdvn f ou2.52!!!!!Gjrhe!1: 0   /5!!!!!Qbhf !42!pg51

IMMIGRATION COURT
3400 CONCORD ROAD., SUITE 2
YORK, PA  17402

In the Matter of

Case No.: A29-973-952

*F-ASEMANI, GHAFOUR (12/2002)
    Respondent                       IN REMOVAL PROCEEDINGS

ORDER OF THE IMMIGRATION JUDGE

This is a summary of the oral decision entered on Jun 1, 2004.
This memorandum is solely for the convenience of the parties. If the
proceedings should be appealed or reopened, the oral decision will become
the official opinion in the case.
[ X ] The respondent was ordered removed from the United States to
                                             or in the alternative to
[ ] Respondent's application for voluntary departure was denied and
    respondent was ordered removed to
    alternative to
[ ] Respondent's application for voluntary departure was granted until
    upon posting a bond in the amount of $ _____
    with an alternate order of removal to
[ ] Respondent's application for asylum was ( )granted ( )denied
    ( )withdrawn.
[ X ] Respondent's application for withholding of removal was ( )granted
    ( )denied ( )withdrawn.  CAT + withdrawn
[ ] Respondent's application for cancellation of removal under section
    240A(a) was ( )granted ( )denied ( )withdrawn.
[ ] Respondent's application for cancellation of removal was ( ) granted
    under section 240A(b)(1)   ( ) granted under section 240A(b)(2)
    ( ) denied ( ) withdrawn.  If granted, it was ordered that the
    respondent be issued all appropriate documents necessary to give
    effect to this order.
[ ] Respondent's application for a waiver under section _____ of the INA was
    ( )granted ( )denied ( )withdrawn or ( )other.
[ ] Respondent's application for adjustment of status under section _____
    of the INA was ( )granted ( )denied ( )withdrawn.  If granted, it
    was ordered that respondent be issued all appropriate documents necessary
    to give effect to this order.
[ ] Respondent's status was rescinded under section 246.
[ ] Respondent is admitted to the United States as a _____ until _____.
[ ] As a condition of admission, respondent is to post a $ _____ bond.
[ ] Respondent knowingly filed a frivolous asylum application after proper
    notice.
[ ] Respondent was advised of the limitation on discretionary relief for
    failure to appear as ordered in the Immigration Judge's oral decision.
[ X ] Proceedings were terminated.
[ ] Other: Alien does not waive issue of nationality

Date:  Jun 1, 2004
Appeal: Waived/Reserved   Appeal Due By:

WALTER A. DURLING
Immigration Judge

K01

CIRCUIT COURT FOR HOWARD COUNTY
Margaret D. Rappaport
Clerk of the Circuit Court
8360 Court Avenue
Ellicott City, MD 21043-4579
(410)-313-2111, TTY for Deaf: (410)-313-3840
Civil(410)313-3844 Civ.Assign(410)313-3808 Criminal(410)313-3822


07/09/07                          Case Number: 13-K-05-045163 IN
                                  Date Filed:  08/10/2005
                                  180 Day End: 02/12/06 Text: DONE
                                  Status: Reopened/Active
                                  Judge Assigned: Leasure, Diane
                                  Arrest Tracking Numbers: 05-6080-10471-0
                                  Arrest Date: 07/09/05
                                  Location : DOC
                                  CTS Start : 08/16/05 Target : 02/12/06
State Of Maryland vs Ghafour Asemani


## C A S E    H I S T O R Y


### OTHER REFERENCE NUMBERS

| Description | Number |
| --- | --- |
| Arrest Tracking Number | 05-6080-10471-0 |
| District Court Number | 6T46479 |
| Case Folder ID | K05045163V02 |


### INVOLVED PARTIES

| Type Num Name(Last,First,Mid,Title) | Addr Str/End | Pty. Disp. Addr Update | Entered |
| --- | --- | --- | --- |
| PLT  001 State Of Maryland | | | 08/10/05 |
| | Party ID: 0000013 | | |
| Attorney: Clary, Brendan J | Appear: 08/10/2005 | | 08/10/05 |
| Office Of The State's Attorney For Howard County | | | |
| The Carroll Building | | | |
| 3450 Courthouse Drive | | | |
| Ellicott City, MD  21043 | | | |
| (410)313-2108 | | | |
| 0802830 Mayer, Stacy | Appear: 08/10/2005 | | 08/10/05 |
| Office Of The State's Attorney For Howard County | | | |
| The Carroll Building | | | |

13-K-05-045163    Date:    07/09/07    Time:  08:30                                    Page:    2

```
                 3450 Courthouse Drive
                 Ellicott City, MD   21043
                 (410)313-2108
```

Type Num  Name(Last,First,Mid,Title)           Addr Str/End              Pty. Disp.            Entered
                                                                          Addr Update
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DEF   001 Asemani, Ghafour 11/23/67                                                            08/10/05
                                                Party ID: 0187801

    Inmate Number: 339-096


    Incarceration Facility: Division Of Correction
    Inst: Division Of Correction              11/27/06                                         11/27/06 EFS
          Trans Div, 550 E Madison St
          Baltimore, MD   21202


    Mail: Division Of Correction No. 339096   06/08/07                                         06/08/07 TH
          MCI-H, D2-34, 18601 Roxbury Road
          Hagerstown, MD   21746-1000


    Attorney: 0013989 Hanson, Carol A              Appear:  08/16/2005 Removed:08/19/05        08/16/05


              0020064 Truette, W Samuel             Appear:  08/19/2005                         08/19/05
              Office Of Public Defender
              3451 Courthouse Drive
              Ellicott City, MD   21043
              (410)480-7777


              0810543 Brand, Olga                   Appear:  05/29/2007                         06/01/07
              Office Of The Public Defender
              300 W Preston Street
              Suite 213
              Baltimore, MD   21201
              (410)767-4700


VIC   001 Salmasi, Sima                                                                        08/11/06
                                                Party ID: 0212005


    Mail: 3043 Veazey Ave                     08/11/06                                         08/11/06 PJW
          Cincinnati, OH   45238



                        **CALENDAR EVENTS**


Date    Time   Fac  Event Description           Text SA  Jdg Day  Of Notice   User ID
    Result               ResultDt By Result Judge     Rec

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

09/09/05 08:45A CR1  Scheduling Conference               DOL  01 /01 08/16/05 JMS
    Held/Concluded       09/09/05 E  D.Leasure        Y
  Stenographer(s): Leslie Cale
```

13-K-05-045163    Date:   03/29/07    Time:  16:22                          Page:    3

| Date | Time | Fac | Event Description | | Text | SA | Jdg | Day | Of Notice | User ID |
|------|------|-----|------------------|---|------|-----|-----|-----|-----------|---------|
| | Result | | ResultDt | By Result Judge | | Rec | | | | |

--------------------------------------------------------------------------------

05/31/06 08:45A CR1  Criminal Jury Trial                    DOL  01 /01 12/08/05 WR  JMS
    Cancelled/Vacated    04/26/06 E

09/13/06 02:00P CR1  Sentencing Hearing                     DOL  01 /01          PJW SH
    Postponed/Reset      09/12/06 C

10/17/06 02:00P CR2  Sentencing Hearing                     DOL  01 /01 09/12/06 SH  SH
    Held/Concluded       10/18/06 E  D.Leasure       Y
Stenographer(s): Leslie Cale

02/09/07 01:30P CR1A Three Judge Panel Review               RSB  01 /01 11/27/06 EFS EFS
    Held/Concluded       02/09/07 E  R.Bernhardt     Y
Stenographer(s): Carol Vasques


## COUNTS AND SENTENCING

| Count | Ver Reas | Amd | Off/Amd Date | ATN | CJIS | Statute | Class | Disp | Disp Date | Stg | Plea | Plea Date | Vrd | Vrd Date | Judge |
|-------|----------|-----|--------------|-----|------|---------|-------|------|-----------|-----|------|-----------|-----|----------|-------|
| 01 | 0 | 0 | 07/09/05 | 05-6080-10471-0 2 | 0910 | CR.2.205 | F | NP | 04/26/06 | PH | NG | 04/26/06 | NP | 04/26/06 | DOL * |
| | | | | | | Attempted First Degree Murder | | | | | | | | | |
| 02 | 0 | 0 | 07/09/05 | 05-6080-10471-0 2 | 0920 | CR.2.206 | F | G | 04/26/06 | PH | G | 04/26/06 | G | 04/26/06 | DOL * |
| | | | | | | Attempted Second Degree Murder | | | | | | | | | |

| Jail | Life Death | Start Date | | Years | Months | Days | Hours |
|------|------------|------------|---|-------|--------|------|-------|
| | | 10/17/06 | Sentence | 30 | | | |
| | | | Suspended | | | | |
| | | | UnSuspended | 30 | | | |

    Text: Start 7/9/05No remarks.
          The defendant is eligible for parole.

| Probation | Supervised | | | | UnSupervised | | | | |
|-----------|------------|--------|------|-------|--------------|--------|------|-------|-------------------|
| | Years | Months | Days | Hours | Years | Months | Days | Hours | Supervising Agency |
| | 000 | 000 | 000 | 000 | 000 | 000 | 000 | 000 | |

Conditions

        COSTS  Court costs & OPD fee waived

--------------------------------------------------------------------------------

13-K-05-045163    Date:    07/09/07    Time:  08:30                    Page:    4

```
                    10/17/06   Sentence        30
                               Suspended
                               UnSuspended     30

        Text:  Start 7/9/05No remarks.
               The defendant is eligible for parole.
```

Probation     Supervised            UnSupervised
              Years Months Days Hours Years Months Days Hours Supervising Agency
              ----- ------ ---- ----- ----- ------ ---- ----- ------------------------------------------
               000   000  000   000    000   000  000   000

Conditions
              COSTS  Court costs & OPD fee waived

----------------------------------------------------------------------------------------------------
         Ver  Off/Amd                                        Disp          Plea        Vrd
Count Reas Amd Date     ATN        CJIS   Statute     Class Disp Date   Stg Plea Date   Vrd Date    Judge
----- ---- --- -------- ---------- ------ -----------  ----- ---- -------- --- ---- -------- --- -------- -----
 03    0    0 07/09/05 05-6080-10471-0 1 1420 CR.3.202   F    NP  04/26/06 PH  NG  04/26/06 NP 04/26/06 DOL   *
                               Assault-First Degree

                        SENTENCING NET TOTALS

        Jail            Probation       Fine and CWS

 Serve Years: 0030      Years: 0000   Total Fine Amount: 0.00
Serve Months: 000      Months: 000        Fine Due Date:
 Serve Days: 000         Days: 000          CWS Hours: 0000
 Serve Hours: 000       Hours: 000   CWS In Lieu Amount: 0.00
 Credit Days: 0000                      CWS Complete By:

                        JUDGE HISTORY

JUDGE ASSIGNED            Type Assign Date Removal RSN
............................... ---- ----------- -----------
DOL  Leasure, Diane       J   09/08/05

                        DOCUMENT TRACKING

Num/Seq Description                  Filed    Entered  Party  Jdg Ruling         Closed   User ID
------- -----------                  -------- -------- ------ --- ------------------ -------- -------
0001000 Criminal Indictment          08/10/05 08/10/05 000    TBA                04/26/06 JMS SH
```

13-K-05-045163   Date:   07/09/07   Time:  08:30                                         Page:        5

| Num/Seq | Description | Filed | Entered | Party | Jdg Ruling | Closed | User ID |
|---------|-------------|-------|---------|-------|-----------|--------|---------|
| 0002000 | Bail Bond | 08/10/05 | 08/10/05 | 000 | TBA | 04/26/06 | JMS SH |
| 0002001 | Bond Set at No Bond<br>Upon Release - Notify Court of Any Address Changes<br>No contact with Samira Salmasi<br>Follow all Court Directives<br>Not to leave State without Court Approval | 08/10/05 | 08/10/05 | 000 | DMS | 04/26/06 | JMS SH |
| 0003000 | Attorney Appearance<br>Brendan J Clary | 08/10/05 | 08/10/05 | PLT001 | TBA | 08/10/05 | JMS JMS |
| 0004000 | Attorney Appearance<br>Stacy  Mayer | 08/10/05 | 08/10/05 | PLT001 | TBA | 08/10/05 | JMS JMS |
| 0005000 | Memorandum to Judge Leasure for possible<br>assignment | 08/11/05 | 08/11/05 | 000 | TBA | 04/26/06 | SH SH |
| 0005001 | Case specially assigned to Judge Leasure | 08/11/05 | 08/11/05 | 000 | DOL | 04/26/06 | SH SH |
| 0006000 | Hearing Notice Issued | 08/11/05 | 08/11/05 | 000 | TBA | 08/11/05 | SH SH |
| 0007000 | Writ of Habeas Corpus Issued | 08/11/05 | 08/11/05 | 000 | TBA | 08/11/05 | SH SH |
| 0008000 | Defense Attorney Appearance Filed<br>Carol A Hanson | 08/16/05 | 08/16/05 | DEF001 | TBA | 08/16/05 | JMS JMS |
| 0009000 | Hearing Notice Issued | 08/16/05 | 08/16/05 | 000 | TBA | 08/16/05 | JMS JMS |
| 0010000 | Writ of Habeas Corpus Issued | 08/16/05 | 08/16/05 | 000 | TBA | 08/16/05 | JMS JMS |
| 0011000 | Appearance-Office of Public Defender | 08/16/05 | 08/16/05 | DEF001 | TBA | 08/16/05 | JMS JMS |
| 0012000 | OPD pleadings pursuant to MISC #20 | 08/16/05 | 08/16/05 | DEF001 | TBA | 04/26/06 | JMS SH |
| 0013000 | Correspondence: OPD Requests Copy of<br>Indictment | 08/16/05 | 08/16/05 | DEF001 | TBA | 04/26/06 | JMS SH |
| 0014000 | Line (re:discovery) | 08/19/05 | 08/19/05 | 000 | TBA | 04/26/06 | EFS SH |
| 0015000 | Attorney Appearance Removed<br>Carol A Hanson | 08/19/05 | 08/19/05 | DEF001 | TBA | 08/19/05 | JMS JMS |
| 0016000 | Defense Attorney Appearance Filed<br>W S Truette | 08/19/05 | 08/19/05 | DEF001 | TBA | 08/19/05 | JMS JMS |
| 0017000 | Defendant's Demand for Bill of<br>Particulars | 08/19/05 | 08/19/05 | DEF001 | TBA | 04/26/06 | JMS SH |
| 0017001 | Response-Demand for Bill of Particulars | 08/23/05 | 08/24/05 | PLT001 | TBA | 04/26/06 | PJW SH |
| 0018000 | Correspondence: Discovery | 08/31/05 | 08/31/05 | PLT001 | TBA | 04/26/06 | JMS SH |

13-K-05-045163   Date:   07/09/07   Time:   08:30                                      Page:   6

| Num/Seq Description | Filed | Entered | Party | Jdg | Ruling | Closed | User ID |
|---|---|---|---|---|---|---|---|
| 0019000 Line with attached supplemental<br>discovery letter. | 09/02/05 | 09/02/05 | 000 | | TBA | 04/26/06 | AMM SH |
| 0020000 Line with attached discovery item | 09/08/05 | 09/08/05 | PLT001 | | TBA | 04/26/06 | JMS SH |
| 0021000 Open Court Proceedings<br>Def Produced from HCD for SCHE<br>Motions set for 12/09/05 8:45 AM<br>Jury Trial set for 01/09/06 8:45 AM<br>Notice Signed<br>Keep Light for Week of 01/09/06 | 09/09/05 | 09/09/05 | 000 | | DOL | 04/26/06 | JMS SH |
| 0022000 Writ of Habeas Corpus Issued | 09/09/05 | 09/09/05 | 000 | | TBA | 09/09/05 | JMS JMS |
| 0023000 Writ of Habeas Corpus Issued | 09/09/05 | 09/09/05 | DEF001 | | TBA | 09/09/05 | JMS JMS |
| 0024000 Correspondence:<br>From: Stacy Mayer, Assistant State's Attorney<br>To: Carol A. Hanson, Equire, District Public Defender | 10/11/05 | 10/12/05 | 000 | | TBA | 04/26/06 | AMM SH |
| 0025000 Line with attached supplemental<br>discovery letter. | 11/23/05 | 11/29/05 | 000 | | TBA | 04/26/06 | AMM SH |
| 0026000 Motion for Continuance of MH 12/09/05<br>and JT 01/09/06 | 12/07/05 | 12/07/05 | DEF001 | | TBA | 04/26/06 | JMS SH |
| 0026001 Order (Granted. Court finds good cause<br>for postponment. Clerk to reset) | 12/08/05 | 12/08/05 | 000 | | DOL | 04/26/06 | WR SH |
| 0027000 Waiver of Hick's Rule | 12/07/05 | 12/07/05 | 000 | | TBA | 04/26/06 | JMS SH |
| 0028000 Line with attached discovery letter | 12/08/05 | 12/08/05 | PLT001 | | TBA | 04/26/06 | JMS SH |
| 0029000 Hearing Notice Issued | 12/08/05 | 12/08/05 | 000 | | TBA | 12/08/05 | WR |
| 0030000 Writ of Habeas Corpus Issued | 12/08/05 | 12/08/05 | 000 | | TBA | 12/08/05 | WR |
| 0031000 Hearing Notice Issued | 12/08/05 | 12/08/05 | 000 | | TBA | 12/08/05 | WR |
| 0032000 Writ of Habeas Corpus Issued | 12/08/05 | 12/08/05 | 000 | | TBA | 12/08/05 | WR |
| 0033000 Hearing Notice Issued | 12/08/05 | 12/08/05 | PLT001 | | TBA | 12/08/05 | WR |
| 0034000 Line (By agreement of counsel Motions<br>set for 4/25/06 and JT set 5/31/06) | 12/08/05 | 12/08/05 | 000 | | TBA | 04/26/06 | WR SH |
| 0035000 Line (Amended discovery letter.should<br>read pages 687-1365) | 12/09/05 | 12/09/05 | PLT001 | | TBA | 04/26/06 | EFS SH |
| 0036000 Line Re: supplemental letter | 01/11/06 | 01/11/06 | PLT001 | | TBA | 04/26/06 | PJW SH |

13-K-05-045163    Date:    07/09/07    Time:  08:30    Page:    7

| Num/Seq | Description | Filed | Entered | Party | Jdg | Ruling | Closed | User ID |
|---------|-------------|-------|---------|-------|-----|--------|--------|---------|
| 0037000 | line to attached supplemental discovery | 01/27/06 | 01/31/06 | 000 | | TBA | 04/26/06 | SMH SH |
| 0038000 | Correspondence from def attn advising that he has no motions to file. He requests that matter be removed from 2/9/06 docket. | 02/08/06 | 02/08/06 | 000 | | TBA | 04/26/06 | EFS SH |
| 0039000 | Line Re: supplemental letter | 03/10/06 | 03/14/06 | PLT001 | | TBA | 04/26/06 | PJW SH |
| 0040000 | Request for Docket Entry - forward to Clifton Hospital | 04/06/06 | 04/06/06 | 000 | | TBA | 04/06/06 | PJW |
| 0041000 | Open Court Proceedings Def not present for MH.  Def is in Perkins - reset 4/26/06 per DOL - 1st case to be called. | 04/25/06 | 04/25/06 | 000 | | DOL | 04/26/06 | SH  SH |
| 0042000 | Writ of Habeas Corpus Issued | 04/25/06 | 04/25/06 | DEF001 | | TBA | 04/25/06 | SH |
| 0043000 | Open Court Proceedings deft produced - ctp - plea plea ct 2 statement of facts guilty ct 2 & cts 1-3 np disp continued 9/13/06 notice signed no bond status will remain | 04/26/06 | 04/26/06 | 000 | | DOL | 04/26/06 | PJW SH |
| 0044000 | Writ of Habeas Corpus Issued | 04/26/06 | 04/26/06 | 000 | | TBA | 04/26/06 | PJW |
| 0045000 | Crime Victim Notification Request Form | 08/10/06 | 08/11/06 | VIC001 | | TBA | 08/11/06 | PJW PJW |
| 0046000 | Request for Docket Entry & New Address: Clifton Perkins Hospital | 08/21/06 | 08/25/06 | DEF001 | | TBA | 08/25/06 | PJW |
| 0047000 | Memorandum in Aid of Sentencing | 08/31/06 | 09/01/06 | PLT001 | | TBA | 04/26/06 | JMS SH |
| 0048000 | Motion for Continuance sent 9/13/06 Filed by Attorney: W Samuel Truette III | 09/08/06 | 09/11/06 | DEF001 | | TBA | 04/26/06 | PJW SH |
| 0048001 | Continuance granted. reset DISP 10/17/06 | 09/12/06 | 09/12/06 | 000 | | DOL | 04/26/06 | SH  SH |
| 0049000 | Hearing Notice Issued | 09/12/06 | 09/12/06 | 000 | | TBA | 09/12/06 | SH |
| 0050000 | Writ of Habeas Corpus Issued | 09/12/06 | 09/12/06 | 000 | | TBA | 09/12/06 | SH |
| 0051000 | Sentencing Memorandum | 10/16/06 | 10/16/06 | DEF001 | | TBA | 04/26/06 | SH  SH |
| 0052000 | Open Court Proceedings Def produced from CTP for DISP.  Disposition held. | 10/18/06 | 10/18/06 | 000 | | DOL | 04/26/06 | SH  SH |
| 0053000 | Commitment Record Issued Orig & TT to HCDC | 10/18/06 | 10/19/06 | 000 | | TBA | 10/19/06 | SH  SH |

13-K-05-045163   Date:   07/09/07   Time:  08:30                              Page:      8

| Num/Seq | Description | Filed | Entered | Party | Jdg | Ruling | Closed | User ID |
|---|---|---|---|---|---|---|---|---|
| 0054000 | Reopen/Modification | 10/25/06 | 10/26/06 | 000 | DOL | | | SMH SMH |
| 0055000 | Motion to Reconsider Sentence | 10/25/06 | 10/26/06 | 000 | DOL | | | SMH SMH |
| 0055001 | Order (Request to hold motion sub curia until a hearing is requested as granted | 10/26/06 | 10/26/06 | 000 | DOL | | | SMH |
| 0055002 | Answer/ State Answer to defendant's motion for modification of sentence that due to the nature of this offense. the sentence imposed was legal. fair and reasonable.  wherefore. the state most respectfully requests that the court deny the defendant's motion for modification and reduction of sentence. | 10/31/06 | 11/01/06 | PLT001 | DOL | | | SMH |
| 0056000 | Application for Review of Sentence Filed by Attorney: W Samuel Truette III | 11/02/06 | 11/03/06 | 000 | TBA | | | PJR |
| 0057000 | Ordered that Judge Bernhardt. Judge Sweeney & Judge Gelfman are appointed members of the Review Panel.  Further ordered that Judge Bernhardt be appointed Chairperson. | 11/17/06 | 11/17/06 | 000 | DOL | | 11/17/06 | SH |
| 0058000 | Ordered that Judge Becker to replace Judge Sweeney on Review Panel - Judge Sweeney has recused himself | 11/17/06 | 11/17/06 | 000 | DOL | | 11/17/06 | SH |
| 0059000 | Order (Review of Sentence scheduled 2/9/07.Clerk to issue writ.) | 11/27/06 | 11/27/06 | 000 | RSB | | 11/27/06 | EFS |
| 0060000 | Hearing Notice Issued | 11/27/06 | 11/27/06 | 000 | TBA | | 11/27/06 | EFS |
| 0061000 | Writ of Habeas Corpus Issued | 11/27/06 | 11/27/06 | 000 | TBA | | 11/27/06 | EFS |
| 0062000 | Writ of Habeas Corpus Issued | 11/27/06 | 11/27/06 | DEF001 | TBA | | 11/27/06 | EFS |
| 0063000 | Writ of Habeas Corpus Issued | 11/27/06 | 11/27/06 | DEF001 | TBA | | 11/27/06 | EFS |
| 0064000 | Writ of Habeas Corpus Issued | 12/01/06 | 12/01/06 | 000 | TBA | | 12/01/06 | SH |
| 0065000 | Notice sent to Clifton T Perkins Hospital: Attempted not known | 12/06/06 | 12/07/06 | 000 | TBA | | 12/07/06 | TH |
| 0066000 | Correspondence from Senior Assistant State's Attorney | 01/08/07 | 01/09/07 | PLT001 | TBA | | | TH |
| 0067000 | Open Court Proceedings Def produced from DOC Three judge panel review hearing held Def requests that panel review sentence/case State requests that 30 year sentence be upheld Panel holds subcuria | 02/09/07 | 02/13/07 | 000 | RSB | | | EFS |

13-K-05-045163    Date:    07/09/07    Time:  08:30                                    Page:    9

| Num/Seq | Description | Filed | Entered | Party | Jdg | Ruling | Closed | User ID |
|---------|-------------|-------|---------|-------|-----|--------|--------|---------|
| 0068000 | Order - Sentence to be unchanged and AFFIRMED<br>Judge Bernhardt - Chair<br>Judge Becker<br>Judge Gelfman | 02/16/07 | 02/16/07 | 000 | | TBA | 02/16/07 | JMS JMS |
| 0069000 | Misc Document (notice issued to DOC, returned to sender, wrong DOC number | 02/28/07 | 02/28/07 | 000 | | TBA | | SMH |
| 0070000 | Misc Document (notice issued to DOC returned to sender, wrong DOC # | 03/22/07 | 03/26/07 ) | 000 | | TBA | | SMH |
| 0071000 | Correspondence requesting transcript & copy of case history<br>copy case history send 3/30/07 | 03/29/07 | 03/29/07 | DEF001 | | TBA | | PJR |
| 0072000 | Reopen for Post-Conviction<br>Can't be Judge Leasure. She was original Trial Judge. | 04/09/07 | 04/09/07 | 000 | | TBA | | PJR |
| 0072001 | Please assign to Judge Bernhardt | 04/11/07 | 04/11/07 | 000 | | DOL | | PJR |
| 0073000 | Copy of PCON & History sent to OPD Collateral Review Division | 04/09/07 | 04/09/07 | 000 | | TBA | | PJR |
| 0074000 | Copy of PCON request sent to State | 04/11/07 | 04/11/07 | 000 | | TBA | | PJR |
| 0075000 | Hearing Notice Issued | 04/11/07 | 04/11/07 | 000 | | TBA | 04/11/07 | PJR |
| 0076000 | Writ of Habeas Corpus Issued | 04/11/07 | 04/11/07 | 000 | | TBA | 04/11/07 | PJR |
| 0077000 | Certified Mail Receipt Received<br>Office of the Public Defender<br>Collateral Review Division<br>300 W. Preston St., Ste 213<br>Baltimore, MD 21202 | 04/13/07 | 04/13/07 | 000 | | TBA | | TH |
| 0078000 | Petition for Post-Conviction Relief | 04/18/07 | 04/18/07 | DEF001 | | TBA | | JMS |
| 0078001 | State's Response to Petition for Post-Conviction Relief | 04/18/07 | 04/18/07 | PLT001 | | DOL | | JMS |
| 0079000 | Amended Petition for Post-Conviction Relief | 04/16/07 | 04/18/07 | DEF001 | | TBA | 04/18/07 | JMS |
| 0080000 | Misc Document (notice issued to DOC, returned to sender, Wrong DOC# | 04/18/07 | 04/18/07 ) | 000 | | TBA | | SMH |
| 0081000 | Motion to Retract a Claim Against Defense Counsel & Motion to Incorporate a "Legally Adequate Provocation" Analysis into the Petition | 04/23/07 | 04/24/07 | DEF001 | | TBA | | PJR |

13-K-05-045163   Date:   07/09/07   Time:   08:30                        Page:   10

| Num/Seq | Description | Filed | Entered | Party | Jdg | Ruling | Closed | User ID |
|---------|-------------|-------|---------|-------|-----|--------|--------|---------|
| 0082000 | Motion of Intention to Support Petitioner's Mental Illness Contentions by Submitting Evidence Not Currently in his Possession | 04/23/07 | 04/24/07 | DEF001 | | TBA | | PJR |
| 0083000 | Notice of Intent to Offer Evidence/Testimony at the Hearing | 04/23/07 | 04/24/07 | DEF001 | | TBA | | PJR |
| 0084000 | Motion for Leave of Court to Supplement the Petition for Post-Conviction Relief. and Motion for Disqualification of the Sentencing Judge and the Judges on the Three Judge Review Panel | 04/23/07 | 04/24/07 | DEF001 | | TBA | | PJR PJR |
| 0085000 | Order to remove Judge Bernhardt as assigned Judge and assign Judge Sweeney as permanent Judge | 04/26/07 | 04/26/07 | 000 | | DOL | 04/26/07 | PJR |
| 0086000 | Supplemental Brief in Support of Petition for Post Conviction Relief | 04/26/07 | 04/27/07 | DEF001 | | TBA | | PJR |
| 0087000 | Certified Mail Receipt Received | 04/30/07 | 04/30/07 | 000 | | TBA | | JMS |
| 0088000 | State's request for extension on filing an answer to petitioner's amended petition for post conviction relief. | 04/26/07 | 05/01/07 | PLT001 | | TBA | | EFS EFS |
| 0088001 | Order (Granted) | 05/08/07 | 05/08/07 | 000 | | DMS | | JMS |
| 0089000 | Open Court Proceedings Def produced from DOC for ARGN Change DOC inmate # to 339096 Case referred to Public Defender Clerk to contact OPD Collateral Review Collateral review to contact Def Court denied Def's appt request without Counsel Def received ATROC PCON set for 8/02/07 Notice signed Court holds file | 05/10/07 | 05/10/07 | 000 | | DOL | | PJR PJR |
| 0090000 | Hearing Notice Issued | 05/10/07 | 05/10/07 | 000 | | TBA | 05/10/07 | PJR |
| 0091000 | Writ of Habeas Corpus Issued | 05/10/07 | 05/10/07 | 000 | | TBA | 05/10/07 | PJR |
| 0092000 | Order to remove Judge Sweeney as assigned Judge and assign Judge Becker as Permanent Judge | 05/10/07 | 05/10/07 | 000 | | DOL | 05/10/07 | JMS |
| 0093000 | Correspondence to clerk re: Judge Sweeney's recusal & assignment copy of Judge Leasure's recent order assigning Judge Becker sent to def | 05/10/07 | 05/10/07 | 000 | | TBA | | PJR PJR |

28 USCA S 2241
28 U.S.C.A. § 2241

▶



This document has been updated.  Use KEYCITE.

Effective: December 30, 2005

UNITED STATES CODE ANNOTATED
United States Code Annotated Currentness
TITLE 28. JUDICIARY AND JUDICIAL PROCEDURE
Title 28. Judiciary and Judicial Procedure (Refs & Annos)
PART VI--PARTICULAR PROCEEDINGS
 Part VI. Particular Proceedings
CHAPTER 153--HABEAS CORPUS
 Chapter 153. Habeas Corpus (Refs & Annos)

§ 2241. Power to grant writ

 (a) Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions.  The order of a circuit judge shall be entered in the records of the district court of the district wherein the restraint complained of is had.

(b) The Supreme Court, any justice thereof, and any circuit judge may decline to entertain an application for a writ of habeas corpus and may transfer the application for hearing and determination to the district court having jurisdiction to entertain it.

(c) The writ of habeas corpus shall not extend to a prisoner unless--

(1) He is in custody under or by color of the authority of the United States or is committed for trial before some court thereof;  or

(2) He is in custody for an act done or omitted in pursuance of an Act of Congress, or an order, process, judgment or decree of a court or judge of the United States;  or

(3) He is in custody in violation of the Constitution or laws or treaties of the United States;  or

(4) He, being a citizen of a foreign state and domiciled therein is in custody for an act done or omitted under any alleged right, title, authority, privilege, protection, or exemption claimed under the commission, order or sanction of any foreign state, or under color thereof, the validity and effect of which depend upon the law of nations;  or

(5) It is necessary to bring him into court to testify or for trial.

(d) Where an application for a writ of habeas corpus is made by a person in custody under the judgment and sentence of a State court of a State which contains two or more Federal judicial districts, the application may be filed in the district court for the district wherein such person is in custody or in the district court for the district within which the State court was held which convicted and sentenced him and each of such district courts shall have concurrent jurisdiction to entertain the application.  The district court for the district wherein such an application is filed in the exercise of its discretion and in furtherance of justice may transfer the application to the other district court for hearing and determination.

(e) Except as provided in section 1005 of the Detainee Treatment Act of 2005, no court, justice, or judge shall have jurisdiction to hear or consider--

(1) an application for a writ of habeas corpus filed by or on behalf of an alien detained by the Department of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

28 USCA S 2241

Defense at Guantanamo Bay, Cuba;  or

(2) any other action against the United States or its agents relating to any aspect of the detention by the Department of Defense of an alien at Guantanamo Bay, Cuba, who--

(A) is currently in military custody;  or

(B) has been determined by the United States Court of Appeals for the District of Columbia Circuit in accordance with the procedures set forth in section 1005(e) of the Detainee Treatment Act of 2005 to have been properly detained as an enemy combatant.

CREDIT(S)

(June 25, 1948, c. 646, 62 Stat. 964;  May 24, 1949, c. 139, § 112, 63 Stat. 105;  Sept. 19, 1966, Pub.L. 89-590, 80 Stat. 811;  Dec. 30, 2005, Pub.L. 109-148, Div. A, Title X § 1005(e)(1), 119 Stat. 2742.)

28 U.S.C.A. § 2241, 28 USCA § 2241

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## Table of Contents for Pertinent Statutes

| Statute | Page |
| --- | --- |
| 8 U.S.C.A. § 1101(a) | a |
| Real ID Act of 2005 – Division B, Pub L. No. 109-13 | v |

**8 U.S.C.A. § 1101**
**United States Code Annotated Currentness**
**Title 8. Aliens and Nationality (Refs & Annos)**
**Chapter 12. Immigration and Nationality**
**Subchapter I. General Provisions (Refs & Annos)**

§ 1101. Definitions

(a) As used in this chapter--

(1) The term "administrator" means the official designated by the Secretary of State pursuant to section 1104(b) of this title.

(2) The term "advocates" includes, but is not limited to, advises, recommends, furthers by overt act, and admits belief in.

(3) The term "alien" means any person not a citizen or national of the United States.

(4) The term "application for admission" has reference to the application for admission into the United States and not to the application for the issuance of an immigrant or nonimmigrant visa.

(5) The term "Attorney General" means the Attorney General of the United States.

(6) The term "border crossing identification card" means a document of identity bearing that designation issued to an alien who is lawfully admitted for permanent residence, or to an alien who is a resident in foreign contiguous territory, by a consular officer or an immigration officer for the purpose of crossing over the borders between the United States and foreign contiguous territory in accordance with such conditions for its issuance and use as may be prescribed by regulations. Such regulations shall provide that (A) each such document include a biometric identifier (such as the fingerprint or handprint of the alien) that is machine readable and (B) an alien presenting a border crossing identification card is not permitted to cross over the border into the United States unless the biometric identifier contained on the card matches the appropriate biometric characteristic of the alien.

(7) The term "clerk of court" means a clerk of a naturalization court.

(8) The terms "Commissioner" and "Deputy Commissioner" mean the Commissioner of Immigration and Naturalization and a Deputy Commissioner of Immigration and Naturalization, respectively.

(9) The term "consular officer" means any consular, diplomatic, or other officer or employee of the United States designated under regulations prescribed under authority contained in this chapter, for the purpose of issuing immigrant or nonimmigrant visas or, when used in subchapter III of this chapter, for the purpose of adjudicating nationality.

a

(10) The term "crewman" means a person serving in any capacity on board a vessel or aircraft.

(11) The term "diplomatic visa" means a nonimmigrant visa bearing that title and issued to a nonimmigrant in accordance with such regulations as the Secretary of State may prescribe.

(12) The term "doctrine" includes, but is not limited to, policies, practices, purposes, aims, or procedures.

(13)(A) The terms "admission" and "admitted" mean, with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer.

(B) An alien who is paroled under section 1182(d)(5) of this title or permitted to land temporarily as an alien crewman shall not be considered to have been admitted.

(C) An alien lawfully admitted for permanent residence in the United States shall not be regarded as seeking an admission into the United States for purposes of the immigration laws unless the alien--

(i) has abandoned or relinquished that status,

(ii) has been absent from the United States for a continuous period in excess of 180 days,

(iii) has engaged in illegal activity after having departed the United States,

(iv) has departed from the United States while under legal process seeking removal of the alien from the United States, including removal proceedings under this chapter and extradition proceedings,

(v) has committed an offense identified in section 1182(a)(2) of this title, unless since such offense the alien has been granted relief under section 1182(h) or 1229b(a) of this title, or

(vi) is attempting to enter at a time or place other than as designated by immigration officers or has not been admitted to the United States after inspection and authorization by an immigration officer.

(14) The term "foreign state" includes outlying possessions of a foreign state, but self-governing dominions or territories under mandate or trusteeship shall be regarded as separate foreign states.

(15) The term "immigrant" means every alien except an alien who is within one of the following classes of nonimmigrant aliens--

(A)(i) an ambassador, public minister, or career diplomatic or consular officer who has been accredited by a foreign government, recognized de jure by the United States and who is accepted by the President or by the Secretary of State, and the members of the alien's immediate family;

b

(ii) upon a basis of reciprocity, other officials and employees who have been accredited by a foreign government recognized de jure by the United States, who are accepted by the Secretary of State, and the members of their immediate families; and

(iii) upon a basis of reciprocity, attendants, servants, personal employees, and members of their immediate families, of the officials and employees who have a nonimmigrant status under (i) and (ii) above;

(B) an alien (other than one coming for the purpose of study or of performing skilled or unskilled labor or as a representative of foreign press, radio, film, or other foreign information media coming to engage in such vocation) having a residence in a foreign country which he has no intention of abandoning and who is visiting the United States temporarily for business or temporarily for pleasure;

(C) an alien in immediate and continuous transit through the United States, or an alien who qualifies as a person entitled to pass in transit to and from the United Nations Headquarters District and foreign countries, under the provisions of paragraphs (3), (4), and (5) of section 11 of the Headquarters Agreement with the United Nations (61 Stat. 758);

(D)(i) an alien crewman serving in good faith as such in a capacity required for normal operation and service on board a vessel, as defined in section
1288(a) of this title (other than a fishing vessel having its home port or an operating base in the United States), or aircraft, who intends to land temporarily and solely in pursuit of his calling as a crewman and to depart from the United States with the vessel or aircraft on which he arrived or some other vessel or aircraft;

(ii) an alien crewman serving in good faith as such in any capacity required for normal operations and service aboard a fishing vessel having its home port or an operating base in the United States who intends to land temporarily in Guam and solely in pursuit of his calling as a crewman and to depart from Guam with the vessel on which he arrived;

(E) an alien entitled to enter the United States under and in pursuance of the provisions of a treaty of commerce and navigation between the United States and the foreign state of which he is a national, and the spouse and children of any such alien if accompanying or following to join him; (i) solely to carry on substantial trade, including trade in services or trade in technology, principally between the United States and the foreign state of which he is a national; (ii) solely to develop and direct the operations of an enterprise in which he has invested, or of an enterprise in which he is actively in the process of investing, a substantial amount of capital; or (iii) solely to perform services in a specialty occupation in the United States if the alien is
a national of the Commonwealth of Australia and with respect to whom the Secretary of Labor determines and certifies to the Secretary of Homeland Security and the Secretary of State that the intending employer has filed with the Secretary of Labor an attestation under section 1182(t)(1) of this title;

c

(F) (i) an alien having a residence in a foreign country which he has no intention of abandoning, who is a bona fide student qualified to pursue a full course of study and who seeks to enter the United States temporarily and solely for the purpose of pursuing such a course of study consistent with section 1184(l) of this title at an established college, university, seminary, conservatory, academic high school, elementary school, or other academic institution or in a language training program in the United States, particularly designated by him and approved by the Attorney General after consultation with the Secretary of Education, which institution or place of study shall have agreed to report to the Attorney General the termination of attendance of each nonimmigrant student, and if any such institution of learning or place of study fails to make reports promptly the approval shall be withdrawn, and (ii) the alien spouse and minor children of any alien described in clause (i) if accompanying or following to join such an alien, and (iii) an alien who is a national of Canada or Mexico, who maintains actual residence and place of abode in the country of nationality, who is described in clause (i) except that the alien's qualifications for and actual course of study may be full or part-time, and who commutes to the United States institution or place of study from Canada or Mexico;

(G)(i) a designated principal resident representative of a foreign government recognized de jure by the United States, which foreign government is a member of an international organization entitled to enjoy privileges, exemptions, and immunities as an international organization under the International Organizations Immunities Act (59 Stat. 669)[22 U.S.C.A. 288 et seq.], accredited resident members of the staff of such representatives, [FN1] and members of his or their immediate family;

(ii) other accredited representatives of such a foreign government to such international organizations, and the members of their immediate families;

(iii) an alien able to qualify under (i) or (ii) above except for the fact that the government of which such alien is an accredited representative is not recognized de jure by the United States, or that the government of which he is an accredited representative is not a member of such international organization; and the members of his immediate family;

(iv) officers, or employees of such international organizations, and the members of their immediate families;

(v) attendants, servants, and personal employees of any such representative, officer, or employee, and the members of the immediate families of such attendants, servants, and personal employees;

(H) an alien (i) (a) [Repealed. Pub.L. 106-95, § 2(c), Nov. 12, 1999, 113 Stat. 1316] (b) subject to section 1182(j)(2) of this title, who is coming temporarily to the United States to perform services (other than services described in subclause (a) during the period in which such subclause applies and other than services described in subclause (ii)(a) or in subparagraph (O) or (P)) in a specialty occupation described in section 1184(i)(1) of this title or as a fashion model, who meets the requirements for the occupation specified in section 1184(i)(2) of this title or, in the case of a fashion model, is of distinguished merit and ability, and with respect to whom the Secretary of Labor determines and certifies to the Attorney General that the intending employer has filed with the Secretary an application under section 1182(n)(1) of this title, or (b1) who is entitled to enter

the United States under and in pursuance of the provisions of an agreement listed in section 1184(g)(8)(A) of this title, who is engaged in a specialty occupation described in section 1184(i)(3) of this title, and with respect to whom the Secretary of Labor determines and certifies to the Secretary of Homeland Security and the Secretary of State that the intending employer has filed with the Secretary of

Labor an attestation under section 1182(t)(1) of this title, or (c) who is coming temporarily to the United States to perform services as a registered nurse, who meets the qualifications described in section 1182(m)(1) of this title, and with respect to whom the Secretary of Labor determines and certifies to the Attorney General that an unexpired attestation is on file and in effect under section 1182(m)(2) of this title for the facility (as defined in section 1182(m)(6) of this title) for which the alien will perform the services; or (ii)(a) having a residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States to perform agricultural labor or services, as defined by the Secretary of Labor in regulations and including agricultural labor defined in section 3121(g) of Title 26, agriculture as defined in section 203(f) of Title 29, and the pressing of apples for cider on a farm, of a temporary or seasonal nature, or (b) having a residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States to perform other temporary service or labor if unemployed persons capable of performing such service or labor cannot be found in this country, but this clause shall not apply to graduates of medical schools coming to the United States to perform services as members of the medical profession; or (iii) having a residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States as a trainee, other than to receive graduate medical education or training, in a training program that is not designed primarily to provide productive employment; and the alien spouse and minor children of any such alien specified in this paragraph if accompanying him or following to join him;

(I) upon a basis of reciprocity, an alien who is a bona fide representative of foreign press, radio, film, or other foreign information media, who seeks to enter the United States solely to engage in such vocation, and the spouse and children of such a representative, if accompanying or following to join him;

(J) an alien having a residence in a foreign country which he has no intention of abandoning who is a bona fide student, scholar, trainee, teacher, professor, research assistant, specialist, or leader in a field of specialized knowledge or skill, or other person of similar description, who is coming temporarily to the United States as a participant in a program designated by the Director of the United States Information Agency, for the purpose of teaching, instructing or lecturing, studying, observing, conducting research, consulting, demonstrating special skills, or receiving training and who, if he is coming to the United States to participate in a program under which he will receive graduate medical education or training, also meets the requirements of section 1182(j) of this title, and the alien spouse and minor children of

any such alien if accompanying him or following to join him;

(K) subject to subsections (d) and (p) of section 1184 of this title, an alien who--

(i) is the fiancee or fiance of a citizen of the United States and who seeks to enter the United States solely to conclude a valid marriage with the petitioner within ninety days after admission;

e

(ii) has concluded a valid marriage with a citizen of the United States who is the petitioner, is the beneficiary of a petition to accord a status under section 1151(b)(2)(A)(i) of this title that was filed under section 1154 of this title by the petitioner, and seeks to enter the United States to await the approval of such petition and the availability to the alien of an immigrant visa; or

(iii) is the minor child of an alien described in clause (i) or (ii) and is accompanying, or following to join, the alien;

(L) an alien who, within 3 years preceding the time of his application for admission into the United States, has been employed continuously for one year by a firm or corporation or other legal entity or an affiliate or subsidiary thereof and who seeks to enter the United States temporarily in order to continue to render his services to the same employer or a subsidiary or affiliate thereof in a capacity that is managerial, executive, or involves specialized knowledge, and the alien spouse and minor children of any such alien if accompanying him or following to join him;

(M) (i) an alien having a residence in a foreign country which he has no intention of abandoning who seeks to enter the United States temporarily and solely for the purpose of pursuing a full course of study at an established vocational or other recognized nonacademic institution (other than in a language training program) in the United States particularly designated by him and approved by the Attorney General, after consultation with the Secretary of Education, which institution shall have agreed to report to the Attorney General the termination of attendance of each nonimmigrant nonacademic student and if any such institution fails to make reports promptly the approval shall be withdrawn, and (ii) the alien spouse and minor children of any alien described in clause (i) if accompanying or following to join such an alien, and (iii) an alien who is a national of Canada or Mexico, who maintains actual residence and place of abode in the country of nationality, who is described in clause (i) except that the alien's course of study may be full or part-time, and who commutes to the United States institution or place of study from Canada or Mexico;

(N)(i) the parent of an alien accorded the status of special immigrant under paragraph (27)(I)(i) (or under analogous authority under paragraph (27)(L)), but only if and while the alien is a child, or

(ii) a child of such parent or of an alien accorded the status of a special immigrant under clause (ii), (iii), or (iv) of paragraph (27)(I) (or under analogous authority under paragraph (27)(L));

(O) an alien who--

(i) has extraordinary ability in the sciences, arts, education, business, or athletics which has been demonstrated by sustained national or international acclaim or, with regard to motion picture and television productions a demonstrated record of extraordinary achievement, and whose achievements have been recognized in the field through extensive documentation, and seeks to enter the United States to continue work in the area of extraordinary ability; or

f

(ii)(I) seeks to enter the United States temporarily and solely for the purpose of accompanying and assisting in the artistic or athletic performance by an alien who is admitted under clause (i) for a specific event or events,

(II) is an integral part of such actual performance,

(III) (a)has critical skills and experience with such alien which are not of a general nature and which cannot be performed by other individuals, or (b) in the case of a motion picture or television production, has skills and experience with such alien which are not of a general nature and which are
critical either based on a pre-existing longstanding working relationship or, with respect to the specific production, because significant production (including pre- and post-production work) will take place both inside and outside the United States and the continuing participation of the alien is essential to the successful completion of the production, and

(IV) has a foreign residence which the alien has no intention of abandoning; or

(iii) is the alien spouse or child of an alien described in clause (i) or (ii) and is accompanying, or following to join, the alien;

(P) an alien having a foreign residence which the alien has no intention of abandoning who--

(i) (a) is described in section 1184(c)(4)(A) of this title (relating to athletes), or (b) is described in section 1184(c)(4)(B) of this title (relating to entertainment groups);

(ii)(I) performs as an artist or entertainer, individually or as part of a group, or is an integral part of the performance of such a group, and

(II) seeks to enter the United States temporarily and solely for the purpose of performing as such an artist or entertainer or with such a group under a reciprocal exchange program which is between an organization or organizations in the United States and an organization or organizations in one or more
foreign states and which provides for the temporary exchange of artists and entertainers, or groups of artists and entertainers;

(iii)(I) performs as an artist or entertainer, individually or as part of a group, or is an integral part of the performance of such a group, and

(II) seeks to enter the United States temporarily and solely to perform, teach, or coach as such an artist or entertainer or with such a group under a commercial or noncommercial program that is culturally unique; or

(iv) is the spouse or child of an alien described in clause (i), (ii), or (iii) and is accompanying, or following to join, the alien;

(Q)(i) an alien having a residence in a foreign country which he has no intention of abandoning who is coming temporarily (for a period not to exceed 15 months) to the United States as a participant in an international cultural exchange program approved by the Secretary of Homeland Security for the purpose of providing practical training, employment, and the sharing of the history, culture, and traditions of the country of the alien's nationality and who will be employed under the same wages and working conditions as domestic workers; or (ii)(I) an alien citizen of the United Kingdom or the Republic of Ireland, 21 to 35 years of age, unemployed for not less than 12 months, and having a residence for not less than 18 months in Northern Ireland, or the counties of Louth, Monaghan, Cavan, Leitrim, Sligo, and Donegal within the Republic of Ireland, which the alien has no intention of abandoning who is coming temporarily (for a period not to exceed 24 months) to the United States as a participant in a cultural and training program approved by the Secretary of State and the Secretary of Homeland Security under section 2(a) of the Irish Peace Process Cultural and Training Program Act of 1998 for the purpose of providing practical training, employment, and the experience of coexistence and conflict resolution in a diverse society, and (II) the alien spouse and minor children of any such alien if accompanying the alien or following to join the alien;

(R) an alien, and the spouse and children of the alien if accompanying or following to join the alien, who--

(i) for the 2 years immediately preceding the time of application for admission, has been a member of a religious denomination having a bona fide nonprofit, religious organization in the United States; and

(ii) seeks to enter the United States for a period not to exceed 5 years to perform the work described in subclause (I), (II), or (III) of paragraph (27)(C)(ii);

(S) subject to section 1184(k) of this title, an alien--

(i) who the Attorney General determines--

(I) is in possession of critical reliable information concerning a criminal organization or enterprise;

(II) is willing to supply or has supplied such information to Federal or State law enforcement authorities or a Federal or State court; and

(III) whose presence in the United States the Attorney General determines is essential to the success of an authorized criminal investigation or the successful prosecution of an individual involved in the criminal organization or enterprise; or

(ii) who the Secretary of State and the Attorney General jointly determine--

(I) is in possession of critical reliable information concerning a terrorist organization, enterprise, or operation;

h

(II) is willing to supply or has supplied such information to Federal law enforcement authorities or a Federal court;

(III) will be or has been placed in danger as a result of providing such information; and

(IV) is eligible to receive a reward under section 2708(a) of Title 22,

and, if the Attorney General (or with respect to clause (ii), the Secretary of State and the Attorney General jointly) considers it to be appropriate, the spouse, married and unmarried sons and daughters, and parents of an alien described in clause (i) or (ii) if accompanying, or following to join, the alien;

(T)(i) subject to section 1184(o) of this title, an alien who the Attorney General determines--

(I) is or has been a victim of a severe form of trafficking in persons, as defined in section 7102 of Title 22,

(II) is physically present in the United States, American Samoa, or the Commonwealth of the Northern Mariana Islands, or at a port of entry thereto, on account of such trafficking,

(III)(aa) has complied with any reasonable request for assistance in the investigation or prosecution of acts of trafficking, or

(bb) has not attained 18 years of age, and

(IV) the alien would suffer extreme hardship involving unusual and severe harm upon removal; and

(ii) if the Attorney General considers it necessary to avoid extreme hardship--

(I) in the case of an alien described in clause (i) who is under 21 years of age, the spouse, children, unmarried siblings under 18 years of age on the date on which such alien applied for status under such clause, and parents of such alien; and

(II) in the case of an alien described in clause (i) who is 21 years of age or older, the spouse and children of such alien,

if accompanying, or following to join, the alien described in clause (i);

(U)(i) subject to section 1184(p) of this title, an alien who files a petition for status under this subparagraph, if the Attorney General determines that--

(I) the alien has suffered substantial physical or mental abuse as a result of having been a victim of criminal activity described in clause (iii);

(II) the alien (or in the case of an alien child under the age of 16, the parent, guardian, or next friend of the alien) possesses information concerning criminal activity described in clause (iii);

(III) the alien (or in the case of an alien child under the age of 16, the parent, guardian, or next friend of the alien) has been helpful, is being helpful, or is likely to be helpful to a Federal, State, or local law enforcement official, to a Federal, State, or local prosecutor, to a Federal or State judge, to the Service, or to other Federal, State, or local authorities investigating or prosecuting criminal activity described in clause (iii); and

(IV) the criminal activity described in clause (iii) violated the laws of the United States or occurred in the United States (including in Indian country and military installations) or the territories and possessions of the United States;

(ii) if the Attorney General considers it necessary to avoid extreme hardship to the spouse, the child, or, in the case of an alien child, the parent of the alien described in clause (i), the Attorney General may also grant status under this paragraph based upon certification of a government official listed in clause (i)(III) that an investigation or prosecution would be harmed without the assistance of the spouse, the child, or, in the case of an alien child, the parent of the alien; and

(iii) the criminal activity referred to in this clause is that involving one or more of the following or any similar activity in violation of Federal, State, or local criminal law: rape; torture; trafficking; incest; domestic violence; sexual assault; abusive sexual contact; prostitution; sexual exploitation; female genital mutilation; being held hostage; peonage; involuntary servitude; slave trade; kidnapping; abduction; unlawful criminal restraint; false imprisonment; blackmail; extortion; manslaughter; murder; felonious assault; witness tampering; obstruction of justice; perjury; or attempt, conspiracy, or solicitation to commit any of the above mentioned crimes; or

(V) subject to section 1184(q) of this title, an alien who is the beneficiary (including a child of the principal alien, if eligible to receive a visa under section 1153(d) of this title) of a petition to accord a status
under section 1153(a)(2)(A) of this title that was filed with the Attorney General under section 1154 of this title on or before December 21, 2000, if--

(i) such petition has been pending for 3 years or more; or

(ii) such petition has been approved, 3 years or more have elapsed since such filing date, and--

(I) an immigrant visa is not immediately available to the alien because of a waiting list of applicants for visas under section 1153(a)(2)(A) of this title; or

(II) the alien's application for an immigrant visa, or the alien's application for adjustment of status under section 1255 of this title, pursuant to the approval of such petition, remains pending.

j

(16) The term "immigrant visa" means an immigrant visa required by this chapter and properly issued by a consular officer at his office outside of the United States to an eligible immigrant under the provisions of this chapter.

(17) The term "immigration laws" includes this chapter and all laws, conventions, and treaties of the United States relating to the immigration, exclusion, deportation, expulsion, or removal of aliens.

(18) The term "immigration officer" means any employee or class of employees of the Service or of the United States designated by the Attorney General, individually or by regulation, to perform the functions of an immigration officer specified by this chapter or any section of this title.

(19) The term "ineligible to citizenship," when used in reference to any individual, means, notwithstanding the provisions of any treaty relating to military service, an individual who is, or was at any time permanently debarred from becoming a citizen of the United States under section 3(a) of the Selective Training and Service Act of 1940, as amended (54 Stat. 885; 55 Stat. 844), or under section 4(a) of the Selective Service Act of 1948, as amended (62 Stat. 605; 65 Stat. 76)[50 App. U.S.C.A. 454(a)], or under any section of this chapter, or any other Act, or under any law amendatory of, supplementary to, or in substitution for, any of such sections or Acts.

(20) The term "lawfully admitted for permanent residence" means the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed.

(21) The term "national" means a person owing permanent allegiance to a state.

(22) The term "national of the United States" means (A) a citizen of the United States, or (B) a person who, though not a citizen of the United States, owes permanent allegiance to the United States.

(23) The term "naturalization" means the conferring of nationality of a state upon a person after birth, by any means whatsoever.

(24) Repealed. Pub.L. 102-232, Title III, § 305(m)(1), Dec. 12, 1991, 105 Stat. 1750.

(25) The term "noncombatant service" shall not include service in which the individual is not subject to military discipline, court martial, or does not wear the uniform of any branch of the armed forces.

(26) The term "nonimmigrant visa" means a visa properly issued to an alien as an eligible nonimmigrant by a competent officer as provided in this chapter.

k

(27) The term "special immigrant" means--

(A) an immigrant, lawfully admitted for permanent residence, who is returning from a temporary visit abroad;

(B) an immigrant who was a citizen of the United States and may, under section 1435(a) or 1438 of this title, apply for reacquisition of citizenship;

(C) an immigrant, and the immigrant's spouse and children if accompanying or following to join the immigrant, who--

(i) for at least 2 years immediately preceding the time of application for admission, has been a member of a religious denomination having a bona fide nonprofit, religious organization in the United States;

(ii) seeks to enter the United States--

(I) solely for the purpose of carrying on the vocation of a minister of that religious denomination,

(II) before October 1, 2008, in order to work for the organization at the request of the organization in a professional capacity in a religious vocation or occupation, or

(III) before October 1, 2008, in order to work for the organization (or for a bona fide organization which is affiliated with the religious denomination and is exempt from taxation as an organization described in section 501(c)(3) of Title 26) at the request of the organization in a religious vocation or occupation; and

(iii) has been carrying on such vocation, professional work, or other work continuously for at least the 2-year period described in clause (i);

(D) an immigrant who is an employee, or an honorably retired former employee, of the United States Government abroad, or of the American Institute in Taiwan, and who has performed faithful service for a total of fifteen years, or more, and his accompanying spouse and children: Provided, That the principal officer of a Foreign Service establishment (or, in the case of the American Institute in Taiwan, the Director thereof), in his discretion, shall have recommended the granting of special immigrant status to such alien in exceptional circumstances and the Secretary of State approves such recommendation and finds that it is in the national interest to grant such status;

(E) an immigrant, and his accompanying spouse and children, who is or has been an employee of the Panama Canal Company or Canal Zone Government before the date on which the Panama Canal Treaty of 1977 (as described in section 3602(a)(1) of Title 22) enters into force [October 1, 1979], who was resident in the Canal Zone on the effective date of the exchange of instruments of ratification of such Treaty [April 1, 1979], and who has performed faithful service as such an employee for one year or more;

(F) an immigrant, and his accompanying spouse and children, who is a Panamanian national and (i) who, before the date on which such Panama Canal Treaty of 1977 enters into force [October 1, 1979], has been honorably retired from United States Government employment in the Canal Zone with a total of 15 years or more of faithful service, or (ii) who, on the date on which such Treaty enters into force, has been employed by the United States Government in the Canal Zone with a total of 15 years or more of faithful service and who subsequently is honorably retired from such employment or continues to be employed by the United States Government in an area of the former Canal Zone;

(G) an immigrant, and his accompanying spouse and children, who was an employee of the Panama Canal Company or Canal Zone Government on the effective date of the exchange of instruments of ratification of such Panama Canal Treaty of 1977 [April 1, 1979], who has performed faithful service for five years or more as such an employee, and whose personal safety, or the personal safety of whose spouse or children, as a direct result of such Treaty, is reasonably placed in danger because of the special nature of any of that employment;

(H) an immigrant, and his accompanying spouse and children, who--

(i) has graduated from a medical school or has qualified to practice medicine in a foreign state,

(ii) was fully and permanently licensed to practice medicine in a State on January 9, 1978, and was practicing medicine in a State on that date,

(iii) entered the United States as a nonimmigrant under subsection (a)(15)(H) or (a)(15)(J) of this section before January 10, 1978, and

(iv) has been continuously present in the United States in the practice or study of medicine since the date of such entry;

(I)(i) an immigrant who is the unmarried son or daughter of an officer or employee, or of a former officer or employee, of an international organization described in paragraph (15)(G)(i), and who (I) while maintaining the status of a nonimmigrant under paragraph (15)(G)(iv) or paragraph (15)(N), has resided and been physically present in the United States for periods totaling at least one-half of the seven years before the date of application for a visa or for adjustment of status to a status under this subparagraph and for a period or periods aggregating at least seven years between the ages of five and 21 years, and (II) applies for a visa or adjustment of status under this subparagraph no later than his twenty-fifth birthday or six months after October 24, 1988, whichever is later;

(ii) an immigrant who is the surviving spouse of a deceased officer or employee of such an international organization, and who (I) while maintaining the status of a nonimmigrant under paragraph (15)(G)(iv) or paragraph (15)(N), has resided and been physically present in the United States for periods totaling at least one-half of the seven years before the date of application for a visa or for adjustment of status to a status under this subparagraph and for a period or periods aggregating at least 15 years before the date of the death of such officer or

employee, and (II) files a petition for status under this subparagraph no later than six months after the date of such death or six months after October 24, 1988, whichever is later;

(iii) an immigrant who is a retired officer or employee of such an international organization, and who (I) while maintaining the status of a nonimmigrant under paragraph (15)(G)(iv), has resided and been physically present in the United States for periods totaling at least one-half of the seven years before the date of application for a visa or for adjustment of status to a status under this subparagraph and for a period or periods
aggregating at least 15 years before the date of the officer or employee's retirement from any such international organization, and (II) files a petition for status under this subparagraph no later than six months after the date of such retirement or six months after October 25, 1994, whichever is later; or

(iv) an immigrant who is the spouse of a retired officer or employee accorded the status of special immigrant under clause (iii), accompanying or following to join such retired officer or employee as a member of his immediate family;

(J) an immigrant who is present in the United States--

(i) who has been declared dependent on a juvenile court located in the United States or whom such a court has legally committed to, or placed under the custody of, an agency or department of a State and who has been deemed eligible by that court for long-term foster care due to abuse, neglect, or abandonment;

(ii) for whom it has been determined in administrative or judicial proceedings that it would not be in the alien's best interest to be returned to the alien's or parent's previous country of nationality or country of last habitual residence; and

(iii) in whose case the Attorney General expressly consents to the dependency order serving as a precondition to the grant of special immigrant juvenile status; except that--

(I) no juvenile court has jurisdiction to determine the custody status or
placement of an alien in the actual or constructive custody of the Attorney General unless the Attorney General specifically consents to such jurisdiction; and

(II) no natural parent or prior adoptive parent of any alien provided special immigrant status under this subparagraph shall thereafter, by virtue of such parentage, be accorded any right, privilege, or status under this chapter;

(K) an immigrant who has served honorably on active duty in the Armed Forces of the United States after October 15, 1978, and after original lawful enlistment outside the United States (under a treaty or agreement in effect on October 1, 1991) for a period or periods aggregating--

(i) 12 years and who, if separated from such service, was never separated except under honorable conditions, or

n

(ii) 6 years, in the case of an immigrant who is on active duty at the time of seeking special immigrant status under this subparagraph and who has reenlisted to incur a total active duty service obligation of at least 12 years,

and the spouse or child of any such immigrant if accompanying or following to join the immigrant, but only if the executive department under which the immigrant serves or served recommends the granting of special immigrant status to the immigrant;

(L) an immigrant who would be described in clause (i), (ii), (iii), or (iv) of subparagraph (I) if any reference in such a clause--

(i) to an international organization described in paragraph (15)(G)(i) were treated as a reference to the North Atlantic Treaty Organization (NATO);

(ii) to a nonimmigrant under paragraph (15)(G)(iv) were treated as a reference to a nonimmigrant classifiable under NATO-6 (as a member of a civilian component accompanying a force entering in accordance with the provisions of the NATO Status-of-Forces Agreement, a member of a civilian component attached to or employed by an Allied Headquarters under the "Protocol on the Status of International Military Headquarters" set up pursuant to the North Atlantic Treaty, or as a dependent); and

(iii) to the Immigration Technical Corrections Act of 1988 or to the Immigration and Nationality Technical Corrections Act of 1994 were a reference to the American Competitiveness and Workforce Improvement Act of 1998 [FN2]

(M) subject to the numerical limitations of section 1153(b)(4) of this title, an immigrant who seeks to enter the United States to work as a broadcaster in the United States for the International Broadcasting Bureau of the Broadcasting Board of Governors, or for a grantee of the Broadcasting Board of Governors, and the immigrant's accompanying spouse and children.

(28) The term "organization" means, but is not limited to, an organization, corporation, company, partnership, association, trust, foundation or fund; and includes a group of persons, whether or not incorporated, permanently or temporarily associated together with joint action on any subject or subjects.

(29) The term "outlying possessions of the United States" means American Samoa and Swains Island.

(30) The term "passport" means any travel document issued by competent authority showing the bearer's origin, identity, and nationality if any, which is valid for the admission of the bearer into a foreign country.

(31) The term "permanent" means a relationship of continuing or lasting nature, as distinguished from temporary, but a relationship may be permanent even though it is one that may be dissolved eventually at the instance either of the United States or of the individual, in accordance with law.

(32) The term "profession" shall include but not be limited to architects, engineers, lawyers, physicians, surgeons, and teachers in elementary or secondary schools, colleges, academies, or seminaries.

(33) The term "residence" means the place of general abode; the place of general abode of a person means his principal, actual dwelling place in fact, without regard to intent.

(34) The term "Service" means the Immigration and Naturalization Service of the Department of Justice.

(35) The term "spouse", "wife", or "husband" do not include a spouse, wife, or husband by reason of any marriage ceremony where the contracting parties thereto are not physically present in the presence of each other, unless the marriage shall have been consummated.

(36) The term "State" includes the District of Columbia, Puerto Rico, Guam, and the Virgin Islands of the United States.

(37) The term "totalitarian party" means an organization which advocates the establishment in the United States of a totalitarian dictatorship or totalitarianism. The terms "totalitarian dictatorship" and "totalitarianism" mean and refer to systems of government not representative in fact, characterized by (A) the existence of a single political party, organized on a dictatorial basis, with so close an identity between such party and its policies and the governmental policies of the country in which it exists, that the party and the government constitute an indistinguishable unit, and (B) the forcible suppression of opposition to such party.

(38) The term "United States", except as otherwise specifically herein provided, when used in a geographical sense, means the continental United States, Alaska, Hawaii, Puerto Rico, Guam, and the Virgin Islands of the United States.

(39) The term "unmarried", when used in reference to any individual as of any time, means an individual who at such time is not married, whether or not previously married.

(40) The term "world communism" means a revolutionary movement, the purpose of which is to establish eventually a Communist totalitarian dictatorship in any or all the countries of the world through the medium of an internationally coordinated Communist political movement.

(41) The term "graduates of a medical school" means aliens who have graduated from a medical school or who have qualified to practice medicine in a foreign state, other than such aliens who are of national or international renown in the field of medicine.

(42) The term "refugee" means (A) any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion, or (B) in such special circumstances as the President after appropriate consultation (as defined in section 1157(e) of this title) may specify, any person who is within the country of such person's nationality or, in the case of a person having no nationality, within the country in which such person is habitually residing, and who is persecuted or who has a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. The term "refugee" does not include any person who ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion. For purposes of determinations under this chapter, a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.

(43) The term "aggravated felony" means--

(A) murder, rape, or sexual abuse of a minor;

(B) illicit trafficking in a controlled substance (as defined in section 802 of Title 21), including a drug trafficking crime (as defined in section 924(c) of Title 18);

(C) illicit trafficking in firearms or destructive devices (as defined in section 921 of Title 18) or in explosive materials (as defined in section 841(c) of that title);

(D) an offense described in section 1956 of Title 18 (relating to laundering of monetary instruments) or section 1957 of that title (relating to engaging in monetary transactions in property derived from specific unlawful activity) if the amount of the funds exceeded $10,000;

(E) an offense described in--

(i) section 842(h) or (i) of Title 18, or section 844(d), (e), (f), (g), (h), or (i) of that title (relating to explosive materials offenses);

(ii) section 922(g)(1), (2), (3), (4), or (5), (j), (n), (o), (p), or (r) or 924(b) or (h) of Title 18 (relating to firearms offenses); or

(iii) section 5861 of Title 26 (relating to firearms offenses);

(F) a crime of violence (as defined in section 16 of Title 18, but not including a purely political offense) for which the term of imprisonment at [FN3] least one year;

(G) a theft offense (including receipt of stolen property) or burglary offense for which the term of imprisonment at [FN3] least one year;

(H) an offense described in section 875, 876, 877, or 1202 of Title 18 (relating to the demand for or receipt of ransom);

(I) an offense described in section 2251, 2251A, or 2252 of Title 18 (relating to child pornography);

(J) an offense described in section 1962 of Title 18 (relating to racketeer influenced corrupt organizations), or an offense described in section 1084 (if it is a second or subsequent offense) or 1955 of that title (relating to gambling offenses), for which a sentence of one year imprisonment or more may be imposed;

(K) an offense that--

(i) relates to the owning, controlling, managing, or supervising of a prostitution business;

(ii) is described in section 2421, 2422, or 2423 of Title 18 (relating to transportation for the purpose of prostitution) if committed for commercial advantage; or

(iii) is described in any of sections 1581-1585 or 1588-1591 of Title 18 (relating to peonage, slavery, involuntary servitude, and trafficking in persons);

(L) an offense described in--

(i) section 793 (relating to gathering or transmitting national defense information), 798 (relating to disclosure of classified information), 2153 (relating to sabotage) or 2381 or 2382 (relating to treason) of Title 18;

(ii) section 421 of Title 50 (relating to protecting the identity of undercover intelligence agents); or

(iii) section 421 of Title 50 (relating to protecting the identity of undercover agents);

(M) an offense that--

(i) involves fraud or deceit in which the loss to the victim or victims exceeds $10,000; or

(ii) is described in section 7201 of Title 26 (relating to tax evasion) in which the revenue loss to the Government exceeds $10,000;

r

(N) an offense described in paragraph (1)(A) or (2) of section 1324(a) of this title (relating to alien smuggling), except in the case of a first offense for which the alien has affirmatively shown that the alien committed the offense for the purpose of assisting, abetting, or aiding only the alien's spouse, child, or parent (and no other individual) to violate a provision of this chapter [FN4]

(O) an offense described in section 1325(a) or 1326 of this title committed by an alien who was previously deported on the basis of a conviction for an offense described in another subparagraph of this paragraph;

(P) an offense (i) which either is falsely making, forging, counterfeiting, mutilating, or altering a passport or instrument in violation of section 1543 of Title 18 or is described in section 1546(a) of such title (relating to document fraud) and (ii) for which the term of imprisonment is at least 12 months, except in the case of a first offense for which the alien has affirmatively shown that the alien committed the offense for the purpose of assisting, abetting, or aiding only the alien's spouse, child, or parent (and no other individual) to violate a provision of this chapter;

(Q) an offense relating to a failure to appear by a defendant for service of sentence if the underlying offense is punishable by imprisonment for a term of 5 years or more;

(R) an offense relating to commercial bribery, counterfeiting, forgery, or trafficking in vehicles the identification numbers of which have been altered for which the term of imprisonment is at least one year;

(S) an offense relating to obstruction of justice, perjury or subornation of perjury, or bribery of a witness, for which the term of imprisonment is at least one year;

(T) an offense relating to a failure to appear before a court pursuant to a court order to answer to or dispose of a charge of a felony for which a sentence of 2 years' imprisonment or more may be imposed; and

(U) an attempt or conspiracy to commit an offense described in this paragraph.

The term applies to an offense described in this paragraph whether in violation of Federal or State law and applies to such an offense in violation of the law of a foreign country for which the term of imprisonment was completed within the previous 15 years. Notwithstanding any other provision of law (including any effective date), the term applies regardless of whether the conviction was entered before, on, or after September 30, 1996.

(44)(A) The term "managerial capacity" means an assignment within an organization in which the employee primarily--

(i) manages the organization, or a department, subdivision, function, or component of the organization;

(ii) supervises and controls the work of other supervisory, professional, or managerial employees, or manages an essential function within the organization, or a department or subdivision of the organization;

(iii) if another employee or other employees are directly supervised, has the authority to hire and fire or recommend those as well as other personnel actions (such as promotion and leave authorization) or, if no other employee is directly supervised, functions at a senior level within the organizational hierarchy or with respect to the function managed; and

(iv) exercises discretion over the day-to-day operations of the activity or function for which the employee has authority.


A first-line supervisor is not considered to be acting in a managerial capacity merely by virtue of the supervisor's supervisory duties unless the employees supervised are professional.

(B) The term "executive capacity" means an assignment within an organization in which the employee primarily--

(i) directs the management of the organization or a major component or function of the organization;

(ii) establishes the goals and policies of the organization, component, or function;

(iii) exercises wide latitude in discretionary decision-making; and

(iv) receives only general supervision or direction from higher level executives, the board of directors, or stockholders of the organization.

(C) If staffing levels are used as a factor in determining whether an individual is acting in a managerial or executive capacity, the Attorney General shall take into account the reasonable needs of the organization, component, or function in light of the overall purpose and stage of development of the organization, component, or function. An individual shall not be considered to be acting in a managerial or executive capacity (as previously defined) merely on the basis of the number of employees that the individual supervises or has supervised or directs or has directed.

(45) The term "substantial" means, for purposes of paragraph (15)(E) with reference to trade or capital, such an amount of trade or capital as is established by the Secretary of State, after consultation with appropriate agencies of Government.

t

(46) The term "extraordinary ability" means, for purposes of subsection (a)(15)(O)(i) of this section, in the case of the arts, distinction.

(47)(A) The term "order of deportation" means the order of the special inquiry officer, or other such administrative officer to whom the Attorney General has delegated the responsibility for determining whether an alien is deportable, concluding that the alien is deportable or ordering deportation.

(B) The order described under subparagraph (A) shall become final upon the earlier of--

(i) a determination by the Board of Immigration Appeals affirming such order; or

(ii) the expiration of the period in which the alien is permitted to seek review of such order by the Board of Immigration Appeals.

(48)(A) The term "conviction" means, with respect to an alien, a formal
judgment of guilt of the alien entered by a court or, if adjudication of guilt has been withheld, where--

(i) a judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt, and

(ii) the judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed.

(B) Any reference to a term of imprisonment or a sentence with respect to an offense is deemed to include the period of incarceration or confinement ordered by a court of law regardless of any suspension of the imposition or execution of that imprisonment or sentence in whole or in part.

(49) The term "stowaway" means any alien who obtains transportation without the consent of the owner, charterer, master or person in command of any vessel or aircraft through concealment aboard such vessel or aircraft. A passenger who boards with a valid ticket is not to be considered a stowaway.

(50) The term "intended spouse" means any alien who meets the criteria set forth in section 1154(a)(1)(A)(iii)(II)(aa)(BB), 1154(a)(1)(B)(ii)(II)(aa)(BB), or 1229b(b)(2)(A)(i)(III) of this title.

u

**PL 109-13 (HR 1268)**
**May 11, 2005**
**EMERGENCY SUPPLEMENTAL APPROPRIATIONS ACT FOR DEFENSE, THE**
**GLOBAL WAR ON TERROR, AND TSUNAMI RELIEF, 2005**

**DIVISION B--REAL ID ACT OF 2005**

<< 8 USCA § 1101 NOTE >>

SECTION 1. SHORT TITLE.

This division may be cited as the "REAL ID Act of 2005".

TITLE I--AMENDMENTS TO FEDERAL LAWS TO PROTECT AGAINST TERRORIST
ENTRY

SEC. 101. PREVENTING TERRORISTS FROM OBTAINING RELIEF FROM REMOVAL.

<< 8 USCA § 1158 >>

(a) CONDITIONS FOR GRANTING ASYLUM.--Section 208(b)(1) of the Immigration and
Nationality Act (8 U.S.C. 1158(b)(1)) is amended--
(1) by striking "The Attorney General" the first place such term appears and inserting the
following:
"(A) ELIGIBILITY.--The Secretary of Homeland Security or the Attorney General";

<< 8 USCA § 1158 >>

*303 (2) by striking "the Attorney General" the second and third places such term appears and
inserting "the Secretary of Homeland Security or the Attorney General"; and

<< 8 USCA § 1158 >>

(3) by adding at the end the following:
"(B) BURDEN OF PROOF.--
"(i) IN GENERAL.--The burden of proof is on the applicant to establish that the applicant is a
refugee, within the meaning of section 101(a)(42)(A). To establish that the applicant is a refugee
within the meaning of such section, the applicant must establish that race, religion, nationality,
membership in a particular social group, or political opinion was or will be at least one central
reason for persecuting the applicant.
"(ii) SUSTAINING BURDEN.--The testimony of the applicant may be sufficient to sustain the
applicant's burden without corroboration, but only if the applicant satisfies the trier of fact that
the applicant's testimony is credible, is persuasive, and refers to specific facts sufficient to
demonstrate that the applicant is a refugee. In determining whether the applicant has met the
applicant's burden, the trier of fact may weigh the credible testimony along with other evidence
of record. Where the trier of fact determines that the applicant should provide evidence that

v

corroborates otherwise credible testimony, such evidence must be provided unless the applicant does not have the evidence and cannot reasonably obtain the evidence.

"(iii) CREDIBILITY DETERMINATION.--Considering the totality of the circumstances, and all relevant factors, a trier of fact may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor. There is no presumption of credibility, however, if no adverse credibility determination is explicitly made, the applicant or witness shall have a rebuttable presumption of credibility on appeal.".

<< 8 USCA § 1158 >>

(b) EXCEPTIONS TO ELIGIBILITY FOR ASYLUM.--Section 208(b)(2)(A)(v) of the Immigration and Nationality Act (8 U.S.C. 1158(b)(2)(A)(v)) is amended--
(1) by striking "inadmissible under" each place such term appears and inserting "described in"; and
(2) by striking "removable under".

<< 8 USCA § 1231 >>

(c) WITHHOLDING OF REMOVAL.--Section 241(b)(3) of the Immigration and Nationality Act (8 U.S.C. 1231(b)(3)) is amended by adding at the end the following:

*304
"(C) SUSTAINING BURDEN OF PROOF; CREDIBILITY DETERMINATIONS.--In determining whether an alien has demonstrated that the alien's life or freedom would be threatened for a reason described in subparagraph (A), the trier of fact shall determine whether the alien has sustained the alien's burden of proof, and shall make credibility determinations, in the manner described in clauses (ii) and (iii) of section 208(b)(1)(B).".

<< 8 USCA § 1229a >>

(d) OTHER REQUESTS FOR RELIEF FROM REMOVAL.--Section 240(c) of the Immigration and Nationality Act (8 U.S.C. 1230(c)) is amended--
(1) by redesignating paragraphs (4), (5), and (6) as paragraphs (5), (6), and (7), respectively; and
(2) by inserting after paragraph (3) the following:
"(4) APPLICATIONS FOR RELIEF FROM REMOVAL.--
"(A) IN GENERAL.--An alien applying for relief or protection from removal has the burden of proof to establish that the alien--
"(i) satisfies the applicable eligibility requirements; and

"(ii) with respect to any form of relief that is granted in the exercise of discretion, that the alien merits a favorable exercise of discretion.

"(B) SUSTAINING BURDEN.--The applicant must comply with the applicable requirements to submit information or documentation in support of the applicant's application for relief or protection as provided by law or by regulation or in the instructions for the application form. In evaluating the testimony of the applicant or other witness in support of the application, the immigration judge will determine whether or not the testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant has satisfied the applicant's burden of proof. In determining whether the applicant has met such burden, the immigration judge shall weigh the credible testimony along with other evidence of record. Where the immigration judge determines that the applicant should provide evidence which corroborates otherwise credible testimony, such evidence must be provided unless the applicant demonstrates that the applicant does not have the evidence and cannot reasonably obtain the evidence.

"(C) CREDIBILITY DETERMINATION.--Considering the totality of the circumstances, and all relevant factors, the immigration judge may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor. There is no presumption of *305 credibility, however, if no adverse credibility determination is explicitly made, the applicant or witness shall have a rebuttable presumption of credibility on appeal.".

<< 8 USCA § 1252 >>

(e) STANDARD OF REVIEW FOR ORDERS OF REMOVAL.--Section 242(b)(4) of the Immigration and Nationality Act (8 U.S.C. 1252(b)(4)) is amended by adding at the end, after subparagraph (D), the following: "No court shall reverse a determination made by a trier of fact with respect to the availability of corroborating evidence, as described in section 208(b)(1)(B), 240(c)(4)(B), or 241(b)(3)(C), unless the court finds, pursuant to section 242(b)(4)(B), that a reasonable trier of fact is compelled to conclude that such corroborating evidence is unavailable.".

<< 8 USCA § 1252 >>

(f) CLARIFICATION OF DISCRETION.--Section 242(a)(2)(B) of the Immigration and Nationality Act (8 U.S.C. 1252(a)(2)(B)) is amended--
(1) by inserting "or the Secretary of Homeland Security" after "Attorney General" each place such term appears; and
(2) in the matter preceding clause (i), by inserting "and regardless of whether the judgment, decision, or action is made in removal proceedings," after "other provision of law,".
(g) REMOVAL OF CAPS.--

(1) ASYLEES.--Section 209 of the Immigration and Nationality Act (8 U.S.C.1159) is amended-
-

<< 8 USCA § 1159 >>

(A) in subsection (a)(1)--
(i) by striking "Service" and inserting "Department of Homeland Security"; and
(ii) by striking "Attorney General" each place such term appears and inserting "Secretary of Homeland Security or the Attorney General";

<< 8 USCA § 1159 >>

(B) in subsection (b)--
(i) by striking "Not more" and all that follows through "asylum who--" and inserting "The Secretary of Homeland Security or the Attorney General, in the Secretary's or the Attorney General's discretion and under such regulations as the Secretary or the Attorney General may prescribe, may adjust to the status of an alien lawfully admitted for permanent residence the status of any alien granted asylum who--"; and
(ii) in the matter following paragraph (5), by striking "Attorney General" and inserting "Secretary of Homeland Security or the Attorney General"; and

<< 8 USCA § 1159 >>

(C) in subsection (c), by striking "Attorney General" and inserting "Secretary of Homeland Security or the Attorney General".

<< 8 USCA § 1157 >>

(2) PERSONS RESISTING COERCIVE POPULATION CONTROL METHODS.--Section 207(a) of the Immigration and Nationality Act (8 U.S.C. 1157(a)) is amended by striking paragraph (5).
(h) EFFECTIVE DATES.--

<< 8 USCA § 1158 NOTE >>

(1) The amendments made by paragraphs (1) and (2) of subsection (a) shall take effect as if enacted on March 1, 2003.

<< 8 USCA § 1158 NOTE >>

(2) The amendments made by subsections (a)(3), (b), (c), and (d) shall take effect on the date of the enactment of this division and shall apply to applications for asylum, withholding, or other relief from removal made on or after such date.

<< 8 USCA § 1252 NOTE >>

y

(3) The amendment made by subsection (e) shall take effect on the date of the enactment of this division and shall apply *306 to all cases in which the final administrative removal order is or was issued before, on, or after such date.

<< 8 USCA § 1252 NOTE >>

(4) The amendments made by subsection (f) shall take effect on the date of the enactment of this division and shall apply to all cases pending before any court on or after such date.

<< 8 USCA § 1157 NOTE >>

(5) The amendments made by subsection (g) shall take effect on the date of the enactment of this division.
(i) REPEAL.--Section 5403 of the Intelligence Reform and Terrorism Prevention Act of 2004 (Public Law 108-458) is repealed.

<< 8 USCA § 1103 NOTE >>

SEC. 102. WAIVER OF LEGAL REQUIREMENTS NECESSARY FOR IMPROVEMENT OF BARRIERS AT BORDERS; FEDERAL COURT REVIEW.

Section 102(c) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1103 note) is amended to read as follows:
"(c) WAIVER.--
"(1) IN GENERAL.--Notwithstanding any other provision of law, the Secretary of Homeland Security shall have the authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section. Any such decision by the Secretary shall be effective upon being published in the Federal Register.
"(2) FEDERAL COURT REVIEW.--
"(A) IN GENERAL.--The district courts of the United States shall have exclusive jurisdiction to hear all causes or claims arising from any action undertaken, or any decision made, by the Secretary of Homeland Security pursuant to paragraph (1). A cause of action or claim may only be brought alleging a violation of the Constitution of the United States. The court shall not have jurisdiction to hear any claim not specified in this subparagraph.
"(B) TIME FOR FILING OF COMPLAINT.--Any cause or claim brought pursuant to subparagraph (A) shall be filed not later than 60 days after the date of the action or decision made by the Secretary of Homeland Security. A claim shall be barred unless it is filed within the time specified.
"(C) ABILITY TO SEEK APPELLATE REVIEW.--An interlocutory or final judgment, decree, or order of the district court may be reviewed only upon petition for a writ of certiorari to the Supreme Court of the United States.".

SEC. 103. INADMISSIBILITY DUE TO TERRORIST AND TERRORIST-RELATED ACTIVITIES.

<< 8 USCA § 1182 >>

(a) IN GENERAL.--So much of section 212(a)(3)(B)(i) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(B)(i)) as precedes the final sentence is amended to read as follows:
"(i) IN GENERAL.--Any alien who--
"(I) has engaged in a terrorist activity;
"(II) a consular officer, the Attorney General, or the Secretary of Homeland Security knows, or has reasonable ground to believe, is engaged in or is likely to engage after entry in any terrorist activity (as defined in clause (iv));
*307 "(III) has, under circumstances indicating an intention to cause death or serious bodily harm, incited terrorist activity;
"(IV) is a representative (as defined in clause (v)) of--
"(aa) a terrorist organization (as defined in clause (vi)); or
"(bb) a political, social, or other group that endorses or espouses terrorist activity;
"(V) is a member of a terrorist organization described in subclause (I) or (II) of clause (vi);
"(VI) is a member of a terrorist organization described in clause (vi)(III), unless the alien can demonstrate by clear and convincing evidence that the alien did not know, and should not reasonably have known, that the organization was a terrorist organization;
"(VII) endorses or espouses terrorist activity or persuades others to endorse or espouse terrorist activity or support a terrorist organization;
"(VIII) has received military-type training (as defined in section 2339D(c)(1) of title 18, United States Code) from or on behalf of any organization that, at the time the training was received, was a terrorist organization (as defined in clause (vi)); or

"(IX) is the spouse or child of an alien who is inadmissible under this subparagraph, if the activity causing the alien to be found inadmissible occurred within the last 5 years, is inadmissible.".

<< 8 USCA § 1182 >>

(b) ENGAGE IN TERRORIST ACTIVITY DEFINED.--Section 212(a)(3)(B)(iv) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(B)(iv)) is amended to read as follows:
"(iv) ENGAGE IN TERRORIST ACTIVITY DEFINED.--As used in this Act, the term 'engage in terrorist activity' means, in an individual capacity or as a member of an organization--
"(I) to commit or to incite to commit, under circumstances indicating an intention to cause death or serious bodily injury, a terrorist activity;
"(II) to prepare or plan a terrorist activity;
"(III) to gather information on potential targets for terrorist activity;
"(IV) to solicit funds or other things of value for--
"(aa) a terrorist activity;
"(bb) a terrorist organization described in clause (vi)(I) or (vi)(II); or
"(cc) a terrorist organization described in clause (vi)(III), unless the solicitor can demonstrate by clear and convincing evidence that he did not know, and should not reasonably have known, that the organization was a terrorist organization;
"(V) to solicit any individual--
"(aa) to engage in conduct otherwise described in this subsection;



*308 "(bb) for membership in a terrorist organization described in clause (vi)(I) or (vi)(II); or

"(cc) for membership in a terrorist organization described in clause (vi)(III) unless the solicitor can demonstrate by clear and convincing evidence that he did not know, and should not reasonably have known, that the organization was a terrorist organization; or

"(VI) to commit an act that the actor knows, or reasonably should know, affords material support, including a safe house, transportation, communications, funds, transfer of funds or other material financial benefit, false documentation or identification, weapons (including chemical, biological, or radiological weapons), explosives, or training--

"(aa) for the commission of a terrorist activity;

"(bb) to any individual who the actor knows, or reasonably should know, has committed or plans to commit a terrorist activity;

"(cc) to a terrorist organization described in subclause (I) or (II) of clause (vi) or to any member of such an organization; or

"(dd) to a terrorist organization described in clause (vi)(III), or to any member of such an organization, unless the actor can demonstrate by clear and convincing evidence that the actor did not know, and should not reasonably have known, that the organization was a terrorist organization.".

<< 8 USCA § 1182 >>

(c) TERRORIST ORGANIZATION DEFINED.--Section 212(a)(3)(B)(vi) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(B)(vi)) is amended to read as follows:

"(vi) TERRORIST ORGANIZATION DEFINED.--As used in this section, the term 'terrorist organization' means an organization--

"(I) designated under section 219;

"(II) otherwise designated, upon publication in the Federal Register, by the Secretary of State in consultation with or upon the request of the Attorney General or the Secretary of Homeland Security, as a terrorist organization, after finding that the organization engages in the activities described in subclauses (I) through (VI) of clause (iv); or

"(III) that is a group of two or more individuals, whether organized or not, which engages in, or has a subgroup which engages in, the activities described in subclauses (I) through (VI) of clause (iv).".

<< 8 USCA § 1182 NOTE >>

(d) EFFECTIVE DATE.--The amendments made by this section shall take effect on the date of the enactment of this division, and these amendments, and section 212(a)(3)(B) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(B)), as amended by this section, shall apply to--

*309 (1) removal proceedings instituted before, on, or after the date of the enactment of this division; and

(2) acts and conditions constituting a ground for inadmissibility, excludability, deportation, or removal occurring or existing before, on, or after such date.

SEC. 104. WAIVER FOR CERTAIN GROUNDS OF INADMISSIBILITY.

Section 212(d)(3) of the Immigration and Nationality Act (8 U.S.C. 1182(d)(3)) is amended--

<< 8 USCA § 1182 >>

(1) by striking "(3)" and inserting "(3)(A)";

<< 8 USCA § 1182 >>

(2) by striking "alien (A)" and inserting "alien (i)";

<< 8 USCA § 1182 >>

(3) by striking "or (B)" and inserting "or (ii)"; and

<< 8 USCA § 1182 >>

(4) by adding at the end the following:
"(B)(i) The Secretary of State, after consultation with the Attorney General and the Secretary of Homeland Security, or the Secretary of Homeland Security, after consultation with the Secretary of State and the Attorney General, may conclude in such Secretary's sole unreviewable discretion that subsection (a)(3)(B)(i)(IV)(bb) or (a)(3)(B)(i)(VII) shall not apply to an alien, that subsection (a)(3)(B)(iv)(VI) shall not apply with respect to any material support an alien afforded to an organization or individual that has engaged in a terrorist activity, or that subsection (a)(3)(B)(vi)(III) shall not apply to a group solely by virtue of having a subgroup within the scope of that subsection. The Secretary of State may not, however, exercise discretion under this clause with respect to an alien once removal proceedings against the alien are instituted under section 240.
"(ii) Not later than 90 days after the end of each fiscal year, the Secretary of State and the Secretary of Homeland Security shall each provide to the Committees on the Judiciary of the House of Representatives and of the Senate, the Committee on International Relations of the House of Representatives, the Committee on Foreign Relations of the Senate, and the Committee on Homeland Security of the House of Representatives a report on the aliens to whom such Secretary has applied clause (i). Within one week of applying clause (i) to a group, the Secretary of State or the Secretary of Homeland Security shall provide a report to such Committees.".

SEC. 105. REMOVAL OF TERRORISTS.

(a) IN GENERAL.--

<< 8 USCA § 1227 >>

(1) IN GENERAL.--Section 237(a)(4)(B) of the Immigration and Nationality Act (8 U.S.C. 1227(a)(4)(B)) is amended to read as follows:
"(B) TERRORIST ACTIVITIES.--Any alien who is described in subparagraph (B) or (F) of section 212(a)(3) is deportable.".

cc

<< 8 USCA § 1227 NOTE >>

(2) EFFECTIVE DATE.--The amendment made by paragraph (1) shall take effect on the date of the enactment of this division, and the amendment, and section 237(a)(4)(B) of the Immigration and Nationality Act (8 U.S.C. 1227(a)(4)(B)), as amended by such paragraph, shall apply to--
(A) removal proceedings instituted before, on, or after the date of the enactment of this division; and
(B) acts and conditions constituting a ground for inadmissibility, excludability, deportation, or removal occurring or existing before, on, or after such date.

*310

<< 8 USCA § 1227 NOTE >>

<< 8 USCA § 1227 >>

(b) REPEAL.--Effective as of the date of the enactment of the Intelligence Reform and Terrorism Prevention Act of 2004 (Public Law 108-458), section 5402 of such Act is repealed, and the Immigration and Nationality Act shall be applied as if such section had not been enacted.

SEC. 106. JUDICIAL REVIEW OF ORDERS OF REMOVAL.

(a) IN GENERAL.--Section 242 of the Immigration and Nationality Act (8 U.S.C. 1252) is amended--
(1) in subsection (a)--

<< 8 USCA § 1252 >>

(A) in paragraph (2)--
(i) in subparagraph (A), by inserting "(statutory or nonstatutory), including section 2241 of title 28, United States Code, or any other habeas corpus provision, and sections 1361 and 1651 of such title" after "Notwithstanding any other provision of law";

<< 8 USCA § 1252 >>

(ii) in each of subparagraphs (B) and (C), by inserting "(statutory or nonstatutory), including section 2241 of title 28, United States Code, or any other habeas corpus provision, and sections 1361 and 1651 of such title, and except as provided in subparagraph (D)" after "Notwithstanding any other provision of law"; and
(iii) by adding at the end the following:

<< 8 USCA § 1252 >>

"(D) JUDICIAL REVIEW OF CERTAIN LEGAL CLAIMS.--Nothing in subparagraph (B) or (C), or in any other provision of this Act (other than this section) which limits or eliminates

judicial review, shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals in accordance with this section."; and
(B) by adding at the end the following:

<< 8 USCA § 1252 >>

"(4) CLAIMS UNDER THE UNITED NATIONS CONVENTION.--Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, United States Code, or any other habeas corpus provision, and sections 1361 and 1651 of such title, a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of any cause or claim under the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman, or Degrading Treatment or Punishment, except as provided in subsection (e).

<< 8 USCA § 1252 >>

"(5) EXCLUSIVE MEANS OF REVIEW.--Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, United States Code, or any other habeas corpus provision, and sections 1361 and 1651 of such title, a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this Act, except as provided in subsection (e). For purposes of this Act, in every provision that limits or eliminates judicial review or jurisdiction to review, the terms 'judicial review' and 'jurisdiction to review' include habeas corpus review pursuant to section 2241 of title 28, United States Code, or any other habeas corpus provision, *311 sections 1361 and 1651 of such title, and review pursuant to any other provision of law (statutory or nonstatutory).";

<< 8 USCA § 1252 >>

(2) in subsection (b)(9), by adding at the end the following: "Except as otherwise provided in this section, no court shall have jurisdiction, by habeas corpus under section 2241 of title 28, United States Code, or any other habeas corpus provision, by section 1361 or 1651 of such title, or by any other provision of law (statutory or nonstatutory), to review such an order or such questions of law or fact."; and

<< 8 USCA § 1252 >>

(3) in subsection (g), by inserting "(statutory or nonstatutory), including section 2241 of title 28, United States Code, or any other habeas corpus provision, and sections 1361 and 1651 of such title" after "notwithstanding any other provision of law".

<< 8 USCA § 1252 NOTE >>

(b) EFFECTIVE DATE.--The amendments made by subsection (a) shall take effect upon the date of the enactment of this division and shall apply to cases in which the final administrative

ee

order of removal, deportation, or exclusion was issued before, on, or after the date of the enactment of this division.

<< 8 USCA § 1252 NOTE >>

(c) TRANSFER OF CASES.--If an alien's case, brought under section 2241 of title 28, United States Code, and challenging a final administrative order of removal, deportation, or exclusion, is pending in a district court on the date of the enactment of this division, then the district court shall transfer the case (or the part of the case that challenges the order of removal, deportation, or exclusion) to the court of appeals for the circuit in which a petition for review could have been properly filed under section 242(b)(2) of the Immigration and Nationality Act (8 U.S.C. 1252), as amended by this section, or under section 309(c)(4)(D) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1101 note). The court of appeals shall treat the transferred case as if it had been filed pursuant to a petition for review under such section 242, except that subsection (b)(1) of such section shall not apply.

<< 8 USCA § 1252 NOTE >>

(d) TRANSITIONAL RULE CASES.--A petition for review filed under former section 106(a) of the Immigration and Nationality Act (as in effect before its repeal by section 306(b) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1252 note)) shall be treated as if it had been filed as a petition for review under section 242 of the Immigration and Nationality Act (8 U.S.C. 1252), as amended by this section. Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, United States Code, or any other habeas corpus provision, and sections 1361 and 1651 of such title, such petition for review shall be the sole and exclusive means for judicial review of an order of deportation or exclusion.

124 S.Ct. 2711                                                                                    Page 1
542 U.S. 426, 124 S.Ct. 2711, 159 L.Ed.2d 513, 72 USLW 4584, 04 Cal. Daily Op. Serv. 5701, 2004 Daily Journal
D.A.R. 7765, 17 Fla. L. Weekly Fed. S 466
**(Cite as: 542 U.S. 426, 124 S.Ct. 2711)**

▷

Supreme Court of the United States
Donald H. RUMSFELD, Secretary of Defense,
Petitioner,
v.
Jose PADILLA and Donna R. Newman, as next
friend of Jose Padilla.
**No. 03-1027.**

Argued April 28, 2004.
Decided June 28, 2004.

**Background:** Prisoner, a United States citizen, filed petition for writ of habeas corpus, challenging his detention as "enemy combatant." The United States District Court for the Southern District of New York, Michael B. Mukasey, Chief Judge, denied Government's motion to dismiss, ruling that Secretary of Defense was proper respondent and that court could assert jurisdiction over Secretary, but, on the merits, ruled that the President had authority to detain prisoner, 233 F.Supp.2d 564. Thereafter, the Court denied motion for reconsideration, 243 F.Supp.2d 42, and granted parties' application to have orders certified for interlocutory review, 256 F.Supp.2d 218. The United States Court of Appeals for the Second Circuit, 352 F.3d 695, affirmed determinations that Secretary was proper respondent and that district court had jurisdiction, but reversed on the merits. Certiorari was granted.

**Holdings:** The Supreme Court, Chief Justice Rehnquist, held that:
(1) commander of naval brig where prisoner was detained was only proper respondent, and
(2) district court did not have jurisdiction over commander.
Reversed and remanded.

Justice Kennedy filed concurring opinion in which Justice O'Connor joined.

Justice Stevens filed dissenting opinion in which Justices Souter, Ginsburg and Breyer joined.

West Headnotes

**[1] Habeas Corpus** ⚖️**662.1**
197k662.1 Most Cited Cases
There is generally only one proper respondent to

prisoner's habeas petition; this custodian is "the person" with ability to produce prisoner's body before habeas court. 28 U.S.C.A. § 2242.

**[2] Habeas Corpus** ⚖️**662.1**
197k662.1 Most Cited Cases
In habeas challenges to present physical confinement, default rule is that proper respondent is warden of facility where prisoner is being held, not Attorney General or some other remote supervisory official. 28 U.S.C.A. § 2242.

**[3] Habeas Corpus** ⚖️**662.1**
197k662.1 Most Cited Cases
Proper respondent to prisoner's habeas corpus petition challenging his detention by Department of Defense pursuant to the President's designation of prisoner as "enemy combatant" was not Secretary of Defense, but, rather, commander of naval brig where prisoner was detained. 28 U.S.C.A. § 2242.

**[4] Habeas Corpus** ⚖️**638**
197k638 Most Cited Cases
Only district where prisoner was confined could issue habeas petition in action challenging his detention by Department of Defense pursuant to the President's designation of prisoner as "enemy combatant." 28 U.S.C.A. § 2241(a).

**[5] Habeas Corpus** ⚖️**632.1**
197k632.1 Most Cited Cases
Generally, jurisdiction for core habeas petitions challenging present physical confinement lies only in district of confinement. 28 U.S.C.A. § 2241.
**\*\*2712 \*426 Syllabus [FN\*]**

FN\* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Timber & Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

Respondent Padilla, a United States citizen, was brought to New York for detention in federal criminal custody after federal agents apprehended him while executing a material witness warrant issued by the District Court for the Southern District of New York (Southern District) in connection with its grand jury investigation into the September 11,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

124 S.Ct. 2711                                                                    Page 2
542 U.S. 426, 124 S.Ct. 2711, 159 L.Ed.2d 513, 72 USLW 4584, 04 Cal. Daily Op. Serv. 5701, 2004 Daily Journal
D.A.R. 7765, 17 Fla. L. Weekly Fed. S 466
**(Cite as: 542 U.S. 426, 124 S.Ct. 2711)**

2001, al Qaeda terrorist attacks. While his motion to vacate the warrant was pending, the President issued an order to Secretary of Defense Rumsfeld designating Padilla an "enemy combatant" and directing that he be detained in military custody. Padilla was later moved to a Navy brig in Charleston, S. C., where he has been held ever since. His counsel then filed in the Southern District a habeas petition under 28 U.S.C. § 2241, which, as amended, alleged that Padilla's military detention violates the Constitution, and named as respondents the President, the Secretary, and Melanie Marr, the brig's commander. The Government moved to dismiss, arguing, *inter alia,* that Commander Marr, as Padilla's immediate custodian, was the only proper respondent, and that the District Court lacked jurisdiction over her because she is located outside the Southern District. That court held that the Secretary's personal involvement in Padilla's military custody rendered him a proper respondent, and that it could assert jurisdiction over the Secretary under New York's long-arm statute, notwithstanding his absence from the District. On the merits, the court accepted the Government's contention that the President has authority as Commander in Chief to detain as enemy combatants citizens captured on American soil during a time of war. The **2713 Second Circuit agreed that the Secretary was a proper respondent and that the Southern District had jurisdiction over the Secretary under New York's long-arm statute. The appeals court reversed on the merits, however, holding that the President lacks authority to detain Padilla militarily.

*Held:*

1. Because this Court answers the jurisdictional question in the negative, it does not reach the question whether the President has authority to detain Padilla militarily. P. 2715.

*427 2. The Southern District lacks jurisdiction over Padilla's habeas petition. Pp. 2717-2727.

(a) Commander Marr is the only proper respondent to Padilla's petition because she, not Secretary Rumsfeld, is Padilla's custodian. The federal habeas statute straightforwardly provides that the proper respondent is "the person" having custody over the petitioner. § § 2242, 2243. Its consistent use of the definite article indicates that there is generally only one proper respondent, and the custodian is "the person" with the ability to produce the prisoner's body before the habeas court, see *Wales v. Whitney,*

114 U.S. 564, 574, 5 S.Ct. 1050, 29 L.Ed. 277. In accord with the statutory language and *Wales* ' immediate custodian rule, longstanding federal-court practice confirms that, in "core" habeas challenges to present physical confinement, the default rule is that the proper respondent is the warden of the facility where the prisoner is being held, not the Attorney General or some other remote supervisory official. No exceptions to this rule, either recognized or proposed, apply here. Padilla does not deny the immediate custodian rule's general applicability, but argues that the rule is flexible and should not apply on the unique facts of this case. The Court disagrees. That the Court's understanding of custody has broadened over the years to include restraints short of physical confinement does nothing to undermine the rationale or statutory foundation of the *Wales* rule where, in core proceedings such as the present, physical custody *is* at issue. Indeed, that rule has consistently been applied in this core context. The Second Circuit erred in taking the view that this Court has relaxed the immediate custodian rule with respect to prisoners detained for other than federal criminal violations, and in holding that the proper respondent is the person exercising the "legal reality of control" over the petitioner. The statute itself makes no such distinction, nor does the Court's case law support a deviation from the immediate custodian rule here. Rather, the cases Padilla cites stand for the simple proposition that the immediate physical custodian rule, by its terms, does not apply when a habeas petitioner challenges something other than his present physical confinement. See, *e.g., Braden v. 30th Judicial Circuit Court of Ky.,* 410 U.S. 484, 93 S.Ct. 1123, 35 L.Ed.2d 443; *Strait v. Laird,* 406 U.S. 341, 92 S.Ct. 1693, 32 L.Ed.2d 141. That is not the case here: Marr exercises day-to-day control over Padilla's physical custody. The petitioner cannot name someone else just because Padilla's physical confinement stems from a military order by the President. Identification of the party exercising legal control over the detainee only comes into play when there is no immediate physical custodian. *Ex parte Endo,* 323 U.S. 283, 304-305, 65 S.Ct. 208, 89 L.Ed. 243, distinguished. Although Padilla's detention is unique in many respects, it is at bottom a simple challenge to physical custody imposed by the Executive. His detention is thus not unique in any way that *428 would provide **2714 arguable basis for a departure from the immediate custodian rule. Pp. 2717-2722.

(b) The Southern District does not have jurisdiction over Commander Marr. Section 2241(a)'s language

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

limiting district courts to granting habeas relief "within their respective jurisdictions" requires "that the court issuing the writ have jurisdiction over the custodian," _Braden, supra,_ at 495, 93 S.Ct. 1123. Because Congress added the "respective jurisdictions" clause to prevent judges anywhere from issuing the Great Writ on behalf of applicants far distantly removed, _Carbo v. United States,_ 364 U.S. 611, 617, 81 S.Ct. 338, 5 L.Ed.2d 329, the traditional rule has always been that habeas relief is issuable only in the district of confinement, _id., at 618, 81 S.Ct. 338._ This commonsense reading is supported by other portions of the habeas statute, _e.g.,_ § 2242, and by Federal Rule of Appellate Procedure 22(a). Congress has also legislated against the background of the "district of confinement" rule by fashioning explicit exceptions: _E.g.,_ when a petitioner is serving a state criminal sentence in a State containing more than one federal district, "the district ... wherein [he] is in custody" and "the district ... within which the State court was held which convicted and sentenced him" have "concurrent jurisdiction," § 2241(d). Such exceptions would have been unnecessary if, as the Second Circuit believed, § 2241 permits a prisoner to file outside the district of confinement. Despite this ample statutory and historical pedigree, Padilla urges that, under _Braden_ and _Strait,_ jurisdiction lies in any district in which the respondent is amenable to service of process. The Court disagrees, distinguishing those two cases. Padilla seeks to challenge his present physical custody in South Carolina. Because the immediate custodian rule applies, the proper respondent is Commander Marr, who is present in South Carolina. There is thus no occasion to designate a "nominal" custodian and determine whether he or she is "present" in the same district as petitioner. The habeas statute's "respective jurisdictions" proviso forms an important corollary to the immediate custodian rule in challenges to present physical custody under § 2241. Together they compose a simple rule that has been consistently applied in the lower courts, including in the context of military detentions: Whenever a § 2241 habeas petitioner seeks to challenge his present physical custody within the United States, he should name his warden as respondent and file the petition in the district of confinement. This rule serves the important purpose of preventing forum shopping by habeas petitioners. The District of South Carolina, not the Southern District of New York, was where Padilla should have brought his habeas petition. Pp. 2722-2725.

(c) The Court rejects additional arguments made by

the dissent in support of the mistaken view that exceptions exist to the immediate *429 custodian and district of confinement rules whenever exceptional, special, or unusual cases arise. Pp. 2725-2727.

352 F.3d 695, reversed and remanded.

REHNQUIST, C.J., delivered the opinion of the Court, in which O'CONNOR, SCALIA, KENNEDY, and THOMAS, JJ., joined. KENNEDY, J., filed a concurring opinion, in which O'CONNOR, J., joined, _post,_ p. 2727. STEVENS, J., filed a dissenting opinion, in which SOUTER, GINSBURG, and BREYER, JJ., joined, _post,_ p. 2729.

Paul D. Clement, Atlanta, GA, for petitioner.

Jennifer Martinez, for respondents.

**2715 Theodore B. Olson, Solicitor General, Counsel of Record, Department of Justice, Washington, D.C., for petitioner.

David W. DeBruin, William M. Hohengarten, Matthew Hersh, Duane C. Pozza, Scott B. Wilkens, Jenner & Block LLP, Washington, DC, Jenny S. Martinez, Stanford, CA, Donna R. Newman, Counsel of Record, New York City, Andrew G. Patel, New York City, Jonathan M. Freiman, Wiggin and Dana, New Haven, CT, for respondent.

Theodore B. Olson, Solicitor General, Counsel of Record, Paul D. Clement, Deputy Solicitor General, Sri Srinivasan, David B. Salmons, Assistants to the Solicitor General, Jonathan L. Marcus, Attorney, Department of Justice, Washington, D.C., for petitioner.

Chief Justice REHNQUIST delivered the opinion of the Court.

*430 Respondent Jose Padilla is a United States citizen detained by the Department of Defense pursuant to the President's determination that he is an "enemy combatant" who conspired with al Qaeda to carry out terrorist attacks in the United States. We confront two questions: First, did Padilla properly file his habeas petition in the Southern District of New York; and second, did the President possess authority to detain Padilla militarily. We answer the threshold question in the negative and thus do not reach the second question presented.

Because we do not decide the merits, we only briefly

124 S.Ct. 2711                                                                                    Page 4
542 U.S. 426, 124 S.Ct. 2711, 159 L.Ed.2d 513, 72 USLW 4584, 04 Cal. Daily Op. Serv. 5701, 2004 Daily Journal
D.A.R. 7765, 17 Fla. L. Weekly Fed. S 466
(Cite as: 542 U.S. 426, 124 S.Ct. 2711)

recount the relevant facts. On May 8, 2002, Padilla flew from Pakistan to Chicago's O'Hare International Airport. As he stepped off the plane, Padilla was apprehended by federal agents executing a material witness warrant issued by the United States District Court for the Southern District of *431 New York (Southern District) in connection with its grand jury investigation into the September 11th terrorist attacks. Padilla was then transported to New York, where he was held in federal criminal custody. On May 22, acting through appointed counsel, Padilla moved to vacate the material witness warrant.

Padilla's motion was still pending when, on June 9, the President issued an order to Secretary of Defense Donald H. Rumsfeld designating Padilla an "enemy combatant" and directing the Secretary to detain him in military custody. App. D to Brief for Petitioner 5a (June 9 Order). In support of this action, the President invoked his authority as "Commander in Chief of the U.S. armed forces" and the Authorization for Use of Military Force Joint Resolution, Pub.L. 107-40, 115 Stat. 224 (AUMF), [FN1] enacted by Congress on September 18, 2001. June 9 Order 5a. The President also made several factual findings explaining his decision to designate Padilla an enemy combatant. [FN2] Based on these findings, **2716 the President concluded that it is "consistent with U.S. law and the laws of war for the Secretary of Defense to detain Mr. Padilla as an enemy combatant." Id., at 6a.

> FN1. The AUMF provides in relevant part: "[T]he President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons." 115 Stat. 224.

> FN2. In short, the President "[d]etermine[d]" that Padilla (1) "is closely associated with al Qaeda, an international terrorist organization with which the United States is at war;" (2) that he "engaged in ... hostile and war-like acts, including ... preparation for acts of international terrorism" against the United States; (3) that he "possesses intelligence" about al Qaeda that "would aid U.S. efforts to prevent attacks by al Qaeda on the United

States"; and finally, (4) that he "represents a continuing, present and grave danger to the national security of the United States," such that his military detention "is necessary to prevent him from aiding al Qaeda in its efforts to attack the United States." June 9 Order 5a-6a.

*432 That same day, Padilla was taken into custody by Department of Defense officials and transported to the Consolidated Naval Brig in Charleston, South Carolina. [FN3] He has been held there ever since.

> FN3. Also on June 9, the Government notified the District Court ex parte of the President's order; informed the court that it was transferring Padilla into military custody in South Carolina and that it was consequently withdrawing its grand jury subpoena of Padilla; and asked the court to vacate the material witness warrant. Padilla ex rel. Newman v. Bush, 233 F.Supp.2d 564, 571 (S.D.N.Y.2002). The court vacated the warrant. Ibid.

On June 11, Padilla's counsel, claiming to act as his next friend, filed in the Southern District a habeas corpus petition under 28 U.S.C. § 2241. The petition, as amended, alleged that Padilla's military detention violates the Fourth, Fifth, and Sixth Amendments and the Suspension Clause, Art. I, § 9, cl. 2, of the United States Constitution. The amended petition named as respondents President Bush, Secretary Rumsfeld, and Melanie A. Marr, Commander of the Consolidated Naval Brig.

The Government moved to dismiss, arguing that Commander Marr, as Padilla's immediate custodian, is the only proper respondent to his habeas petition, and that the District Court lacks jurisdiction over Commander Marr because she is located outside the Southern District. On the merits, the Government contended that the President has authority to detain Padilla militarily pursuant to the Commander in Chief Clause of the Constitution, Art. II, § 2, cl. 1, the congressional AUMF, and this Court's decision in Ex parte Quirin, 317 U.S. 1, 63 S.Ct. 1, 87 L.Ed. 3 (1942).

The District Court issued its decision in December 2002. Padilla ex rel. Newman v. Bush, 233 F.Supp.2d 564. The court held that the Secretary's "personal involvement" in Padilla's military custody renders him a proper respondent to Padilla's habeas

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

124 S.Ct. 2711                                                                                              Page 5
542 U.S. 426, 124 S.Ct. 2711, 159 L.Ed.2d 513, 72 USLW 4584, 04 Cal. Daily Op. Serv. 5701, 2004 Daily Journal
D.A.R. 7765, 17 Fla. L. Weekly Fed. S 466
(Cite as: 542 U.S. 426, 124 S.Ct. 2711)

petition, and that it can assert jurisdiction over the Secretary under New York's long-arm statute, notwithstanding*433 his absence from the Southern District. [FN4] *Id., at 581-587.* On the merits, however, the court accepted the Government's contention that the President has authority to detain as enemy combatants citizens captured on American soil during a time of war. *Id., at 587-599.* [FN5]

> FN4. The court dismissed Commander Marr, Padilla's immediate custodian, reasoning that she would be obliged to obey any order the court directed to the Secretary. *Id., at 583* The court also dismissed President Bush as a respondent, a ruling Padilla does not challenge. *Id., at 582-583.*

> FN5. Although the District Court upheld the President's authority to detain domestically captured enemy combatants, it rejected the Government's contentions that Padilla has no right to challenge the factual basis for his detention and that he should be denied access to counsel. Instead, the court held that the habeas statute affords Padilla the right to controvert alleged facts, and granted him monitored access to counsel to effectuate that right. *Id., at 599-605.* Finally, the court announced that after it received Padilla's factual proffer, it would apply a deferential "some evidence" standard to determine whether the record supports the President's designation of Padilla as an enemy combatant. *Id., at 605-608.*

**2717 The Court of Appeals for the Second Circuit reversed. *352 F.3d 695 (2003).* The court agreed with the District Court that Secretary Rumsfeld is a proper respondent, reasoning that in cases where the habeas petitioner is detained for "other than federal criminal violations, the Supreme Court has recognized exceptions to the general practice of naming the immediate physical custodian as respondent." *Id., at 704-708.* The Court of Appeals concluded that on these "unique" facts Secretary Rumsfeld is Padilla's custodian because he exercises "the legal reality of control" over Padilla and because he was personally involved in Padilla's military detention. *Id., at 707-708.* The Court of Appeals also affirmed the District Court's holding that it has jurisdiction over the Secretary under New York's long-arm statute. *Id., at 708-710.*

Reaching the merits, the Court of Appeals held that the President lacks authority to detain Padilla militarily. *Id., at 710-724.* The court concluded that neither the President's *434 Commander in Chief power nor the AUMF authorizes military detentions of American citizens captured on American soil. *Id., at 712-718, 722-723.* To the contrary, the Court of Appeals found in both our case law and in the Non-Detention Act, 18 U.S.C. § 4001(a), [FN6] a strong presumption against domestic military detention of citizens absent explicit congressional authorization. *352 F.3d, at 710- 722.* Accordingly, the court granted the writ of habeas corpus and directed the Secretary to release Padilla from military custody within 30 days. *Id., at 724.*

> FN6. Section 4001(a) provides that "[n]o citizen shall be imprisoned or otherwise detained by the United States except pursuant to an Act of Congress."

We granted the Government's petition for certiorari to review the Court of Appeals' rulings with respect to the jurisdictional and the merits issues, both of which raise important questions of federal law. 540 U.S. 1173, 124 S.Ct. 1353, 157 L.Ed.2d 1226 (2004). [FN7]

> FN7. The word "jurisdiction," of course, is capable of different interpretations. We use it in the sense that it is used in the habeas statute, 28 U.S.C. § 2241(a), and not in the sense of subject-matter jurisdiction of the District Court.

The question whether the Southern District has jurisdiction over Padilla's habeas petition breaks down into two related subquestions. First, who is the proper respondent to that petition? And second, does the Southern District have jurisdiction over him or her? We address these questions in turn.

I

[1] The federal habeas statute straightforwardly provides that the proper respondent to a habeas petition is "the person who has custody over [the petitioner]." 28 U.S.C. § 2242; see also § 2243 ("The writ, or order to show cause shall be directed to the person having custody of the person detained"). The consistent use of the definite article in reference to the custodian indicates that there is generally only one proper respondent to a given prisoner's habeas petition. *435 This custodian, moreover, is "the person" with the ability to produce the prisoner's

124 S.Ct. 2711
542 U.S. 426, 124 S.Ct. 2711, 159 L.Ed.2d 513, 72 USLW 4584, 04 Cal. Daily Op. Serv. 5701, 2004 Daily Journal
D.A.R. 7765, 17 Fla. L. Weekly Fed. S 466
**(Cite as: 542 U.S. 426, 124 S.Ct. 2711)**

body before the habeas court. *Ibid.* We summed up the plain language of the habeas statute over 100 years ago in this way: "[T]hese provisions contemplate a proceeding against some person who has the *immediate custody* of the party detained, with the power to produce the body of such party before the court or judge, that he may be liberated if no sufficient reason is shown to the contrary." *Wales v. Whitney,* 114 U.S. 564, 574, 5 S.Ct. 1050, 29 L.Ed. 277 (1885) **2718 (emphasis added); see also *Braden v. 30th Judicial Circuit Court of Ky.,* 410 U.S. 484, 494-495, 93 S.Ct. 1123, 35 L.Ed.2d 443 (1973) ("The writ of habeas corpus" acts upon "the person who holds [the detainee] in what is alleged to be unlawful custody," citing *Wales, supra, at* 574, 5 S.Ct. 1050); *Braden, supra, at* 495, 93 S.Ct. 1123 (" '[T]his writ ... is directed to ... [the] jailer,' " quoting *In re Jackson,* 15 Mich. 417, 439-440 (1867)).

[2] In accord with the statutory language and *Wales*' immediate custodian rule, longstanding practice confirms that in habeas challenges to present physical confinement--"core challenges"--the default rule is that the proper respondent is the warden of the facility where the prisoner is being held, not the Attorney General or some other remote supervisory official. See, *e.g., Hogan v. Hanks,* 97 F.3d 189, 190 (C.A.7 1996); *Brittingham v. United States,* 982 F.2d 378, 379 (C.A.9 1992); *Blango v. Thornburgh,* 942 F.2d 1487, 1491-1492 (C.A.10 1991) *(per curiam); Brennan v. Cunningham,* 813 F.2d 1, 12 (C.A.1 1987); *Guerra v. Meese,* 786 F.2d 414, 416 (C.A.D.C.1986) *(per curiam); Billiteri v. United States Bd. of Parole,* 541 F.2d 938, 948 (C.A.2 1976); *Sanders v. Bennett,* 148 F.2d 19, 20 (C.A.D.C.1945); *Jones v. Biddle,* 131 F.2d 853, 854 (C.A.8 1942). [FN8] No exceptions to this rule, either recognized*436 [ FN9] or proposed, see *post,* at 2729 (KENNEDY, J., concurring), apply here.

> FN8. In *Ahrens v. Clark,* 335 U.S. 188, 68 S.Ct. 1443, 92 L.Ed. 1898 (1948), we left open the question whether the Attorney General is a proper respondent to a habeas petition filed by an alien detained pending deportation. *Id., at* 189, 193, 68 S.Ct. 1443. The lower courts have divided on this question, with the majority applying the immediate custodian rule and holding that the Attorney General is not a proper respondent. Compare *Robledo-Gonzales v. Ashcroft,* 342 F.3d 667 (C.A.7 2003) (Attorney General is not proper respondent); *Roman v. Ashcroft,* 340 F.3d 314 (C.A.6

2003) (same); *Vasquez v. Reno,* 233 F.3d 688 (C.A.1 2000) (same); *Yi v. Maugans,* 24 F.3d 500 (C.A.3 1994) (same), with *Armentero v. INS,* 340 F.3d 1058 (C.A.9 2003) (Attorney General is proper respondent). The Second Circuit discussed the question at some length, but ultimately reserved judgment in *Henderson v. INS,* 157 F.3d 106 (1998). Because the issue is not before us today, we again decline to resolve it.

> FN9. We have long implicitly recognized an exception to the immediate custodian rule in the military context where an American citizen is detained outside the territorial jurisdiction of any district court. *Braden v. 30th Judicial Circuit Court of Ky.,* 410 U.S. 484, 498, 93 S.Ct. 1123, 35 L.Ed.2d 443 (1973) (discussing the exception); *United States ex rel. Toth v. Quarles,* 350 U.S. 11, 76 S.Ct. 1, 100 L.Ed. 8 (1955) (courts-martial convict detained in Korea named Secretary of the Air Force as respondent); *Burns v. Wilson,* 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953) (court-martial convicts detained in Guam named Secretary of Defense as respondent).

[3] If the *Wales* immediate custodian rule applies in this case, Commander Marr--the equivalent of the warden at the military brig--is the proper respondent, not Secretary Rumsfeld. See *Al-Marri v. Rumsfeld,* 360 F.3d 707, 708-709 (C.A.7 2004) (holding in the case of an alleged enemy combatant detained at the Consolidated Naval Brig, the proper respondent is Commander Marr, not Secretary Rumsfeld); *Monk v. Secretary of the Navy,* 793 F.2d 364, 369 (C.A.D.C.1986) (holding that the proper respondent in a habeas action brought by a military prisoner is the commandant of the military detention facility, not the Secretary of the Navy); cf. 10 U.S.C. § 951(c) (providing that the commanding officer of a military correctional facility "shall have custody and control" of the prisoners confined therein). Neither Padilla, nor the courts below, nor Justice STEVENS' dissent deny the general applicability of the immediate custodian rule to **2719 habeas petitions challenging physical custody. *Post,* at 2731. They argue instead that the rule is flexible and should not apply on the "unique facts" of this case. Brief for Respondents 44. We disagree.

*437 First, Padilla notes that the substantive holding

124 S.Ct. 2711                                                                                                    Page 7
542 U.S. 426, 124 S.Ct. 2711, 159 L.Ed.2d 513, 72 USLW 4584, 04 Cal. Daily Op. Serv. 5701, 2004 Daily Journal
D.A.R. 7765, 17 Fla. L. Weekly Fed. S 466
(Cite as: 542 U.S. 426, 124 S.Ct. 2711)

of *Wales*-- that a person released on his own recognizance is not "in custody" for habeas purposes--was disapproved in *Hensley v. Municipal Court, San Jose Milpitas Judicial Dist., Santa Clara Cty., 411 U.S. 345, 350, n. 8, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973),* as part of this Court's expanding definition of "custody" under the habeas statute. [FN10] Padilla seems to contend, and the dissent agrees, *post,* at 2733, that because we no longer require physical detention as a prerequisite to habeas relief, the immediate custodian rule, too, must no longer bind us, even in challenges to physical custody. That argument, as the Seventh Circuit aptly concluded, is a "non sequitur." *Al-Marri, supra,* at 711. That our understanding of custody has broadened to include restraints short of physical confinement does nothing to undermine the rationale or statutory foundation of *Wales'* immediate custodian rule where physical custody *is* at issue. Indeed, as the cases cited above attest, it has consistently been applied in this core habeas context within the United States. [FN11]

>   FN10. For other landmark cases addressing the meaning of "in custody" under the habeas statute, see *Garlotte v. Fordice, 515 U.S. 39, 115 S.Ct. 1948, 132 L.Ed.2d 36 (1995); Carafas v. LaVallee, 391 U.S. 234, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968); Peyton v. Rowe, 391 U.S. 54, 88 S.Ct. 1549, 20 L.Ed.2d 426 (1968); Jones v. Cunningham, 371 U.S. 236, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963).*

>   FN11. Furthermore, Congress has not substantively amended in more than 130 years the relevant portions of the habeas statute on which *Wales* based its immediate custodian rule, despite uniform case law embracing the *Wales* rule in challenges to physical custody.

The Court of Appeals' view that we have relaxed the immediate custodian rule in cases involving prisoners detained for "other than federal criminal violations," and that in such cases the proper respondent is the person exercising the "legal reality of control" over the petitioner, suffers from the same logical flaw. *352 F.3d, at 705, 707.* Certainly the statute itself makes no such distinction based on the source of the physical detention. Nor does our case law support a deviation from the immediate custodian rule here. Rather, *438 the cases cited by Padilla stand for the simple proposition that the immediate physical custodian rule, by its terms, does not apply when a

habeas petitioner challenges something other than his present physical confinement.

In *Braden,* for example, an Alabama prisoner filed a habeas petition in the Western District of Kentucky. He did not contest the validity of the Alabama conviction for which he was confined, but instead challenged a detainer lodged against him in Kentucky state court. Noting that petitioner sought to challenge a "confinement that would be imposed in the future," we held that petitioner was "in custody" in Kentucky by virtue of the detainer. *410 U.S., at 488-489, 93 S.Ct. 1123.* In these circumstances, the Court held that the proper respondent was not the prisoner's immediate physical custodian (the Alabama warden), but was instead the Kentucky court in which the detainer was lodged. This made sense because the Alabama warden was not "the person who [held] him in what [was] alleged to be unlawful custody." *Id., at 494-495, 93 S.Ct. 1123* (citing *Wales, 114 U.S., at 574); Hensley, supra,* at 351, n. 9, 93 S.Ct. 1571 (observing that the petitioner in *Braden* "was in the custody of Kentucky officials **2720 for purposes of his habeas corpus action"). Under *Braden,* then, a habeas petitioner who challenges a form of "custody" other than present physical confinement may name as respondent the entity or person who exercises legal control with respect to the challenged "custody." But nothing in *Braden* supports departing from the immediate custodian rule in the traditional context of challenges to present physical confinement. See *Al-Marri, supra,* at 711-712; *Monk, supra,* at 369. To the contrary, *Braden* cited *Wales* favorably and reiterated the traditional rule that a prisoner seeking release from confinement must sue his "jailer." *410 U.S., at 495, 93 S.Ct. 1123* (internal quotation marks omitted).

For the same reason, *Strait v. Laird, 406 U.S. 341, 92 S.Ct. 1693, 32 L.Ed.2d 141 (1972),* does not aid Padilla. *Strait* involved an inactive reservist domiciled in California who filed a § 2241 petition seeking *439 relief from his military obligations. We noted that the reservist's "nominal" custodian was a commanding officer in Indiana who had charge of petitioner's Army records. *Id., at 344, 92 S.Ct. 1693.* As in *Braden,* the immediate custodian rule had no application because petitioner was not challenging any present physical confinement.

In *Braden* and *Strait,* the immediate custodian rule did not apply because *there was no* immediate physical custodian with respect to the "custody" being challenged. That is not the case here:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

124 S.Ct. 2711                                                                                          Page 8
542 U.S. 426, 124 S.Ct. 2711, 159 L.Ed.2d 513, 72 USLW 4584, 04 Cal. Daily Op. Serv. 5701, 2004 Daily Journal
D.A.R. 7765, 17 Fla. L. Weekly Fed. S 466
**(Cite as: 542 U.S. 426, 124 S.Ct. 2711)**

Commander Marr exercises day-to-day control over Padilla's physical custody. We have never intimated that a habeas petitioner could name someone other than his immediate physical custodian as respondent simply because the challenged physical custody does not arise out of a criminal conviction. Nor can we do so here just because Padilla's physical confinement stems from a military order by the President.

It follows that neither *Braden* nor *Strait* supports the Court of Appeals' conclusion that Secretary Rumsfeld is the proper respondent because he exercises the "legal reality of control" over Padilla. [FN12] As we have explained, identification of the party exercising legal control only comes into play when there is no immediate physical custodian with respect to the challenged "custody." In challenges to present physical confinement, we reaffirm that the immediate custodian, not a supervisory official who exercises legal control, is the proper respondent. If the "legal control" test applied to physical-custody challenges, a convicted prisoner would be able to name the State or the Attorney General as a respondent to a § 2241 petition. As the statutory language, *440 established practice, and our precedent demonstrate, that is not the case. [FN13]

FN12. The Court of Appeals reasoned that "only [the Secretary]--not Commander Marr--could inform the President that further restraint of Padilla as an enemy combatant is no longer necessary." 352 F.3d 695, 707 (C.A.2 2003). Justice STEVENS' dissent echoes this argument. *Post*, at 2733.

FN13. Even less persuasive is the Court of Appeals' and the dissent's belief that Secretary Rumsfeld's "unique" and "pervasive" personal involvement in authorizing Padilla's detention justifies naming him as the respondent. 352 F.3d, at 707-708 (noting that the Secretary "was charged by the President in the June 9 Order with detaining Padilla" and that the Secretary "determined that Padilla would be sent to the brig in South Carolina"); *post*, at 2733. If personal involvement were the standard, "then the prosecutor, the trial judge, or the governor would be named as respondents" in criminal habeas cases. *Al-Marri v. Rumsfeld*, 360 F.3d 707, 711 (C.A.7 2004). As the Seventh Circuit correctly held, the proper respondent is the person responsible for maintaining--not

authorizing--the custody of the prisoner. *Ibid.*

**2721 At first blush *Ex parte Endo*, 323 U.S. 283, 65 S.Ct. 208, 89 L.Ed. 243 (1944), might seem to lend support to Padilla's "legal control" argument. There, a Japanese-American citizen interned in California by the War Relocation Authority (WRA) sought relief by filing a § 2241 petition in the Northern District of California, naming as a respondent her immediate custodian. After she filed the petition, however, the Government moved her to Utah. Thus, the prisoner's immediate physical custodian was no longer within the jurisdiction of the District Court. We held, nonetheless, that the Northern District "acquired jurisdiction in this case and that [Endo's] removal ... did not cause it to lose jurisdiction where a person in whose custody she is remains within the district." *Id.*, at 306, 65 S.Ct. 208. We held that, under these circumstances, the assistant director of the WRA, who resided in the Northern District, would be an "appropriate respondent" to whom the District Court could direct the writ. *Id.*, at 304-305, 65 S.Ct. 208.

While *Endo* did involve a petitioner challenging her present physical confinement, it did not, as Padilla and Justice STEVENS contend, hold that such a petitioner may properly name as respondent someone other than the immediate physical custodian. *Post*, at 2733 (citing *Endo* as supporting a "more functional approach" that allows habeas petitioners *441 to name as respondent an individual who "control" over the petitioner). Rather, the Court's holding that the writ could be directed to a supervisory official came not in our holding that the District Court initially acquired jurisdiction--it did so because Endo properly named her immediate custodian and filed in the district of confinement--but in our holding that the District Court could effectively grant habeas relief despite the Government-procured absence of petitioner from the Northern District. [FN14] Thus, *Endo* stands for the important but limited proposition that when the Government moves a habeas petitioner after she properly files a petition naming her immediate custodian, the District Court retains jurisdiction and may direct the writ to any respondent within its jurisdiction who has legal authority to effectuate the prisoner's release.

FN14. As we explained: "Th[e] objective [of habeas relief] may be in no way impaired or defeated by the removal of the prisoner from the territorial jurisdiction of the

124 S.Ct. 2711                                                                                Page 9
542 U.S. 426, 124 S.Ct. 2711, 159 L.Ed.2d 513, 72 USLW 4584, 04 Cal. Daily Op. Serv. 5701, 2004 Daily Journal
D.A.R. 7765, 17 Fla. L. Weekly Fed. S 466
**(Cite as: 542 U.S. 426, 124 S.Ct. 2711)**

District Court. That end may be served and the decree of the court made effective if a respondent who has custody of the [petitioner] is within reach of the court's process." 323 U.S., at 307, 65 S.Ct. 208.

*Endo's* holding does not help respondents here. Padilla moved from New York to South Carolina before his lawyer filed a habeas petition on his behalf. Unlike the District Court in *Endo,* therefore, the Southern District never acquired jurisdiction over Padilla's petition.

Padilla's argument reduces to a request for a new exception to the immediate custodian rule based upon the "unique facts" of this case. While Padilla's detention is undeniably unique in many respects, it is at bottom a simple challenge to physical custody imposed by the Executive--the traditional core of the Great Writ. There is no indication that there was any attempt to manipulate behind Padilla's transfer--he was taken to the same facility where other al Qaeda members were already being held, and the Government did not attempt to hide from Padilla's lawyer where it had taken him. *Infra,* at 2726-2727, and n. 17; *post,* at 2729 (KENNEDY, **\*442** J., concurring). His detention is thus not unique in any way that would provide arguable basis for a departure from the immediate custodian rule. Accordingly, we hold that Commander **\*\*2722** Marr, not Secretary Rumsfeld, is Padilla's custodian and the proper respondent to his habeas petition.

## II

[4] We turn now to the second subquestion. District courts are limited to granting habeas relief "within their respective jurisdictions." 28 U.S.C. § 2241(a). We have interpreted this language to require "nothing more than that the court issuing the writ have jurisdiction over the custodian." *Braden,* 410 U.S., at 495, 93 S.Ct. 1123. Thus, jurisdiction over Padilla's habeas petition lies in the Southern District only if it has jurisdiction over Commander Marr. We conclude it does not.

Congress added the limiting clause--"within their respective jurisdictions"-- to the habeas statute in 1867 to avert the "inconvenient [and] potentially embarrassing" possibility that "every judge anywhere [could] issue the Great Writ on behalf of applicants far distantly removed from the courts whereon they sat." *Carbo v. United States,* 364 U.S. 611, 617, 81 S.Ct. 338, 5 L.Ed.2d 329 (1961). Accordingly, with respect to habeas petitions "designed to relieve an

individual from oppressive confinement," the traditional rule has always been that the Great Writ is "issuable only in the district of confinement." *Id., at* 618, 81 S.Ct. 338.

Other portions of the habeas statute support this commonsense reading of § 2241(a). For example, if a petitioner seeks habeas relief in the court of appeals, or from this Court or a Justice thereof, the petition must "state the reasons for not making application to *the* district court of the district *in which the applicant is held.*" 28 U.S.C. § 2242 (emphases added). Moreover, the court of appeals, this Court, or a Justice thereof "may decline to entertain an application for a writ of habeas corpus and may transfer the application ... to *the* district court having jurisdiction to entertain it." **\*443** § 2241(b) (emphasis added). The Federal Rules similarly provide that an "application for a writ of habeas corpus must be made to *the* appropriate district court." Fed. Rule App. Proc. 22(a) (emphasis added).

Congress has also legislated against the background of the "district of confinement" rule by fashioning explicit exceptions to the rule in certain circumstances. For instance, § 2241(d) provides that when a petitioner is serving a state criminal sentence in a State that contains more than one federal district, he may file a habeas petition not only "in the district court for the district wherein [he] is in custody," but also "in the district court for the district within which the State court was held which convicted and sentenced him"; and "each of such district courts shall have concurrent jurisdiction to entertain the application." Similarly, until Congress directed federal criminal prisoners to file certain postconviction petitions in the sentencing courts by adding § 2255 to the habeas statute, federal prisoners could litigate such collateral attacks only in the district of confinement. See *United States v. Hayman,* 342 U.S. 205, 212-219, 72 S.Ct. 263, 96 L.Ed. 232 (1952). Both of these provisions would have been unnecessary if, as the Court of Appeals believed, § 2241's general habeas provisions permit a prisoner to file outside the district of confinement.

[5] The plain language of the habeas statute thus confirms the general rule that for core habeas petitions challenging present physical confinement, jurisdiction lies in only one district: the district of confinement. Despite this ample statutory and historical pedigree, Padilla contends, and the Court of Appeals held, that the district of confinement rule no longer applies to **\*\*2723** core habeas challenges.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

124 S.Ct. 2711                                                                                                          Page 10
542 U.S. 426, 124 S.Ct. 2711, 159 L.Ed.2d 513, 72 USLW 4584, 04 Cal. Daily Op. Serv. 5701, 2004 Daily Journal
D.A.R. 7765, 17 Fla. L. Weekly Fed. S 466
(Cite as: 542 U.S. 426, 124 S.Ct. 2711)

Rather, Padilla, as well as today's dissenters, *post,* at 2733-2735, urge that our decisions in *Braden* and *Strait* stand for the proposition that jurisdiction will lie in any district in which the respondent is amenable to service of process. We disagree.

**\*444** Prior to *Braden,* we had held that habeas jurisdiction depended on the presence of both the petitioner and his custodian within the territorial confines of the district court. See *Ahrens v. Clark,* 335 U.S. 188, 190-192, 68 S.Ct. 1443, 92 L.Ed. 1898 (1948). By allowing an Alabama prisoner to challenge a Kentucky detainer in the Western District of Kentucky, *Braden* changed course and held that habeas jurisdiction requires only "that the court issuing the writ have jurisdiction over the custodian." 410 U.S., at 495, 93 S.Ct. 1123.

But we fail to see how *Braden*'s requirement of jurisdiction over the respondent alters the district of confinement rule for challenges to present physical custody. *Braden* itself did not involve such a challenge; rather, Braden challenged his future confinement in Kentucky by suing his Kentucky custodian. We reasoned that "[u]nder these circumstances it would serve no useful purpose to apply the *Ahrens* rule and require that the action be brought in Alabama." *Id.,* at 499, 93 S.Ct. 1123. In habeas challenges to *present* physical confinement, by contrast, the district of confinement is *synonymous* with the district court that has territorial jurisdiction over the proper respondent. This is because, as we have held, the immediate custodian rule applies to core habeas challenges to present physical custody. By definition, the immediate custodian and the prisoner reside in the same district.

Rather than focusing on the holding and historical context of *Braden,* Justice STEVENS, *post,* at 2733, like the Court of Appeals, seizes on dicta in which we referred to "service of process" to contend that the Southern District could assert jurisdiction over Secretary Rumsfeld under New York's long-arm statute. See *Braden,* 410 U.S., at 495, 93 S.Ct. 1123 ("So long as the custodian can be reached by service of process, the court can issue a writ 'within its jurisdiction' ... even if the prisoner himself is confined outside the court's territorial jurisdiction"). But that dicta did not indicate that a custodian may be served with process *outside* of the district court's territorial jurisdiction. To the contrary, the facts and holding **\*445** of *Braden* dictate the opposite inference. Braden served his Kentucky custodian in Kentucky. Accordingly, we concluded that the

Western District of Kentucky had jurisdiction over the petition "since the respondent was properly served *in that district.*" *Id.,* at 500, 93 S.Ct. 1123 (emphasis added); see also *Endo,* 323 U.S., at 304-305, 65 S.Ct. 208 (noting that the court could issue the writ to a WRA official "whose office is at San Francisco, which is in the jurisdiction of the [Northern District of California]"). Thus, *Braden* in no way authorizes district courts to employ long-arm statutes to gain jurisdiction over custodians who are outside of their territorial jurisdiction. See *Al-Marri,* 360 F.3d, at 711; *Guerra,* 786 F.2d, at 417. Indeed, in stating its holding, *Braden* favorably cites *Schlanger v. Seamans,* 401 U.S. 487, 91 S.Ct. 995, 28 L.Ed.2d 251 (1971), a case squarely holding that the custodian's absence from the territorial jurisdiction of the district court is fatal to habeas jurisdiction. 410 U.S., at 500, 93 S.Ct. 1123. Thus, *Braden* does not derogate from the traditional district of confinement rule for core habeas petitions challenging present physical custody.

The Court of Appeals also thought *Strait* supported its long-arm approach to habeas jurisdiction. But *Strait* offers even **\*\*2724** less help than *Braden.* In *Strait,* we held that the Northern District of California had jurisdiction over Strait's "nominal" custodian--the commanding officer of the Army records center-- even though he was physically located in Indiana. We reasoned that the custodian was "present" in California "through the officers in the hierarchy of the command who processed [Strait's] application for discharge." 406 U.S., at 345, 92 S.Ct. 1693. The *Strait* Court contrasted its broad view of "presence" in the case of a nominal custodian with a " 'commanding officer who is responsible for the day to day control of his subordinates,' " who would be subject to habeas jurisdiction only in the district where he physically resides. *Ibid.* (quoting *Arlen v. Laird,* 451 F.2d 684, 687 (C.A.2 1971)).

The Court of Appeals, much like Justice STEVENS' dissent, reasoned that Secretary Rumsfeld, in the same way as **\*446** Strait's commanding officer, was "present" in the Southern District through his subordinates who took Padilla into military custody. 352 F.3d, at 709-710; *post,* at 2733. We think not.

*Strait* simply has no application to the present case. *Strait* predated *Braden,* so the then-applicable *Ahrens* rule required that both the petitioner and his custodian be present in California. Thus, the only question was whether Strait's commanding officer was present in California notwithstanding his

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

124 S.Ct. 2711                                                                      Page 11
542 U.S. 426, 124 S.Ct. 2711, 159 L.Ed.2d 513, 72 USLW 4584, 04 Cal. Daily Op. Serv. 5701, 2004 Daily Journal
D.A.R. 7765, 17 Fla. L. Weekly Fed. S 466
(Cite as: 542 U.S. 426, 124 S.Ct. 2711)

physical absence from the district. Distinguishing *Schlanger, supra,* we held that it would "exalt fiction over reality" to require Strait to sue his "nominal custodian" in Indiana when Strait had always resided in California and had his only meaningful contacts with the Army there. 406 U.S. at 344-346, 92 S.Ct. 1693. Only under these limited circumstances did we invoke concepts of personal jurisdiction to hold that the custodian was "present" in California through the actions of his agents. *Id., at 345, 92 S.Ct. 1693.*

Here, by contrast, Padilla seeks to challenge his present physical custody in South Carolina. Because the immediate custodian rule applies to such habeas challenges, the proper respondent is Commander Marr, who is also present in South Carolina. There is thus no occasion to designate a "nominal" custodian and determine whether he or she is "present" in the same district as petitioner. [FN15] Under *Braden* and the district of confinement rule, as we have explained, Padilla must file his habeas action in South Carolina. Were we to extend *Strait's* limited exception to the territorial nature of habeas jurisdiction to the context of physical-custody challenges, we would undermine, if not negate, the purpose of Congress in amending the habeas statute in 1867.

> FN15. In other words, Commander Marr is the equivalent of the "commanding officer [with] day to day control" that we distinguished in *Strait,* 406 U.S., at 345, 92 S.Ct. 1693 (internal quotation marks omitted).

The proviso that district courts may issue the writ only "within their respective jurisdictions" forms an important *447 corollary to the immediate custodian rule in challenges to present physical custody under § 2241. Together they compose a simple rule that has been consistently applied in the lower courts, including in the context of military detentions: Whenever a § 2241 habeas petitioner seeks to challenge his present physical custody within the United States, he should name his warden as respondent and file the petition in the district of confinement. See *Al-Marri, supra,* at 710, 712 (alleged enemy combatant detained at Consolidated Naval Brig must file petition in the District of **2725 South Carolina; collecting cases dismissing § 2241 petitions filed outside the district of confinement); *Monk,* 793 F.2d. at 369 (court-martial convict must file in district of confinement). [FN16]

FN16. As a corollary to the previously referenced exception to the immediate custodian rule, n. 8, *supra,* we have similarly relaxed the district of confinement rule when "American citizens confined overseas (and thus outside the territory of any district court) have sought relief in habeas corpus." *Braden,* 410 U.S., at 498, 93 S.Ct. 1123 (citing cases). In such cases, we have allowed the petitioner to name as respondent a supervisory official and file the petition in the district where the respondent resides. *Burns v. Wilson,* 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953) (courts-martial convicts held in Guam sued Secretary of Defense in the District of Columbia); *United States ex rel. Toth v. Quarles,* 350 U.S. 11, 76 S.Ct. 1, 100 L.Ed. 8 (1955) (court-martial convict held in Korea sued Secretary of the Air Force in the District of Columbia).

This rule, derived from the terms of the habeas statute, serves the important purpose of preventing forum shopping by habeas petitioners. Without it, a prisoner could name a high-level supervisory official as respondent and then sue that person wherever he is amenable to long-arm jurisdiction. The result would be rampant forum shopping, district courts with overlapping jurisdiction, and the very inconvenience, expense, and embarrassment Congress sought to avoid when it added the jurisdictional limitation 137 years ago.

### III

Justice STEVENS' dissent, not unlike the Court of Appeals' decision, rests on the mistaken belief that we have *448 made various exceptions to the immediate custodian and district of confinement rules whenever "exceptional," " 'special,' " or "unusual" cases have arisen. *Post,* at 2730, 2731, 2734, n. 5. We have addressed most of his contentions in the foregoing discussion, but we briefly touch on a few additional points.

Apparently drawing a loose analogy to *Endo,* Justice STEVENS asks us to pretend that Padilla and his immediate custodian were present in the Southern District at the time counsel filed the instant habeas petition, thus rendering jurisdiction proper. *Post,* at 2731-2732. The dissent asserts that the Government "depart[ed] from the time-honored practice of giving one's adversary fair notice of an intent to present an important motion to the court," when on June 9 it

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

124 S.Ct. 2711                                                    Page 12
542 U.S. 426, 124 S.Ct. 2711, 159 L.Ed.2d 513, 72 USLW 4584, 04 Cal. Daily Op. Serv. 5701, 2004 Daily Journal
D.A.R. 7765, 17 Fla. L. Weekly Fed. S 466
(Cite as: 542 U.S. 426, 124 S.Ct. 2711)

moved *ex parte* to vacate the material witness warrant and allegedly failed to immediately inform counsel of its intent to transfer Padilla to military custody in South Carolina. *Ibid.;* cf. n. 3, *supra.* Constructing a hypothetical "scenario," the dissent contends that if counsel had been immediately informed, she "would have filed the habeas petition then and there," while Padilla remained in the Southern District, "rather than waiting two days." *Post,* at 2731-2732. Therefore, Justice STEVENS concludes, the Government's alleged misconduct "justifies treating the habeas application as the functional equivalent of one filed two days earlier." *Post,* at 2732 ("[W]e should not permit the Government to obtain a tactical advantage as a consequence of an *ex parte* proceeding").

The dissent cites no authority whatsoever for its extraordinary proposition that a district court can exercise statutory jurisdiction based on a series of events that did not occur, or that jurisdiction might be premised on "punishing" alleged Government misconduct. The lower courts--unlike the dissent-- did not perceive any hint of Government misconduct or bad faith that would warrant extending *Endo* to a case where both the petitioner and his immediate custodian were *449 outside of the district at the time of filing. Not surprisingly, then, neither Padilla nor the lower **2726 courts relied on the dissent's counterfactual theory to argue that habeas jurisdiction was proper. Finding it contrary to our well-established precedent, we are not persuaded either. [FN17]

FN17. On a related note, the dissent argues that the facts as they actually existed at the time of filing should not matter, because "what matters for present purposes are the facts available to [counsel] at the time of filing." *Post,* at 2731-2732, n. 3. According to the dissent, because the Government "shrouded ... in secrecy" the location of Padilla's military custody, counsel was entitled to file in the district where Padilla's presence was "last officially confirmed." *Ibid.* As with the argument addressed above, neither Padilla nor the District Court--which was much closer to the facts of the case than we are--or the Court of Appeals ever suggested that the Government concealed Padilla's whereabouts from counsel, much less contended that such concealment was the basis for habeas jurisdiction in the Southern District. And

even if this were a valid legal argument, the record simply does not support the dissent's inference of Government secrecy. The dissent relies solely on a letter written by Padilla's counsel. In that same letter, however, counsel states that she "was informed [on June 10]" that her client had been taken into custody by the Department of Defense and "detain[ed] at a naval military prison." App. 66. When counsel filed Padilla's habeas petition on June 11, she averred that "Padilla is being held in segregation at the high-security Consolidated Naval Brig in Charleston, South Carolina." Pet. for Writ of Habeas Corpus, in No. 02 Civ. 4445 (S.D.N.Y.), p. 2, Record, Doc. 1. The only reasonable inference, particularly in light of Padilla's failure to argue to the contrary, is that counsel was well aware of Padilla's presence in South Carolina when she filed the habeas petition, not that the Government "shrouded" Padilla's whereabouts in secrecy.

The dissent contends that even if we do not indulge its hypothetical scenario, the Court has made "numerous exceptions" to the immediate custodian and district of confinement rules, rendering our bright-line rule "far from bright." *Post,* at 2732. Yet the dissent cannot cite *a single case* in which we have deviated from the longstanding rule we reaffirm today--that is, a case in which we allowed a habeas petitioner challenging his present physical custody within the United States to name as respondent someone other than *450 the immediate custodian and to file somewhere other than the district of confinement. [FN18] If **2727 Justice STEVENS' view were accepted, district courts would be consigned to making ad hoc determinations as to whether the circumstances of a given case are "exceptional," "special," or "unusual" enough to require departure from the jurisdictional rules this Court has consistently applied. We do not think Congress intended such a result.

FN18. Instead, Justice STEVENS, like the Court of Appeals, relies heavily on *Braden, Strait,* and other cases involving challenges to something other than present physical custody. *Post,* at 2733-2735, and n. 4; *post,* at 2733, n. 4 (citing *Garlotte v. Fordice,* 515 U.S. 39, 115 S.Ct. 1948, 132 L.Ed.2d 36 (1995) (habeas petitioner challenging expired sentence named Governor as

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

124 S.Ct. 2711                                                                      Page 13
542 U.S. 426, 124 S.Ct. 2711, 159 L.Ed.2d 513, 72 USLW 4584, 04 Cal. Daily Op. Serv. 5701, 2004 Daily Journal
D.A.R. 7765, 17 Fla. L. Weekly Fed. S 466
**(Cite as: 542 U.S. 426, 124 S.Ct. 2711)**

respondent; immediate custodian issue not addressed); *Middendorf v. Henry*, 425 U.S. 25, 96 S.Ct. 1281, 47 L.Ed.2d 556 (1976) (putative habeas class action challenging court-martial procedures throughout the military; immediate custodian issue not addressed)); *post*, at 2734 (citing *Eisel v. Secretary of the Army*, 477 F.2d 1251 (C.A.D.C.1973) (allowing an inactive reservist challenging his military status to name the Secretary of the Army as respondent)). *Demjanjuk v. Meese*, 784 F.2d 1114 (C.A.D.C.1986), on which the dissent relies, *post*, at 2731, is similarly unhelpful: When, as in that case, a prisoner is held in an undisclosed location by an unknown custodian, it is impossible to apply the immediate custodian and district of confinement rules. That is not the case here, where the identity of the immediate custodian and the location of the appropriate district court are clear.

The dissent also cites two cases in which a state prisoner proceeding under 28 U.S.C. § 2254 named as respondent the State's officer in charge of penal institutions. *Post*, at 2733, n. 4 (citing *California Dept. of Corrections v. Morales*, 514 U.S. 499, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995); *Wainwright v. Greenfield*, 474 U.S. 284, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986)). But such cases do not support Padilla's cause. First of all, the respondents did not challenge their designation as inconsistent with the immediate custodian rule. More to the point, Congress has authorized § 2254 petitioners challenging present physical custody to name either the warden *or* the chief state penal officer as a respondent. Rule 2(a) of the Rules Governing Section 2254 Cases in the United States District Courts; Advisory Committee's Note on Rule 2(a), 28 U.S.C., pp. 469-470 (adopted in 1976). Congress has made no such provision for § 2241 petitioners like Padilla.

Finally, the dissent urges us to bend the jurisdictional rules because the merits of this case are indisputably of "profound importance," *post*, at 2729, 2732. But it is surely *451 just as necessary in important cases as in unimportant ones that courts take care not to exceed their "respective jurisdictions" established by Congress.

The District of South Carolina, not the Southern District of New York, was the district court in which Padilla should have brought his habeas petition. We therefore reverse the judgment of the Court of Appeals and remand the case for entry of an order of dismissal without prejudice.

*It is so ordered.*

Justice KENNEDY, with whom Justice O'CONNOR joins, concurring.

Though I join the opinion of the Court, this separate opinion is added to state my understanding of how the statute should be interpreted in light of the Court's holding. The Court's analysis relies on two rules. First, the habeas action must be brought against the immediate custodian. Second, when an action is brought in the district court, it must be filed in the district court whose territorial jurisdiction includes the place where the custodian is located.

These rules, however, are not jurisdictional in the sense of a limitation on subject-matter jurisdiction. *Ante*, at 2717, n. 7. That much is clear from the many cases in which petitions have been heard on the merits despite their noncompliance with either one or both of the rules. See, *e.g.*, *Braden v. 30th Judicial Circuit Court of Ky.*, 410 U.S. 484, 495, 93 S.Ct. 1123, 35 L.Ed.2d 443 (1973); *Strait v. Laird*, 406 U.S. 341, 345, 92 S.Ct. 1693, 32 L.Ed.2d 141 (1972); *United States ex rel. Toth v. Quarles*, 350 U.S. 11, 76 S.Ct. 1, 100 L.Ed. 8 (1955); *Burns v. Wilson*, 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953); *Ex parte Endo*, 323 U.S. 283, 65 S.Ct. 208, 89 L.Ed. 243 (1944).

In my view, the question of the proper location for a habeas petition is best understood as a question of personal jurisdiction or venue. This view is more in keeping with the opinion in *Braden*, and its discussion explaining the rules for the proper forum for habeas petitions. 410 U.S., at 493, 500, 93 S.Ct. 1123 (indicating that the analysis is guided by "traditional *452 venue considerations" and "traditional principles of venue"); see also *Moore v. Olson*, 368 F.3d 757, 759-760 (C.A.7 2004) (suggesting that the territorial-jurisdiction rule is a venue rule, and the immediate-custodian rule is a personal-jurisdiction rule). This approach is consistent with the reference in the statute to the "respective jurisdictions" of the district court. 28 U.S.C. § 2241. As we have noted twice this Term, the word "jurisdiction" is susceptible of different

124 S.Ct. 2711                                                                                          Page 14
542 U.S. 426, 124 S.Ct. 2711, 159 L.Ed.2d 513, 72 USLW 4584, 04 Cal. Daily Op. Serv. 5701, 2004 Daily Journal
D.A.R. 7765, 17 Fla. L. Weekly Fed. S 466
**(Cite as: 542 U.S. 426, 124 S.Ct. 2711)**

meanings, not all of which refer to the power of a federal court to hear a certain class of cases. _Kontrick v. Ryan,_ 540 U.S. 443, 124 S.Ct. 906, 157 L.Ed.2d 867 (2004); _Scarborough v. Principi,_ 541 U.S. 401, 124 S.Ct. 1856, 158 L.Ed.2d 674 (2004). The phrase "respective jurisdictions" does establish a territorial **2728 restriction on the proper forum for habeas petitions, but does not of necessity establish that the limitation goes to the power of the court to hear the case.

Because the immediate-custodian and territorial-jurisdiction rules are like personal-jurisdiction or venue rules, objections to the filing of petitions based on those grounds can be waived by the Government. _Moore, supra,_ at 759; cf. _Endo, supra, at 305, 65 S.Ct. 208_ ("The fact that no respondent was ever served with process or appeared in the proceedings is not important. The United States resists the issuance of a writ. A cause exists in that state of the proceedings and an appeal lies from denial of a writ without the appearance of a respondent"). For the same reason, the immediate-custodian and territorial rules are subject to exceptions, as acknowledged in the Court's opinion. _Ante,_ at 2718, n. 9, 2719-2722, 2723-2724. This does not mean that habeas petitions are governed by venue rules and venue considerations that apply to other sorts of civil lawsuits. Although habeas actions are civil cases, they are not automatically subject to all of the Federal Rules of Civil Procedure. See _Fed. Rule Civ. Proc. 81(a)(2)_ ("These rules are applicable to proceedings for ... habeas corpus ... to the extent that the practice in such proceedings is not set forth in statutes of the United States, the Rules Governing Section 2254 Cases, or the *453 Rules Governing Section 2255 Proceedings"). Instead, these forum-location rules for habeas petitions are based on the habeas statutes and the cases interpreting them. Furthermore, the fact that these habeas rules are subject to exceptions does not mean that, in the exceptional case, a petition may be properly filed in any one of the federal district courts. When an exception applies, see, e.g., _Rasul v. Bush, ante,_ 542 U.S. 466, 124 S.Ct. 2686, 159 L.E.2d 548, 2004 WL 1432134 (2004), courts must still take into account the considerations that in the ordinary case are served by the immediate-custodian rule, and, in a similar fashion, limit the available forum to the one with the most immediate connection to the named custodian.

I would not decide today whether these habeas rules function more like rules of personal jurisdiction or rules of venue. It is difficult to describe the precise

nature of these restrictions on the filing of habeas petitions, as an examination of the Court's own opinions in this area makes clear. Compare, e.g., _Ahrens v. Clark,_ 335 U.S. 188, 68 S.Ct. 1443, 92 L.Ed. 1898 (1948), with _Schlanger v. Seamans,_ 401 U.S. 487, 491, 91 S.Ct. 995, 28 L.Ed.2d 251 (1971), and _Braden, supra,_ at 495, 93 S.Ct. 1123. The precise question of how best to characterize the statutory direction respecting where the action must be filed need not be resolved with finality in this case. Here there has been no waiver by the Government; there is no established exception to the immediate-custodian rule or to the rule that the action must be brought in the district court with authority over the territory in question; and there is no need to consider some further exception to protect the integrity of the writ or the rights of the person detained.

For the purposes of this case, it is enough to note that, even under the most permissive interpretation of the habeas statute as a venue provision, the Southern District of New York was not the proper place for this petition. As the Court concludes, in the ordinary case of a single physical custody within the borders of the United States, where the objection has not been waived by the Government, the immediate-custodian and territorial-jurisdiction rules must *454 apply. _Ante,_ at 2727. I also agree with the arguments from statutory text and case law that the Court marshals in support of these two rules. **2729 _Ante,_ at 2717-2718, 2722. Only in an exceptional case may a court deviate from those basic rules to hear a habeas petition filed against some person other than the immediate custodian of the prisoner, or in some court other than the one in whose territory the custodian may be found.

The Court has made exceptions in the cases of nonphysical custody, see, e.g., _Strait,_ 406 U.S., at 345, 92 S.Ct. 1693, of dual custody, see, e.g., _Braden,_ 410 U.S., at 500, 93 S.Ct. 1123, and of removal of the prisoner from the territory of a district after a petition has been filed, see, e.g., _Endo,_ 323 U.S., at 306, 65 S.Ct. 208; see also _ante,_ at 2721, 2723. In addition, I would acknowledge an exception if there is an indication that the Government's purpose in removing a prisoner were to make it difficult for his lawyer to know where the habeas petition should be filed, or where the Government was not forthcoming with respect to the identity of the custodian and the place of detention. In cases of that sort, habeas jurisdiction would be in the district court from whose territory the petitioner had been removed. In this

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

124 S.Ct. 2711                                                                                          Page 15
542 U.S. 426, 124 S.Ct. 2711, 159 L.Ed.2d 513, 72 USLW 4584, 04 Cal. Daily Op. Serv. 5701, 2004 Daily Journal
D.A.R. 7765, 17 Fla. L. Weekly Fed. S 466
(Cite as: 542 U.S. 426, 124 S.Ct. 2711)

case, if the Government had removed Padilla from the Southern District of New York but refused to tell his lawyer where he had been taken, the District Court would have had jurisdiction over the petition. Or, if the Government did inform the lawyer where a prisoner was being taken but kept moving him so a filing could not catch up to the prisoner, again, in my view, habeas jurisdiction would lie in the district or districts from which he had been removed.

None of the exceptions apply here. There is no indication that the Government refused to tell Padilla's lawyer where he had been taken. The original petition demonstrates that the lawyer knew where Padilla was being held at that time. *Ante,* at 2726, n. 17. In these circumstances, the basic rules apply, and the District of South Carolina was the proper *455 forum. The present case demonstrates the wisdom of those rules.

Both Padilla's change in location and his change of custodian reflected a change in the Government's rationale for detaining him. He ceased to be held under the authority of the criminal justice system, see 18 U.S.C. § 3144, and began to be held under that of the military detention system. Rather than being designed to play games with forums, the Government's removal of Padilla reflected the change in the theory on which it was holding him. Whether that theory is a permissible one, of course, is a question the Court does not reach today.

The change in custody, and the underlying change in rationale, should be challenged in the place the Government has brought them to bear and against the person who is the immediate representative of the military authority that is detaining him. That place is the District of South Carolina, and that person is Commander Marr. The Second Circuit erred in holding that the Southern District of New York was a proper forum for Padilla's petition. With these further observations, I join the opinion and judgment of the Court.

Justice ·STEVENS, with whom Justice SOUTER, Justice GINSBURG, and Justice BREYER join, dissenting.

The petition for a writ of habeas corpus filed in this case raises questions of profound importance to the Nation. The arguments set forth by the Court do not justify avoidance of our duty to answer those questions. It is quite wrong to characterize the proceeding as a "simple challenge to physical custody," *ante,* at 2721, that should be resolved by slavish application of a "bright-line rule," *ante,* at 2726, **2730 designed to prevent "rampant forum shopping" by litigious prison inmates, *ante,* at 2725. As the Court's opinion itself demonstrates, that rule is riddled with exceptions fashioned to protect the high office of the Great Writ. This is an exceptional case that we clearly have jurisdiction to decide.

*456 I
In May 2002, a grand jury convened in the Southern District of New York was conducting an investigation into the September 11, 2001, terrorist attacks. In response to an application by the Department of Justice, the Chief Judge of the District issued a material witness warrant authorizing Padilla's arrest when his plane landed in Chicago on May 8. [FN1] Pursuant to that warrant, agents of the Department of Justice took Padilla (hereinafter respondent) into custody and transported him to New York City, where he was detained at the Metropolitan Correctional Center. On May 15, the court appointed Donna R. Newman, a member of the New York bar, to represent him. She conferred with respondent in person and filed motions on his behalf, seeking his release on the ground that his incarceration was unauthorized and unconstitutional. The District Court scheduled a hearing on those motions for Tuesday, June 11, 2002.

> FN1. As its authority for detaining respondent as a material witness, the Government relied on a federal statute that provides: "If it appears from an affidavit filed by a party that the testimony of a person is material in a criminal proceeding, and if it is shown that it may become impracticable to secure the presence of the person by subpoena, a judicial officer may order the arrest of the person and treat the person in accordance with the provisions of section 3142 .... Release of a material witness may be delayed for a reasonable period of time until the deposition of the witness can be taken pursuant to the Federal Rules of Criminal Procedure." 18 U.S.C. § 3144.

On Sunday, June 9, 2002, before that hearing could occur, the President issued a written command to the Secretary of Defense concerning respondent. "Based on the information available to [him] from all sources," the President determined that respondent is an "enemy combatant," that he is "closely associated

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

124 S.Ct. 2711                                                                                           Page 16
542 U.S. 426, 124 S.Ct. 2711, 159 L.Ed.2d 513, 72 USLW 4584, 04 Cal. Daily Op. Serv. 5701, 2004 Daily Journal
D.A.R. 7765, 17 Fla. L. Weekly Fed. S 466
(Cite as: 542 U.S. 426, 124 S.Ct. 2711)

with al Qaeda, an international terrorist organization with which the United States is at war," and that he possesses intelligence that, "if communicated to the U.S., would aid U.S. efforts to prevent attacks by al Qaeda" *457 on U.S. targets. App. A to Pet. for Cert. 57a. The command stated that "it is in the interest of the United States" and "consistent with U.S. law and the laws of war for the Secretary of Defense to detain Mr. Padilla as an enemy combatant." *Id.,* at 58a. The President's order concluded: "Accordingly, you are directed to receive Mr. Padilla from the Department of Justice and to detain him as an enemy combatant." *Ibid.*

On the same Sunday that the President issued his order, the Government notified the District Court in an *ex parte* proceeding that it was withdrawing its grand jury subpoena, and it asked the court to enter an order vacating the material witness warrant. *Padilla ex rel. Newman v. Bush,* 233 F.Supp.2d 564, 571 (S.D.N.Y.2002). In that proceeding, in which respondent was not represented, the Government informed the court that the President had designated respondent an enemy combatant and had directed the Secretary of Defense, petitioner Donald Rumsfeld, to detain respondent. *Ibid.* The Government also disclosed that the Department of Defense would take custody of respondent and immediately transfer him to South Carolina. The District Court complied with the Government's request and vacated **2731 the warrant. [FN2]

> FN2. The order vacating the material witness warrant that the District Court entered in the *ex parte* proceeding on June 9 terminated the Government's lawful custody of respondent. After that order was entered, Secretary Rumsfeld's agents took custody of respondent. The authority for that action was based entirely on the President's command to the Secretary--a document that, needless to say, would not even arguably qualify as a valid warrant. Thus, whereas respondent's custody during the period between May 8 and June 9, 2002, was pursuant to a judicially authorized seizure, he has been held ever since--for two years-- pursuant to a warrantless arrest.

On Monday, June 10, 2002, the Attorney General publicly announced respondent's detention and transfer "to the custody of the Defense Department," which he called "a significant step forward in the War on Terrorism." Amended Pet. *458 for Writ of Habeas Corpus in No. 02 Civ. 4445 (S.D.N.Y.), Exh. A, p. 1, Record, Doc. 4. On June 11, 2002, presumably in response to that announcement, Newman commenced this proceeding by filing a petition for a writ of habeas corpus in the Southern District of New York. 233 F.Supp.2d, at 571. At a conference on that date, which had been originally scheduled to address Newman's motion to vacate the material witness warrant, the Government conceded that Defense Department personnel had taken custody of respondent in the Southern District of New York. *Id., at 571-572.*

II

All Members of this Court agree that the immediate custodian rule should control in the ordinary case and that habeas petitioners should not be permitted to engage in forum shopping. But we also all agree with Judge Bork that "special circumstances" can justify exceptions from the general rule. *Demjanjuk v. Meese,* 784 F.2d 1114, 1116 (C.A.D.C.1986). See *ante,* at 2726-2727, n. 18. Cf. *ante,* at 2727 (KENNEDY, J., concurring). More narrowly, we agree that if jurisdiction was proper when the petition was filed, it cannot be defeated by a later transfer of the prisoner to another district. *Ex parte Endo,* 323 U.S. 283, 306, 65 S.Ct. 208, 89 L.Ed. 243 (1944). See *ante,* at 2721.

It is reasonable to assume that if the Government had given Newman, who was then representing respondent in an adversary proceeding, notice of its intent to ask the District Court to vacate the outstanding material witness warrant and transfer custody to the Department of Defense, Newman would have filed the habeas petition then and there, rather than waiting two days. [FN3] Under that scenario, respondent's *459 **2732 immediate custodian would then have been physically present in the Southern District of New York carrying out orders of the Secretary of Defense. Surely at that time Secretary Rumsfeld, rather than the lesser official who placed the handcuffs on petitioner, would have been the proper person to name as a respondent to that petition.

> FN3. The record indicates that the Government had not *officially* informed Newman of her client's whereabouts at the time she filed the habeas petition on June 11. Pet. for Writ of Habeas Corpus in No. 02 Civ. 4445 (S.D.N.Y.), p. 2, & ¶ 4, Record, Doc. 1 ("On information and belief, Padilla is being held in segregation at the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

124 S.Ct. 2711                                                                     Page 17
542 U.S. 426, 124 S.Ct. 2711, 159 L.Ed.2d 513, 72 USLW 4584, 04 Cal. Daily Op. Serv. 5701, 2004 Daily Journal
D.A.R. 7765, 17 Fla. L. Weekly Fed. S 466
(Cite as: 542 U.S. 426, 124 S.Ct. 2711)

high-security Consolidated Naval Brig in Charleston, South Carolina"); Letter from Donna R. Newman to General Counsel of the Department of Defense, June 17, 2002 ("I understand *from the media* that my client is being held in Charleston, South Carolina in the military brig" (emphasis added)), Amended Pet. for Writ of Habeas Corpus in No. 02 Civ. 4445 (S.D.N.Y.), Exh. A, p. 4, Record, Doc. 4. Thus, while it is true, as the Court observes, that "Padilla was moved from New York to South Carolina before his lawyer filed a habeas petition on his behalf," *ante,* at 2721, what matters for present purposes are the facts available to Newman at the time of filing. When the Government shrouded those facts in secrecy, Newman had no option but to file immediately in the district where respondent's presence was last officially confirmed.

Moreover, Newman was appointed to represent respondent by the District Court for the Southern District of New York. Once the Government removed her client, it did not permit her to counsel him until February 11, 2004. Consultation thereafter has been allowed as a matter of the Government's grace, not as a matter of right stemming from the Southern District of New York appointment. Further, it is not apparent why the District of South Carolina, rather than the Southern District of New York, should be regarded as the proper forum to determine the validity of the "change in the Government's rationale for detaining" respondent. *Ante,* at 2729. If the Government's theory is not "a permissible one," *ibid.,* then the New York federal court would remain the proper forum in this case. Why should the New York court not have the authority to determine the legitimacy of the Government's removal of respondent beyond that court's borders?

The difference between that scenario and the secret transfer that actually occurred should not affect our decision, for we should not permit the Government to obtain a tactical advantage as a consequence of an *ex parte* proceeding. The departure from the time-honored practice of giving one's adversary fair notice of an intent to present an important motion to the court justifies treating the habeas application as the functional equivalent of one filed two days earlier. See *Baldwin v. Hale,* 1 Wall. 223, 233, 17 L.Ed. 531

(1864) ("Common justice *460 requires that no man shall be condemned in his person or property without notice and an opportunity to make his defence"). "The very nature of the writ demands that it be administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and corrected." *Harris v. Nelson,* 394 U.S. 286, 291, 89 S.Ct. 1082, 22 L.Ed.2d 281 (1969). But even if we treat respondent's habeas petition as having been filed in the Southern District after the Government removed him to South Carolina, there is ample precedent for affording special treatment to this exceptional case, both by recognizing Secretary Rumsfeld as the proper respondent and by treating the Southern District as the most appropriate venue.

Although the Court purports to be enforcing a "bright-line rule" governing district courts' jurisdiction, *ante,* at 2726, an examination of its opinion reveals that the line is far from bright. Faced with a series of precedents emphasizing the writ's "scope and flexibility," *Harris,* 394 U.S., at 291, 89 S.Ct. 1082, the Court is forced to acknowledge the numerous exceptions we have made to the immediate custodian rule. The rule does not apply, the Court admits, when physical custody is not at issue, *ante,* at 2719, or when American citizens are confined overseas, *ante,* at 2725, n. 16, or when the petitioner has been transferred after filing, *ante,* at 2721, or when the custodian is " 'present' " in the district through his agents' conduct, *ante,* at 2724. In recognizing exception upon exception and corollaries to corollaries, the Court itself persuasively demonstrates that the rule is not ironclad. It is, instead, a workable general rule that frequently gives way outside the context of " 'core challenges' " to executive confinement. *Ante,* at 2718.

In the Court's view, respondent's detention falls within the category of " 'core challenges' " because it is "not unique in any way that would provide arguable basis for a departure from the immediate custodian rule." *Ante,* at 2721. It is, however, disingenuous at best to classify respondent's petition with run-of-the-mill collateral attacks on federal criminal*461 convictions. On the contrary, this case is singular not only because it calls into **2733 question decisions made by the Secretary himself, but also because those decisions have created a unique and unprecedented threat to the freedom of every American citizen.

"[W]e have consistently rejected interpretations of

124 S.Ct. 2711      Page 18
542 U.S. 426, 124 S.Ct. 2711, 159 L.Ed.2d 513, 72 USLW 4584, 04 Cal. Daily Op. Serv. 5701, 2004 Daily Journal
D.A.R. 7765, 17 Fla. L. Weekly Fed. S 466
**(Cite as: 542 U.S. 426, 124 S.Ct. 2711)**

the habeas corpus statute that would suffocate the writ in stifling formalisms or hobble its effectiveness with the manacles of arcane and scholastic procedural requirements." *Hensley v. Municipal Court, San Jose Milpitas Judicial Dist., Santa Clara Cty.,* 411 U.S. 345, 350, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973). With respect to the custody requirement, we have declined to adopt a strict reading of *Wales v. Whitney,* 114 U.S. 564, 5 S.Ct. 1050, 29 L.Ed. 277 (1885), see *Hensley,* 411 U.S., at 350, n. 8, 93 S.Ct. 1571, and instead have favored a more functional approach that focuses on the person with the power to produce the body, see *Endo,* 323 U.S., at 306-307, 65 S.Ct. 208. [FN4] In this case, the President entrusted the Secretary of Defense *462 with control over respondent. To that end, the Secretary deployed Defense Department personnel to the Southern District with instructions to transfer respondent to South Carolina. Under the President's order, only the Secretary--not a judge, not a prosecutor, not a warden--has had a say in determining respondent's location. As the District Court observed, Secretary Rumsfeld has publicly shown "both his familiarity with the circumstances of Padilla's detention, and his personal involvement in the handling of Padilla's case." 233 F.Supp.2d, at 574. Having "emphasized and jealously guarded" the Great Writ's "ability to cut through barriers of form and procedural mazes," *Harris,* 394 U.S., at 291, 89 S.Ct. 1082, surely we should acknowledge that the writ reaches the Secretary as the relevant custodian in this case.

FN4. For other cases in which the immediate custodian rule has not been strictly applied, see *Garlotte v. Fordice,* 515 U.S. 39, 115 S.Ct. 1948, 132 L.Ed.2d 36 (1995) (prisoner named Governor of Mississippi, not warden, as respondent); *California Dept. of Corrections v. Morales,* 514 U.S. 499, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995) (prisoner named Department of Corrections, not warden, as respondent); *Wainwright v. Greenfield,* 474 U.S. 284, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986) (prisoner named Secretary of Florida Department of Corrections, not warden, as respondent); *Middendorf v. Henry,* 425 U.S. 25, 96 S.Ct. 1281, 47 L.Ed.2d 556 (1976) (persons convicted or ordered to stand trial at summary courts-martial named Secretary of the Navy as respondent); *Strait v. Laird,* 406 U.S. 341, 345-346, 92 S.Ct. 1693, 32 L.Ed.2d 141 (1972) ("The concepts of 'custody' and 'custodian' are sufficiently

broad to allow us to say that the commanding officer in Indiana, operating through officers in California in processing petitioner's claim, is in California for the limited purposes of habeas corpus jurisdiction"); *Burns v. Wilson,* 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953) (service members convicted and held in military custody in Guam named Secretary of Defense as respondent); *United States ex rel. Toth v. Quarles,* 350 U.S. 11, 76 S.Ct. 1, 100 L.Ed. 8 (1955) (next friend of ex-service member in military custody in Korea named Secretary of the Air Force as respondent); *Ex parte Endo,* 323 U.S., at 304, 65 S.Ct. 208 (California District Court retained jurisdiction over Japanese-American's habeas challenge to her internment, despite her transfer to Utah, noting absence of any "suggestion that there is no one within the jurisdiction of the District Court who is responsible for the detention of appellant and who would be an appropriate respondent").

Since the Secretary is a proper custodian, the question whether the petition was appropriately filed in the Southern District is easily answered. "So long as the custodian can be reached by service of process, the court can issue a writ 'within its jurisdiction' requiring that the prisoner be brought before the court for a hearing on his claim ... even if the prisoner himself is confined outside the court's territorial jurisdiction." **2734*Braden v. 30th Judicial Circuit Court of Ky.,* 410 U.S. 484, 495, 93 S.Ct. 1123, 35 L.Ed.2d 443 (1973). [FN5] See also *Endo,* 323 U.S., at 306, 65 S.Ct. 208 ("[T]he court may act if there is a respondent within reach of its process who has custody of the petitioner"). In this case, Secretary Rumsfeld no doubt has sufficient contacts with the Southern District properly to be served with process there. The Secretary, after all, ordered military personnel to that forum to seize and remove respondent.

FN5. Although, as the Court points out, *ante,* at 2723, the custodian in *Braden* was served within the territorial jurisdiction of the District Court, the salient point is that *Endo* and *Braden* decoupled the District Court's jurisdiction from the detainee's place of confinement and adopted for unusual cases a functional analysis that does not depend on the physical location of any

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

124 S.Ct. 2711                                                                                           Page 19
542 U.S. 426, 124 S.Ct. 2711, 159 L.Ed.2d 513, 72 USLW 4584, 04 Cal. Daily Op. Serv. 5701, 2004 Daily Journal
D.A.R. 7765, 17 Fla. L. Weekly Fed. S 466
**(Cite as: 542 U.S. 426, 124 S.Ct. 2711)**

single party.

*463 It bears emphasis that the question of the proper forum to determine the legality of Padilla's incarceration is not one of federal subject-matter jurisdiction. See *ante*, at 2717, n. 7; *ante*, at 2727 (KENNEDY, J., concurring). Federal courts undoubtedly have the authority to issue writs of habeas corpus to custodians who can be reached by service of process "within their respective jurisdictions." 28 U.S.C. § 2241(a). Rather, the question is one of venue, *i.e.,* in which federal court the habeas inquiry may proceed. [FN6] The Government purports to exercise complete control, free from judicial surveillance, over that placement. Venue principles, however, center on the most convenient and efficient forum for resolution of a case, see *Braden*, 410 U.S., at 493-494, 499-500, 93 S.Ct. 1123 (considering those factors in allowing Alabama prisoner to sue in Kentucky), and on the placement most likely to minimize forum shopping by either party, see *Eisel v. Secretary of the Army*, 477 F.2d 1251, 1254 (C.A.D.C.1973) (preferring such functional considerations to "blind incantation of words with implied magical properties, such as 'immediate custodian' "). [FN7] Cf. *Ex parte Bollman*, 4 Cranch 75, 136, 2 L.Ed. 554 (1807) ("It would ... be extremely dangerous to say, that because the *464 prisoners were apprehended, not by a civil magistrate, but by the military power, there could be given by law a right to try the persons so seized in any place which the general might select, and to which he might direct them to be carried").

> FN6. Although the Court makes no reference to venue principles, it is clear that those principles, not rigid jurisdictional rules, govern the forum determination. In overruling *Ahrens v. Clark*, 335 U.S. 188, 68 S.Ct. 1443, 92 L.Ed. 1898 (1948), the Court in *Braden v. 30th Judicial Circuit Court of Ky.*, 410 U.S. 484, 93 S.Ct. 1123, 35 L.Ed.2d 443 (1973), clarified that the place of detention pertains only to the question of venue. See *id.,* at 493-495, 93 S.Ct. 1123 (applying "traditional venue considerations" and rejecting a stricter jurisdictional approach); *id.,* at 502, 93 S.Ct. 1123 (REHNQUIST, J., dissenting) ("Today the Court overrules *Ahrens*"); *Moore v. Olson,* 368 F.3d 757, 758 (C.A.7 2004) ("[A]fter *Braden* ..., which overruled *Ahrens*, the location of a collateral attack is best understood as a matter of venue");

> *Armentero v. INS,* 340 F.3d 1058, 1070 (C.A.9 2003) ("District courts may use traditional venue considerations to control where detainees bring habeas petitions" (citing *Braden,* 410 U.S., at 493-494, 93 S.Ct. 1123)).

> FN7. If, upon consideration of traditional venue principles, the district court in which a habeas petition is filed determines that venue is inconvenient or improper, it of course has the authority to transfer the petition. See 28 U.S.C. §§ 1404(a), 1406(a).

When this case is analyzed under those traditional venue principles, it is evident that the Southern District of New York, not South Carolina, is the more appropriate place to litigate respondent's petition. The Government sought a material witness warrant for respondent's detention in the **2735 Southern District, indicating that it would be convenient for its attorneys to litigate in that forum. As a result of the Government's initial forum selection, the District Judge and counsel in the Southern District were familiar with the legal and factual issues surrounding respondent's detention both before and after he was transferred to the Defense Department's custody. Accordingly, fairness and efficiency counsel in favor of preserving venue in the Southern District. In sum, respondent properly filed his petition against Secretary Rumsfeld in the Southern District of New York.

III

Whether respondent is entitled to immediate release is a question that reasonable jurists may answer in different ways. [FN8] There is, however, only one possible answer to the question whether he is entitled to a hearing on the justification for his detention. [FN9]

> FN8. Consistent with the judgment of the Court of Appeals, I believe that the Non-Detention Act, 18 U.S.C. § 4001(a), prohibits--and the Authorization for Use of Military Force Joint Resolution, 115 Stat. 224, adopted on September 18, 2001, does not authorize--the protracted, incommunicado detention of American citizens arrested in the United States.

> FN9. Respondent's custodian has been remarkably candid about the Government's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

542 U.S. 426, 124 S.Ct. 2711, 159 L.Ed.2d 513, 72 USLW 4584, 04 Cal. Daily Op. Serv. 5701, 2004 Daily Journal
D.A.R. 7765, 17 Fla. L. Weekly Fed. S 466
**(Cite as: 542 U.S. 426, 124 S.Ct. 2711)**

motive in detaining respondent: " '[O]ur interest really in his case is not law enforcement, it is not punishment because he was a terrorist or working with the terrorists. Our interest at the moment is to try and find out everything he knows so that hopefully we can stop other terrorist acts.' " 233 F.Supp.2d 564, 573-574 (S.D.N.Y.2002) (quoting News Briefing, Dept. of Defense (June 12, 2002), 2002 WL 22026773).

**\*465** At stake in this case is nothing less than the essence of a free society. Even more important than the method of selecting the people's rulers and their successors is the character of the constraints imposed on the Executive by the rule of law. Unconstrained executive detention for the purpose of investigating and preventing subversive activity is the hallmark of the Star Chamber. [FN10] Access to counsel for the purpose of protecting the citizen from official mistakes and mistreatment is the hallmark of due process.

FN10. See *Watts v. Indiana,* 338 U.S. 49, 54, 69 S.Ct. 1347, 93 L.Ed. 1801 (1949) (opinion of Frankfurter, J.). "There is torture of mind as well as body; the will is as much affected by fear as by force. And there comes a point where this Court should not be ignorant as judges of what we know as men." *Id.,* at 52, 69 S.Ct. 1347.

Executive detention of subversive citizens, like detention of enemy soldiers to keep them off the battlefield, may sometimes be justified to prevent persons from launching or becoming missiles of destruction. It may not, however, be justified by the naked interest in using unlawful procedures to extract information. Incommunicado detention for months on end is such a procedure. Whether the information so procured is more or less reliable than that acquired by more extreme forms of torture is of no consequence. For if this Nation is to remain true to the ideals symbolized by its flag, it must not wield the tools of tyrants even to resist an assault by the forces of tyranny.

I respectfully dissent.

542 U.S. 426, 124 S.Ct. 2711, 159 L.Ed.2d 513, 72 USLW 4584, 04 Cal. Daily Op. Serv. 5701, 2004 Daily Journal D.A.R. 7765, 17 Fla. L. Weekly Fed. S 466

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

70 S.Ct. 936
339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255
**(Cite as: 339 U.S. 763, 70 S.Ct. 936)**

Page 1

▷

**Briefs and Other Related Documents**

Supreme Court of the United States
JOHNSON, Secretary of Defense, et al.,
v.
EISENTRAGER et al.
No. 306.

Argued April 17, 1950.
Decided June 5, 1950.

Habeas corpus proceedings by Lothar Eisentrager, alias Ludwig Ehrhardt, on his own behalf and as next friend of Franz Siebert, and others, against Louis A. Johnson, Secretary of Defense of the United States, and others. A judgment of the United States District Court for the District of Columbia dismissing the petition for lack of jurisdiction was reversed by the United States Court of Appeals for the District of Columbia Circuit, E. Barrett Prettyman, Circuit Judge, 84 U.S.App.D.C. 396, 174 F.2d 961, and the respondents brought certiorari. The Supreme Court, Mr. Justice Jackson, held that German nationals, confined in custody of United States Army in Germany following conviction by military commission of having engaged in military activity against United States in China after surrender of Germany, had no right to writ of habeas corpus to test legality of their detention.

Judgment of Court of Appeals reversed and judgment of District Court affirmed.

Mr. Justice Black, Mr. Justice Douglas and Mr. Justice Burton, dissented.

West Headnotes

**[1] War and National Emergency** 🔑11
402k11 Most Cited Cases
(Formerly 402k1)
An "alien friend" is a subject of a foreign state at peace with United States while an "alien enemy" is the subject of a foreign state at war with United States.

**[2] Aliens, Immigration, and Citizenship** 🔑120
24k120 Most Cited Cases

(Formerly 24k3)
Mere lawful presence in the country by an alien creates an implied assurance of safe conduct and gives him certain rights, and such rights become more extensive and secure when he makes preliminary declaration of intention to become a citizen, and they expand to those of full citizenship upon naturalization.

**[3] War and National Emergency** 🔑11
402k11 Most Cited Cases
(Formerly 402k1)
An alien enemy is bound by an allegiance which commits him to lose no opportunity to forward the cause of the enemy, and hence United States, assuming him to be faithful to his allegiance, regards him as part of the enemy resources, and takes measures to disable him from commission of hostile acts imputed as his intention.

**[4] War and National Emergency** 🔑11
402k11 Most Cited Cases
(Formerly 402k1)
A resident enemy alien is constitutionally subject to summary arrest, internment and deportation whenever a "declared war" exists and courts will entertain his plea for freedom from executive custody only to ascertain the existence of a state of war and whether he is an alien enemy and so subject to the Alien Enemy Act. Alien Enemy Act, as amended, 50 U.S.C.A. § 21.

**[5] War and National Emergency** 🔑10(2)
402k10(2) Most Cited Cases
Under rule of common law and law of nations, alien enemies resident in the country of the enemy cannot maintain an action in courts of the United States during the period of hostilities.

**[6] Habeas Corpus** 🔑685
197k685 Most Cited Cases
(Formerly 197k82)
A basic consideration in habeas corpus is that the prisoner will be produced before the courts, though production of the prisoner may be dispensed with where it appears on face of the application that no cause for granting the writ exists. 28 U.S.C.A. § 2243.

**[7] Armed Services** 🔑31
34k31 Most Cited Cases

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 S.Ct. 936
339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255
(Cite as: 339 U.S. 763, 70 S.Ct. 936)

Page 2

**[7] Constitutional Law** 278.6(1)
92k278.6(1) Most Cited Cases
(Formerly 92k252, 197k82)
American citizens conscripted into the military
service are thereby stripped of their Fifth Amendment
rights and as members of the military establishment
are subject to its discipline, including military trial
for offenses against aliens or Americans.
U.S.C.A.Const. Amend. 5.

**[8] War and National Emergency** 11
402k11 Most Cited Cases
The federal Constitution does not confer a right of
personal security or an immunity from military trial
and punishment upon an alien enemy engaged in
hostile service of a government at war with the
United States. U.S.C.A.Const. Amend. 5.

**[9] War and National Emergency** 32
402k32 Most Cited Cases
Military authorities have jurisdiction, during or
following hostilities, to punish those guilty of
offenses against the laws of war.

**[10] War and National Emergency** 32
402k32 Most Cited Cases
The article of Geneva Convention requiring notice to
the protecting power at the opening of a judicial
proceeding directed against a prisoner of war before
date set for opening of the trial applied only to
proceedings for disciplinary offenses committed
during captivity, and not in case of war crimes
committed before capture. Geneva Convention July
27, 1929, art. 60, 47 Stat. 2051.

**[11] War and National Emergency** 32
402k32 Most Cited Cases
The article of Geneva Convention providing that
sentence be pronounced against the prisoner of war
only by same course and according to same
procedure as in case of persons belonging to armed
forces of detaining power referred only to those
proceedings for disciplinary offenses during
captivity, and did not apply to a trial for war crimes.
Geneva Convention, July, 27, 1929, art. 63, 47 Stat.
2052.

**[12] Habeas Corpus** 521
197k521 Most Cited Cases
(Formerly 197k38)
German nationals, confined in custody of United
States Army in Germany following conviction by
military commission of having engaged in military

activity against United States in China after surrender
of Germany, had no right to writ of habeas corpus to
test legality of their detention. U.S.C.A.Const. arts. 1,
2, § 2, art. 3; Amends. 5, 6; Geneva Convention,
July 27, 1929, arts. 60, 63, 75, 47 Stat. 2021, 2051,
2052, 2055.
**937 *765 Mr. Solicitor General Philip B. Perlman,
Washington, D.C., for petitioners.

Messrs. A. Frank Reel, Boston, Mass., Milton
Sandberg, New York City, for respondents.

Mr. Justice JACKSON delivered the opinion of the
Court.

The ultimate question in this case is one of
jurisdiction of civil courts of the United States vis-a -
vis military authorities in dealing with enemy aliens
overseas. The issues come here in this way:

Twenty-one German nationals petitioned the District
Court of the District of Columbia for writs of habeas
corpus. They alleged that, prior to May 8, 1945, they
were in service of German armed forces in China.
They amended to allege that their employment there
was by civilian agencies of the German Government.
Their exact affiliation is disputed, and, for our
purposes, immaterial. On May 8, 1945, the German
High Command *766 executed an act of
unconditional surrender, expressly obligating all
forces under German control at once to cease active
hostilities. These prisoners have been convicted of
violating laws of war, by engaging in, permitting or
ordering continued military activity against the
United States after surrender of Germany and before
surrender of Japan. Their hostile operations
consisted principally of collecting and furnishing
intelligence concerning American forces and their
movements to the Japanese armed forces. They, with
six others who were acquitted, were taken into
custody by the United States Army after the Japanese
surrender and were tried and convicted by a Military
Commission constituted by our Commanding
General at Nanking by delegation from the
Commanding General, United States Forces, China
Theatre, pursuant to authority specifically granted by
the Joint Chiefs of Staff of the United States. The
Commission sat in China, with express consent of the
Chinese Government. The proceeding was
conducted wholly under American auspices and
involved no international participation. After
conviction, the sentences were duly reviewed and,
with immaterial modification, approved by military
reviewing authority.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The prisoners were repatriated to Germany to serve their sentences.  Their immediate custodian is Commandant of Landsberg Prison, an American Army officer under the Commanding General, Third United States Army and the Commanding General, European Command.  He could not be reached by process from **938 the District Court.  Respondents named in the petition are Secretary of Defense, Secretary of the Army, Chief of Staff of the Army, and the Joint Chiefs of Staff of the United States.

The petition alleges, and respondents denied, that the jailer is subject to their direction.  The Court of Appeals assumed, and we do likewise, that, while prisoners are *767 in immediate physical custody of an officer or officers not parties to the proceeding, respondents named in the petition have lawful authority to effect that release.

The petition prays an order that the prisoners be produced before the District Court, that it may inquire into their confinement and order them discharged from such offenses and confinement.  It is claimed that their trial, conviction and imprisonment violate Articles I and III of the Constitution, and the Fifth Amendment thereto, and other provisions of the Constitution and laws of the United States and provisions of the Geneva Convention governing treatment of prisoners of war.

A rule to show cause issued, to which the United States made return.  Thereupon the petition was dismissed on authority of Ahrens v. Clark, 335 U.S. 188, 68 S.Ct. 1443, 92 L.Ed. 1898.

The Court of Appeals reversed and, reinstating the petition, remanded for further proceedings.  84 U.S.App.D.C. 396, 174 F.2d 961.  It concluded that any person, including an enemy alien, deprived of his liberty anywhere under any purported authority of the United States is entitled to the writ if he can show that extension to his cases of any constitutional rights or limitations would show his imprisonment illegal; that, although no statutory jurisdiction of such cases is given, courts must be held to possess it as part of the judicial power of the United States; that where deprivation of liberty by an official act occurs outside the territorial jurisdiction of any District Court, the petition will lie in the District Court which has territorial jurisdiction over officials who have directive power over the immediate jailer.

The obvious importance of these holdings to both judicial administration and military operations impelled us to grant certiorari.  338 U.S. 877, 70 S.Ct. 158.  The case is before us only on issues of law.  The writ of habeas corpus must be granted 'unless it appears from the application' that the applicants are not entitled to it. 28 U.S.C. s 2243, 28 U.S.C.A. s 2243.

*768 We are cited to no instance where a court, in this or any other country where the writ is known, has issued it on behalf of an alien enemy who, at no relevant time and in no stage of his captivity, has been within its territorial jurisdiction. Nothing in the text of the Constitution extends such a right, nor does anything in our statutes.  Absence of support from legislative or juridical sources is implicit in the statement of the court below that 'The answers stem directly from fundamentals.  They cannot be found by casual reference to statutes or cases.'  The breadth of the court's premises and solution requires us to consider questions basic to alien enemy and kindred litigation which for some years have been beating upon our doors. [FN1]

> FN1. From January 1948 to today, motions for leave to file petitions for habeas corpus in this Court, and applications treated by the Court as such, on behalf of over 200 German enemy aliens confined by American military authorities abroad were filed and denied.  Brandt v. United States, and 13 companion cases, 333 U.S. 836, 68 S.Ct. 603, 92 L.Ed. 1119; In re Eichel (one petition on behalf of three persons), 333 U.S. 865, 68 S.Ct. 787, 92 L.Ed. 1144; Everett v. Truman (one petition on behalf of 74 persons), 334 U.S. 824, 68 S.Ct. 1081, 92 L.Ed. 1753; In re Krautwurst, and 11 companion cases, 334 U.S. 826, 68 S.Ct. 1328, 92 L.Ed. 1754; In re Ehlen 'et al.,' and In re Girke 'et al.,' 334 U.S. 836, 68 S.Ct. 1491, 92 L.Ed. 1762; In re Gronwald 'et al.,' 334 U.S. 857, 68 S.Ct. 1522, 92 L.Ed. 1777; In re Stattmann, and 3 companion cases, 335 U.S. 805, 69 S.Ct. 18, 93 L.Ed. 362; In re Vetter, and 6 companion cases, 335 U.S. 841, 69 S.Ct. 59, 93 L.Ed. 392; In re Eckstein, 335 U.S. 851, 69 S.Ct. 79, 93 L.Ed. 399; In re Heim, 335 U.S. 856, 69 S.Ct. 126, 93 L.Ed. 404; In re Dammann, and 4 companion cases, 336 U.S. 922--923, 69 S.Ct. 644, 93 L.Ed. 1084; In re Muhlbauer, and 57 companion cases, covering at least 80 persons, 336 U.S. 964, 69 S.Ct. 930, 93 L.Ed. 1115; In re Felsch, 337 U.S. 953, 69 S.Ct. 1523, 93 L.Ed. 1754; In re Buerger, 338 U.S. 884, 70 S.Ct. 183; In

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255
**(Cite as: 339 U.S. 763, 70 S.Ct. 936)**

re Hans, 339 U.S. 976, 70 S.Ct. 1007; In re Schmidt, 339 U.S. 976, 70 S.Ct. 1007; Lammers v. U.S., 339 U.S. 976, 70 S.Ct. 1008. And see also Milch v. United States, 332 U.S. 789, 68 S.Ct. 92, 92 L.Ed. 371. These cases and the variety of questions they raised are analyzed and discussed by Fairman, Some New Problems of the Constitution Following the Flag, 1 Standard L.Rev. 587.

**\*\*939 I.**

[1] Modern American law has come a long way since the time when outbreak of war made every enemy national \*769 an outlaw, subject to both public and private slaughter, cruelty and plunder. But even by the most magnanimous view, our law does not abolish inherent distinctions recognized throughout the civilized world between citizens and aliens, nor between aliens of friendly and of enemy allegiance, [FN2] nor between resident enemy aliens who have submitted themselves to our laws and nonresident enemy aliens who at all times have remained with, and adhered to, enemy governments.

> FN2. '* * * In the primary meaning of the words, an alien friend is the subject of a foreign state at peace with the United States; an alien enemy is the subject of a foreign state at war with the United States. 1 Kent, Comm. p. 55; 2 Halleck, Int.L. (Rev.1908) p. 1; Hall, Int.Law (7th Ed.) p. 403, s 126; Baty & Morgan, 'War: Its Conduct and Legal Results,' p. 247; 1 Halsbury, Laws of England, p. 310; Sylvester's Case, 7 Mod. 150; The Roumanian, 1915, Prob.Div. 26; affd., 1916, 1 A.C. 124; Griswold v. Waddington, 16 Johns., N.Y., 438, 448; White v. Burnley, 20 How. 235, 249 (61 U.S. 235), 15 L.Ed. 886; The Benito Estenger, 176 U.S. 568, 571, 20 S.Ct. 489, 44 L.Ed. 592; Kershaw v. Kelsey, 100 Mass. 561, 97 Am.Dec. 124, 1 Am.Rep. 142; so all the lexicographers, as, e.g., Webster, Murray, Abbott, Black, Bouvier. * * *' Cardozo, J., in Techt v. Hughes, 229 N.Y. 222, 229, 128 N.E. 185, 186, 11 A.L.R. 166.

With the citizen we are now little concerned, except to set his case apart as untouched by this decision and to take measure of the difference between his status and that of all categories of aliens. Citizenship as a head of jurisdiction and a ground of protection was old when Paul invoked it in his appeal to Caesar. The years have not destroyed nor diminished the importance of citizenship nor have they sapped the vitality of a citizen's claims upon his government for protection. If a person's claim to United States citizenship is denied by any official, Congress has directed our courts to entertain his action to declare him to be a citizen 'regardless of whether he is within the United States or abroad.' 54 Stat. 1171, 8 U.S.C. s 903, 8 U.S.C.A. s 903. This Court long ago extended habeas corpus to one seeking admission to the country to assure fair hearing of his claims to citizenship, \*770Chin Yow v. United States, 208 U.S. 8, 28 S.Ct. 201, 52 L.Ed. 369, and has secured citizenship against forfeiture by involuntary formal acts, Perkins v. Elg, 307 U.S. 325, 59 S.Ct. 884, 83 L.Ed. 1320. [FN3] Because the Government's obligation of protection is correlative with the duty of loyal support inherent in the citizen's allegiance, Congress has directed the President to exert the full diplomatic and political power of the United States on behalf of any citizen, but of no other, in jeopardy abroad. When any citizen is deprived of his liberty by any foreign government, it is made the duty of the President to demand the reasons and, if the detention appears wrongful, to use means not amounting to acts of war to effectuate his release. [FN4] It is neither sentimentality nor chauvinism to repeat that 'Citizenship is a \*\*940 high privilege.' United States v. Manzi, 276 U.S. 463, 467, 48 S.Ct. 328, 329, 72 L.Ed. 654.

> FN3. For cases in lower courts, see Note, 18 Geo.Wash.L.Rev. 410.
>
> FN4. 'Whenever it is made known to the President that any citizen of the United States has been unjustly deprived of his liberty by or under the authority of any foreign government, it shall be the duty of the President forthwith to demand of that government the reasons of such imprisonment; and if it appears to be wrongful and in violation of the rights of American citizenship, the President shall forthwith demand the release of such citizen, and if the release so demanded is unreasonably delayed or refused, the President shall use such means, not amounting to acts of war, as he may think necessary and proper to obtain or effectuate the release; and all the facts and proceedings relative thereto shall as soon as practicable be communicated by the President to Congress.' 15 Stat. 224, 8 U.S.C. s 903b, 8 U.S.C.A. s 903b.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 S.Ct. 936
339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255
(Cite as: 339 U.S. 763, 70 S.Ct. 936)

[2] The alien, to whom the United States has been traditionally hospitable, has been accorded a generous and ascending scale of rights as he increases his identity with our society. Mere lawful presence in the country creates an implied assurance of safe conduct and gives him certain rights; they become more extensive and secure when he makes preliminary declaration of intention to become a citizen, and they expand to those of full citizenship upon naturalization.    During his probationary residence, **771 this Court has steadily enlarged his right against Executive deportation except upon full and fair hearing.    The Japanese Immigrant Case (Yamataya v. Fisher), 189 U.S. 86, 23 S.Ct. 611, 47 L.Ed. 721; Low Wah Suey v. Backus, 225 U.S. 460, 32 S.Ct. 734, 56 L.Ed. 1165; Tisi v. Tod, 264 U.S. 131, 44 S.Ct. 260, 68 L.Ed. 590; United States ex rel. Vajtauer v. Com'r, 273 U.S. 103, 47 S.Ct. 302, 71 L.Ed. 560; Bridges v. Wixon, 326 U.S. 135, 65 S.Ct. 1443, 89 L.Ed. 2103; Wong Yang Sung v. McGrath, 339 U.S. 33, 70 S.Ct. 445. And, at least since 1886, we have extended to the person and property of resident aliens important constitutional guaranties-- such as the due process of law of the Fourteenth Amendment.    Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220.

But, in extending constitutional protections beyond the citizenry, the Court has been at pains to point out that it was the alien's presence within its territorial jurisdiction that gave the Judiciary power to act. In the pioneer case of Yick Wo v. Hopkins, the Court said of the Fourteenth Amendment, 'These provisions are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality; * * *.' (Italics supplied.) 118 U.S. 356, 369, 6 S.Ct. 1064, 1070, 30 L.Ed. 220. And in The Japanese Immigrant Case, the Court held its processes available to 'an alien who has entered the country, and has become subject in all respects to its jurisdiction, and a part of its population, although alleged to be illegally here.' 189 U.S. 86, 101, 23 S.Ct. 611, 614, 47 L.Ed. 721.

Since most cases involving aliens afford this ground of jurisdiction, and the civil and property rights of immigrants or transients of foreign nationality so nearly approach equivalence to those of citizens, courts in peace time have little occasion to inquire whether litigants before them are alien or citizen.

It is war that exposes the relative vulnerability of the alien's status. The security and protection enjoyed while the nation of his allegiance remains in amity with the United States are greatly impaired when his nation takes up arms against us. While his lot is far more humane *772 and endurable than the experience of our citizens in some enemy lands, it is still not a happy one. But disabilities this country lays upon the alien who becomes also an enemy are imposed temporarily as an incident of war and not as an incident of alienage. Judge Cardozo commented concerning this distinction: 'Much of the obscurity which surrounds the rights of aliens has its origin in this confusion of diverse subjects.' Techt v. Hughes, 229 N.Y. 222, 237, 128 N.E. 185, 189, 11 A.L.R. 166.

**941 [3] American doctrine as to effect of war upon the status of nationals of belligerents took permanent shape following our first foreign war. Chancellor Kent, after considering the leading authorities of his time, declared the law to be that '* * * in war, the subjects of each country were enemies to each other, and bound to regard and treat each other as such.' Griswold v. Waddington, 16 Johns., N.Y., 438, 480.    If this was ever something of a fiction, it is one validated by the actualities of modern total warfare. Conscription, compulsory service and measures to mobilize every human and material resource and to utilize nationals--wherever they may be--in arms, intrigue and sabotage, attest the prophetic realism of what once may have seemed a doctrinaire and artificial principle.    With confirmation of recent history, we may reiterate this Court's earlier teaching that in war 'every individual of the one nation must acknowledge every individual of the other nation as his own enemy--because the enemy of his country.' The Rapid, 8 Cranch 155, 161, 3 L.Ed. 520.  See also White v. Burnley, 20 How. 235, 249, 15 L.Ed. 886. Lamar v. Browne, 92 U.S. 187, 194, 23 L.Ed. 650. And this without regard to his individual sentiments or disposition.     The Benito Estenger, 176 U.S. 568, 571, 20 S.Ct. 489, 490, 44 L.Ed. 592. The alien enemy is bound by an allegiance which commits him to lose no opportunity to forward the cause of our enemy; hence the United States, assuming him to be faithful to his allegiance, *773 regards him as part of the enemy resources. It therefore takes measures to disable him from commission of hostile acts imputed as his intention because they are a duty to his sovereign.

The United States does not invoke this enemy allegiance only for its own interest, but respects it also when to the enemy's advantage. In World War I our conscription act did not subject the alien enemy to compulsory military service. 40 Stat. 885, c. XII, s 4. The Selective Service Act of 1948, 62 Stat. 604, 50 U.S.C.Appendix, s 454(a), 50 U.S.C.A.Appendix, s

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

454(a), exempts aliens who have not formally declared their intention to become citizens from military training, service and registration, if they make application, but if so relieved, they are barred from becoming citizens. Thus the alien enemy status carries important immunities as well as disadvantages. The United States does not ask him to violate his allegiance or to commit treason toward his own country for the sake of ours. This also is the doctrine and the practice of other states comprising our Western Civilization. [FN5]

FN5. See Delaney, The Alien Enemy and the Draft, 12 Brooklyn L.Rev. 91.

The essential pattern for seasonable Executive constraint of enemy aliens, not on the basis of individual prepossessions for their native land but on the basis of political and legal relations to the enemy government, was laid down in the very earliest days of the Republic and has endured to this day. It was established by the Alien Enemy Act of 1798. 1 Stat. 577, as amended, 50 U.S.C. s 21, 50 U.S.C.A. s 21. And it is to be noted that, while the Alien and Sedition Acts of that year provoked a reaction which helped sweep the party of Mr. Jefferson into power in 1800, and though his party proceeded to undo what was regarded as the mischievous legislation of the Federalists, *774 this enactment was never repealed. [FN6] Executive power over enemy aliens, undelayed and unhampered by litigation, **942 has been deemed, throughout our history, essential to war-time security. This is in keeping with the practices of the most enlightened of nations and has resulted in treatment of alien enemies more considerate than that *775 which has prevailed among any of our enemies and some of our allies. This statute was enacted or suffered to continue by men who helped found the Republic and formulate the Bill of Rights, and although it obviously denies enemy aliens the constitutional immunities of citizens, it seems not then to have been supposed that a nation's obligations to its foes could ever be put on a parity with those to its defenders.

FN6. '* * * In 1798, the 5th Congress passed three acts in rapid succession, 'An Act concerning Aliens', approved June 25, 1798 (1 Stat. 570), 'An Act respecting Alien Enemies', approved July 6, 1798 (1 Stat. 577, 50 U.S.C.A. s 21 et seq.), and 'An Act in addition to the act, entitled 'An act for the punishment of certain crimes against the United States'', approved July 14, 1798. (1 Stat. 596.) The first and last were the Alien and Sedition Acts, vigorously attacked in Congress and by the Virginia and Kentucky Resolutions as unconstitutional. But the members of Congress who vigorously fought the Alien Act saw no objection to the Alien Enemy Act. (8 Annals of Cong. 2035 (5th Cong., 1798).) In fact, Albert Gallatin, who led that opposition, was emphatic in distinguishing between the two bills and in affirming the constitutional power of Congress over alien enemies as part of the power to declare war. (Id. at 1980.) James Madison was the author of the Virginia Resolutions, and in his report to the Virginia House of Delegates the ensuing year after the deluge of controversy, he carefully and with some tartness asserted a distinction between alien members of a hostile nation and alien members of a friendly nation, disavowed any relation of the Resolutions to alien enemies, and declared, 'With respect to alien enemies, no doubt has been intimated as to the federal authority over them; the Constitution having expressly delegated to Congress the power to declare war against any nation, and of course to treat it and all its members as enemies.' (Madison's Report, 4 Elliot's Deb. 546, 554 (1800).) Thomas Jefferson wrote the Kentucky Resolutions, and he was meticulous in identifying the Act under attack as the Alien Act 'which assumes power over alien friends'. (Kentucky Resolutions of 1798 and 1799, 4 Elliot's Deb. 540, 541.) It is certain that in the white light which beat about the subject in 1798, if there had been the slightest question in the minds of the authors of the Constitution or their contemporaries concerning the constitutionality of the Alien Enemy Act, it would have appeared. None did.

'The courts, in an unbroken line of cases from Fries' case (Case of Fries, C.C.D.Pa.1799, 9 Fed.Cas. at pages 826, 830 et seq., No. 5,126), in 1799 to Schwarzkopf's case (United States ex rel. Schwarzkopf v. Uhl, 2 Cir., 1943, 137 F.2d 898) in 1943, have asserted or assumed the validity of the Act and based numerous decisions upon the assumption. (Brown v. United States, 1814, 8 Cranch 110, 3 L.Ed. 504; De Lacey v. United States, 9 Cir., 1918, 249 F. 625, L.R.A.1918E, 1011; Grahl v. United States, 7 Cir., 1919, 261 F. 487; Lockington's Case, 1813, Brightly, N.P., Pa.,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 7

339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255
(Cite as: 339 U.S. 763, 70 S.Ct. 936)

269, 283; Lockington v. Smith, C.C.D.Pa., 1817, 15 Fed.Cas. page 758, No. 8,448; Ex parte Graber, D.C.N.D.Ala.1918, 247 F. 882; Minotto v. Bradley, D.C.N.D.Ill.1918, 252 F. 600; Ex parte Fronklin, D.C.Miss.1918, 253 F. 984; Ex parte Risse, D.C.S.D.N.Y.1919, 257 F. 102; Ex parte Gilroy, D.C.S.D.N.Y.1919, 257 F. 110.) The judicial view has been without dissent.
'At common law 'alien enemies have no rights, no privileges, unless by the king's special favour, during the time of war.' (1 Blackstone * 372, 373.)' Prettyman, J. in Citizens Protective League v. Clark, 81 U.S.App.D.C. 116, 119, 155 F.2d 290, 293.

[4] The resident enemy alien is constitutionally subject to summary arrest, internment and deportation whenever a 'declared war' exists. Courts will entertain his plea for freedom from Executive custody only to ascertain the existence of a state of war and whether he is an alien enemy and so subject to the Alien Enemy Act. Once these jurisdictional elements have been determined, courts will not inquire into any other issue as to his internment. Ludecke v. Watkins, 335 U.S. 160, 68 S.Ct. 1429, 92 L.Ed. 1881. [FN7]

> FN7. See also Notes, 22 So.Cal.L.Rev. 307; 60 Harv.L.Rev. 456; 47 Mich.L.Rev. 404; 17 Geo.Wash.L.Rev. 578; 27 N.C.L.Rev. 238; 34 Corn.L.Q. 425. In this respect our courts follow the practice of the English courts. 44 Am.J.Int.L. 382.

*776 The standing of the enemy alien to maintain any action in the courts of the United States has been often challenged and sometimes denied. The general statement was early made on combined authority of Kent and Story 'That they have no power to sue in the public courts of the enemy nation.' Griswold v. Waddington, 16 Johns., N.Y., 438, 477. Our rule of generous access to the resident enemy alien was first laid down **943 by Chancellor Kent in 1813, when, squarely faced with the plea that an alien enemy could not sue upon a debt contracted before the War of 1812, he reviewed the authorities to that time and broadly declared that 'A lawful residence implies protection, and a capacity to sue and be sued. A contrary doctrine would be repugnant to sound policy, no less than to justice and humanity.' Clarke v. Morey, 10 Johns., N.Y., 70, 72. A unanimous Court recently clarified both the privilege of access to our courts and the limitations upon it. We said: 'The ancient rule against suits by resident alien enemies

has survived only so far as necessary to prevent use of the courts to accomplish a purpose which might hamper our own war efforts or give aid to the enemy. This may be taken as the sound principle of the common law today.' Ex parte Kawato, 317 U.S. 69, 75, 63 S.Ct. 115, 118, 87 L.Ed. 58.

[5] But the nonresident enemy alien, especially one who has remained in the service of the enemy, does not have even this qualified access to our courts, for he neither has comparable claims upon our institutions nor could his use of them fail to be helpful to the enemy. Our law on this subject first emerged about 1813 when the Supreme Court of the State of New York had occassion, in a series of cases, to examine the foremost authorities of the Continent and of England. It concluded the rule of the common law and the law of nations to be that alien enemies resident in the country of the enemy could not maintain an action in its courts during the period of hostilities. Bell v. Chapman, 10 Johns., N.Y., 183; Jackson ex dem. Johnston v. Decker, 11 *777 Johns., N.Y., 418; Clarke v. Morey, 10 Johns., N.Y., 69, 70, 74--75. This Court has recognized that rule, Caperton v. Bowyer, 14 Wall. 216, 236, 20 L.Ed. 882; Masterson v. Howard, 18 Wall. 99, 105, 21 L.Ed. 764, and followed it, Ex parte Colonna, 314 U.S. 510, 62 S.Ct. 373, 86 L.Ed. 379, and it continues to be the law throughout this country and in England. [FN8]

> FN8. See cases collected in Annotations, 137 A.L.R. 1335, 1355; 1918B L.R.A. 189, 191. See also Borchard, The Right of Alien Enemies to Sue in Our Courts, 27 Yale L.J. 104; Gordon, The Right of Alien Enemies to Sue in American Courts, 36 Ill.L.Rev. 809, 810; Battle, Enemy Litigants in Our Courts, 28 Va.L.Rev. 429; Rylee, Enemy Aliens as Litigants, 12 Geo.Wash.L.Rev. 55, 65; notes, 5 U. of Detroit L.J., 106, 22 Neb.L.Rev. 36, 30 Cal.L.Rev. 358, 54 Harv.L.Rev. 350.

II.

The foregoing demonstrates how much further we must go if we are to invest these enemy aliens, resident, captured and imprisoned abroad, with standing to demand access to our courts.

We are here confronted with a decision whose basic premise is that these prisoners are entitled, as a constitutional right, to sue in some court of the United States for a writ of habeas corpus. To support that assumption we must hold that a prisoner of our

339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255
**(Cite as: 339 U.S. 763, 70 S.Ct. 936)**

military authorities is constitutionally entitled to the writ, even though he (a) is an enemy alien; (b) has never been or resided in the United States; (c) was captured outside of our territory and there held in military custody as a prisoner of war; (d) was tried and convicted by a Military Commission sitting outside the United States; (e) for offenses against laws of war committed outside the United States; (f) and is at all times imprisoned outside the United States.

We have pointed out that the privilege of litigation has been extended to aliens, whether friendly or enemy, only because permitting their presence in the country implied *778 protection. No such basis can be invoked here, for these prisoners at no relevant time were within any territory over which the United States is sovereign, and the scenes of their offense, their capture, their trial and their punishment were all beyond the territorial jurisdiction of any court of the United States.

Another reason for a limited opening of **944 our courts to resident aliens is that among them are many of friendly personal disposition to whom the status of enemy is only one imputed by law. But these prisoners were actual enemies, active in the hostile service of an enemy power There is no fiction about their enmity. Yet the decision below confers upon them a right to use our courts, free even of the limitation we have imposed upon resident alien enemies, to whom we deny any use of our courts that would hamper our war effort or aid the enemy.

[6] A basic consideration in habeas corpus practice is that the prisoner will be produced before the court. This is the crux of the statutory scheme established by the Congress; [FN9] indeed, it is inherent in the very term 'habeas corpus.' [FN10] And though production of the prisoner may be dispensed with where it appears on the face of the application that no cause for granting the writ exists, Walker v. Johnston, 312 U.S. 275, 284, 61 S.Ct. 574, 578, 85 L.Ed. 830, we have consistently adhered to and recognized the general rule. Ahrens v. Clark, 335 U.S. 188, 190--191, 68 S.Ct. 1443, 1441, 92 L.Ed. 1898. To grant the *779 writ to these prisoners might mean that our army must transport them across the seas for hearing. This would require allocation of shipping space, guarding personnel, billeting and rations. It might also require transportation for whatever witnesses the prisoners desired to call as well as transportation for those necessary to defend legality of the sentence. The writ, since it is held to be a matter of right, would be equally available to enemies during active

hostilities as in the present twilight between war and peace. Such trials would hamper the war effort and bring aid and comfort to the enemy. They would diminish the prestige of our commanders, not only with enemies but with wavering neutrals. It would be difficult to devise more effective fettering of a field commander than to allow the very enemies he is ordered to reduce to submission to call him to account in his own civil courts and divert his efforts and attention from the military offensive abroad to the legal defensive at home. Nor is it unlikely that the result of such enemy litigiousness would be a conflict between judicial and military opinion highly comforting to enemies of the United States.

> FN9. 28 U.S.C. s 2243, 28 U.S.C.A. s 2243, provides in part: 'Unless the application for the writ and the return present only issues of law the person to whom the writ is directed shall be required to produce at the hearing the body of the person detained.'

> FN10. 'Habeas Corpus * * * thou (shalt) have the body (sc. in court).
> 'A writ issuing out of a court of justice * * * requiring the body of a person to be brought before the judge or into the court for the purpose specified in the writ; * * * requiring the body of a person restrained of liberty to be brought before the judge or into court, that the lawfulness of the restraint may be investigated and determined.' The Oxford English Dictionary (1933), Vol. V, p. 2.

Moreover, we could expect no reciprocity for placing the litigation weapon in unrestrained enemy hands. The right of judicial refuge from military action, which it is proposed to bestow on the enemy, can purchase no equivalent for benefit of our citizen soldiers. Except England, whose law appears to be in harmony with the views we have expressed, and other English-speaking peoples in whose practice nothing has been cited to the contrary, the writ of habeas corpus is generally unknown.

The prisoners rely, however, upon two decisions of this Court to get them over the threshold--Ex parte Quirin, 317 U.S. 1, 63 S.Ct. 2, 87 L.Ed. 3, and In re Yamashita, 327 U.S. 1, 66 S.Ct. 340, 90 L.Ed. 499. Reliance on the Quirin case is clearly mistaken. Those prisoners were in custody in the District of Columbia. One was, or *780 claimed to be, a citizen. They were tried by a Military Commission sitting in the District of Columbia at a time when civil courts were open and functioning normally. **945 They

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 S.Ct. 936                                                                                      Page 9
339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255
**(Cite as: 339 U.S. 763, 70 S.Ct. 936)**

were arrested by civil authorities and the prosecution was personally directed by the Attorney General, a civilian prosecutor, for acts committed in the United States. They waived arraignment before a civil court and it was contended that the civil courts thereby acquired jurisdiction and could not be ousted by the Military. None of the places where they were acting, arrested, tried or imprisoned were, it was contended, in a zone of active military operations, were not under martial law or any other military control, and no circumstances justified transferring them from civil to military jurisdiction. None of these grave grounds for challenging military jurisdiction can be urged in the case now before us.

Nor can the Court's decision in the Yamashita case aid the prisoners. This Court refused to receive Yamashita's petition for a writ of habeas corpus. For hearing and opinion, it was consolidated with another application for a writ of certiorari to review the refusal of habeas corpus by the Supreme Court of the Philippines over whose decisions the statute then gave this Court a right of review. 28 U.S.C. s 349 (1940), repealed by Act of June 25, 1948, c. 646, s \ 39, 62 Stat. 992, 1000. By reason of our sovereignty at that time over these insular possessions, Yamashita stood much as did Quirin before American courts. Yamashita's offenses were committed on our territory, he was tried within the jurisdiction of our insular courts and he was imprisoned within territory of the United States. None of these heads of jurisdiction can be invoked by these prisoners.

Despite this, the doors of our courts have not been summarily closed upon these prisoners. Three courts have considered their application and have provided their counsel opportunity to advance every argument in their *781 support and to show some reason in the petition why they should not be subject to the usual disabilities of non-resident enemy aliens. This is the same preliminary hearing as to sufficiency of application that was extended in Quirin, supra, Yamashita, supra, and Hirota v. MacArthur, 338 U.S. 197, 69 S.Ct. 197, 1238, 93 L.Ed. 1902. After hearing all contentions they have seen fit to advance and considering every contention we can base on their application and the holdings below, we arrive at the same conclusion the Court reached in each of those cases, viz.: that no right to the writ of habeas corpus appears.

III.

The Court of Appeals dispensed with all requirement of territorial jurisdiction based on place of residence, captivity, trial, offense, or confinement. It could not predicate relief upon any intraterritorial contact of these prisoners with our laws or institutions. Instead, it gave our Constitution an extraterritorial application to embrace our enemies in arms. Right to the writ, it reasoned, is a subsidiary procedural right that follows from possession of substantive constitutional rights. These prisoners, it considered, are invested with a right of personal liberty by our Constitution and therefore must have the right to the remedial writ. The court stated the steps in its own reasoning as follows: 'First. The Fifth Amendment, by its terms, applies to 'any person'. Second. Action of Government officials in violation of the Constitution is void. This is the ultimate essence of the present controversy. Third. A basic and inherent function of the judicial branch of a government built upon a constitution is to set aside void action by government officials, and so to restrict executive action to the confines of the constitution. In our jurisprudence, no Government action which is void under the Constitution is exempt from judicial power. Fourth. The writ *782 of habeas corpus is the established, time-honored process in our law for testing the authority of one who deprives another of his liberty,-- 'the best and only sufficient defense of personal freedom.' * * *' 84 U.S.App.D.C. 396, 398--399, 174 F.2d 961, 963--964.

The doctrine that the term 'any person' in the Fifth Amendment spreads its protection **946 over alien enemies anywhere in the world engaged in hostilities against us, should be weighed in light of the full text of that Amendment: 'No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.'

When we analyze the claim prisoners are asserting and the court below sustained, it amounts to a right not to be tried at all for an offense against our armed forces. If the Fifth Amendment protects them from military trial, the Sixth Amendment as clearly prohibits their trial by civil courts. The latter requires in all criminal prosecutions that 'the accused' be tried 'by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law.' And

70 S.Ct. 936
339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255
(Cite as: 339 U.S. 763, 70 S.Ct. 936)

Page 10

if the Fifth be held to embrace these prisoners because it uses the inclusive term 'no person,' the Sixth must, for it applies to all 'accused.' No suggestion is advanced by the court below or by prisoners of any constitutional *783 method by which any violations of the laws of war endangering the United States forces could be reached or punished, if it were not by a Military Commission in the theatre where the offense was committed.

The Court of Appeals has cited no authority whatever for holding that the Fifth Amendment confers rights upon all persons, whatever their nationality, wherever they are located and whatever their offenses, except to quote extensively from a dissenting opinion in In re Yamashita, 327 U.S. 1, 26, 66 S.Ct. 340, 353, 90 L.Ed. 499. The holding of the Court in that case is, of course, to the contrary.

[7] If this Amendment invests enemy aliens in unlawful hostile action against us with immunity from military trial, it puts them in a more protected position than our own soldiers. American citizens conscripted into the military service are thereby stripped of their Fifth Amendment rights and as members of the military establishment are subject to its discipline, including military trials for offenses against aliens or Americans. Cf. Humphrey v. Smith, 336 U.S. 695, 69 S.Ct. 830, 93 L.Ed. 986; Wade v. Hunter, 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974. Can there be any doubt that our foes would also have been excepted, but for the assumption 'any person' would never be read to include those in arms against us? It would be a paradox indeed if what the Amendment denied to Americans it guaranteed to enemies. And, of course, it cannot be claimed that such shelter is due them as a matter of comity for any reciprocal rights conferred by enemy governments on American soldiers. [FN11]

FN11. 'All merchants, if they were not openly prohibited before, shall have their safe and sure conduct to depart out of England, to come into England, to tarry in, and go through England, as well by land as by water, to buy and sell without any manner of evil tolles by the old and rightful customs, except in time of war; and if they be of a land making war against us, and be found in our realm at the beginning of the wars, they shall be attached without harm of body or goods, until it be known unto us, or our chief justice, how our merchants be entreated who are then found in the land making war against us; and if our merchants

be well intreated there, theirs shall be likewise with us.' (Emphasis added.) C. 30 of the Magna Carta, in 3 The Complete Statutes of England (Halsbury's Laws of England 1929) at p. 27.

*784 The decision below would extend coverage of our Constitution to nonresident alien enemies denied to resident alien enemies. The latter are entitled only to judicial hearing to determine what the petition of these prisoners admits: that they are really alien **947 enemies. When that appears, those resident here may be deprived of liberty by Executive action without hearing. Ludecke v. Watkins, 335 U.S. 160, 68 S.Ct. 1429, 92 L.Ed. 1881. While this is preventive rather than punitive detention, no reason is apparent why an alien enemy charged with having committed a crime should have greater immunities from Executive action than one who it is only feared might at some future time commit a hostile act.

If the Fifth Amendment confers its rights on all the world except Americans engaged in defending it, the same must be true of the companion civil-rights Amendments, for none of them is limited by its express terms, territorially or as to persons. Such a construction would mean that during military occupation irreconcilable enemy elements, guerrilla fighters, and 'were-wolves' could require the American Judiciary to assure them freedoms of speech, press, and assembly as in the First Amendment, right to bear arms as in the Second, security against 'unreasonable' searches and seizures as in the Fourth, as well as rights to jury trial as in the Fifth and Sixth Amendments.

Such extraterritorial application of organic law would have been so significant an innovation in the practice of governments that, if intended or apprehended, it could scarcely have failed to excite contemporary comment. Not one word can be cited. No decision of this Court supports such a view. Cf. *785Downes v. Bidwell, 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088. None of the learned commentators on our Constitution has ever hinted at it. The practice of every modern government is opposed to it.

[8] We hold that the Constitution does not confer a right of personal security or an immunity from military trial and punishment upon an alien enemy engaged in the hostile service of a government at war with the United States.

IV.

The Court of Appeals appears to have been of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 S.Ct. 936
339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255
**(Cite as: 339 U.S. 763, 70 S.Ct. 936)**

opinion that the petition shows some action by some official of the United States in excess of his authority which confers a private right to have it judicially voided. Its Second and Third propositions were that 'action of government officials in violation of the Constitution is void' and 'a basic and inherent function of the judicial branch * * * is to set aside void action by government officials * * *.' For this reason it thought the writ could be granted.

The petition specifies four reasons why conviction of the Military Commission was in excess of its jurisdiction: two based on the Geneva Convention on July 27, 1929, 47 Stat. 2021, with which we deal later; and two apparently designed to raise constitutional questions. The constitutional contentions are that 'the detention of the prisoners as convicted war criminals is illegal and in violation of Articles I and III of the Constitution of the United States and of the Fifth Amendment thereto, and of other provisions of said Constitution and laws of the United States * * *, in that:

'(a) There being no charge of an offense against the laws of war by the prisoners, the Military Commission was without jurisdiction.

'(b) In the absence of hostilities, martial law, or American military occupation of China, and in view of treaties between the United States and China **786 dated February 4, 1943, and May 4, 1943, and between Germany and China, dated May 18, 1921, the Military Commission was without jurisdiction.'

The petition does not particularize and neither does the court below the specific respects in which it is claimed acts of the Military were ultra vires.

[9] The jurisdiction of military authorities, during or following hostilities, to punish those guilty of offenses against the laws of war is long-established. By the **948 Treaty of Versailles, 'The German Government recognizes the right of the Allied and Associated Powers to bring before military tribunals persons accused of having committed acts in violation of the laws and customs of war.' Article 228. This Court has characterized as 'well-established' the 'power of the military to exercise jurisdiction over members of the armed forces, those directly connected with such forces, or enemy belligerents, prisoners of war, or others charged with violating the laws of war.' Duncan v. Kahanamoku, 327 U.S. 304, 312, 313-314, 66 S.Ct. 606, 610, 90 L.Ed. 688. And we have held in the Quirin and Yamashita cases, supra, that the Military

Commission is a lawful tribunal to adjudge enemy offenses against the laws of war. [FN12]

> FN12.   See   Green,   The   Military
> Commission, 42 Am.J.Int.L. 832.

It is not for us to say whether these prisoners were or were not guilty of a war crime, or whether if we were to retry the case we would agree to the findings of fact or the application of the laws of war made by the Military Commission. The petition shows that these prisoners were formally accused of violating the laws of war and fully informed of particulars of these charges. As we observed in the Yamashita case, 'If the military tribunals have lawful authority to hear, decide and condemn, their action is not subject to judicial review merely because they have made a wrong decision on disputed *787 facts. Correction of their errors of decision is not for the courts but for the military authorities which are alone authorized to review their decisions.' 327 U.S. 1, 8, 66 S.Ct. 340, 344, 90 L.Ed. 499. 'We consider here only the lawful power of the commission to try the petitioner for the offense charged.' Ibid.

That there is a basis in conventional and long-established law by which conduct ascribed to them might amount to a violation seems beyond question. Breach of the terms of an act of surrender is no novelty among war crimes. 'That capitulations must be scrupulously adhered to is an old customary rule, since enacted by Article 35 of the Hague Regulations. [FN13] Any act contrary to a capitulation would constitute an international delinquency if ordered by a belligerent Government, and a war crime if committed without such order. Such violation may be met by reprisals or punishment of the offenders as war criminals.' II Oppenheim, International Law 433 (6th ed. rev., Lauterpacht, 1944). Vattel tells us: 'If any of the subjects, whether military men or private citizens offend against the truce * * * the delinquents should be compelled to make ample compensation for the damage, and severely punished. * * *' Law of Nations, *788 Book III, c. XVI, s 241. And so too, Lawrence, who says, 'If * * * the breach of the conditions agreed upon is the act of unauthorized individuals, the side that suffers * * * may demand the punishment of the guilty parties and an indemnity for any losses it has sustained.' Principles of International Law (5th ed.) p. 566. It being within the jurisdiction of a Military Commission to try the prisoners, it was for it to determine whether the laws of war applied and whether an offense against them had been committed.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN13. Article XXXV of Convention IV signed at The Hague, October 18, 1907, 36 Stat. 2277, 2305, provides: 'Capitulations agreed upon between contracting parties must take into account the rules of military honour.

'Once settled, they must be scrupulously observed by both parties.'

And see VII Moore, International Law Digest (1906) 330: 'If there is one rule of the law of war more clear and peremptory than another, it is that compacts between enemies, such as truces and capitulations, shall be faithfully adhered to; and their non-observance is denounced as being manifestly at variance with the true interest any duty, not only of the immediate parties, but of all mankind. Mr. Webster, Sec. of State, to Mr. Thompson, Apr. 5, 1842, 6 Webster's Works, 438.'

We can only read '(b)' to mean either that the presence of the military forces of the United States in China at the times in question was unconstitutional or if lawfully there, that they had no right under **949 the Constitution to set up a Military Commission on Chinese territory. But it can hardly be meant that it was unconstitutional for the Government of the United States to wage a war in foreign parts. Among powers granted to Congress by the Constitution is power to provide for the common defense, to declare war, to raise and support armies, to provide and maintain a navy, and to make rules for the government and regulation of the land and naval forces, Art. I, s 8, Const. It also gives power to make rules concerning captures on land and water, ibid., which this Court has construed as an independent substantive power. Brown v. United States, 8 Cranch 110, 126, 3 L.Ed. 504. Indeed, out of seventeen specific paragraphs of congressional power, eight of them are devoted in whole or in part to specification of powers connected with warfare. The first of the enumerated powers of the President is that he shall be Commander-in-Chief of the Army and Navy of the United States. Art. II, s 2, Const. And, of course, grant of war power includes all that is necessary and proper for carrying these powers into execution.

*789 Certainly it is not the function of the Judiciary to entertain private litigation--even by a citizen--which challenges the legality, the wisdom, or the propriety of the Commander-in-Chief in sending our armed forces abroad or to any particular region. China appears to have fully consented to the trial within her territories and, if China had complaint at

the presence of American forces there, China's grievance does not become these prisoners' right. The issue tendered by '(b)' involves a challenge to conduct of diplomatic and foreign affairs, for which the President is exclusively responsible. United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255; Chicago & Southern Air Lines v. Waterman Steamship Corp., 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568.

These prisoners do not assert, and could not, that anything in the Geneva Convention makes them immune from prosecution or punishment for war crimes. [FN14] Article 75 thereof expressly provides that a prisoner of war may be detained until the end of such proceedings and, if necessary, until the expiration of the punishment. 47 Stat. 2021, 2055.

FN14. We are not holding that these prisoners have no right which the military authorities are bound to respect. The United States, by the Geneva Convention of July 27, 1929. 47 Stat. 2021, concluded with forty-six other countries, including the German Reich, an agreement upon the treatment to be accorded captives. These prisoners claim to be and are entitled to its protection. It is, however, the obvious scheme of the Agreement that responsibility for observance and enforcement of these rights is upon political and military authorities. Rights of alien enemies are vindicated under it only through protests and intervention of protecting powers as the rights of our citizens against foreign governments are vindicated only by Presidential intervention.

[10] The petition, however, makes two claims in the nature of procedural irregularities said to deprive the Military Commission of jurisdiction. One is that the United States was obliged to give the protecting power of Germany *790 notice of the trial as specified in Article 60 of the Convention. This claim the Court has twice considered and twice rejected, holding that such notice is required only of proceedings for disciplinary offenses committed during captivity and not in case of war crimes committed before capture. Ex parte Quirin, supra; Ex parte Yamashita, supra.

[11] The other claim is that they were denied trial 'by the same courts and according to the same procedure as in the case of persons belonging to the armed forces of the detaining power,' required by Article 63

339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255
**(Cite as: 339 U.S. 763, 70 S.Ct. 936)**

of the Convention. It may be noted that no prejudicial disparity is pointed out as between the Commission that tried prisoners and those that would try an offending soldier of the American forces of like rank. By a parity of reasoning with that in the foregoing decisions, this Article also refers to those, and only to those, proceedings for **950 disciplinary offenses during captivity. Neither applies to a trial for war crimes.

We are unable to find that the petition alleges any fact showing lack of jurisdiction in the military authorities to accuse, try and condemn these prisoners or that they acted in excess of their lawful powers.

V.

[12] The District Court dismissed this petition on authority of Ahrens v. Clark, 335 U.S. 188, 68 S.Ct. 1443, 92 L.Ed. 1898. The Court of Appeals considered only questions which it regarded as reserved in that decision and in Ex parte Endo, 323 U.S. 283, 65 S.Ct. 208, 89 L.Ed. 243. Those cases dealt with persons both residing and detained within the United States and whose capacity and standing to invoke the process of federal courts somewhere was unquestioned. The issue was where.

Since in the present application we find no basis for invoking federal judicial power in any district, we need *791 not debate as to where, if the case were otherwise, the petition should be filed.

For reasons stated, the judgment of the Court of Appeals is reversed and the judgment of the District Court dismissing the petition is affirmed.

Reversed.

Mr. Justice BLACK, with whom Mr. Justice DOUGLAS and Mr. Justice BURTON concur, dissenting.

Not only is United States citizenship a 'high privilege,' it is a priceless treasure. For that citizenship is enriched beyond price by our goal of equal justice under law--equal justice not for citizens alone, but for all persons coming within the ambit of our power. This ideal gave birth to the constitutional provision for an independent judiciary with authority to check abuses of executive power and to issue writs of habeas corpus liberating persons illegally imprisoned. [FN1]

FN1. Article I, s 9, cl. 2 of the Constitution

provides: 'The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it.'

This case tests the power of courts to exercise habeas corpus jurisdiction on behalf of aliens, imprisoned in Germany, under sentences imposed by the executive through military tribunals. The trial court held that, because the persons involved are imprisoned overseas, it had no territorial jurisdiction even to consider their petitions. The Court of Appeals reversed the District Court's dismissal on the ground that the judicial rather than the executive branch of government is vested with final authority to determine the legality of imprisonment for crime. 84 U.S.App.D.C. 396, 174 F.2d 961. This Court now affirms the District Court's dismissal. I agree with the Court of Appeals and need add little to the *792 cogent reasons given for its decision. The board reach of today's opinion, however, requires discussion.

First. In Part IV of its opinion the Court apparently bases its holding that the District Court was without jurisdiction on its own conclusion that the petition for habeas corpus failed to show facts authorizing the relief prayed for. But jurisdiction of a federal district court does not depend on whether the initial pleading sufficiently states a cause of action; if a court has jurisdiction of subject matter and parties, it should proceed to try the case, beginning with consideration of the pleadings. Bell v. Hood, 327 U.S. 678, 682--683, 66 S.Ct. 773, 776, 90 L.Ed. 939; Ex parte Kawato, 317 U.S. 69, 71, 63 S.Ct. 115, 116, 87 L.Ed. 58. [FN2] Therefore Part IV of the opinion is wholly irrelevant and lends no support whatever to the Court's holding that the District Court was without jurisdiction.

FN2. Cases are occasionally dismissed where the claims are 'wholly insubstantial and frivolous', Bell v. Hood, supra, but the very complexity of this Court's opinion belies any such classification of this petition.

**951 Moreover, the question of whether the petition showed on its face that these prisoners had violated the laws of war, even if it were relevant, is not properly before this Court. The trial court did not reach that question because it concluded that their imprisonment outside its district barred it even from considering the petition; its doors were 'summarily closed.' And in reversing, the Court of Appeals specifically rejected requests that it consider the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 S.Ct. 936
339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255
(Cite as: 339 U.S. 763, 70 S.Ct. 936)

sufficiency of the petition, properly remanding the cause to the District Court for that determination--just as this Court did in the Hood and Kawato cases, supra. The Government's petition for certiorari here presented no question except that of jurisdiction; and neither party has argued, orally or in briefs, that this Court should pass on the sufficiency of the petition. *793 To decide this unargued question under these circumstances seems an unwarranted and highly improper deviation from ordinary judicial procedure. At the very least, fairness requires that the Court hear argument on this point.

Despite these objections, the Court now proceeds to find a 'war crime' in the fact that after Germany had surrendered these prisoners gave certain information to Japanese military forces. I am not convinced that this unargued question is correctly decided. The petition alleges that when the information was given, the accused were 'under the control of the armed forces of the Japanese Empire,' in Japanese-occupied territory. Whether obedience to commands of their Japanese superiors would in itself constitute 'unlawful' belligerency in violation of the laws of war is not so simple a question as the Court assumes. The alleged circumstances, if proven, would place these Germans in much the same position as patriotic French, Dutch, or Norwegian soldiers who fought on with the British after their homelands officially surrendered to Nazi Germany. There is not the slightest intimation that the accused were spies, or engaged in cruelty, torture, or any conduct other than that which soldiers or civilians might properly perform when entangled in their country's war. It must be remembered that legitimate 'acts of warfare,' however murderous, do not justify criminal conviction. In Ex parte Quirin, 317 U.S. 1, 30--31, 63 S.Ct. 2, 11--12, 87 L.Ed. 3, we cautioned that military tribunals can punish only 'unlawful' combatants; it is no 'crime' to be a soldier. See also Dow v. Johnson, 100 U.S. 158, 169, 25 L.Ed. 632; Ford v. Surget, 97 U.S. 594, 605--606, 24 L.Ed. 1018. Certainly decisions by the trial court and the Court of Appeals concerning applicability of that principle to these facts would be helpful, as would briefs and arguments by the adversary parties. It should not be decided by this Court now without that assistance, particularly since *794 failure to remand deprives these petitioners of any right to meet alleged deficiencies by amending their petitions.

Second. In Parts I, II, and III of its opinion, the Court apparently holds that no American court can even consider the jurisdiction of the military tribunal to convict and sentence these prisoners for the alleged crime. Except insofar as this holding depends on the gratuitous conclusions in Part IV (and I cannot tell how far it does), it is based on the facts that (1) they were enemy aliens who were belligerents when captured, and (2) they were captured, tried, and imprisoned outside our realm, never having been in the United States.

The contention that enemy alien belligerents have no standing whatever to contest conviction for war crimes by habeas corpus proceedings has twice been emphatically rejected by a unanimous Court. In Ex parte Quirin, 317 U.S. 1, 63 S.Ct. 2, 87 L.Ed. 3, we held that status as an enemy alien did not foreclose 'consideration by the courts of petitioners' contentions that the Constitution and laws of the United States constitutionally enacted forbid their trial by military commission.' Id., 317 U.S. at 25, 63 S.Ct. at 9, 87 L.Ed. 3. This we did in the face of a presidential proclamation denying such prisoners access to our courts. Only after thus upholding jurisdiction of the courts to consider such **952 habeas corpus petitions did we go on to deny those particular petitions upon a finding that the prisoners had been convicted by a military tribunal of competent jurisdiction for conduct that we found constituted an actual violation of the law of war. Similarly, in re Yamashita, 327 U.S. 1, 66 S.Ct. 340, 90 L.Ed. 499, we held that courts could inquire whether a military commission, promptly after hostilities had ceased, had lawful authority to try and condemn a Japanese general charged with violating the law of war before hostilities had ceased. There we stated: '(T)he Executive branch of the government could not, unless there was suspension of the writ, withdraw from the courts the duty and power to *795 make such inquiry into the authority of the commission as may be made by habeas corpus.' Id., 327 U.S. at 9, 66 S.Ct. at 345, 90 L.Ed. 499. That we went on to deny the requested writ, as in the Quirin case, in no way detracts from the clear holding that habeas corpus jurisdiction is available even to belligerent aliens convicted by a military tribunal for an offense committed in actual acts of warfare.

Since the Court expressly disavows conflict with the Quirin or Yamashita decisions, it must be relying not on the status of these petitioners as alien enemy belligerents but rather on the fact that they were captured, tried and imprisoned outside our territory. The Court cannot, and despite its rhetoric on the point does not, deny that if they were imprisoned in the United States our courts would clearly have jurisdiction to hear their habeas corpus complaints. Does a prisoner's right to test legality of a sentence

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 S.Ct. 936
339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255
(Cite as: 339 U.S. 763, 70 S.Ct. 936)

then depend on where the Government chooses to imprison him? Certainly the Quirin and Yamashita opinions lend no support to that conclusion, for in upholding jurisdiction they place no reliance whatever on territorial location. The Court is fashioning wholly indefensible doctrine if it permits the executive branch, by deciding where its prisoners will be tried and imprisoned, to deprive all federal courts of their power to protect against a federal executive's illegal incarcerations.

If the opinion thus means, and it apparently does, that these petitioners are deprived of the privilege of habeas corpus solely because they were convicted and imprisoned overseas, the Court is adopting a broad and dangerous principle. The range of that principle is underlined by the argument of the Government brief that habeas corpus is not even available for American citizens convicted and imprisoned in Germany by American military tribunals. While the Court wisely disclaims any such necessary effect for its holding, rejection of the Government's argument is certainly made difficult by the logic of today's *796 opinion. Conceivably a majority may hereafter find citizenship a sufficient substitute for territorial jurisdiction and thus permit courts to protect Americans from illegal sentences. But the Court's opinion inescapably denies courts power to afford the least bit of protection for any alien who is subject to our occupation government abroad, even if he is neither enemy nor belligerent and even after peace is officially declared. [FN3]

> FN3. The Court indicates that not even today can a nonresident German or Japanese bring even a civil suit in American courts. With this restrictive philosophy compare Ex parte Kawato, 317 U.S. 69, 63 S.Ct. 115, 87 L.Ed. 58; see also McKenna v. Fisk, 1 How. 241, 249, 11 L.Ed. 117.

Third. It has always been recognized that actual warfare can be conducted successfully only if those in command are left the most ample independence in the theatre of operations. Our Constitution is not so impractical or inflexible that it unduly restricts such necessary independence. It would be fantastic to suggest that alien enemies could hail our military leaders into judicial tribunals to account for their day to day activities on the battlefront. Active fighting forces must be free to fight while hostilities are in progress. But that undisputable axiom has no bearing on this **953 case or the general problem from which it arises.

When a foreign enemy surrenders, the situation changes markedly. If our country decides to occupy conquered territory either temporarily or permanently, it assumes the problem of deciding how the subjugated people will be ruled, what laws will govern, who will promulgate them, and what governmental agency of ours will see that they are properly administered. This responsibility immediately raises questions concerning the extent to which our domestic laws, constitutional and statutory, are transplanted abroad. Probably no one would suggest, and certainly I would not, that this nation either must or should attempt to apply every constitutional *797 provision of the Bill of Rights in controlling temporarily occupied countries. But that does not mean that the Constitution is wholly inapplicable in foreign territories that we occupy and govern. See Downes v. Bidwell, 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088.

The question here involves a far narrower issue. Springing from recognition that our government is composed of three separate and independent branches, it is whether the judiciary has power in habeas corpus proceedings to test the legality of criminal sentences imposed by the executive through military tribunals in a country which we have occupied for years. The extent of such a judicial test of legality under charges like these, as we have already held in the Yamashita case, is of most limited scope. We ask only whether the military tribunal was legally constituted and whether it had jurisdiction to impose punishment for the conduct charged. Such a limited habeas corpus review is the right of every citizen of the United States, civilian or soldier (unless the Court adopts the Government's argument that Americans imprisoned abroad have lost their right to habeas corpus). Any contention that a similarly limited use of habeas corpus for these prisoners would somehow give them a preferred position in the law cannot be taken seriously.

Though the scope of habeas corpus review of military tribunal sentences is narrow, I think it should not be denied to these petitioners and others like them. We control that part of Germany we occupy. These prisoners were convicted by our own military tribunals under our own Articles of War, years after hostilities had ceased. However illegal their sentences might be, they can expect no relief from German courts or any other branch of the German Government we permit to function. Only our own courts can inquire into the legality of their imprisonment. Perhaps, as some nations believe, there is merit in leaving the administration of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 S.Ct. 936                                                                                                                      Page 16
339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255
**(Cite as: 339 U.S. 763, 70 S.Ct. 936)**

criminal laws *798 to executive and military agencies completely free from judicial scrutiny. Our Constitution has emphatically expressed a contrary policy.

As the Court points out, Paul was fortunate enough to be a Roman citizen when he was made the victim of prejudicial charges; that privileged status afforded him an appeal to Rome, with a right to meet his 'accusers face to face.' Acts 25:16. But other martyrized disciples were not so fortunate. Our Constitution has led people everywhere to hope and believe that wherever our laws control, all people, whether our citizens or not, would have an equal chance before the bar of criminal justice.

Conquest by the United States, unlike conquest by many other nations, does not mean tyranny. For our people 'choose to maintain their greatness by justice rather than violence.' [FN4] Our constitutional principles are such that their mandate of equal justice under law should be applied as well when we occupy lands across the sea as when our flag flew only over thirteen colonies. Our nation proclaims a belief in the dignity of human beings as such, no matter what their nationality or where **954 they happen to live. Habeas corpus, as an instrument to protect against illegal imprisonment, is written into the Constitution. Its use by courts cannot in my judgment be constitutionally abridged by Executive or by Congress. I would hold that our courts can exercise it whenever any United States official illegally imprisons any person in any land we govern. [FN5] Courts should not for any reason abdicate this, the loftiest power with which the Constitution has endowed them.

> FN4. This goal for government is not new. According to Tacitus, it was achieved by another people almost 2,000 years ago. See 2 Works of Tacitus 326 (Oxford trans., New York, 1869).

> FN5. See the concurring opinion of Mr. Justice Douglas in Koki Hirota v. MacArthur, 338 U.S. 197, 199, 69 S.Ct. 197, 1238, 93 L.Ed. 1902.

339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255

**Briefs and Other Related Documents (Back to top)**

• 1950 WL 78515 (Appellate Brief) Brief for Respondent (Apr. 8, 1950)

• 1950 WL 78514 (Appellate Brief) Brief for Petitioners (Mar. 1950)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

80 F.3d 124
80 F.3d 124
(Cite as: 80 F.3d 124)

Page 1

▷

United States Court of Appeals,
Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Andrew Scott MORIN, a/k/a Scott Morris,
Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellant,
v.
Andrew Scott MORIN, a/k/a Scott Morris,
Defendant-Appellee.
Nos. 95-5242, 95-5300.

Argued Jan. 29, 1996.
Decided April 5, 1996.

Defendant was convicted in the United States District Court for the Eastern District of Virginia, Leonie M. Brinkema, J., of murder-for-hire and was sentenced to 21-months imprisonment. On appeal, the Court of Appeals, Wilkinson, Chief Judge, held that: (1) evidence was sufficient to support conviction even though intended murder was to occur in Philippines; (2) downward departure in sentence was not warranted on basis of victim misconduct; and (3) downward departure in sentence was not warranted on ground that defendant's offense fell outside heartland of murder-for-hire.

Affirmed in part, vacated and remanded in part.

West Headnotes

[1] Conspiracy ⬤⟿24(7)
91k24(7) Most Cited Cases
Under Virginia law, defendant may not be convicted for conspiracy to commit murder where conspiracy was with undercover Federal Bureau of Investigation (FBI) agent. Va.Code 1950, § 18.2-22.

[2] Homicide ⬤⟿1169
203k1169 Most Cited Cases
        (Formerly 203k256)
Evidence that defendant hired undercover agent posing as assassin to murder permanent resident alien of United States and that transaction occurred in Virginia was sufficient to support defendant's conviction for murder-for-hire even though intended murder was to occur in Philippines, as defendant intended to murder "a national of the United States, while such national is outside the United States," in

violation of federal law, and to commit a "willful, deliberate, and premeditated killing of any person by another for hire" and conspiracy to commit capital murder, in violation of Virginia law. 18 U.S.C.A. § § 1958(a), 2332(a); Va.Code 1950, § § 18.2-22, 18.2-31, subd. 2.

[3] Sentencing and Punishment ⬤⟿857
350Hk857 Most Cited Cases
        (Formerly 110k1302)
Downward departure in sentence for murder-for-hire was not warranted on basis of victim misconduct despite claim that victim posed serious physical threat to victim's wife where only evidence that victim did anything wrong was defendant's recollection of statement by victim's wife, defendant's recollections were suspect given his psychiatrist's testimony of delusions, wife denied alleged affair with defendant, defendant immediately set out to kill victim instead of attempting to insulate wife from perceived danger, and defendant was in no personal danger from victim. 18 U.S.C.A. § 1958(a); U.S.S.G. § 5K2.10, p.s., 18 U.S.C.A.

[4] Sentencing and Punishment ⬤⟿857
350Hk857 Most Cited Cases
        (Formerly 110k1302)
Provision of Sentencing Guidelines which permits downward departure for victim misconduct was not intended to benefit defendant who sets out to murder someone whose conduct fails to meet with his approval. U.S.S.G. § 5K2.10, p.s., 18 U.S.C.A.

[5] Sentencing and Punishment ⬤⟿855
350Hk855 Most Cited Cases
        (Formerly 110k1302)
Downward departure in sentence for murder-for-hire was not warranted on ground that defendant's offense fell outside heartland of murder-for-hire even though defendant claimed altruistic motivation in protecting victim's wife from perceived danger from victim where defendant was in love with wife, defendant knew how to locate victim, defendant provided undercover agent with photographs, money, and airline ticket, and defendant suggested that assassin use "one large caliber shot to the back of the head." 18 U.S.C.A. § 1958(a); U.S.S.G. § 2E1.4, 18 U.S.C.A.

[6] Sentencing and Punishment ⬤⟿870
350Hk870 Most Cited Cases

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

80 F.3d 124
Page 2

80 F.3d 124
**(Cite as: 80 F.3d 124)**

(Formerly 110k1302)

Fact that undercover agent detects offense is irrelevant to whether particular defendant falls within heartland of murder-for-hire under Sentencing Guidelines. 18 U.S.C.A. § 1958(a); U.S.S.G. § 2E1.4, 18 U.S.C.A.

**[7] Criminal Law** ⚖️ **1181.5(8)**

110k1181.5(8) Most Cited Cases

Remand for resentencing on murder-for-hire conviction was required where district court's finding that defendant's plot was "non-violent" may have been influenced by court's erroneous belief that defendant's behavior fell outside heartland of murder-for-hire cases, two of court's other justifications for departure were in error, and court did not specify weight it gave to those factors in determining extent of any departure. 18 U.S.C.A. § 1958(a); U.S.S.G. § § 2E1.4, 5K2.13, p.s., 18 U.S.C.A.

*125 Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria. Leonie M. Brinkema, District Judge. (CR-94- 375-A)

**ARGUED:** Lisa Bondareff Kemler, Moffitt, Zwerling & Kemler, P.C., Alexandria, Virginia, for Appellant. Vincent L. Gambale, Assistant United States Attorney, United States Attorney's Office, Alexandria, Virginia, for Appellee. **ON BRIEF:** John Kenneth Zwerling, Moffitt, Zwerling & Kemler, P.C., Alexandria, Virginia, for Appellant. Helen F. Fahey, United States Attorney, William Graham Otis, Senior Litigation Counsel, United States Attorney's Office, Alexandria, Virginia, for Appellee.

Before WILKINSON, Chief Judge, HAMILTON, Circuit Judge, and BLAKE, United States District Judge for the District of Maryland, sitting by designation.

Affirmed in part, vacated and remanded in part by published opinion. Chief Judge WILKINSON wrote the opinion, in which Judge HAMILTON and Judge BLAKE joined.

**OPINION**

WILKINSON, Chief Judge:

Andrew Scott Morin was convicted of murder-for-hire, 18 U.S.C. § 1958(a), and sentenced to 21 months imprisonment. Morin contends that because the murder would have taken place outside the United States, it would have violated no federal or state law, a necessary element of § 1958(a). We

disagree. Morin's intended murder would have violated at least one federal law and two Virginia laws.

The government, meanwhile, appeals the district court's substantial downward departure pursuant to the Sentencing Guidelines. The district court found three grounds for downward departure: (1) that the victim had engaged in wrongful conduct; (2) that the circumstances of Morin's offense fell outside the heartland of murder-for-hire cases; and (3) that Morin suffered from diminished capacity. We hold the district court erred in departing downward on the grounds of victim misconduct as well as on the circumstances of Morin's offense. We therefore affirm Morin's conviction but vacate and remand this case for resentencing.

**I.**

In 1984, when Morin was 10 years old, he began to take martial arts lessons from Dr. Armando Soto-Bararra ("Dr. Soto"). Eventually, Dr. Soto became Morin's mentor and friend. Their friendship was such that Morin spent most of his free time working with Dr. Soto at his California home. In early 1994, Dr. Soto left his wife and daughter in California and travelled to the Philippines to manage a clinic. While Dr. Soto was away, Morin stayed with and was to look after Dr. Soto's family.

Morin claimed that during this stay, Dr. Soto's wife, Raghnild Perstolen, seduced him. Ms. Perstolen, however, has denied any sexual relationship with Morin. Whatever the case, Morin stated that he fell in love with Perstolen and that Perstolen later told him that she was being abused by Dr. Soto. Morin concluded that the only way to protect Perstolen was to hire a hit man to kill Dr. Soto.

*126 Morin began his search for a hired killer by telephoning an acquaintance in New York, who referred Morin to Steve Hartman, a Virginia private investigator. Morin met with Hartman in Virginia and attempted to hire Hartman to kill Dr. Soto. Following this meeting, Hartman contacted the FBI. The FBI provided an undercover agent to pose as an assassin, and Hartman referred Morin to the agent. Morin subsequently telephoned the agent, discussed the plan to murder Dr. Soto, and mailed the agent a 13-page letter listing "Target Information/Pictures" and "Proposed Scenarios" for Dr. Soto's murder, including "one large caliber shot to the back of the head." Morin eventually flew to Virginia, met with the undercover agent, and provided him with $1,400 in cash and an airline ticket to the Philippines. The

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

agent then arrested Morin.

Morin was charged with three counts of murder-for-hire, 18 U.S.C. § 1958(a), and one count of mailing a threatening communication, 18 U.S.C. § 876.   At his bench trial, Morin offered an insanity defense.   His psychiatrist testified that Morin was delusional and that the alleged affair between Morin and Perstolen had never occurred.   The district court concluded that while Morin suffered from a "severe mental illness which included a delusional motivation for illegal conduct ... [Morin] appreciat[ed] the nature and quality of wrongfulness of his acts."   Morin was ultimately found guilty on all counts.

Under the Guidelines, Morin's base offense level was 32.   Because Morin had accepted responsibility for his actions, he received a three level Guidelines reduction to 29.   This resulted in a sentencing range of 87 to 108 months.   The Presentence Report also noted three other factors that might warrant a downward departure in Morin's sentence:   (1) Dr. Soto's alleged misconduct;   (2) the unusual circumstances of this case;   and (3) Morin's diminished capacity.   The district court found that all three of these departures were appropriate, reduced Morin's offense level to 15 (with a recommended sentencing range of 18 to 24 months), and sentenced Morin to 21 months imprisonment.   Both Morin and the government now appeal.

## II.

The federal murder-for-hire statute requires an "intent that a murder be committed in *violation of the laws of any State or the United States.*"  18 U.S.C. § 1958(a) (emphasis added).  [FN1]  Morin argues that this element has not been satisfied because the murder of Dr. Soto was to occur in the Philippines, outside the jurisdiction of the United States.   Even so, however, Morin's intended murder would have violated both federal and Virginia law.

> FN1. 18 U.S.C. § 1958(a) states:
> Whoever travels in or causes another (including the intended victim) to travel in interstate or foreign commerce, or uses or causes another (including the intended victim) to use the mail or any facility in interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay anything of pecuniary value or who conspires to do so, shall be ... imprisoned for

not more than ten years ... and if personal injury results, shall be ... imprisoned for not more than twenty years ... and if death results, shall be punished by death or life imprisonment....

First, the murder of "a national of the United States, while such national is outside the United States" is a federal offense punishable "by death or imprisonment for any term of years or for life."  18 U.S.C. § 2332(a).  Morin seeks to escape this offense by alleging that Dr. Soto was not a national of the United States, but rather, a Mexican citizen. Citizenship, however, is not the sine qua non of "nationality."   A "national of the United States" may also be "a person who, though not a citizen of the United States, owes permanent allegiance to the United States."  8 U.S.C. § 1101(a)(22).  The district court found that because Dr. Soto was a permanent resident alien of the United States who had applied for United States citizenship, he was indeed "a national of the United States."   We agree--an application for citizenship is the most compelling evidence of permanent allegiance to the United States short of citizenship itself.   Accordingly, *127 had Morin succeeded in killing Dr. Soto, the murder would have violated § 2332(a). [FN2]

> FN2. We recognize that 18 U.S.C. § 2332(a) is part of an anti-terrorism statute and that it is uncertain whether Morin would have been prosecuted under § 2332(a).  *See* 18 U.S.C. § 2332(d).  Questions of ultimate prosecution and jurisdiction, however, simply exceed the plain meaning of § 1958. The "violation" element of murder-for-hire is a low hurdle, nothing more than an abstract comparison of a crime's elements with what the defendant intended to accomplish.   Any further inquiry would lead courts down the path of speculation and distract both courts and juries from the central issues at stake in a § 1958 prosecution:  1) "travel or cause another to travel in interstate commerce, 2) with the intent that a murder be committed, [and 3) ] consideration for the receipt of or promise to pay anything of pecuniary value."  *United States v. Ritter, 989 F.2d 318, 321 (9th Cir.1993).*

Second, Morin's intended killing would also have violated Virginia law.   The Virginia Code includes within its definition of "Capital Murder" the "willful, deliberate, and premeditated killing of any person by

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

another for hire." Va.Code § 18.2-31(2). This is exactly what Morin intended to accomplish. It is without consequence that Morin intended for the killing to take place in the Philippines, because the hiring of the killer took place in Virginia and this is sufficient to violate the Virginia statute. *See, e.g., Johnson v. Commonwealth,* 220 Va. 146, 255 S.E.2d 525, 527 (1979) (Person who "conceived and instigated a murder for hire, and who procured" the killer violates the Virginia capital murder statute).

[1] In fact, the government need not demonstrate that the murder of Dr. Soto would have violated the Virginia capital murder law. Section 1958(a) requires only that there be a "violation of the laws of any State or the United States." An intended murder may well violate laws other than those specifically prohibiting homicide. Here, Virginia has a separate crime of conspiracy to commit capital murder. Va.Code § 18.2-22. Even if Morin could not have been charged by Virginia with a murder that took place in the Philippines, both Morin and his assassin, because they conspired to kill Dr. Soto in Virginia, would have committed the Virginia crime of conspiracy to commit capital murder. *See Stevens v. Commonwealth,* 14 Va.App. 238, 415 S.E.2d 881, 883 (1992) ("[t]he crime is 'committed when the agreement to commit the offense is complete' and no overt act in furtherance of the underlying crime is necessary") (quoting *Johnson v. Commonwealth,* 8 Va.App. 34, 377 S.E.2d 636, 638 (1989)). [FN3]

> FN3. As a matter of Virginia law, Morin could not have been convicted for conspiracy to commit murder where the conspiracy was with an FBI agent. *See Fortune v. Commonwealth of Virginia,* 12 Va.App. 643, 406 S.E.2d 47 (1991). The relevant question, however, under the federal murder-for-hire statute is whether Morin had an "*intent* that a murder be committed in violation of the laws of any State or the United States." 18 U.S.C. § 1958(a) (emphasis added). Although Morin ended up interacting with an FBI agent here, he *intended* to conspire with a hit man to commit murder, and under the plain terms of the federal statute, this is sufficient.

[2] As Morin's intended murder of Dr. Soto would have violated at least one federal and two Virginia laws, Morin's conviction satisfied the requisite elements of § 1958.

### III.

We next turn to Morin's sentence. After the three-level reduction for acceptance of responsibility, Morin's Guidelines range fell between 87 and 108 months imprisonment. The district court, however, substantially departed from this recommended sentence because of: (1) Dr. Soto's alleged misconduct (USSG § 5K2.10); (2) the unusual circumstances of this case (USSG § 5K2.0); and (3) Morin's supposed diminished capacity (USSG § 5K2.13). Morin was ultimately sentenced to 21 months in prison, a punishment well below the usual range for murder-for-hire.

### A.

[3] The district court found that Morin's "viewing Soto as posing a serious physical threat to Ms. Perstolen is a significant circumstance the Court must consider [because Soto's] *perceived* conduct played a part in this case" (emphasis added). The Sentencing Guidelines, however, explain that the victim misconduct departure is appropriate only "[i]f the victim's *wrongful* conduct contributed significantly to provoking the offense." USSG § 5K2.10 (emphasis added). The *128 plain meaning of this provision contemplates that the victim must actually have done something wrong. *See United States v. Desormeaux,* 952 F.2d 182, 186 (8th Cir.1991) (victim's conduct must be more than provocative, it must also be wrongful). Here, the only evidence that Dr. Soto did anything wrong was Morin's recollection of a statement by Ms. Perstolen--yet all of Morin's recollections are suspect given his psychiatrist's testimony of delusions and Perstolen's denial of the alleged affair. As it appears that Dr. Soto's behavior was imagined rather than real, it cannot be said that he did anything wrong. The victim misconduct departure does not apply in such cases.

[4] Moreover, even if Dr. Soto had abused Ms. Perstolen, "[a] concern for the proportionality of the defendant's response is manifested by the terms of § 5K2.10." *United States v. Shortt,* 919 F.2d 1325, 1328 (8th Cir.1990) (recognizing the wrongfulness of adultery but finding defendant's plot to blow up the adulterers to be a disproportionate response). This is evidenced by the factors that § 5K2.10 instructs the court to consider: "any efforts by the defendant to prevent confrontation"; "the danger reasonably perceived by the defendant"; and "the danger actually presented to the defendant by the victim." Here, Morin was in no personal danger from Dr. Soto. He did not attempt to prevent a confrontation with his intended victim. He did not even attempt to insulate Ms. Perstolen from the perceived danger (for example, he could have contacted law enforcement

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

80 F.3d 124
80 F.3d 124
**(Cite as: 80 F.3d 124)**

officials about Dr. Soto's alleged behavior). Instead, Morin immediately set out to kill Dr. Soto. The victim misconduct guideline was not intended to benefit a defendant who sets out to murder someone whose conduct fails to meet with his approval. *See Shortt*, 919 F.2d at 1328. The district court erred in using it as a basis for a downward departure.

**B.**

Next, we address the district court's departure on the ground that Morin's offense fell outside the heartland of murder-for-hire. Because Morin was convicted of multiple offenses, he should have been sentenced based on "the most serious of the counts comprising the Group." USSG § 3D1.3. Instead of sentencing Morin for murder-for-hire, his most serious offense, USSG § 2E1.4, the district court contravened the Guidelines by "using the guideline for threatening communications," a less serious offense, USSG § 2A6.1.

[5] The district court justified its decision by concluding that the "motive for the hit, the extremely convoluted way in which the murder was to be committed, the naive way defendant interacted with the hit man and the fact that the hit man was an FBI agent" placed Morin's case outside the heartland of murder-for-hire. For many reasons, this rationale is not persuasive. While Morin claims an altruistic motivation for his murder-for-hire plot, it appears just as likely that Morin's motive, even if delusional, was simply the elimination of a perceived competitor for Ms. Perstolen's affections. In this regard, Morin's story is hardly outside the heartland of murder-for-hire; instead, it is another tale of romantic rivalry fueling a murder plot.

Moreover, it is not at all clear that Morin's supposed naivete would have prevented him from finding a willing assassin. He knew how to locate Dr. Soto, had photographs of Dr. Soto, and had financial resources sufficient to travel back and forth between California and Virginia, to purchase an airline ticket to the Philippines, and to provide the undercover agent with that ticket and $1400 in cash. Whether or not Morin had been able to locate a *real* hired killer willing to accept his offer at the time the plot was foiled is without moment. Murder-for-hire plots will often be thwarted at various stages between their fulfillment of the elements of 18 U.S.C. § 1958 and the actual point at which murder is to be committed. The statute takes this into account by distinguishing between plots that result in no injury, plots that result in injury, and plots that result in actual death. *See* 18 U.S.C. § 1958. Further, the Guidelines Commentary

states: "This guideline and the statute to which it applies do not require that a murder actually have been committed." USSG § 2E1.4, comment. (backg'd.). Had the Sentencing Commission intended for foiled plots to fall outside **\*129** the heartland of murder-for-hire cases, it would have said so.

[6] The district court's other reasons for declaring this case outside the heartland are no more persuasive. Morin's plot is typical of murder-for-hire cases; he did after all suggest "one large caliber shot to the back of the head." And the fact that it was an undercover agent who detected the offense is simply irrelevant to whether a particular defendant falls within the heartland of murder-for-hire. *See United States v. Costales*, 5 F.3d 480, 486-88 (11th Cir.1993) (downward departure for minimal participation in offense not justified by fact that other participants were undercover officers). In short, Morin tendered a supposed hit man the sum of $1400 and plane tickets to the Philippines as part of a scheme to kill Dr. Soto. Morin's murder-for-hire plot was within the murder-for-hire heartland.

**C.**

[7] We turn finally to the diminished capacity ground for the downward departure. Its validity hinges on the district court's factual determination that Morin's murder-for-hire plot was "non-violent." *See* USSG § 5K2.13 ("[i]f the defendant committed a non-violent offense while suffering from significantly reduced mental capacity ... a lower sentence may be warranted"); *United States v. Weddle*, 30 F.3d 532 (4th Cir.1994) (unlike USSG § 4B1.2, the specific facts of the offense determine whether it is non-violent under § 5K2.13). Because we are uncertain regarding the extent to which this factual finding may have been influenced by the district court's erroneous belief that Morin's behavior fell outside the heartland of murder-for-hire cases, we must remand this case for resentencing. Resentencing would be required in any event because two of the district court's justifications for departure are in error and the court did not specify the weight it gave to those factors in determining the extent of any departure.

**IV.**

For the forgoing reasons, we affirm Morin's conviction but we vacate and remand his case for resentencing.

***AFFIRMED IN PART, VACATED AND REMANDED IN PART.***

•UNITED          STATES          OF          AMERICA,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

80 F.3d 124
80 F.3d 124
**(Cite as: 80 F.3d 124)**

Appellee/Cross-Appellant, v. Andrew Scott MORIN, Appellant/Cross-Appellee., 1995 WL 17054180 (Appellate Brief) (C.A.4 August 9, 1995), Brief of Appellant

•UNITED STATES OF AMERICA, Appellee and Cross-Appellant, v. Andrew Scott MORIN, Appellant and Cross-Appellee., 1995 WL 17054182 (Appellate Brief) (C.A.4 September 5, 1995), Brief for the United States

•UNITED STATES OF AMERICA, Appellee/Cross-Appellant, v. Andrew Scott MORIN, Appellant/Cross-Appellee., 1995 WL 17054181 (Appellate Brief) (C.A.4 October 6, 1995), Appellant/Cross-Appellee's Reply/Answering Brief

80 F.3d 124

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Service: Get by LEXSEE®
Citation: **255 F.3d 752 (9th Cir. 2001)**

*255 F.3d 752, \*; 2001 U.S. App. LEXIS 14004, \*\*;*
*2001 Cal. Daily Op. Service 5179; 2001 Daily Journal DAR 6566*

LESZEK HUGHES, a.k.a. Thomas Lloyd Hughes, a.k.a. Tom, Petitioner, v. JOHN ASHCROFT,
\* Attorney General, Respondent.

\* John Ashcroft is substituted for his predecessor, Janet Reno, as Attorney General, United
States Department of Justice. Fed. R. App. P. 43(c)(2).

No. 99-70565

UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

255 F.3d 752; 2001 U.S. App. LEXIS 14004; 2001 Cal. Daily Op. Service 5179; 2001 Daily
Journal DAR 6566

April 17, 2001, Submitted \*\* Pasadena, California

\*\* The panel unanimously finds this case suitable for decision without oral argument. Fed.
R. App. P. 34(a)(2).
June 22, 2001, Filed

**PRIOR HISTORY: [\*\*1]** Petition to Review the Decision of the Board of Immigration
Appeals. INS No. A11-761-460.

**DISPOSITION:** PETITION DISMISSED.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Petitioner alien sought judicial review of the decision of the
Board of Immigration Appeals issuing a final order of removal as an alien who had been
convicted of an aggravated felony.

**OVERVIEW:** The alien was born in Poland in 1956, and came to the United States and
was adopted by United States citizens while a minor child. He never applied for
citizenship in the United States. On appeal, the alien argued that he was a "national of
the United States" or a "citizen" and thus is not an alien subject to removal
proceedings. The court held that because the alien was not born in a territory of the
United States and did not apply for citizenship so as to demonstrate objectively an
allegiance to the United States, he did not qualify as a noncitizen national of the United
States. That Poland did not consider the alien to be a citizen of Poland had no bearing
on whether he was a United States national under United States law. The court also
held that the alien was not entitled to automatic citizenship under the Child Citizenship
Act of 2000 (CCA), because he was over 40 years old when the CCA took effect, and the
statute applied only to those who were minor children on its effective date.

**OUTCOME:** The court of appeals dismissed the alien's petition.

**CORE TERMS:** citizenship, alien, nationality, allegiance, deference, qualify, effective date,
removal, immigration, removable, de novo, noncitizen, territory, birth, naturalization,
Nationality Act, genuine issue of material fact, residency, automatic, jurisdiction to review,
permanent resident, court of appeals, final order, false claim, convicted, married, owe,

voted, adult, jurisdictional fact

## CORE CONCEPTS - ◆ Hide Concepts

Immigration Law : Judicial Review : Scope & Standards of Review
See 8 U.S.C.S. § 1252(a)(2)(C).

Immigration Law : Judicial Review : Scope & Standards of Review
A court of appeals has jurisdiction to review a petitioner's claim that he is a United States national or citizen and thus is not "an alien" subject to removal. 8 U.S.C.S. § 1252(b)(5)(A) requires the court of appeals to decide the issue if the petitioner claims to be a national of the United States and the facts are not in dispute.

Immigration Law : Judicial Review : Scope & Standards of Review
Under 8 U.S.C.S. § 1252(b)(5), a court of appeals reviews a petitioner's claim to be a national of the United States to determine whether a genuine issue of material fact exists. If not, the court must decide the claim. 8 U.S.C.S. § 1252(b)(5)(A). Courts review de novo the legal questions involved in a claim that a person is a national of the United States.

Immigration Law : Citizenship
8 U.S.C.S. § 1101(a)(3) defines an alien as any person not a citizen or national of the United States. In turn, 8 U.S.C.S. § 1101(a)(22)(A), (B) defines a "national of the United States" as a citizen of the United States or a person who, though not a citizen of the United States, owes permanent allegiance to the United States. Only aliens are removable. 8 U.S.C.S. § 1227. Thus, if a petitioner is either a citizen of the United States or a national of the United States, he is not removable.

Immigration Law : Citizenship
The category of noncitizen "national of the United States" is a constricted one, and courts reject the argument that one can become a national through lengthy residency alone. It appears that, to qualify as a national, a noncitizen resident of the United States must have applied for citizenship.

Immigration Law : Citizenship
In order for a person who is born outside the United States to qualify for "national" status, the person must, at a minimum, demonstrate (1) birth in a United States territory or (2) an application for United States citizenship.

Immigration Law : Citizenship
Federal case law requires that, to qualify as a national of the United States, a person must demonstrate an affirmative allegiance to the United States.

Immigration Law : Judicial Review : Scope & Standards of Review
Generally, a court of appeals reviews de novo the Board of Immigration Appeals' (BIA) determination of purely legal questions regarding the requirements of the Immigration and Nationality Act. The BIA's interpretation and application of the immigration laws are entitled to deference under Chevron. However, deference is only appropriate when a matter is consigned to the Immigration and Naturalization Service's discretion in the first place.

Immigration Law : Deportation & Removal : Administrative Proceedings : Jurisdiction

000312

Case 1:07-cv-01868-UNA    Document 1    Filed 10/17/2007    Page 153 of 183    Page 3 of 11

In the context of an order of removal, the Immigration and Nationality Act explicitly places the determination of nationality claims solely in the hands of the courts of appeals and (if there are questions of fact to resolve) the district courts.

Immigration Law : Deportation & Removal : Administrative Proceedings : Jurisdiction
See 8 U.S.C.S. § 1252(b)(5).

Immigration Law : Citizenship
See 8 U.S.C.S. § 1431(a).

Immigration Law : Citizenship
Under 8 U.S.C.S. § 1431(b), the criteria under 8 U.S.C.S. § 1431(a) apply to a child who is adopted by a citizen parent, if the child satisfies the requirements of 8 U.S.C.S. § 1101(b)(1).

Immigration Law : Citizenship
The "effective date" section in the Child Citizenship Act of 2000 states that the amendments shall take effect 120 days after the date of the enactment of the act and shall apply to individuals who satisfy the requirements of § 320 or § 322 of the Immigration and Nationality Act, as in effect on such effective date.

Governments : Legislation : Interpretation
When interpreting a statute, in the absence of ambiguity there is no need to resort to other aids to construction.

Immigration Law : Citizenship
The Child Citizenship Act of 2000 grants automatic citizenship only to those children who were under the age of 18, and who met the other criteria, on February 27, 2001.

**COUNSEL:** Jesse A. Moorman, Los Angeles, California, for the petitioner.

Terri J. Scadron, Senior Litigation Counsel, Office of Immigration Litigation, Civil Division, U.S. Department of Justice, Washington, D. C., for the respondent.

**JUDGES:** Before: Harry Pregerson, Ferdinand F. Fernandez, and Susan P. Graber, Circuit Judges. Opinion by Judge Graber; Partial Concurrence and Partial Dissent by Judge Fernandez.

**OPINIONBY:** Susan P. Graber

**OPINION: [\*754]**

GRABER, Circuit Judge:

Petitioner Hughes challenges a final order of removal issued by the Board of Immigration Appeals (BIA) on April 9, 1999. The BIA held that Hughes was removable under 8 U.S.C. § 1227(a)(2)(A)(iii) because he was an alien who had been convicted of an aggravated felony. On appeal, he argues that he is a "national of the United States" or a "citizen" and thus is not an alien subject to removal proceedings. We disagree and, for that reason, dismiss the petition.

JURISDICTION

000313



We begin with the proposition that, in general, we lack jurisdiction to review a final order of removal of this kind. Title [**2] ※ 8 U.S.C. § 1252(a)(2)(C) provides that "no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed a criminal offense covered in section ... 1227(a)(2)(A)(iii)." It is undisputed that Petitioner committed such an offense and that the commission of the offense is the reason why he was found to be removable. See Miranda v. Reno, 238 F.3d 1156, 1159 (9th Cir. 2001) (holding that the court lacked jurisdiction of a similar removal order), petition for cert. filed, 69 [*755] U.S.L.W. 3740 (U.S. May 8, 2001) (No. 00-1693).

Nevertheless, ※we do have jurisdiction to review Petitioner's claim that he is a United States national or citizen and thus is not "an alien" subject to removal. Scales v. INS, 232 F.3d 1159, 1161 (9th Cir. 2000). Title 8 U.S.C. § 1252(b)(5)(A) requires the court of appeals to decide the issue "if the petitioner claims to be a national of the United States" and the facts -- as here -- are not in dispute. See also Briseno v. INS, 192 F.3d 1320, 1323 n. 4 (9th Cir. 1999) (acknowledging that a [**3] petitioner's status as an alien is a "jurisdictional fact"); Bowrin v. INS, 194 F.3d 483, 486 (4th Cir. 1999) (holding that the court of appeals had jurisdiction to determine the "jurisdictional fact" of whether the petitioner was an alien).

FACTUAL AND PROCEDURAL HISTORY

Petitioner was born in Poland in 1956. He became an orphan and was adopted by two United States citizens in May of 1960. In October of 1960, Petitioner was admitted into the United States as an immigrant. His parents did not have him naturalized, and Petitioner does not contend (nor does the record reflect) that he ever initiated naturalization proceedings on his own.

In 1985, when he was 28 years old, Petitioner was convicted in California state court of felonies stemming from his repeated sexual abuse of a minor. He was sentenced to 24 years' imprisonment but was paroled in 1997 after having served 12 years of his sentence.

Shortly after his release from prison, in December of 1997, Petitioner was placed in removal proceedings. On February 10, 1998, an immigration judge (IJ) ordered Petitioner's removal. Petitioner, who had appeared pro se, waived the right to appeal, and the removal order became [**4] final.

In July of 1998, Petitioner, through a lawyer, filed a motion to reopen. The IJ denied the motion because it was untimely and because Petitioner presented no new, relevant evidence.

In August of 1998, Petitioner filed a "motion to reconsider" based on new evidence that the Polish government believed that Petitioner was a United States citizen. The IJ denied that motion as well.

Petitioner timely appealed to the BIA. The BIA dismissed the appeal on procedural grounds, without reaching the merits.

Petitioner timely filed this petition for review.

STANDARD OF REVIEW

※Under 8 U.S.C. § 1252(b)(5), we review a petitioner's claim to be a national of the United States to determine whether a genuine issue of material fact exists. If not, we must decide

000314



the claim. 8 U.S.C. § 1252(b)(5)(A). n1 We review de novo the legal questions involved in a claim that a person is a national of the United States. Scales, 232 F.3d at 1162.

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n1 If we conclude that there is a genuine issue of material fact, we must transfer the case to the district court for a hearing. 8 U.S.C. § 1252(b)(5)(B). Neither party argues that there are disputed issues of material fact, and we find none in the record.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - **[**5]**

DISCUSSION

A. "National of the United States"

Title 8 U.S.C. § 1101(a)(3) defines an alien as "any person not a citizen or national of the United States." In turn, 8 U.S.C. § 1101(a)(22) defines a "national of the United States" as "(A) a citizen of the **[*756]** United States, or (B) a person who, though not a citizen of the United States, owes permanent allegiance to the United States." Only aliens are removable. 8 U.S.C. § 1227 (identifying classes of removable aliens). Thus, if Petitioner is either a "citizen ... of the United States" or a "national of the United States," he is not removable.

Petitioner argues that he is a "national of the United States." n2 He reasons that the length of his residency in the United States, his lack of allegiance to Poland, his allegiance to the United States, and the fact that Poland does not consider him a citizen support his contention.

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n2 As we discuss below, we also asked the parties to address the question whether a new statute operates to grant retroactive citizenship to Petitioner.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - **[**6]**

All circuits that have considered the question recognize that the category of noncitizen "national of the United States" is a constricted one, and they reject the argument that one can become a national through lengthy residency alone. United States v. Sotelo, 109 F.3d 1446, 1448 (9th Cir. 1997); Carreon-Hernandez v. Levi, 543 F.2d 637, 638 (8th Cir. 1976); Oliver v. INS, 517 F.2d 426 (2d Cir. 1975). It appears that, to qualify as a national, a noncitizen resident of the United States must have applied for citizenship. United States v. Morin, 80 F.3d 124, 126 (4th Cir. 1996); Carreon-Hernandez, 543 F.2d at 638.

The Ninth Circuit has not "definitively" settled on the meaning of the term "national" in the context of 8 U.S.C. § 1101. Sotelo, 109 F.3d at 1448. We have "suggested a person attains national status primarily through birth." Id. We also have acknowledged that the term historically referred to the noncitizen inhabitants of United States territories. Id. (quoting Rabang v. INS, 35 F.3d 1449 (9th Cir. 1994)). Finally, we have rejected **[**7]** the argument that a person who enters the United States illegally, lives in this country for a lengthy period, and maintains a subjective allegiance to the United States qualifies as a "national." Id. (Of course, here, Petitioner entered the United States legally, so Sotelo does not dispose of this case.)

The Second Circuit has addressed the question whether a person in a position similar to Petitioner's qualifies as a "national," and that court concluded that the answer is "no."

000315



<u>Oliver, 517 F.2d at 427.</u> In Oliver, the petitioner was born in Canada, lawfully entered the United States at the age of 10, and became a permanent resident. She lived in the United States for 20 years, married and had children with one United States citizen, divorced him, and married another United States citizen. After the petitioner was convicted of a narcotics offense, the INS sought to deport her. She argued that, because of her residency in the United States since childhood, she owed allegiance to the United States and was thus a "national." Id.

The Second Circuit rejected the petitioner's argument, reasoning that her allegiance was to Canada rather than to the United **[**8]** States, albeit by neglect rather than intention, because she had not opted to begin the naturalization process and thereby officially declare her allegiance to the United States. <u>Id. at 427-28.</u> The court further reasoned that, historically, the term "national" applied to an inhabitant of United States territories and that the primary way to become a "national" was through birth. Id.

In Carreon-Hernandez, the Eighth Circuit adopted the reasoning of Oliver and held that a permanent resident alien who entered the United States legally, lived in this country for 20 years, and during that **[*757]** time married a citizen and fathered a son, did not qualify as a "national" because he had never begun the naturalization process. <u>543 F.2d at 638</u> (affirming and adopting the district court's opinion at <u>409 F. Supp. 1208 (D. Minn. 1976)).</u>

Using a similar analysis, the Fourth Circuit held that a native of Mexico who had applied for United States citizenship was a "national of the United States "for purposes of <u>18 U.S.C. § 2332,</u> which prohibits the murder of United States nationals outside the United States. <u>Morin, 80 F.3d at 126.</u> **[**9]** The court reasoned that "an application for citizenship is the most compelling evidence of permanent allegiance to the United States short of citizenship itself." Id.

Thus, it appears that, in order for a person who is born outside the United States to qualify for "national" status, the person must, at a minimum, demonstrate (1) birth in a United States territory or (2) an application for United States citizenship. Because Petitioner does not meet either of those minimal requirements, we need not delineate what additional facts (if any) he would have to show. He was not born in a United States territory, and at no time during his 40 years of residency in the United States did he attempt to apply for citizenship.

Petitioner argues that the fact that Poland does not consider him to be a citizen of Poland means that he is a national of the United States. That fact may be evidence of how Polish law treats questions of citizenship and nationality, but it can have no bearing on our interpretation of United States law on those topics. Even if this fact is viewed as evidence of Petitioner's lack of allegiance to Poland, it is not material because it fails to demonstrate an affirmative **[**10]** allegiance to the United States, as federal case law requires.

In summary, Petitioner has failed to demonstrate that he is a noncitizen "national of the United States" within the meaning of <u>8 U.S.C. § 1101.</u>

B. The Child Citizenship Act of 2000

Congress recently enacted the Child Citizenship Act of 2000, Pub. Law 106-395, 114 Stat. 1631 (Oct. 30, 2000) ("CCA"). We asked the parties to file supplemental briefs concerning the effect, if any, of the CCA on Petitioner's claim that he is not an alien.

We first explain why we decide this issue of law ourselves, instead of sending it to the BIA in the first instance. Generally, we review de novo the BIA's "determination of purely legal

000316



questions regarding the requirements of the Immigration and Nationality Act [(INA)]. The [BIA's]interpretation and application of the immigration laws are entitled to deference" under <u>Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 81 L. Ed. 2d 694, 104 S. Ct. 2778 (1984). Coronado-Durazo v. INS, 123 F.3d 1322, 1324 (9th Cir. 1997)</u> (citation omitted). However, deference is only "appropriate when a matter is consigned **[\*\*11]** to the INS's discretion in the first place. " <u>Id. at 1324 n. 1.</u> We concluded in Coronado-Durazo that we owed no deference to a BIA determination that solicitation to possess cocaine is a deportable offense, because "the INS is not granted any discretion under § 241(a)(2)(B)(i) in deciding whether a particular crime is one relating to a controlled substance as it is, for example, when determining whether or not to grant an alien relief from deportation under a statutory standard." Id.; see also <u>Nehme v. INS, 252 F.3d 415, 2001 U.S. App. LEXIS 11739, 2001 WL 533357,</u> at \*3 (5th Cir. 2001) (holding that no Chevron deference is owed to the INS's interpretation of the INA in the course of the court's inquiry as to its own jurisdiction).

 **[\*758]** Here, the question is whether Congress has granted any discretion to the BIA to decide questions of law related to nationality. Based on the text of the statute and on our own precedent, we conclude that the answer is "no."

In the context of an order of removal, which is what Petitioner challenges in this case, the INA explicitly places the determination of nationality claims solely in the hands of the courts of appeals and (if **[\*\*12]** there are questions of fact to resolve) the district courts:

(A) Court determination if no issue of fact

> If the petitioner claims to be a national of the United States and the court of appeals finds from the pleadings and affidavits that no genuine issue of material fact about the petitioner's nationality is presented, the court shall decide the nationality

claim.

(B) Transfer if issue of fact

> If the petitioner claims to be a national of the United States and the court of appeals finds that a genuine issue of material fact about the petitioner's nationality is presented, the court shall transfer the proceeding to the district court of the United States for the judicial district in which the petitioner resides for a new hearing on the nationality claim and a decision on that claim as if an action had been brought in the district court under section 2201 of Title 28.

(C) Limitation on determination

> The petitioner may have such nationality claim decided only as provided in this paragraph.

<u>8 U.S.C. § 1252</u>(b)(5) (emphasis added); see also <u>8 U.S.C. § 1421</u>(c) (providing that a person whose **[\*\*13]** application for naturalization is denied may seek de novo review in a district court, which "shall make its own findings of fact and conclusions of law" and, at the petitioner's request, conduct a hearing de novo). The review that we have conducted in

000317



past cases also illustrates that issues of law pertaining to nationality are for the court. In Scales, 232 F.3d at 1162-63, we reviewed de novo--and rejected--the BIA's interpretation of 8 U.S.C. § 1401, which establishes the qualifications for becoming either a national or a citizen of the United States at birth. In conducting de novo review, we also rejected the argument that we should defer to the State Department's interpretation of § 1401, on the ground that the State Department lacked expertise with respect to the nationality of a person within the United States. Id. at 1165-66.

We conclude, under the foregoing authorities, that the issue of law before us is one that we are obliged to resolve de novo. That being so, we turn to it now. In Title I, the CCA revised the law concerning how children born outside the United States acquire United States citizenship. As amended, ❋ [**14] 8 U.S.C. § 1431(a) (§ 320(a) of the Immigration and Nationality Act) provides:

> A child born outside of the United States automatically becomes a citizen of the United States when all of the following conditions have been fulfilled:
>
> (1) At least one parent of the child is a citizen of the United States, whether by birth or naturalization.
>
> (2) The child is under the age of eighteen years.
>
> (3) The child is residing in the United States in the legal and physical custody of the citizen parent pursuant
>
> to a lawful admission for permanent residence.

❋Under 8 U.S.C. § 1431(b), the foregoing criteria apply to a child who is adopted by a citizen parent, if the child satisfies the [*759] requirements of 8 U.S.C. § 1101(b)(1). ❋The "effective date" section in the CCA states that the amendments

> shall take effect 120 days after the date of the enactment of this Act and shall apply to individuals who satisfy the requirements of section 320 or 322 of the Immigration and Nationality Act, as in effect on such effective date.

(Emphasis added.) The effective date of the CCA was February 27, 2001.

The dispute [**15] between the parties is what it means for an individual to "satisfy the requirements" of the CCA "as in effect on such effective date." Petitioner argues that he had fulfilled all the required conditions by February 27, 2001, because he was adopted by United States citizens, was lawfully admitted as a permanent resident while a young child, and was in the legal and physical custody of his parents then and for a period of several years afterwards. Respondent argues that a person can satisfy the requirements on February 27, 2001, only by being under the age of 18 (and meeting the other criteria) as of that date.

We are persuaded by Respondent's reading of the CCA, based on its text and context. At the same time that Congress enacted the provisions quoted above, it also enacted Title II, "Protections for Certain Aliens Voting Based on Reasonable Belief in Citizenship." Title II protects certain aliens who have either voted illegally or made false claims of citizenship.

Under Title II, if an alien who permanently resided in the United States before the age of

000318

16, and whose natural or adoptive parents were both United States citizens, reasonably believed at the time of the unlawful voting **[**16]** or false claim that he or she was a citizen, then the alien cannot be (1) found to be of "not good moral character," 8 U.S.C. § 1101(f) (as amended by § 201(a) of the CCA); (2) considered inadmissible, 8 U.S.C. § 1182 (a)(6)(C)(ii) & (a)(10)(D) (as amended by § 201(b) of the CCA); (3) considered deportable, 8 U.S.C. § 1227(a)(3)(D) & (a)(6) (as amended by § 201(c) of the CCA); or (4) subjected to criminal sanctions, 18 U.S.C. §§ 611 and 1015 (as amended by § 201(d) of the CCA), as a consequence of the unlawful voting or false claim.

In Title I, Congress repeatedly used the words "child" and "children" to describe those being granted automatic citizenship. By contrast, in Title II, Congress used the word "alien" to describe an adult who was receiving additional legal protection. Title I, which applies to "children, "grants automatic citizenship. By contrast, with respect to adults who have resided permanently in the United States since they were children and who have voted or claimed citizenship under a reasonable (although mistaken) belief that they are citizens, Title II does not grant **[**17]** citizenship but relieves such aliens only from adverse consequences of having voted or made the false claim.

In the effective-date provision, Congress did not use either "children" or "aliens," but instead used the term "individuals" to describe those who can qualify for citizenship on the effective date of the CCA. But Congress also used the present tense of the verb "satisfy": The CCA "shall apply to individuals who satisfy the requirements ...on such effective date." In order to qualify, an individual must "satisfy the requirements" on February 27, 2001. And, as quoted above, one of those requirements is being a "child under the age of eighteen years."

We think that Congress' intention is clear from the text and context of the statute. See Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 438, 142 L. Ed. 2d 881, 119 S. Ct. 755 (1999) (explaining that, ※when **[*760]** interpreting a statute, in the absence of ambiguity there is no need to resort to other aids to construction); see also INS v. Pangilinan, 486 U.S. 875, 883-84, 100 L. Ed. 2d 882, 108 S. Ct. 2210 (1988) (stating that citizenship provisions must be strictly construed); United States v. Ginsberg, 243 U.S. 472, 474, 61 L. Ed. 853, 37 S. Ct. 422 (1917) **[**18]** (stating that the courts' duty is to enforce statutes granting political rights to aliens" rigidly"). Nonetheless, we also have examined the legislative history of the CCA and find nothing to detract from our conclusion. For example, Representative Lamar Smith, who introduced the bill, stated that it would amend the law "to confer United States citizenship automatically and retroactively on certain foreign-born children adopted by citizens of the United States." 146 Cong. Rec. H7774 (daily ed. Sept. 19, 2000) (emphasis added). He further explained that the CCA would apply both to newly adopted children and to "qualifying children who arrived in the United States prior to its enactment and have not yet obtained citizenship pursuant to the Immigration and Nationality Act (as it existed before enactment)." Id. (emphasis added). As in the text of the CCA, the emphasis was on children only.

Nor is that emphasis irrational. Congress could have decided, for example, that a person who already is an adult has an independent opportunity to apply for citizenship. On the other hand, children are in need of greater help and protection. In short, ※the CCA granted automatic citizenship **[**19]** only to those children who were under the age of 18, and who met the other criteria, on February 27, 2001. n3

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n3 In so holding, we reach the same conclusion as did the Fifth Circuit. Nehme v. INS, 252 F.3d 415, 2001 U.S. App. LEXIS 11739, 2001 WL 533357, at *11-*13 (5th Cir. 2001).

000319

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

CONCLUSION

Because Petitioner was not born in a territory of the United States and did not apply for citizenship so as to demonstrate objectively an allegiance to the United States, he does not qualify as a noncitizen national of the United States. And, because Petitioner was over 40 years old when the CCA took effect, he is not entitled to automatic citizenship.

PETITION DISMISSED.

**CONCURBY:** FERNANDEZ

**DISSENTBY:** FERNANDEZ

**DISSENT:** FERNANDEZ, Circuit Judge, concurring and dissenting:

I concur in the proposed opinion, with the exception of part B. With respect to that part, I agree that the majority's construction of CCA § 104 is very plausible; indeed, it is rather persuasive to me.

However, the language of the CCA is not so clear that it will **[**20]** only bear the majority's construction. As I see it, the language could be construed to allow coverage of *individuals who had reached the age of 18 years before the CCA's effective date.* That being so, I think the wiser course would be to allow the BIA to render an opinion on the issue before we do so.

In my view, the fact that we review legal questions de novo does not detract from the fact that we owe Chevron n1 deference to the BIA. If we ever doubted that, the Supreme Court surely disabused us of the notion in 1999. See INS v. Aguirre-Aguirre, 526 U.S. 415, 424-25, 119 S. Ct. 1439, 1445-46, 143 L. Ed. 2d 590 (1999). I am not satisfied that we may eschew that deference simply because the issues at hand touch on the question of nationality. **[*761]** Certainly, we have not been cited to any cases to that effect. n2

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n1 Chevron, U.S. A., Inc. v. Natural Res. Def. Council, 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984).

n2 I do not find it significant that in one instance we did not give the Secretary of State any particular deference as to people within the United States. See Scales v. INS, 232 F.3d 1159, 1165-66 (9th Cir. 2000). In that case, the statute conferred no authority regarding the subject upon the Secretary, and, in any event, the Secretary had not issued regulations to which we did owe deference. Id. We did not question the Secretary's authority in the proper arena.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - **[**21]**

In fine, without denigrating the answer given by the majority, I would, instead, vacate the BIA's decision and remand the case for reconsideration in light of the CCA.


Service: Get by LEXSEE®
Citation: **255 F.3d 752 (9th Cir. 2001)**
View: Full
Date/Time: Monday, August 12, 2002 - 10:25 AM EDT

<u>About LexisNexis</u> | <u>Terms and Conditions</u>

<u>Copyright ©</u> 2002 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.



West Reporter Image (PDF)

216 F.Supp.2d 51

Motions, Pleadings and Filings

United States District Court,
E.D. New York.
Yuen Shing LEE, Petitioner,
v.
John ASHCROFT, Attorney General of the United States of America, Immigration and Naturalization
Services, Respondents.
No. 01 CV 0997(SJ).
July 15, 2002.

Hong Kong-born U.S. resident filed application for a writ of habeas corpus, challenging his final order of removal. The District Court, Johnson, J., held that: (1) venue for habeas proceeding was proper in the Eastern District of New York; (2) Child Citizenship Act (CCA) did not apply retroactively to alien's case to confer derivative citizenship upon a 40 year-old child with one citizen parent; and (3) petitioner, who was born in Hong Kong, demonstrated his allegiance through his application for naturalization and his registration for Selective Service, and was thus a national, and consequently not subject to deportation on the basis of his conviction for mail fraud.

Application granted.

West Headnotes



[1] KeyCite Notes

197 Habeas Corpus
    197III Jurisdiction, Proceedings, and Relief
        197III(B) Jurisdiction and Venue
            197III(B)2 Personal Jurisdiction and Venue
                197k632 Federal Courts
                    197k632.1 k. In General. Most Cited Cases

Factors in analyzing venue in habeas petitions are: (1) whether the court has personal jurisdiction over the petitioner's custodians, and (2) whether the petitioner satisfies traditional venue considerations. 28 U.S.C.A. § 2241.

[2] KeyCite Notes

197 Habeas Corpus
    197III Jurisdiction, Proceedings, and Relief
        197III(B) Jurisdiction and Venue
            197III(B)2 Personal Jurisdiction and Venue
                197k639 k. Aliens. Most Cited Cases

For venue purposes, Attorney General is a proper custodian of a habeas petitioner detained in an Immigration and Naturalization Service (INS) facility. 28 U.S.C.A. § 2241; Immigration and Nationality Act, § 232(a), 8 U.S.C.A. § 1222(a).

[3] KeyCite Notes

197 Habeas Corpus
 197I In General
  197I(A) In General
   197I(A)2 Necessity and Effect of Writ; Mootness and Prematurity
    197k235 k. Aliens. Most Cited Cases

Petitioner's release from custody did not moot his habeas petition where petitioner continued to suffer the consequences of an outstanding order of removal, including the imminent fear of deportation and permanent exclusion from the United States. 28 U.S.C.A. § 2241(c)(3).

[4] KeyCite Notes 

 170B Federal Courts
  170BII Venue
   170BII(A) In General
    170Bk71 k. Territorial Limitations and Venue in General. Most Cited Cases

Traditional venue considerations include 1) the location where the material events took place, 2) where records and witnesses pertinent to the claim are likely to be found, 3) the convenience of the forum for the respondent and petitioner, and 4) the familiarity of the court with the applicable laws.

[5] KeyCite Notes 

 197 Habeas Corpus
  197III Jurisdiction, Proceedings, and Relief
   197III(B) Jurisdiction and Venue
    197III(B)2 Personal Jurisdiction and Venue
     197k639 k. Aliens. Most Cited Cases

Venue for habeas proceeding was proper in the Eastern District of New York, rather than in Louisiana; at all relevant times, petitioner had resided within the Eastern District of New York, the underlying material events included petitioner's conviction in New York, his incarceration in New Jersey, and notice to appear before an immigration judge in New Jersey, petitioner did not leave the region until Immigration and Naturalization Service (INS) transferred him to its facility in Louisiana, and petitioner would be severely disadvantaged by having to bring the habeas proceeding in Louisiana since the witnesses and evidence to establish the merit of petitioner's claim of citizenship were located in New York.

[6] KeyCite Notes

 24 Aliens, Immigration, and Citizenship
  24VIII Citizenship and Naturalization
   24VIII(A) Citizenship
    24k651 k. Constitutional and Statutory Provisions. Most Cited Cases
    (Formerly 77k9 Citizens)

 24 Aliens, Immigration, and Citizenship KeyCite Notes
  24VIII Citizenship and Naturalization
   24VIII(B) Naturalization
    24k691 Constitutional and Statutory Provisions
     24k695 k. Retroactive Operation. Most Cited Cases
     (Formerly 24k40)

Child Citizenship Act (CCA) did not apply retroactively to alien's case to confer derivative citizenship upon a 40 year-old child with one citizen parent. Immigration and Nationality Act, § 320(a), 8 U.S.C.A. § 1431 (a).

[7] KeyCite Notes

24 Aliens, Immigration, and Citizenship
    24VIII Citizenship and Naturalization
        24VIII(A) Citizenship
            24k652 Who Are Citizens
                24k654 k. Nationals of United States. Most Cited Cases
                  (Formerly 24k1)

To qualify as a United States national, an individual must, at a minimum, have demonstrated his or her allegiance by applying for citizenship. Immigration and Nationality Act, § 101(a)(3, 22), 8 U.S.C.A. § 1101(a)(3, 22).

[8] KeyCite Notes

24 Aliens, Immigration, and Citizenship
    24V Denial of Admission and Removal
        24V(C) Removal or Deportation; Grounds
            24k270 Crime and Related Grounds
                24k277 k. Fraud, Forgery, and Theft Offenses. Most Cited Cases
                  (Formerly 24k1, 24k53.2(1))

24 Aliens, Immigration, and Citizenship KeyCite Notes
    24VIII Citizenship and Naturalization
        24VIII(A) Citizenship
            24k652 Who Are Citizens
                24k654 k. Nationals of United States. Most Cited Cases
                  (Formerly 24k53.2(1), 24k1)

Petitioner, who was born in Hong Kong, demonstrated his allegiance through his application for naturalization and his registration for Selective Service, and was thus a national, and consequently not subject to deportation on the basis of his conviction for mail fraud; petitioner had been a permanent resident for nearly 30 years, entered the United States as a child, and had never lived anywhere else since, was married to a United States citizen, had two citizen children, and both of his parents were naturalized citizens. Immigration and Nationality Act, §§ 101(a)(3, 22), 237(a)(2)(A)(iii), 8 U.S.C.A. §§ 11011(a)(3, 22), 1227(a)(2)(A)(iii).

**\*53** Yuen Shing Lee, Brooklyn, New York, petitioner pro se.
Alan Vinegrad, Acting United States Attorney, Eastern District of New York, Brooklyn, New York, by Kathleen Anne Nandan, for respondents.

*MEMORANDUM AND ORDER*

JOHNSON, District Judge.
Presently before the Court is Petitioner Yuen Shing Lee's ("Petitioner") *pro se* application for a writ of habeas corpus, pursuant to 28 U.S.C. § 2241 (" § 2241"), challenging his final order of removal. Petitioner contends that he cannot be deported as an alien because he is either eligible for derivative

citizenship or is a "national" of the United States. This Court finds that Petitioner does not qualify for derivative citizenship under Section 320(a) of the Immigration and Nationality Act ("the INA"), 8 U.S.C. § 1431, as it existed at the time of his father's naturalization on January 24, 1978, or under the Child Citizenship Act of 2000, H.R. 2883, P.L. 106-395 ("the CCA"). However, the Court finds that Petitioner is a national of the United States, and thus cannot be deported under the INA. Accordingly, his § 2241 Petition is hereby GRANTED.

## FACTUAL BACKGROUND

Petitioner was born in Hong Kong on February 8, 1961 and entered the United States as a lawful permanent resident on February 7, 1973. (Nandan Decl., Ex. A.) He has resided in this country ever since. Petitioner's father became a naturalized United States citizen on January 24, 1978, when Petitioner was sixteen years old. ( *Id.,* Ex. B.) His mother was naturalized on May 19, 1983. ( *Id.,* Ex. C.) There is no indication that his parents were legally separated or divorced at the time his father became a citizen. Petitioner registered for Selective Service on September 9, 1980 (Pet.'s Addendum, dated Feb. 6, 2002, Ex. 1), and filed an application for citizenship on July 13, 1998 (Pet.'s Letter, dated March 28, 2001, Ex. 2).

On December 16, 1998, Petitioner was indicted on four counts of mail fraud, and ultimately pled guilty. On September 23, 1999, he was convicted of conspiracy to commit mail fraud and mail fraud, in violation of 18 U.S.C. §§ 371 and 1341, and was sentenced to 6 months incarceration.

On May 5, 2000, the Immigration and Naturalization Service ("the INS") issued to Petitioner a Notice to Appear and charged Petitioner with removability from the United States as an aggravated felon, pursuant to §§ 237(a)(2)(A)(III), 101(a)(43)(M)(i) and 101(a)(43)(U) of the INA. Petitioner contested his removability with the Office of Immigration Review, and filed a *pro se* motion seeking derivation of citizenship through the naturalization of his father. (Nanden Decl., Ex. G.) Immigration Judge Charles A. Wiegand, III denied the motion on December 22, 2000. ( *Id.,* Ex. H.) Subsequently, Petitioner filed an interlocutory appeal with the Board of Immigration Appeals ("the BIA"), which the BIA declined to entertain. ( *Id.,* Ex. J.) Petitioner has also filed an application for political asylum, claiming fear of persecution for violation of China's one-child policy. ( *Id.,* Ex. A.) Petitioner was detained, pending his deportation, in the INS facility in Oakdale, Louisiana for two years. He was released from physical custody on May 31, 2002.

Petitioner filed the instant § 2241 petition on February 13, 2001, contending that he cannot be deported under INA § 237(a)(2)(A)(iii), 8 U.S.C. § 1227(a)(2)(A)(iii), because he is a citizen or a national of the United States.

## DISCUSSION

### I. Jurisdiction

[1]     The United States Attorney argues that Petitioner's case should be dismissed **\*54** or transferred to the Western District of Louisiana, on the grounds that a district court must have jurisdiction over the custodian of a petitioner in order to entertain a habeas corpus action. *See Chukwurah v. United States,* 813 F.Supp. 161, 168 (E.D.N.Y.1993); *see also Yi v. Maugans,* 24 F.3d 500, 507 (3d Cir.1994). The Court must consider two factors in analyzing venue in habeas petitions brought under 28 U.S.C. § 2241: 1) whether the court has personal jurisdiction over the petitioner's custodians, and 2) whether the petitioner satisfies traditional venue considerations. *Mojica v. Reno,* 970 F.Supp. 130, 165 (E.D.N.Y.1997). The Government asserts that Petitioner Lee's custodian is the warden of the Federal Detention Center in Louisiana where he had been held while awaiting deportation. Petitioner contends that he is under the authority of the Attorney General of the United States, who is thus his actual custodian and the proper respondent in this case.

The question of whether the Attorney General is a proper custodian of an alien detained in an INS facility has divided the courts of the Southern and Eastern Districts of New York. *See Alcaide-Zelaya v. McElroy*, Nos. 99 Civ. 5102, 99 Civ. 9999, 2000 WL 1616981, at *4-*5 (S.D.N.Y. Oct.27, 2000) (citing and comparing cases, including *Arias-Agramonte v. Commissioner of INS*, No. 00 Civ. 2412, 2000 WL 1059678, at *7-*9 (S.D.N.Y. Aug. 1, 2000) (discussing split in authority and citing cases); *compare Arias-Agramonte v. Commissioner of INS*, No. 00 Civ. 2412, 2000 WL 1617999, at *5-*9 (S.D.N.Y. Oct. 30, 2000) (Attorney General is proper respondent and district court has personal jurisdiction over Attorney General); *Pena-Rosario v. Reno*, 83 F.Supp.2d 349, 362 (E.D.N.Y.2000) (Attorney General is proper respondent); *Mojica v. Reno*, 970 F.Supp. at 166 (same); *Nwankwo v. Reno*, 828 F.Supp. 171, 173-176 (E.D.N.Y.1993) (same); *with Guerrero-Musla v. Reno*, No. 97 Civ. 2779, 1998 WL 273038, at *1 (S.D.N.Y. May 28, 1998) (Attorney General is not proper respondent); *Carvajales-Cepeda v. Meissner*, 966 F.Supp. 207, 209 (S.D.N.Y.1997) (same); *Wang v. Reno*, 862 F.Supp. 801, 812-813 (E.D.N.Y.1994) (same)). The Second Circuit, while specifically declining to resolve this "difficult question," has also conducted a thorough analysis of the issue. *Henderson v. INS*, 157 F.3d 106, 122-28 (2d Cir.1998).

[2]    This Court finds that the reasons articulated supporting the Attorney General as an appropriate respondent are more persuasive. First, the Attorney General has the power to produce, detain, or release such petitioners and is the ultimate decision-maker on matters concerning the INS and Petitioner's removal. *See* 8 U.S.C. § 1103(a)(1) ("The attorney General shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens."); *see also Henderson*, 157 F.3d at 126 ("[T]he Attorney General has the power to produce the petitioners, remains the ultimate decisionmaker as to matters concerning the INS, and is commonly designated a respondent in these cases, even when personal jurisdiction over the immediate custodian clearly lies."). Further, Congress has designated the Attorney General as the legal custodian of aliens. 8 U.S.C. § 1222 (a) [1226(c)(1)] ("The Attorney General shall take into custody any alien who [is deportable or inadmissible for having committed a crime]."). Additionally, "there is a compelling practical concern that the government can 'seriously undermine the remedy of habeas corpus' by detaining so large a number of aliens in one facility that the local district court is overwhelmed by a flood of habeas petitions." *Alcaide-Zelaya*, 2000 WL 1616981, at *4.

***55** Furthermore, in such cases, the location of custody, and the identity of the day-to-day custodian, frequently change when detainees are transferred among INS facilities, all of which are under the control of the Attorney General. *See Arias-Agramonte*, 2000 WL 1617999, at *8. This potential problem is made manifestly clear by the circumstances of the instant case. Here, Petitioner was released from custody on May 31, 2002. Therefore, he is no longer in the physical custody of the warden. Yet the Attorney General continues to maintain "custody" over Petitioner so long as the removal order remains pending. 8 U.S.C. § 1126(b) ("The Attorney General at any time may revoke a bond or parole ..., rearrest the alien ... and detain the alien.").

[3]    Petitioner's release from custody does not moot his petition. The federal habeas corpus statutes, including § 2241, require that a petitioner be in "custody" at the time of filing of the petition. *See* 28 U.S.C. § 2241(c)(3); *see also Canela v. United States Dep't of Justice*, No. 00 Civ. 8735, 2001 WL 664633 at *3 (S.D.N.Y. June 12, 2001). "Custody" in this context has been interpreted broadly, to include being "subject to restraints not shared by the public generally.' " *Hensley v. Mun. Ct.*, 411 U.S. 345, 351, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973) (quoting *Jones v. Cunningham*, 371 U.S. 236, 240, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963)); *see also Spencer v. Kemna*, 523 U.S. 1, 7, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998) (discussing the extent to which collateral consequences of convictions may meet the "case or controversy" requirement). Although he has since been released from physical custody, Petitioner continues to suffer the consequences of the outstanding order of removal, including the imminent fear of deportation and permanent exclusion from the United States, which are sufficient to meet the "case or controversy" requirement of Article II, § 2, of the Constitution. *See Chong v. District Director, INS*, 264 F.3d 378, 385 (3d Cir.2001) (holding that sufficient collateral consequences flow from an order of removal to make a § 2241 petition a live case or controversy); *see also Chadha v. INS*, 634 F.2d 408, 417 (9th Cir.1980) (holding that the fear of deportation under the INA was sufficient injury to meet the "case or controversy" requirement); *Cardenas v. Superintendent*, No. 94 Civ. 5093, 1996 WL 497138, at *3, n. 1

(E.D.N.Y. Aug.26, 1996) (finding a deported habeas petitioner still "in custody" because he faced "collateral consequences" of his conviction). Accordingly, this Court exercises its jurisdiction over the petition.

## II. Venue

[4]    The Government argues that even if the Court finds that it has jurisdiction over the instant case, the habeas petition should nevertheless be transferred to the Western District of New York because venue is not proper in the Eastern District of New York. Traditional venue considerations include 1) the location where the material events took place, 2) where records and witnesses pertinent to the claim are likely to be found, 3) the convenience of the forum for the respondent and petitioner, and 4) the familiarity of the court with the applicable laws. *See* Henderson, 157 F.3d at 128, n. 25; Alcaide-Zelayà, 2000 WL 1616981, at *5; Arias-Agramonte, 2000 WL 1059678, at *9; Mojica, 970 F.Supp. at 165.

[5]    In the instant case, these venue considerations favor a finding of proper venue in the Eastern District of New York. At all relevant times, Petitioner has resided within the Eastern District of New York. The underlying material events include Petitioner's conviction in the Southern District of New York, his incarceration at Fort Dix, New Jersey, and the Notice to Appear before an immigration judge in ***56** Newark, New Jersey. Petitioner did not leave the region until the INS transferred him to its facility in Oakdale, Louisiana, over the objections of Petitioner and his counsel. The Petitioner would be severely disadvantaged by having to bring the habeas proceeding in Louisiana.[FN1] The witnesses and evidence to establish the merit of Petitioner's claim that he is a citizen or a national of the United States are located in New York, and Petitioner's family resides in New York. The Eastern District of New York is equally as convenient for Respondents as the Western District of Louisiana, and there is no indication that Respondents would be prejudiced by a transfer of venue to New York. Most compelling, Petitioner has now been released and has returned to his home within the Eastern District. Further, the immigration judge in Louisiana has already ruled against Petitioner, and the BIA has declined to review his case. Accordingly, there is no reason that venue should lodge in Louisiana. The Court finds that venue is proper in the Eastern District of New York.

> FN1. There is evidence to suggest that his previous transfer by INS negatively impacted his case before the BIA. Prior to his transfer, Petitioner had retained counsel in New York. Counsel had vociferously opposed Petitioner's transfer, indicating that transfer would cause an extreme hardship. ( *See* Pet.'s March 28, 2001 Let., Ex. 7 (Letter from Vincent A. Schiano, Esq. to INS District Director Andrea J. Quarantillo, dated May 15, 2000) and Ex. 10 (Schiano Letter to Immigration Judge Charles A. Wiegand, III, dated Sept. 7, 2000).) After Petitioner's transfer, Counsel had appeared telephonically on Petitioner's behalf, but had failed to appear at several scheduled conferences and was removed by the Immigration Judge, leaving Petitioner to negotiate the BIA proceedings *pro se.* (Nandan Decl., Ex. F.)

## III. Derivative Citizenship

[6]    Petitioner initially requested relief from deportation on the grounds that he is a citizen, derived through the naturalization of his parents. Although he would not have been eligible for derivative citizenship under the immigration laws in existence at the time that his father naturalized, Petitioner contends that the Child Citizenship Act of 2000 should be applied retroactively to his case. This Court disagrees.

Prior to the 2000 amendment, INA § 321(a) provided that a child born outside of the United States of alien parents and residing in the United States as a lawful permanent resident becomes a citizen upon the naturalization of both parents, or where the parents are legally separated, by the naturalization of the

parent having legal custody of the child. 8 U.S.C. § 1432(a) (1988). The child must be under age 18 at the time of such naturalization. 8 U.S.C. § 1432(a)(4) (1988). Petitioner's mother was not naturalized until 1983, at which time Petitioner was 23 years old, and the naturalization documents of both parents list their status as married and indicate that they resided at the same address. Accordingly, Petitioner would not have been eligible for derivative citizenship under this rule.

On October 30, 2000, Congress enacted the CCA, which amended the INA to confer derivative citizenship upon a child with one citizen parent. 8 U.S.C. § 1431(a) (2000). After the effective date of February 27, 2001, the new rule automatically confers citizenship on a child under the age of 18 upon the naturalization of one parent. However, the language of the CCA does not make it retroactive. The general presumption against retroactive legislation operates to preclude the CCA's application to Petitioner's circumstances. See Hughes Aircraft v. U.S. ex rel Schumer, 520 U.S. 939, 946, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997) ("[W]e apply this time-honored presumption [against retroactive legislation] unless Congress has clearly **57* manifested its intent to the contrary."). Although the Second Circuit has not yet considered the temporal reach of the CCA, those other courts which have ruled on this issue have unanimously agreed that the CCA cannot be applied retroactively. See Cartagena-Paulino v. Reno, 2001 WL 536934, at *3, n. 5 (S.D.N.Y. May 18, 2001); United States v. Arbelo, 288 F.3d 1262, 1263 (11th Cir.2002); Nehme v. INS, 252 F.3d 415, 431 (5th Cir.2001); Hughes v. Ashcroft, 255 F.3d 752, 760 (9th Cir.2001). Petitioner was 40 years old on February 27, 2001, thus the CCA cannot apply to him. Accordingly, his claim of derivative citizenship must fail.

### III. Status as a "National of the United States"

In the alternative, Petitioner asserts in an Addendum to his § 2241 Motion, filed on April 30, 2002, that he cannot be deported because he is not an alien, but a "national of the United States." See 8 U.S.C. § 1101(a)(3) ("The term 'alien' means any person not a citizen or national of the United States.") The INA defines a national as "(A) a citizen of the United States, or (B) a person who, though not a citizen of the United States, owes permanent allegiance to the United States." 8 U.S.C. § 1101(a)(22). Petitioner argues that as a "national," not an "alien," he should not be subject to deportation under INA § 237(a)(2)(A)(iii), which mandates the deportation of "any alien who is convicted of an aggravated felony." 8 U.S.C. § 1227(a)(2)(A)(iii).

The term "national" came into general use when the United States acquired territories outside its continental limits and accorded inhabitants with a status that was not equivalent to citizenship, but that nonetheless conferred certain rights and responsibilities as nationals of the United States. Such nationals were deemed to owe allegiance to the United States. See Oliver v. United States Dep't of Justice, 517 F.2d 426, 428, n. 3 (2d Cir.1975).

[7]    Various courts have considered the modern application of the term "national," without agreeing on the precise qualifications for according that status. Long-term residency and a personal claim or belief that one "owes allegiance" are clearly insufficient standing alone. See Oliver, 517 F.2d at 427 ("[T]he concept of 'owing allegiance' for purposes of nationality is not so easily satisfied or indeed understood"); see also United States v. Sotelo, 109 F.3d 1446, 1448 (9th Cir.1997) (Alien's subjective belief that he owed allegiance to the United States was insufficient to establish that he was a national.); Sierra-Reyes v. INS, 585 F.2d 762, 764 (5th Cir.1978) (Alien's claim to citizenship based on long residency in the United States and lack of allegiance to any other country were insufficient to confer status of national where individual had never filed a petition for naturalization.); Shittu v. Elwood, No. 02 Civ. 0682, 2002 WL 992036, at *3 (E.D.Pa. May 14, 2002) ("[L]ong-term residency alone does not suffice to confer the status of 'national.' There must be some objective demonstration of permanent allegiance."); Carreon-Hernandez v. Levi, 409 F.Supp. 1208, 1210 (D.Minn.) (finding petitioner deportable where he had lived and worked in the United States for over 20 years and was married to a U.S. citizen and the parent of a U.S. citizen child, but had never gone through the naturalization process), aff'd 543 F.2d 637 (8th Cir.1976). At a minimum, it appears that to qualify as a national, an individual must have demonstrated his or her allegiance by applying for citizenship. Hughes v. Ashcroft, 255 F.3d at 756; see also Oliver, 517 F.2d at 428 (finding that the petitioner did not qualify as a national because she continued to owe allegiance to Canada and had not chosen to renounce that allegiance by naturalizing); **58* United States

*v. Morin,* 80 F.3d 124, 126 (4th Cir.1996) ("[A]n application for citizenship is the most compelling evidence of permanent allegiance to the United States short of citizenship itself."). The Supreme Court has also identified the application for citizenship as a step in the process of acquiring the full rights of citizenship. *Johnson v. Eisentrager,* 339 U.S. 763, 770, 70 S.Ct. 936, 94 L.Ed. 1255 (1950) ("The alien, to whom the United States has been traditionally hospitable, has been accorded a generous and ascending scale of rights as he increases his identity with our society. Mere lawful presence in the country creates an implied assurance of safe conduct and gives him certain rights; they become more extensive and secure when he makes preliminary declaration of intention to become a citizen, and they expand to those of full citizenship upon naturalization.")

However, another district court has found that "the existence of a single objective demonstration of permanent allegiance, such as an application for naturalization, is not conclusive if it is contradicted by other evidence showing the applicant's *lack* of such allegiance." *Shittu,* 204 F.Supp.2d at 880-81. In *Shittu v. Elwood,* the Eastern District of Pennsylvania refused to extend the status of national to a permanent resident who had applied for naturalization, but was then convicted of intent to distribute heroin and sentenced to 37 months in prison. That court found that the petitioner's "aggravated felony conviction was sufficient by itself to refute any other evidence of permanent allegiance to this country. The conviction demonstrated that his professed allegiance was no more than a convenient cover for illegal activity." *Id.*

[8]    This Court declines to extend that court's reasoning to Petitioner Lee's case. Unlike Shittu, Lee has been a permanent resident for nearly 30 years. He entered the United States as a child, and has never lived anywhere else since. He is married to a United States citizen and has two citizen children. Both of his parents are naturalized citizens. All of his ties are to the United States. He has no ties to Hong Kong, a territory that is now under a different political authority than it was during the brief period of his residency there. Furthermore, Petitioner has objectively demonstrated his allegiance to the United States. Prior to his arrest and indictment in his only criminal case, Petitioner filed his application for citizenship on July 13, 1998, thereby expressing his willingness to take an oath of allegiance to his adopted country. In addition, his registration for Selective Service on September 9, 1980 further indicates his loyalty to the United States.

Petitioner was convicted of a crime that is defined as an aggravated felony for purposes of INA § 237(a)(2)(A)(iii). However, this was a crime of fraud, not narcotics distribution, nor an offense involving bodily harm or the use of a weapon. He was sentenced to only six months in prison. While the Court does not condone his fraudulent activity, it notes that Petitioner's single foray into criminal activity does not pose any ongoing danger to the community. He, along with three codefendants, have been ordered to pay restitution to the New York City Water Board in the amount of $115,558 in monthly installments dependant on Petitioner's employment income. He has already begun making these payments. The Court believes that Petitioner can thus contribute more positively to society by rejoining the community, resuming employment, and continuing to demonstrate his allegiance and fidelity to his adopted nation.

The Court finds that Petitioner has satisfied the requirements to be considered a national of the United States. He has demonstrated his allegiance through his ***59** application for naturalization and his registration for Selective Service. As a national, he is not subject to deportation on the basis of his conviction for mail fraud. The INS is hereby enjoined from deporting Petitioner under INA § 237(a)(2)(A)(iii).

## CONCLUSION

For the foregoing reasons, Petitioner's application for a writ of habeas corpus seeking clarification of his status as a national of the United States is hereby GRANTED. Petitioner may not be deported as a criminal alien under INA § 237(a)(2)(A)(iii).

SO ORDERED.

E.D.N.Y.,2002.

Lee v. Ashcroft
216 F.Supp.2d 51

Motions, Pleadings and Filings (Back to top)

• 1:01cv00997 (Docket) (Feb. 13, 2001)
END OF DOCUMENT

📄 West Reporter Image (PDF)

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

340 F.3d 1058                                                                                      Page 1
340 F.3d 1058, 03 Cal. Daily Op. Serv. 7738, 2003 Daily Journal D.A.R. 9708
(Cite as: 340 F.3d 1058)

▷

United States Court of Appeals,
Ninth Circuit.
Luis L. ARMENTERO, Petitioner-Appellant,
v.
IMMIGRATION AND NATURALIZATION
SERVICE, Respondent-Appellee.
No. 02-55368.

Argued and Submitted Feb. 4, 2003.
Submission Vacated Feb. 19, 2003.
Resubmitted Aug. 18, 2003.
Filed Aug. 26, 2003.

Excludable alien filed petition for writ of habeas corpus, alleging that his potentially indefinite detention by the Immigration and Naturalization Service (INS) was unconstitutional. The United States District Court for the Central District of California, Terry J. Hatter, Jr., Chief Judge, denied petition, and petitioner appealed. The Court of Appeals, Berzon, Circuit Judge, held that the INS was not proper respondent, but rather the Attorney General in addition to the Secretary of the Department of Homeland Security should be named as respondents.

Remanded.

West Headnotes

**[1] Habeas Corpus** ☞662.1
197k662.1 Most Cited Cases
In immigration habeas cases, circumstances demand flexibility to permit naming of respondents who are not immediate physical custodians; it is not practical or in the interests of justice to apply rigidly the immediate physical custodian rule given logistical problems caused by frequent detainee transfer and remote locations of detention centers, refusing adherence to immediate physical custodian rule would reduce unmanageable burdens and the consequent delay in the very few district courts in which detention centers are located, and district courts may use traditional venue considerations to control where detainees bring habeas petitions. 28 U.S.C.A. § 2241.

**[2] Habeas Corpus** ☞662.1
197k662.1 Most Cited Cases
While a petitioner's immediate physical custodian is

typically a proper respondent in traditional habeas corpus cases, the custodian requirement of general habeas statute is sufficiently flexible to permit the naming of respondents who are not immediate physical custodians if practicality, efficiency, and the interests of justice so demand. 28 U.S.C.A. § 2241.

**[3] Habeas Corpus** ☞662.1
197k662.1 Most Cited Cases
The most appropriate respondent to habeas petitions brought by immigration detainees is the individual in charge of the national government agency under whose auspices the alien is detained, and thus, strict adherence to the rule that the appropriate respondent in a habeas corpus proceeding is the petitioner's immediate physical custodian is not warranted in the immigration context. 28 U.S.C.A. § 2241.

**[4] Habeas Corpus** ☞662.1
197k662.1 Most Cited Cases
Although under certain circumstances it may be appropriate to name an organization or an agency, rather than an individual, as respondent in immigration habeas cases, it is appropriate for immigration detainees to name specific individuals as respondents rather than a now-defunct agency or any of the new entities performing former Immigration and Naturalization Service (INS) functions. 28 U.S.C.A. §§ 2241, 2242.

**[5] Habeas Corpus** ☞662.1
197k662.1 Most Cited Cases
The Bureau of Immigration and Customs Enforcement Interim District Director for the region in which an alien is detained is not the appropriate respondent in immigration habeas cases, since that would illogically tether the detainee's petition to a local figurehead, complicating adjudication of the petition when a detainee is transferred to a facility in another region. 28 U.S.C.A. §§ 2241, 2242.

**[6] Habeas Corpus** ☞662.1
197k662.1 Most Cited Cases
Prior to enactment of the Homeland Security Act, the Attorney General was the appropriate respondent in an alien's habeas corpus petition, since the Attorney General oversaw the activities of the former Immigration and Naturalization Service (INS) and exercised a unique decisionmaking authority over immigration matters, including detention and parole of aliens. Homeland Security Act of 2002, § 1 et

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

340 F.3d 1058

340 F.3d 1058, 03 Cal. Daily Op. Serv. 7738, 2003 Daily Journal D.A.R. 9708

**(Cite as: 340 F.3d 1058)**

Page 2

seq., 6 U.S.C.A. § 101 note; Immigration and Nationality Act, § § 103(a)(1), 212(d)(5)(A), 241(a)(6), 8 U.S.C.A. § § 1103(a)(1), 1182(d)(5)(A), 1231(a)(6); 28 U.S.C.A. § § 2241, 2242.

**[7] Habeas Corpus ⟜662.1**

197k662.1 Most Cited Cases

In immigration habeas cases filed after the enactment of the Homeland Security Act, the Attorney General in addition to the Secretary of the Department of Homeland Security may be named as respondents. Homeland Security Act of 2002, § 1 et seq., 6 U.S.C.A. § 101 note; Immigration and Nationality Act, § 103(a)(1), (a)(11), (g), 8 U.S.C.A. § 1103(a)(1), (a)(11), (g); 28 U.S.C.A. § § 2241, 2242.

*1059 Michael Tanaka, Deputy Federal Public Defender, Los Angeles, CA, for the Petitioner-Appellant.

Greg D. Mack and Earle B. Wilson, Senior Litigation Counsel, Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, DC, for the Respondent-Appellee.

Marc Van Der Hout, Van Der Hout & Brigagliano, San Francisco, California, and Liliana M. Garces, American Civil Liberties Union Foundation Immigrants' Rights Project, Oakland, CA, for the Amici Curiae.

Appeal from the United States District Court for the Central District of California; Terry J. Hatter, Chief District Judge, Presiding. D.C. No. CV-01-08658-TJH.

Before: MESKILL, [FN*] FERGUSON, and BERZON, Circuit Judges.

> FN* The Honorable Thomas J. Meskill, Senior United States Circuit Judge for the Second Circuit, sitting by designation.

BERZON, Circuit Judge.

Luis Armentero, an excludable alien, contends that his potentially indefinite detention by the Immigration and Naturalization Service ("INS") is unlawful under Zadvydas v. INS, 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001), as interpreted by this court's decision in Xi v. INS, 298 F.3d 832 (9th Cir.2002). The INS is named as sole respondent in Armentero's habeas petition. We do not reach the merits of the habeas petition because we conclude that the INS is not an appropriate respondent in these proceedings. We therefore remand to the district

court with instructions that it allow Armentero to *1060 amend his petition by joining the appropriate respondent.

**BACKGROUND**

As we decide only a procedural issue, we summarize the underlying circumstances briefly:

Luis Armentero, a native and citizen of Cuba, arrived at Key West, Florida as part of the Mariel Boatlift. [FN1] He was paroled into the United States pursuant to INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A). During his first five years in the United States, Armentero amassed a record of arrests, convictions, and brief jail stints, mostly for petty offenses. Then, on June 24, 1985, Armentero was convicted of violating § 261.2 of the California Penal Code, Rape by Force, and sentenced to three years in prison. An Immigration Judge found Armentero excludable from the United States and ordered him deported. This order was not appealed and became final in November 1987.

> FN1. The Mariel Boatlift occurred when, after civil unrest by Cubans seeking asylum at the Peruvian embassy in Havana, the Cuban government permitted 125,000 Cubans to depart by boat for the United States from the port city of Mariel. See U.S. Department of State, Fact Sheet: U.S.-Cuba Relations, (May 1, 2001) at http://www.state.gov/p/wha/rls/fs/2001/2558.htm.

The INS was apparently unable to deport Armentero. In the ensuing years, Armentero was released to a halfway house; detained once again by the INS after a new conviction; paroled again; convicted of yet another crime; and detained once more by the INS.

On October 5, 2001, while detained at the INS processing center in San Pedro, California, Armentero filed a pro se habeas petition in the United States District Court for the Central District of California, claiming that he was being indefinitely detained in violation of the Due Process clause of the Fifth Amendment and that the conditions of his detention amounted to punishment imposed in violation of the Constitution. The INS later transferred Armentero from the San Pedro facility to the federal penitentiary at Terre Haute, Indiana, for continued detention.

The district court denied Armentero's petition without prejudice on January 25, 2002. Armentero

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

340 F.3d 1058
340 F.3d 1058, 03 Cal. Daily Op. Serv. 7738, 2003 Daily Journal D.A.R. 9708
**(Cite as: 340 F.3d 1058)**

Page 3

then appealed to this court. Neither party raised the issue whether the INS was properly named as respondent to Armentero's habeas petition. We questioned the parties during oral argument regarding the propriety of naming the INS as respondent and ordered supplemental briefing on the issue. *See Malone v. Calderon,* 165 F.3d 1234, 1237 (9th Cir.1999) ("The court issuing the writ must have personal jurisdiction over the custodian. Without such jurisdiction, the court has no authority to direct the actions of the restraining authority." (internal citations omitted)); *Ortiz-Sandoval v. Gomez,* 81 F.3d 891, 894 (9th Cir.1996) ("Failure to name the correct respondent destroys personal jurisdiction.").

**ANALYSIS**

Perhaps surprisingly, neither this court nor the Supreme Court has decided which official or entity is the appropriate respondent in a habeas petition filed by an INS detainee. [FN2] We therefore look to Supreme **\*1061** Court case law on habeas jurisdiction generally for principles to guide our determination, as well as to other circuit courts' views on this specific issue. In making our determination, we recognize that circumstances specific to the situation of immigration detainees pose unique practical dilemmas for which our holding must account. Further, our ultimate decision regarding the proper respondent is necessarily shaped by this particular moment in the history of our nation's immigration law, as the immigration detention duties formerly administered by the INS and overseen by the Attorney General have now been transferred in significant part to the Department of Homeland Security (DHS).

> FN2. Although the factual circumstances presented here involve a detainee, non-detainees under INS control, such as those under an order of deportation or removal, may also file habeas petitions. *See, e.g., INS v. St. Cyr,* 533 U.S. 289, 306-14, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (habeas is available to challenge the legality of the INS' deportation and removal orders). Because many of the practical problems facing immigration habeas petitioners in naming a respondent are common to detainees and non-detainees alike, we think our analysis of the respondent issue logically applies to most immigration habeas petitioners. The focus of this opinion, however, will be on the situation of those, like Armentero, who are currently in immigration detention.

**A. Habeas Jurisdiction and the Custodian Requirement**

1) *The Habeas Statute*

The relevant statute, 28 U.S.C. § 2241, provides that a writ of habeas corpus shall only be granted if "a prisoner" is in custody under the authority of the United States "in violation of the Constitution or laws or treaties of the United States." Although the statute is commonly used by federal prisoners detained on criminal charges, it has also been employed, both historically and in its current form, by aliens detained for immigration law enforcement purposes. *See, e.g., INS v. St. Cyr,* 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001); *Ahrens v. Clark,* 335 U.S. 188, 68 S.Ct. 1443, 92 L.Ed. 1898 (1948), *abrogated on other grounds by Braden v. 30th Judicial Circuit Court,* 410 U.S. 484, 93 S.Ct. 1123, 35 L.Ed.2d 443 (1973); *see also Zadvydas,* 533 U.S. at 687, 121 S.Ct. 2491 (discussing historical and current use of the federal habeas corpus statute by immigration detainees).

Language specifying the form of an application for a writ of habeas corpus under 28 U.S.C. § 2242 provides that the application "shall allege ... the name of the person who has custody over him." The statute does not specify that the respondent named shall be the petitioner's immediate physical 12075 custodian, but habeas petitions brought by prisoners typically name the warden of the institution at which the prisoner is confined. *See Ortiz-Sandoval,* 81 F.3d at 894; *Brittingham v. United States,* 982 F.2d 378, 379 (9th Cir.1992); *Guerra v. Meese,* 786 F.2d 414, 416 (D.C.Cir.1986). Both Supreme Court and Ninth Circuit case law, however, have recognized exceptions to the general practice of naming an immediate physical custodian as respondent, especially with regard to habeas petitions brought by persons detained for reasons other than federal criminal violations. As the statutory language is of little help in determining the precise "person who has custody over" a habeas petitioner, we look to case law for direction.

2) *Supreme Court Case Law*

The Supreme Court has grappled only obliquely with the determination of which "person" has custody over an immigration detainee and therefore may properly be named as a respondent in a habeas action. On the question of most direct pertinence here, the Court has noted but avoided deciding whether the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

340 F.3d 1058                                                                                                 Page 4
340 F.3d 1058, 03 Cal. Daily Op. Serv. 7738, 2003 Daily Journal D.A.R. 9708
(Cite as: 340 F.3d 1058)

Attorney General is a proper respondent in an immigration habeas action. We review this interesting but ultimately indeterminate history briefly, for it does shed some indirect light on the issue before us.

In *Ex parte Endo,* 323 U.S. 283, 65 S.Ct. 208, 89 L.Ed. 243 (1944), the Supreme Court addressed the jurisdictional questions posed by a habeas petition brought in the District Court for the Northern District of California by Mitsuye Endo, a Japanese-*1062 American woman who was initially interned in Tulelake, California, but was, during the pendency of her habeas case, transferred to an internment camp in Utah. [FN3] Because it was "of the view that the court may act if there is a respondent within reach of its process who has custody of the petitioner," *id.* at 306, 65 S.Ct. 208, and because there were potential respondents--the Secretary of the Interior or national-level officials of the War Relocation Authority--still within the District Court's territorial reach, *id.* at 304-05, 65 S.Ct. 208, the Court held that Endo's transfer did not destroy the California district court's jurisdiction. Thus, rather than formalistically examining who Endo's immediate physical custodian was, *Endo* stated that a habeas petition can be properly directed against national-level officials who have power to "produce[ ]" the petitioner. *Id.* at 305, 65 S.Ct. 208.

> FN3. *Endo* involved a challenge by an American citizen to the mass removal of all persons of Japanese ancestry "from the Pacific coastal regions" pursuant to Executive Order No. 9066, 7 Fed.Reg. 1407 (Feb. 19, 1942). 323 U.S. at 285, 65 S.Ct. 208.

Four years later, in *Ahrens v. Clark,* the Supreme Court examined jurisdictional issues raised by habeas petitions brought by German immigrants detained on Ellis Island under removal orders issued by the Attorney General. The petitions named the Attorney General as sole respondent. The *Ahrens* Court determined that the detainees' habeas petitions had to be dismissed because the detainees had not filed the petitions in the district court for the district in which they were confined. [FN4] 335 U.S. at 193, 68 S.Ct. 1443. In so holding, *Ahrens* explicitly declined to consider whether the Attorney General, under whose removal orders and "custody and control" the aliens were detained, was the proper respondent to the immigrants' petitions. *Id.* at 189, 193, 68 S.Ct. 1443.

> FN4. This holding was later overruled by the

Court's interpretation of amendments to the habeas statute in *Braden v. 30th Judicial Circuit Court of Kentucky,* 410 U.S. 484, 93 S.Ct. 1123, 35 L.Ed.2d 443 (1973).

There ensued in the 1970s a trilogy of Supreme Court cases involving non-traditional habeas petitioners and respondents and concerning jurisdictional and venue questions. These cases focused largely on venue and territorial issues and so failed to enunciate any clear guidelines regarding the identity of proper respondents to such habeas petitions. These cases do offer, however, some general guidance for determining appropriate respondents in non-traditional habeas actions.

*Schlanger v. Seamans,* 401 U.S. 487, 91 S.Ct. 995, 28 L.Ed.2d 251 (1971), addressed a habeas petition filed by a United States soldier temporarily studying at Arizona State University (ASU) but under the command and control of military officers stationed at Moody Air Force Base in Georgia. Schlanger filed a habeas petition in Arizona district court, alleging that his enlistment contract had been breached and that his freedom was being unlawfully restricted by the military. The petition named the Secretary of the Air Force, the Commander of Moody Air Force Base, and the Commander of ROTC on the ASU campus as respondents. *Id.* at 488, 91 S.Ct. 995.

The Court observed that Schlanger was not a participant in ASU's ROTC program and therefore did not fall within the ASU ROTC commander's chain of command. *Id.* at 488-89, 91 S.Ct. 995. Schlanger's custodian--the Commander of Moody Air Force Base, who supervised the soldier's Air Force activities--was located outside the territorial jurisdiction of the Arizona district court. *Id.* at 490-91, 91 S.Ct. 995. Accordingly, the Court found that the Arizona*1063 district court was without jurisdiction to adjudicate the petition. *Id.* at 491, 91 S.Ct. 995.

Oddly, the *Schlanger* Court did not discuss whether the Secretary of the Air Force might be both within the Arizona court's territorial jurisdiction and a proper respondent to Schlanger's petition. By this omission and its emphasis on the Moody Air Force Base commander as an essential party, *Schlanger* suggested that a habeas petition must name as respondent the individual who directly exercises the power to limit the petitioner's liberty-- in the military context, the power to command. But insofar as *Schlanger* recognizes that a person who commands another from a substantial distance may be that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

340 F.3d 1058
340 F.3d 1058, 03 Cal. Daily Op. Serv. 7738, 2003 Daily Journal D.A.R. 9708
(Cite as: 340 F.3d 1058)

Page 5

person's custodian, it does not require that an individual actually exercise immediate, physical control to be a proper respondent in a habeas case.

Just one year after *Schlanger*, *Strait v. Laird*, 406 U.S. 341, 92 S.Ct. 1693, 32 L.Ed.2d 141 (1972), held that Strait, a California-domiciled soldier under the command of an Indiana-based officer, could file a habeas action against that officer in California district court. The Court pointed to the fact that the Indiana officer had directed California-based military personnel in his dealings with Strait regarding Strait's application for conscientious objector discharge. *Id.* at 344, 92 S.Ct. 1693. Accordingly, the Indiana commander was

'present' in California through the officers in the hierarchy of the command who processed this serviceman's application for discharge. To require him to go to Indiana where he never has been or assigned to be would entail needless expense and inconvenience.... The concepts of 'custody' and 'custodian' are sufficiently broad to allow us to say that the commanding officer in Indiana, operating through officers in California in processing petitioner's claim, is in California for the limited purposes of habeas corpus jurisdiction.
*Id.* at 345-46, 92 S.Ct. 1693.

*Strait* thus further developed the recognition in *Schlanger* that a distantly-placed individual who is not a habeas petitioner's immediate custodian can be a proper respondent. Under the *Strait* Court's "broad concept" of custodian, the operative concern is whether the respondent, whether by himself or through agents, directly caused restraint of the petitioner's liberty. Consideration of "needless expense and inconvenience" may also enter into the calculus.

*Strait,* however, offered no insight into how far removed in the chain of command a person can be and still be considered a custodian for habeas purposes. Although Strait had apparently named the Secretary of Defense as a respondent in addition to his Indiana commanding officer, the Court did not discuss whether the Secretary was a proper respondent in this case, just as it had not discussed in *Schlanger* whether the Air Force Secretary was properly named as a respondent.

Capping its trilogy of early 1970s cases on habeas jurisdiction, the Court in *Braden v. 30th Judicial Circuit Court of Kentucky*, 410 U.S. 484, 93 S.Ct. 1123, 35 L.Ed.2d 443 (1973), declared that *Ahrens* was overruled and held that a petitioner imprisoned in Alabama could file a habeas petition in a Kentucky federal district court to challenge Kentucky's alleged failure to grant him a speedy trial on Kentucky state charges. The *Braden* Court reasoned that:

The writ of habeas corpus does not act upon a prisoner who seeks relief, but upon the person who holds him in what is alleged to be unlawful custody.... Read literally, the language of [the habeas statute] requires nothing more *1064 than that the court issuing the writ have jurisdiction over the custodian. So long as the custodian can be reached by service of process, the court can issue a writ 'within its jurisdiction' requiring that the prisoner be brought before the court for a hearing on his claim, or requiring that he be released outright from custody, even if the prisoner himself is confined outside the court's territorial jurisdiction.
*Id.* at 494-95, 93 S.Ct. 1123. In emphasizing the location of the custodian, not that of the petitioner, *Braden* necessarily reaffirmed the earlier rulings that the custodian need not be the person with immediate physical control over the detained prisoner while imprisoned.

Read as a whole, the Supreme Court's pertinent case law indicates that the concept of custodian is a broad one that includes any person empowered to end restraint of a habeas petitioner's liberty, not just the petitioner's on-site, immediate physical custodian.

3) *Ninth Circuit Case Law*

The Ninth Circuit's habeas jurisprudence has often applied the rule that a petitioner's immediate physical custodian is the proper respondent in the context of traditional habeas petitions, but has recognized that the custodian requirement may be flexibly interpreted to encompass other custodians when it is efficient to do so.

*Brittingham v. United States*, 982 F.2d 378 (9th Cir.1992), a brief opinion issued after the trilogy of Supreme Court cases discussed above, did not examine those cases. Rejecting a petitioner's contention that the United States Marshal for the District of Hawaii was his custodian, *Brittingham* held that a habeas petitioner's immediate physical custodian is the proper respondent to a petition: "The proper respondent in a federal habeas corpus petition is the petitioner's 'immediate custodian.' A custodian 'is the person having a day-to-day control over the prisoner. That person is the only one who can produce 'the body' of the petitioner.'" *Id.* at 379(internal citations omitted). As Brittingham was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

340 F.3d 1058                                         Page 6

340 F.3d 1058, 03 Cal. Daily Op. Serv. 7738, 2003 Daily Journal D.A.R. 9708

**(Cite as: 340 F.3d 1058)**

temporarily detained in a California state facility used for the detention of federal prisoners when he first filed his habeas petition, this court found that Brittingham's custodian was the warden of the California state facility, not the federal marshal responsible for transporting him to a federal prison where he might eventually be detained. *Id.* at 379-80.

Since *Brittingham,* however, this court has veered toward a more flexible approach. *Ortiz-Sandoval v. Gomez* held that a state prisoner could name the California Director of Corrections as a respondent to his habeas action instead of the warden of the prison where he was incarcerated. 81 F.3d at 896. Although the court observed that the warden is the "typical respondent," it recognized that the advisory committee notes to 28 U.S.C. § 2254 provided that the named respondent to the action could be the warden, the chief officer in charge of state penal institutions, or, in some cases, the Attorney General. *Id.* at 894. Thus, the advisory committee notes "contemplate[d] a variety of possible respondents, including multiple respondents." *Id. Ortiz-Sandoval* further noted that, although earlier courts had not discussed the propriety of naming the Director of the Department of Corrections, they had treated the director as respondent. *Id.*

*Ortiz-Sandoval* then engaged in a practical inquiry as to whether the Director of Corrections could serve the purposes of a habeas respondent:

> Both the warden of a California prison and the Director of Corrections for California have the power to produce the prisoner. Both may receive service of *1065 process. The director supervises the warden, but this does not mean that the warden is not a proper respondent. If it did, the governor would be the only proper respondent because he has supervisory power over the director. Conversely, the fact that a warden has more direct control over the prisoner than the director does not exclude the director as a possible respondent.

*Id.* at 895. *Ortiz-Sandoval* noted in particular that naming the Director rather than the warden could serve "the efficient administration of justice" by avoiding procedural problems that might arise from situations, such as a prisoner's transfer, in which naming an immediate custodian could lead to a loss of personal jurisdiction if the immediate custodian changed. *Id.* at 896. Thus, *Ortiz-Sandoval* took into account the need for efficient resolution of habeas claims and approved of a flexible, practical approach to designating appropriate respondents.

It is difficult to reconcile *Brittingham's* firm

pronouncements with the Supreme Court's and *Ortiz-Sandoval's* more flexible approach. We think that tension between *Brittingham* and *Ortiz-Sandoval* is best resolved by recognizing that *Brittingham* deals with an unusual, highly fact-specific situation: The federal marshal in *Brittingham* was only responsible for transporting the petitioner and obviously had no power to command or direct the petitioner's release. *Brittingham* did not address the question whether a *higher* official or entity in the hierarchy than the immediate custodian would be a proper habeas custodian, and therefore did not address the pertinent Supreme Court cases so indicating. Accordingly, *Ortiz-Sandoval,* with its flexible view of who can be a proper respondent, is the Ninth Circuit case most applicable to the present case. Neither of these cases, however, addresses the habeas respondent question in the particular circumstances faced by immigration detainees, and thus neither case necessarily dictates our decision here.

*4) Out-of-Circuit Cases Addressing Immigration Detainees*

Although the Supreme Court and the Ninth Circuit have not definitively determined the proper respondent to a habeas petition brought by an immigration detainee, two other circuits have, and one other has discussed the issue at some length without resolving it.

Two Courts of Appeals have determined that a detainee's immediate custodian is the appropriate respondent in an immigration habeas case. In *Vasquez v. Reno,* 233 F.3d 688 (1st Cir.2000), *cert. denied,* 534 U.S. 816, 122 S.Ct. 43, 151 L.Ed.2d 15 (2001), the First Circuit held that the Attorney General was not an appropriate respondent in a habeas action brought by an alien detained in an INS detention facility in Oakdale, Louisiana. Viewing Supreme Court precedent on the proper custodian issue as "inscrutable," the court noted that circuit courts, in the context of traditional habeas petitions, have held "with echolalic regularity, that a prisoner's proper custodian for purposes of habeas review is the warden of the facility where he is being held.... The warden is the proper custodian because he has day-to-day control over the petitioner and is able to produce the latter before the habeas court." *Id.* at 691.

In so holding, the *Vasquez* court pointed to non-immigration cases in other circuits rejecting the designation of the Attorney General as respondent on the grounds that the prison warden has day-to-day

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

340 F.3d 1058                                                                                                    Page 7

340 F.3d 1058, 03 Cal. Daily Op. Serv. 7738, 2003 Daily Journal D.A.R. 9708

**(Cite as: 340 F.3d 1058)**

control over the petitioner and the actual ability to produce the "corpus." *Id.* The court stated that it found "no principled distinction between an alien held in a detention facility awaiting possible deportation and a prisoner held in a correctional facility *1066 awaiting trial or serving a sentence." *Id.* at 693. Moreover, the rule that the proper respondent in habeas actions is the immediate custodian "is clear and easily administered." *Id.*

The *Vasquez* court examined three arguments in favor of considering the Attorney General custodian of aliens for immigration habeas purposes: (1) the court-crippling concentration of habeas cases in the Western District of Louisiana, where the Oakdale INS detention center (and its director) are located; (2) the value of a "practical approach" to the identity of the custodian, as expressed in habeas case law; and (3) the unique role of the Attorney General in immigration matters. *Id.*

Although the court acknowledged that the district courts in the Western District of Louisiana were overwhelmed with alien habeas petitions, the court determined that Congress, not the courts, must rewrite the definition of "custodian" to ease the Louisiana courts' burden. *Id.* at 694. The court further expressed the concern that allowing petitioners to name the Attorney General as respondent using this logic would foster "rampant forum shopping" and generate litigation concerning questions of venue and forum non conveniens. *Id.*

Addressing the argument that "custodian" was a flexible concept under the relevant law, *Vasquez* examined the Supreme Court's *Endo* and *Strait* decisions. Because *Endo* presented a situation in which the petitioner had filed her petition in the district court for the area in which she was being held before her transfer, the court found that it differed significantly from the situation of Vasquez, who, while he was detained at Oakdale, had filed his habeas petition in the Massachusetts district court, "where neither he nor his immediate custodian was physically present." *Id.* at 695. The court distinguished *Strait* on the basis that all Strait's face-to-face contacts with the military had taken place in California; he had never been to Indiana, where his commanding officer was stationed. In contrast, Vasquez, although he had resided, was apprehended, and was initially detained by the INS in Massachusetts, had been transferred to Oakdale and had his removal proceedings conducted in that location. *Id.*

The court concluded that *Endo* and *Strait:*

simply do[ ] not give a legitimate judicial imprimatur to a freewheeling definition of "custodian" such as the petitioner champions. At most, these decisions represent idiosyncratic responses to highly unusual facts. They cannot plausibly be read, singly or in combination, to consign to the scrap heap the substantial body of well-reasoned authority holding that a detainee must name his immediate custodian as the respondent to a habeas petition.

*Id.* at 695-96.

The court then rejected the argument that the Attorney General's unique position as the ultimate decisionmaker on immigration matters and considerable discretion over detention and removal of aliens made her a proper respondent in alien habeas cases: "[T]he Attorney General's role with regard to aliens is not materially different from her role with regard to prisoners, at least not different enough to justify a rule that she is the custodian of aliens, but not prisoners, for habeas purposes." *Id.* at 696. *Vasquez* therefore concluded that, absent exceptional circumstances, an alien contesting the legality of his INS detention "normally must name as the respondent his immediate custodian, that is, the individual having day-to-day control over the facility in which he is being detained." *Id.*

Two other circuit courts have addressed the identity of the proper respondent to an immigration detainee's petition. In *1067 *Yi v. Maugans,* 24 F.3d 500 (3d Cir.1994), the Third Circuit examined whether the district director of the INS, rather than the warden of the INS facility where Li was detained, could be a respondent in an immigration habeas petition. *Yi* rejected this idea, holding that "the warden of the prison or the facility where the detainee is held ... is considered the custodian for purposes of a habeas action." *Id.* at 507. *Yi* offered little support for this conclusion, merely stating:

[I]t is the warden that has day-to-day control over the prisoner and who can produce the actual body. That the district director has the power to release the detainees does not alter our conclusion. Otherwise, the Attorney General of the United States could be considered the custodian of every alien and prisoner in custody because ultimately she controls the district directors and the prisons.

*Id.* (internal citations omitted).

The Second Circuit discussed the issue more fully in *Henderson v. INS,* 157 F.3d 106 (2d Cir.1998), *cert. denied sub nom. Reno v. Navas,* 526 U.S. 1004, 119

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

340 F.3d 1058                                                                                    Page 8
340 F.3d 1058, 03 Cal. Daily Op. Serv. 7738, 2003 Daily Journal D.A.R. 9708
**(Cite as: 340 F.3d 1058)**

S.Ct. 1141, 143 L.Ed.2d 209 (1999), in which it discussed, without deciding the issue, the pros and cons of permitting the Attorney General to be named as a respondent in immigration habeas cases. *Henderson* involved several criminal alien habeas petitions, most of which had named several respondents. The court observed that the question of the proper custodian's identity has historically depended both on "who has power over the petitioner and ... the convenience of the parties and the court," *id.* at 122, and that the concept of custodian "has broadened ... because of increasing practical problems that allegedly attach to the traditional approach," *id.* at 124. Citing *Endo* and *Strait* as examples of the Supreme Court's "flexible approach" to respondents in habeas actions, *Henderson* pointed to specific reasons why the Attorney General might properly be named as respondent in some or all immigration habeas actions. Those reasons include Congress' statutory designation of the Attorney General as legal custodian of criminal aliens and the Attorney General's broad statutory power to detain aliens. *Id.* at 126. The court added:

> There is also no question that the Attorney General has the power to produce the petitioners, remains the ultimate decisionmaker as to matters concerning the INS, and is commonly designated as a respondent in these cases, even when personal jurisdiction over the immediate custodian clearly lies. In this respect, the extraordinary and pervasive role that the Attorney General plays in immigration matters is virtually unique.
>
> *Id.* (internal citations omitted).

Henderson, however, also recounted arguments against allowing the Attorney General to be named a respondent in habeas cases. As in *Vasquez*, the court noted the parallels between the Attorney General's statutory custodianship over prisoners and aliens, "yet no one seriously suggests that she is a proper respondent in prisoner habeas cases." *Id.* The court also recognized concerns about forum-shopping but ultimately concluded that the application of traditional venue doctrine, rather than " 'an inflexible *jurisdictional* rule' " could do much to curb this potential problem. *Id.* at 127-28 (quoting *Braden,* 410 U.S. at 500, 93 S.Ct. 1123) (emphasis in original). Finally, the court observed that although allowing the Attorney General to be named as respondent could ease the Oakdale-generated crisis in the Western District of Louisiana, "it might only accomplish this by overcrowding those relatively few districts in which aliens disproportionately reside, districts that are already among the busiest in the nation." *Id.* at 128.

**\*1068** Despite its extensive discussion, the *Henderson* court ultimately determined that it was unnecessary to reach whether the Attorney General was a proper respondent under the circumstances of the cases before it and declined to decide the issue.

**B. The Flexible Concept of Custodian in Immigration Habeas Cases**

[1][2] As the discussion heretofore illustrates, neither Supreme Court case law nor our own precedent states a clear path toward identifying the proper respondent or respondents in an immigration detainee's habeas petition. What we do glean from these cases and others is that, while a petitioner's immediate physical custodian is typically a proper respondent in traditional habeas petitions, the statutory custodian requirement of 28 U.S.C. § 2241 is sufficiently flexible to permit the naming of respondents who are not immediate physical custodians if practicality, efficiency, and the interests of justice so demand. *See Ortiz-Sandoval,* 81 F.3d at 896("Prompt resolution of prisoners' claims is a principal function of habeas."); *Dunn v. U.S. Parole Comm'n,* 818 F.2d 742, 744 (10th Cir.1987) (as long as the petitioner names as respondent a person or entity with power to release him, a court should not avoid reaching the merits of his petition); *Lee v. United States,* 501 F.2d 494, 503 n. 9 (8th Cir.1974) (Webster, J., concurring) ("[W]e have consistently rejected interpretations of the habeas corpus statute that would suffocate the writ in stifling formalisms or hobble its effectiveness with the manacles of arcane and scholastic procedural requirements.")

The circumstances surrounding the immigration-related detention of aliens demand such flexibility. Although held at the behest of federal authorities, immigration detainees are physically detained in a host of institutions, ranging from specialized immigration detention centers to federal prisons to state and local prisons and jails. *See* Michael Welch, *Detained: Immigration Laws and the Expanding INS Jail Complex* 108 (2002) (due to limited capacity in INS detention centers, more than 10,000 immigration detainees are housed in 900 state prisons and local jails); Julie Sullivan, "Illegal Immigrants Are Dumped into a Secret Network of Prisons," *The Oregonian,* Dec. 10, 2000, at A1 (the INS "[f]arms out more than half the 20,050 people it jails daily to a haphazard network of 1,940 private state prisons and county jails"); Human Rights Watch, "Introduction," *in Locked Away: Immigration Detainees in Jails in the United States* (Sept.1998) [hereinafter *Locked*

340 F.3d 1058

.340 F.3d 1058, 03 Cal. Daily Op. Serv. 7738, 2003 Daily Journal D.A.R. 9708

**(Cite as: 340 F.3d 1058)**

Page 9

*Away* ] (almost 60% of INS detainees are held in local jails).

When immigration detainees are held in state and local institutions--as they frequently are--a writ directed to the warden of the institution would make little legal sense, as the wardens' control over immigration detainees in their institutions results from their limited contractual arrangements with federal authorities. Although local and state authorities may contract with federal agencies to house, maintain, and guard detainees, they do not have any power to release detainees except if explicitly commanded to do so by federal authorities. It is therefore not logical to demand that an immigration detainee's petition be directed to a local or state warden who in reality has no legal power and, often, little actual power to "bring forth the body" of the detainee. *See Roman v. Ashcroft,* 162 F.Supp.2d 755, 760-61 (N.D.Ohio 2001) (noting warden's minimal to non-existent role in producing the petitioner's body for the purpose of modern habeas proceedings); Rachel E. Rosenbloom, *Is the Attorney General the Custodian of an INS Detainee?,* 27 N.Y.U. Rev. L. & Soc. Change 543, 575 (2002) (noting that the Supreme Court focused in *Braden* on the *1069 respondent's ability to free the petitioner from legal, not physical, restraint).

Nor is it practical or in the interests of justice to apply rigidly the immediate physical custodian rule to immigration detainees' habeas petitions. Immigration detainees are frequently transferred among federal, state, and local institutions across the country. *See Locked Away, supra,* at 33- 35(discussing frequent transfers of INS detainees). [FN5] By the time a district court judge is able to consider a habeas petition filed in her court, the petitioner may already have been moved out of the court's territorial jurisdiction, thereby necessitating time-consuming transfer or dismissal of the petition if the immediate custodian rule is strictly applied. *See, e.g., Rumierz v. INS,* 2000 WL 1920003 (D.R.I.Dec. 27, 2000) (district court determined that it lacked personal jurisdiction of habeas petition filed by immigration detainee transferred to five different institutions over the course of five years when petitioner was transferred to a detention center in New Jersey); Rosenbloom, *supra,* at 549. If detainees were permitted only to file their habeas petitions against their immediate physical custodian, and hence, under personal jurisdiction rules could only file in the district in which they were detained (so that their custodian would be within reach of the court's process,) expedient resolution of their habeas claims

would be greatly hampered.

> FN5. Armentero's case illustrates the logistical problems caused by frequent detainee transfer. Since filing his habeas petition in the Central District of California, he has been transferred between an INS facility in California, a local jail in California, and federal prisons in Indiana and Oregon.

When transferred, immigration detainees are often relocated to an area of the country far from the contacts and resources they enjoyed while living in the United States. Detention centers are frequently located in rural areas, far from the location of evidence relevant to the detainee's petition. *See Locked Away, supra,* at 22. The isolated and/or distant location of detainees may severely cripple their ability to obtain and be represented by counsel. For example, if the California attorney of an alien formerly domiciled in California but now detained in rural Oakdale, Louisiana, is only permitted to litigate her client's petition in the District Court for the Western District of Louisiana, the cost of travel and other expenses could prove fatal to the feasibility of the representation. *See Rosenbloom, supra,* at 549-50(discussing logistical barriers to representation of aliens detained in remote areas); Sullivan, *supra* (describing case in which legal aid organization could not afford to represent alien after he was transferred to a detention center in Alabama); *Locked Away, supra,* at 22-24(describing hindrances to legal representation of aliens).

Moreover, out-of-state attorneys may be constrained by an individual state's or court's *pro hac vice* rules limiting the ability of out-of-state attorneys to practice. *See Rosenbloom, supra,* at 550. Although a more flexible custodian rule in immigration cases might not completely resolve these difficulties, it would better account for the reality of the frequently-changing and often far-flung locations in which aliens are detained.

Finally, there are indications that the district courts in areas where immigration detention centers are located have been flooded with detainee habeas petitions. This influx may seriously threaten some district courts' ability to consider petitions in a reasonably prompt manner. *See, e.g., Emejulu v. INS,* 989 F.2d 771, 772 (5th Cir.1993) (per curiam) (noting that "administrative delays in processing deportations" *1070 at the Oakdale INS facility "produce an atypical and unanticipated volume of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

340 F.3d 1058

340 F.3d 1058, 03 Cal. Daily Op. Serv. 7738, 2003 Daily Journal D.A.R. 9708

**(Cite as: 340 F.3d 1058)**

habeas petitions that is beyond the capability of the district court [for the Western District of Louisiana] to process in a timely fashion"). Although refusing adherence to a strict immediate physical custodian rule might still result in larger concentrations of habeas petitions filed in parts of the country where more aliens reside, such flexibility would go a long way towards reducing unmanageable burdens in the very few district courts in which INS facilities are located and the consequent delay facing parties to habeas proceedings before them.

A more flexible approach toward naming a respondent need not open the door to forum shopping by petitioners. District courts may use traditional venue considerations to control where detainees bring habeas petitions. See Braden, 410 U.S. at 493-94, 93 S.Ct. 1123("traditional venue considerations" in determining the proper venue for a habeas action include: where the material events took place; where records and witnesses pertinent to the petitioner's claim are likely to be found; the convenience of the parties); Henderson, 157 F.3d at 128("[T]here is reason to think that strict application of 'traditional principles of venue' in alien habeas cases might adequately control the forum shopping in which aliens might try to engage were the Attorney General to be designated an appropriate respondent.").

Nor would such an approach gut the immediate custodian rule as applied to traditional habeas petitions brought by federal criminal prisoners. Unlike the First and Third Circuits, we see significant differences between the situation of federal criminal prisoners and that of immigration detainees. The government's heavy reliance on local jails, rather than federal institutions, to house immigration detainees necessarily results in a different concept of "custodian," one based more on the legal reality of control than on the technicalities of who administers on a day-to-day basis the facility in which an individual is detained.

Also, although the logistical problems posed by the transferring of detainees and isolated rural detention locations are not unique to immigration habeas cases, the frequency of transfers and the particularly scattershot distribution of aliens in local jails across the nation _[FN6] exacerbate obstacles to bringing habeas petitions. In particular, the muddled custodial circumstances created by the detention of persons via contract arrangements between federal immigration authorities and state and local facilities poses a particular problem for an immigration detainee's identification of a custodian who has the power to

direct his or her release.

> FN6. "INS detainees are frequently transferred from facility to facility and state to state. Decisions about when and where detainees are transferred are made at the district level and informed by such things as court appearances, immigration case status and availability and cost of bed space, but the INS rarely considers the location of families, friends, or legal counsel." *Locked Away, supra,* at 33-34.

Finally, we observe that, under *Ortiz-Sandoval,* we have already disagreed with the First Circuit's conclusion that the immediate custodian rule must be applied even when it fails to facilitate "the efficient administration of justice." 81 F.3d at 896. Because logical, equitable, and efficiency considerations militate against applying the immediate custodian approach to designating a respondent, we proceed to determine who is appropriately designated as respondent in habeas petitions brought by immigration detainees.

**\*1071 C. The Proper Respondent**

[3] For the reasons discussed, strict adherence to the rule that the appropriate respondent in an alien's habeas petitions is the alien's immediate physical custodian does not make sense in the immigration context. After surveying the other possibilities, we conclude that the most appropriate respondent to petitions brought by immigration detainees is the individual in charge of the national government agency under whose auspices the alien is detained.

[4] In supplemental briefing, both Armentero and the INS have advanced their suggestions for a proper respondent in habeas cases brought by immigration detainees. Notably, *neither* party proposes that the warden of the facility in which Armentero is detained is the appropriate respondent. Armentero proposes that we deem the INS, or its successor administrative body, a proper respondent. Because the statutory language specifies that a writ of habeas corpus state "the name of the *person* " who has custody over the petitioner, 28 U.S.C. § 2242 (emphasis added), we think it more appropriate that a natural person, rather than an agency, be named as respondent where, as here, it is possible and logical to do so._[FN7] Compare *Jones v. Cunningham,* 371 U.S. 236, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963) (Parole Board was properly named as respondent in parolee's habeas petition where statutes and parole order placed the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

340 F.3d 1058
340 F.3d 1058, 03 Cal. Daily Op. Serv. 7738, 2003 Daily Journal D.A.R. 9708
(Cite as: 340 F.3d 1058)

Page 11

petitioner under direct custody and control of the Parole Board rather than an individual officer).

> FN7. We recognize that the Supreme Court and this court have reviewed the merits of numerous habeas petitions brought against the INS without questioning the propriety of naming the INS as respondent. Upon full consideration of the issue and taking account of the changes in the nation's immigration law enforcement bureaucracy wrought by the Homeland Security Act, we take the opportunity to fashion what we hope will be a clear, logical rule for future petitioners to follow.
> We do not question that under certain circumstances it may be appropriate to name an organization or an agency, rather than an individual, as respondent. *See, e.g., Jones. 371 U.S. 236, 83 S.Ct. 373, 9 L.Ed.2d 285.* We hold, however, that it is appropriate in this case and future cases like it for petitioners to name specific individuals as respondents rather than a now-defunct agency or any of the new entities performing former INS functions.

[5] We also reject, however, the INS' proposal that the appropriate respondent to such habeas actions is the Bureau of Immigration and Customs Enforcement Interim District Director for the region in which a petitioner is detained. Designating the Interim District Director as the proper respondent would entail some of the same pitfalls presented by strict adherence to the immediate physical custodian rule. It would illogically tether the detainee's petition to a local figurehead, complicating adjudication of the petition when a detainee is transferred to a facility in another region.

[6] Instead of adopting one of these possibilities proffered by the parties, we conclude that the Attorney General was--at the time Armentero's petition was filed, that is, prior to November 2002-- the appropriate respondent to an immigration detainee's habeas petition. Under the old system, the Attorney General oversaw the activities of the INS and exercised a unique decisionmaking authority over immigration matters, including detention and parole of aliens. *See* 8 U.S.C. § 1103(a)(1) (2001) ("The Attorney General shall be charged with administration and enforcement of laws under[the INA]."); 8 U.S.C. § 1182(d)(5)(A) (2001) (Attorney General's power to parole aliens and to return them to custody when he determines that the purposes of

parole are served); 8 U.S.C. § 1231(a)(6) (2001) (Attorney General's power to detain inadmissable or criminal aliens); *Henderson, 157 F.3d at 126.* The *1072 efficiency considerations described above also support this conclusion.

Because Armentero did not designate the proper custodian when his petition was filed, however, we must now remand in order to allow him to name a proper respondent. Thus, the intervening passage of the Homeland Security Act, Pub.L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002), necessarily informs our designation of the proper respondent for the purposes of Armentero's future proceedings, as well as for habeas petitions filed after November 2002.

[7] The Homeland Security Act abolishes the INS and transfers its enforcement responsibilities to the Directorate of Border and Transportation Security (BTS), a division of the newly-created Department of Homeland Security (DHS), thereby dramatically reconfiguring the administrative structure for enforcing the nation's immigration laws. *See* Pub.L. No. 107-296, § § 402, 441, 471, 116 Stat. 2135, 2177-78, 2192, 2205; 6 U.S.C. § § 202, 251, 291. The DHS Secretary, acting through the Under Secretary for the Directorate of BTS, is now charged with "[c]arrying out the immigration enforcement functions vested by statute in, or performed by, the Commissioner of Immigration and Naturalization (or any officer, employee, or component of the Immigration and Naturalization Service)." Pub.L. No. 107-296, § 402(3), 116 Stat. 2135, 2178; 6 U.S.C. § 202(3). These duties include administering the INS' detention and removal program. Pub.L. No. 107-296, § 441(2), 116 Stat. 2135, 2192; 6 U.S.C. § 251(2).

Because the Homeland Security Act transfers most immigration law enforcement responsibilities from the INS, a subdivision of the Department of Justice, to the BTS, a subdivision of the Department of Homeland Security, the extent of the Attorney General's power to direct the detention of aliens is unclear. Notably, statutory language relied on by the Second Circuit in *Henderson* for the proposition that the Attorney General plays a uniquely pervasive role in detaining aliens remains intact, as do other provisions granting the Attorney General power to detain aliens. *See, e.g.,* 8 U.S.C. § 1182(d)(5)(A) (Attorney General may parole an individual alien or return him "to the custody from which he was paroled"); 8 U.S.C. § 1226(c) (Attorney General is required to detain and has the power to release certain criminal aliens); 8 U.S.C. § 1231(a)(6) (Attorney

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

340 F.3d 1058

340 F.3d 1058, 03 Cal. Daily Op. Serv. 7738, 2003 Daily Journal D.A.R. 9708

**(Cite as: 340 F.3d 1058)**

General may determine whether to detain removable and inadmissable aliens); 8 U.S.C. § 1252(b)(3)(A) (designating Attorney General as respondent in petitions for review brought by aliens).

More recent language added to the INA by the Homeland Security Act suggests that the Attorney General may share with the DHS Secretary some responsibility for overseeing the detention of aliens. The amended INA charges the DHS Secretary with

> the administration and enforcement [of the INA] and all other laws relating to the immigration and naturalization of aliens, except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the President, the Attorney General, the Secretary of State, the officers of the Department of State, or diplomatic and consular offices: *Provided, however,* That determination and ruling by the Attorney General with respect to all questions of law shall be controlling.

8 U.S.C. § 1103(a)(1) (emphasis in original). Amended portions of the INA also authorize the Attorney General to make payments for services and supplies necessary to maintain detained aliens, to contract with state and local entities for detention arrangements, to exercise authority as was exercised by the Executive *1073 Office for Immigration Review, and to "establish such regulations, prescribe such forms of bond, reports, entries, and other papers, issue such instructions, review such administrative determinations in immigration proceedings, delegate such authority and perform such other acts as the Attorney General determines to be necessary for carrying out this section." 8 U.S.C. § 1103(a)(11), (g).

Moreover, the Attorney General has recently asserted a broad power to make "controlling" legal and policy determinations regarding whether individual aliens should be detained. *See In re D-J,* 23 I. & N. Dec. 572, 573-74, 2003 WL 1953603 (Op. Att'y Gen. April 17, 2003) ("Although authority to enforce and administer the INA and other laws related to the immigration and naturalization of aliens has recently been transferred to the Secretary of Homeland Security by the HSA, the Attorney General retains his authority to make controlling determinations with respect to questions of law arising under those statutes."); *see also id.* (citing "considerations of sound immigration policy and national security" in denying bond to a detained alien). As it is not the question before us, we do not here decide whether the Attorney General has the powers he asserts. Until the exact parameters of the

Attorney General's power to detain aliens under the new Homeland Security scheme are decisively delineated, we believe it makes sense for immigration habeas petitioners to name the Attorney General *in addition* to naming the DHS Secretary as respondents in their habeas petitions.

Having determined that, generally, the appropriate respondents in an immigration detainee's habeas petition are the Secretary of the Department of Homeland Security [FN8] and, at least for the time being, the Attorney General, we turn to the specific circumstances of this case. Armentero has named the INS as sole respondent in his habeas petition. Although he might properly have named the Attorney General as sole respondent when he first filed his petition in 2001, the DHS Secretary now bears statutory responsibility for his detention. There also remains the possibility that the Attorney General continues to exercise control over his detention. It makes no sense to direct Armentero on remand to name only the Attorney General, who according to the Homeland Security *1074 Act no longer exercises primary custodial control over immigration detainees. We therefore remand to the district court with instructions that it permit Armentero to amend his petition to name the DHS Secretary *and* the Attorney General as respondents. *See, e.g., Stanley v. California Supreme Court,* 21 F.3d 359, 360 (9th Cir.1994) (where petitioner improperly named court as respondent, remanding petition to the district court with instructions to dismiss the petition for lack of jurisdiction unless petition was timely amended is appropriate). The DHS Secretary and the Attorney General "may be described as a party by [their] official title[s] rather than by name; but the court may require the officer[s'] name[s] to be added." Fed. R. Civ. Pro. 25(d)(2). If Armentero does not timely amend his petition, it must be dismissed for lack of jurisdiction. *See Stanley,* 21 F.3d at 360.

> FN8. As we have noted, the DHS Secretary conducts his immigration detention activities through the BTS Under Secretary. The BTS Under Secretary's enforcement responsibilities are further subdivided by the delegation of detention responsibilities to the Bureau of Immigration and Customs Enforcement (BICE). *See Welcome to the Bureau of Immigration and Customs Enforcement* at http://www.bice.immigration.gov; Press Release, U.S. Department of Homeland Security, *Border Reorganization Fact Sheet* (Jan. 30, 2003), *available at*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

340 F.3d 1058                                                                              Page 13
340 F.3d 1058, 03 Cal. Daily Op. Serv. 7738, 2003 Daily Journal D.A.R. 9708
(Cite as: 340 F.3d 1058)

http://www.dhs.gov/ dhspublic/interapp/press--release/press-- release--0073.xml. Conceivably, the individuals in charge of these subdivisions could be appropriate respondents to habeas actions brought by immigration detainees.

We are mindful, however, that the immigration law enforcement hierarchy within DHS is still evolving. *See, e.g., Border Reorganization Fact Sheet, supra* (explaining that the Bureau of Border Security described in the Homeland Security Act of 2002 was renamed the Bureau of Immigration and Customs Enforcement in 2003). Rather than waiting for the internal DHS structure to solidify or attempting to identify the precise commissioner, under secretary or bureau head within the Department most directly linked to immigration detention matters, we believe it is important to announce now a simple, clear rule whereby immigration detainees will know whom they must name as respondents in their habeas petitions. For the sake of clarity, we determine that the DHS Secretary is to be the appropriate respondent for those detained under the authority of DHS and its sub-departments.

### CONCLUSION

Neither Supreme Court law nor our own precedent requires that an immigration detainee name her immediate physical custodian as respondent in a habeas action. Accounting for the considerable practical problems with adhering to an immediate custodian rule in the immigration context and the changes resulting from the recent overhaul of the agencies enforcing our nation's immigration laws, we hold that the appropriate respondents to immigration detainees' petitions are the DHS Secretary and the Attorney General. We therefore remand to the district court with instructions that it grant Armentero a reasonable period of time in which to amend his petition to add the proper respondents.

REMANDED.

•Luis L. ARMENTERO, Petitioner-Appellant, v. IMMIGRATION AND NATURALIZATION SERVICE, Respondent-Appellee., 2002 WL 32163222 (Appellate Brief) (C.A.9 May 6, 2002), Appellant's Opening Brief

340 F.3d 1058, 03 Cal. Daily Op. Serv. 7738, 2003 Daily Journal D.A.R. 9708

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

